IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ZOLOFT (SERTRALINE HYDROCHLORIDE) PRODUCTS LIABILITY LITIGATION | : : : : | MDL No. 2342 |
| | : | 2:12-md-02342-CMR |
| | : : : | |
| THIS DOCUMENT RELATES TO: | : : | HON. CYNTHIA M. RUFE |
| *ALL ACTIONS* | : : | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
THE TESTIMONY OF ANICK BÉRARD, PH.D.**

TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    PFIZER'S MEDICAL INFORMATION LETTERS, INTERNAL COMPANY DOCUMENTS, AND MEDWATCH REPORTS CONTRADICT PFIZER'S CLAIMS, AND PROVIDE SUPPORT FOR DR. BÉRARD'S METHODOLOGY IN FORMING HER GENERAL CAUSATION OPINIONS ...........................................1

     A.    Pfizer Medical Information Letters ........................................................1

     B.    Pfizer Internal Documents ....................................................................3

     C.    MedWatch Reports..............................................................................11

     D.    Pfizer Cannot Hide Behind the FDA ...................................................13

III.   STANDARD OF REVIEW ...................................................................................16

     A.    Daubert Generally ..............................................................................16

     B.    General Acceptance Is Not Required ...................................................17

     C.    Statistical Significance Is Not Required................................................18

     D.    The Authorities Relied Upon by Pfizer Are Unavailing And Inapposite................19

IV.   DR. BÉRARD'S QUALIFICATIONS, METHODOLOGY AND OPINIONS ...............21

     A.    Dr. Bérard's Qualifications .................................................................21

     B.    Summary Of Dr. Bérard's Opinions And Methodology .........................22

     C.    The Methodology That Dr. Bérard Has Used In Forming Her Opinions Is Generally Accepted ..................................................................24

          1.    Dr. Bérard Followed The Bradford-Hill Criteria ......................24

          2.    Dr. Bérard Considered The Totality Of The Available Data ...................25

     D.    Perinatal Epidemiologist Dr. Anick Bérard vs. M.D. Cardiologist With A Master's Degree in Epidemiology, Dr. Kimmel ...................29

i

V.    THE SCIENTIFIC COMMUNITY, THE FDA AND PFIZER HAVE CONSISTENTLY ANALYZED AND EVALUATED SSRI'S AS A CLASS ................29

    A.    Zoloft, Paxil, Prozac, Celexa And Lexapro Are In The Same Class Of SSRI Antidepressant Drugs .............................................................................30

    B.    It Is Common For Experts To Rely On Data Applicable To The Same Class Of Drugs .............................................................................................30

    C.    The Published Literature Has Consistently Analyzed All SSRIs, Including Zoloft, Within The Same Class ...............................................................31

    D.    The FDA Has Treated All SSRIs Together As A Class ...........................32

    E.    Drug Companies, Including Pfizer, Have Internally Recognized That There Is A Class Effect .............................................................................33

    F.    Pfizer's Experts Admit That There Is A Class Effect ............................35

VI.    DR. BÉRARD'S REPORT BELIES PFIZER'S CLAIM OF NO STATISTICALLY SIGNIFICANT FINDINGS ........................................................37

VII.    CONCLUSION ................................................................................................46

ii

TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Brasher v. Sandoz Pharm. Corp.,*
  160 F.Supp.2d 1291 (N.D. Ala. 2001) .................................................................. 25

*Canino v. HRP, Inc.,*
  105 F.Supp.2d 21 (N.D.N.Y. 2000) ...................................................................... 17

*Citizens Fin. Gp., Inc. v. The Citizens Nat'l Bank of Evans City,*
  2003 WL 24010950 (W.D. Pa. Apr. 23, 2003) ..................................................... 17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) .............................................................................................. 17

*Earp v. Novartis Pharm. Corp.,*
  2013 WL 4854488 (E.D.N.C. Sept. 11, 2013) ...................................................... 12

*Goldstein v. Centocor,*
  2007 WL 7428597  (S.D. Fla. May 14, 2007) ....................................................... 12

*In re Asbestos Prods. Liab. Litig.,*
  714 F.Supp.2d 535 (E.D. Pa. 2010) ..................................................................... 16

*In re Avandia Mktg., Sales Prac. & Prods. Liab., Litig.,*
  2011 WL 13576 (E.D. Pa. Jan. 4, 2011) ......................................................... 24, 46

*In re Baycol Prods. Litig.,*
  532 F.Supp.2d 1029 (D.Minn.2007) ..................................................................... 18

*In re Celexa/Lexapro Prods. Liab. Litig.,*
  927 F. Supp. 2d 758 (E.D. Mo. 2013) .............................................. 15, 30, 31, 45

*In re Chantix (Varenicline) Prods. Liab. Litig.,*
  889 F. Supp. 2d 1272 (N.D. Ala. 2012) ................................................ 13, 19, 26, 45

*In re Diet Drugs (Phen-Fen) Prods. Liab. Litig.,*
  890 F.Supp.2d 552 (E.D. Pa. 2012) ................................................................. 36, 43

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.,*
  612 F. Supp. 2d 116 (D. Mass. 2009) ....................................................... 5, 6, 18, 30, 43

*In re Paoli.,*
  35 F.3d 717 (3d Cir. 1994) ................................................................................... 16

*In re Phenylpropanolamine (PPA) Products Liability Litigation,*
  289 F.Supp.2d 1230 (W.D.Wash.2003) ................................................ 26, 31, 45, 46

*In re Prempro Prods. Liab. Litig.,*
  2008 WL 3285183 (E.D. Ark. Aug. 7, 2008) ................................................ 18

*Kannankeril v. Terminix Int'l,*
  128 F.3d 802 (3d Cir. 1997) ................................................ 16

*Kuhn v. Wyeth, Inc.,*
  686 F.3d 618 (8th Cir. 2012) ................................................ 45

*Matrixx Initiatives, Inc. v. Siracusano,*
  131 S. Ct. 1309 (2011) ................................................ 18, 21, 43

*Pineda v. Ford Motor Co.,*
  520 F.3d 237 (3d Cir. 2008) ................................................ 16, 17

*Schneider ex rel. Estate of Schneider v. Fried,*
  320 F.3d 396 (3d Cir.2003) ................................................ 17, 18

*Soldo v. Sandoz Pharms. Corp.,*
  244 F.Supp.2d 434 (W.D.Pa.2003) ................................................ 19, 20

*Stambolian v. Novartis Pharm. Corp.,*
  2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) ................................................ 12

*United States v. Downing,*
  753 F.2d 1224 (3d Cir.1985) ................................................ 16

*United States v. Trala,*
  162 F.Supp.2d 336 (D. Del. 2001) ................................................ 18

*Wade-Greaux v. Whitehall Lab.,*
  874 F.Supp. 1441 (D.Vi.1994) ................................................ 20, 21

*Wells v. Allergan, Inc.,*
  2013 WL 7208337 (W.D. Okla. Feb. 7, 2013) ................................................ 12

*Winter v. Novartis Pharm. Corp.,*
  739 F.3d 405 (8th Cir. 2014) ................................................ 12

*Wyeth v. Levine,* 555 U.S. 555 (2009) ................................................ 13

*Zaprala v. USI Servs. Gp., Inc.,*
  2013 WL 1148335,  (E.D. Pa. Mar. 20, 2013) ................................................ 17

iv

**FEDERAL STATUTES**

18 U.S.C. § 207 ...................................................................................................... 15

**OTHER AUTHORITIES**

Alwan, et al., *Use of Selective Serotonin-Reuptake Inhibitors
    in Pregnancy and the Risk of Birth Defects* (2007) ........................................... 38, 43

Bakker, et al., *Fluoxetine and infantile hypertrophic pylorus
    stenosis: a signal from a birth defects-drug exposure
    surveillance study* (2010) ............................................................................ 40

Bérard, et al., *First Trimester Exposure to Paroxetine and Risk
    of Cardiac Malformations in Infants: The Importance of
    Dosage* (2007) ......................................................................................... 38

Chambers, *Selective Serotonin-Reuptake Inhibitors and Persistent
    Pulmonary Hypertension of the Newborn* (2006) ................................................ 37

Cole, et al., *Paroxetine in the first trimester and the prevalence of
    congenital malformations* (2007) .................................................................. 38

Colvin, et al., *Dispensing Patterns and Pregnancy Outcomes
    for Women Dispensed Selective Serotonin Reuptake Inhibitors
    in Pregnancy* (2011) .................................................................................. 41

Davis, et al., *Risks of congenital malformations and perinatal
    events among infants exposed to antidepressant medications
    during pregnancy* (2007) ........................................................................... 38, 39

Diav-Citrin, et al., *Paroxetine and fluoxetine in pregnancy:
    a prospective, multicentre, controlled, observational study* (2008) ........................ 39

Diaz et al., *5-HT2B receptors are required for serotonin-selective
    antidepressant actions, Molecular Psychiatry* (2012) ....................................... 31, 32

Einarson, et al., *Evaluation of the Risk of the Congenital
    Cardiovascular Defects Associated With Use of Paroxetine
    During Pregnancy* (2008) ........................................................................... 39

FDA Guidance on Determining Established Pharmacologic Class
    for Use in the Highlights of Prescribing Information (2009) .................................. 33

Fed. Jud. Ctr., Ref. Manual on Scientific Evid. 337 (2d ed. 2000) .............................. 46

GSK, *Epidemiology Study:  Preliminary Report on Bupropion
    in Pregnancy and the Occurrence of Cardiovascular and Major
    Congenital Malformation* (2005) ................................................................ 37

Hiemke et al., *Pharmacokinetics of selective serotonin reuptake
    inhibitors*, Pharmacology & Therapeutics (2000) .................................... 31

Jimenez-Solem, et al., *Exposure to selective serotonin reuptake
    inhibitors and the risk of congenital malformations:
    a nationwide cohort study* (2012) ......................................................... 41, 42

Kallen, et al., *Antidepressant drugs during pregnancy and
    infant congenital heart defect* (2006) ........................................................ 37

Kallen, et al., *Maternal Use of Selective Serotonin Re-Uptake
    Inhibitors in Early Pregnancy and Infant Congenital
    Malformations* (2007) ................................................................................ 39

Kallen, et al., *Maternal use of selective serotonin
    re-uptake inhibitors and persistent pulmonary
    hypertension of the newborn* (2008) ......................................................... 39

Kieler, et al., *Selective serotonin reuptake inhibitors during
    pregnancy and risk of persistent pulmonary hypertension in the
    newborn: population based cohort sutdy from the five
    Nordic countries* (2012) ............................................................................. 42

Louik, et al., *First-Trimester Use of Selective Serotonin-Reuptake
    Inhibitors and the Risk of Birth Defects* (2007) ...................................... 39

Malm, et al., *Selective Serotonin Reuptake Inhibitors and Risk
    for Major Congenital Anomalies* (2011) .................................................. 41

Marleen et al., *Teratogenic mechanisms of medical drugs*,
    Human Reproduction Update (2010)  ........................................................ 32

Merlob, et al., *Are selective serotonin reuptake inhibitors cardiac
    teratogens?  Echocardiographic screening of newbors with
    persistent heart murmur* (2009) ............................................................... 40

Milunsky, Y*our Genes, Your Health*, Oxford Univ. (2012) ............................ 3

Nakhai-Pour, *Use of antidepressants during pregnancy and
    the risk of spontaneous abortion*, CMAJ (2010)................................. 32, 40

Narboux-Neme et al., *Serotonin transporter transgenic (SERT^{cre})*
*mouse line reveals developmental targets of serotonin specific*
*reuptake inhibitors (SSRIs),* Neuropharmacology (2008) .......................................................... 32

Nikfar, et al., *Increasing the risk of spontaneous abortion and*
*major malformations in newborns following use of serotonin*
*reuptake inhibitors during pregnancy: A systematic review*
*and updated meta-analysis (2012)* ......................................................................................... 42

Oberlander, et al., *Major Congenital Malformations Following*
*Prenatal Exposure to Serotonin Reuptake Inhibitors and*
*Benzodiazepines Using Population-Based Health Data* (2008) ............................................... 40

Pedersen, et al., *Selective serotonin reuptake inhibitors in pregnancy*
*and congenital malformations: population based cohort study,*
BMJ (2009) ..................................................................................................................... 32, 40

Rahimi, et al., *Pregnancy outcomes following exposure to serotonin*
*reuptake inhibitors: a meta-analysis of clinical trials (2006)* ................................................. 37

Reis and Kallen, *Delivery outcome after maternal use of*
*antidepressant drugs in pregnancy: an update using Swedish*
*data (2010)* ................................................................................................................... 40, 41

Reference Manual on Scientific Evidence, 3rd Edition ................................................................ 44

Rothman et al., *Modern Epidemiology,* 3rd Edition, (2008)....................................................... 43

Sadler, *Selective serotonin reuptake inhibitors (SSRIs) and heart*
*defects: Potential mechanisms for the observed associations* (2011)...................................... 41

Tango et al., *Selective serotonin reuptake inhibitors (SSRIs)*
*in pregnancy,* Rev Med Suisse (2006) ..................................................................................... 32

Tuccori, et al., *Use of Selective Serotonin Reuptake Inhibitors*
*During Pregnancy and Risk of Major and Cardiovascular*
*Malformations: An Update (2010)* ..................................................................................... 40, 41

Wurst, et al., *First trimester paroxetine use and the prevalence*
*of congenital, specifically cardiac, defects: A meta-analysis*
*of epidemiological studies (2009)* ......................................................................................... 41

## I.    INTRODUCTION

No matter how Pfizer attempts to pick apart each study and each additional piece of evidence, the inescapable fact is that the hard science demonstrates that Pfizer is dead wrong when it claims that there is no evidence of a causal relationship between Zoloft and birth defects.  In fact, abundant statistically significant epidemiological evidence supports Dr. Bérard's opinions, which were arrived at through accepted and reliable scientific methodology. There are a multitude of statistically significant increased odds ratios following exposure to SSRIs, in well designed studies published in peer reviewed journals, and there is substantial evidence that SSRIs as a class, including Zoloft, cause congenital anomalies. Moreover, Pfizer's claim is also contradicted by its own internal company documents and Medical Information Letters, as well as MedWatch reports.  Pfizer's disagreements with her conclusions all go to the weight of her testimony, and not to its admissibility.

## II.    PFIZER'S MEDICAL INFORMATION LETTERS, INTERNAL COMPANY DOCUMENTS, AND MEDWATCH REPORTS CONTRADICT PFIZER'S CLAIMS, AND PROVIDE SUPPORT FOR DR. BÉRARD'S METHODOLOGY IN FORMING HER GENERAL CAUSATION OPINIONS

Pfizer's arguments in the Bérard *Daubert* brief are inconsistent with statements in Pfizer's Medical Information Letters on pregnancy, and admissions in Pfizer's internal company documents, as well as notice of hundreds of Zoloft-related birth defects and spontaneous abortions found in Zoloft MedWatch reports that Pfizer received from the FDA.  These Pfizer documents clearly validate and support Dr. Bérard's methodology.

### A.    Pfizer Medical Information Letters

Pfizer, as a company policy, prepares Medical Information Letters to be sent to doctors when they have specific questions about the use of Zoloft and pregnancy.  These documents are written in a manner that supports Dr. Bérard's causation methodology.  ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

1

███████████████████████████████████████ ████ ████ ██ ██

██████████████     The 2012 Medical Information Letter is written with the same type of methodology that Dr. Bérard uses in her report.

For example, in its 2012 Medical Information Letter, Pfizer states: ████████████

██████████████████████████████ ██████████████ ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ ██ █████████

███████████████████████████████ ██ █████████████████

This stands in direct contradiction to its label which to this day states there are "no adequate well-controlled studies of the use of Sertraline during pregnancy." *See* Ex. 3 (Ex. 14 to Chow Dep., 2012 Zoloft Label, at p. 25). "No adequate well controlled studies" is a far cry from ████████████████████████████

In the same letter, Pfizer uses the same methodology as Dr. Bérard when it cites to literature that it now complains about. For example, Pfizer cites the Pedersen paper which stands for the proposition that █████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████ ████████████████████ Pfizer also quotes the Louik, et al. study and points out that ████████████████

███████████████████████████ ██ ███████████ Pfizer cites the Kornum study which alerts physicians ████████████████████████

██████████, that the adjusted odds ratio (OR) for an association between SSRI use and septal defects was 1.4 and sertraline was associated with a 3-fold increased risk of such defects. ██ ██

████ ████████████████████████████████████████████████

████████████████████████████████████████████ ██ ██

██████     All of the above statements are consistent with the methodology that Dr. Bérard uses in her report.

Pfizer also cites Alwan for the proposition that ████████████████████, ████████████████████████████ ██ ███████, and cites Merlob *et al.*, a prospective study for the proposition that █████████████████████ ██████████████████████████████████ ██ ████████████████████ ███████████ ████████████████████████████████ ██ Pfizer goes on to quote Colvin *et al.:* "across all SSRIs, there was an increased risk of major cardiovascular defects (OR, 1.6; 95% CI, 1.1-2.3)." ██ █████. All of the above is consistent with Dr. Bérard's methodology.

In short, Pfizer's own Medical Information Letter on the use of Zoloft during pregnancy delineates in some detail the wealth of causation evidence that links birth defects to the use of SSRIs in general and Zoloft specifically. Pierre Raillard, who served for eleven years as Pfizer's Senior Medical Director, testified that Pfizer's Medical Information Letters are ████████ ████████████████████████████████████████████████ ████████████████████████ Pierre Raillard's description above could be used to describe the methodology in Dr. Bérard's report.

Others in the scientific and medical communities have come to the same conclusion as Dr. Bérard and Pfizer employees. For example, Dr. Aubrey Milunsky, M.D., D.Sc., a respected pediatric geneticist at Harvard who now heads Boston University's Center for Human Genetics, lists Zoloft as a "teratogen" which, if taken during pregnancy, causes "heart and other birth defects." Ex. 4 (Ex. 7 to Graham Dep., Aubrey Milunsky, M.D., D.Sc., "Your Genes, Your Health" Oxford Univ. 2012, at p. 294 Table 23.1).

**B.    Pfizer Internal Documents**

Internal documents show that Pfizer was aware and on notice of the problem of SSRIs, and Zoloft specifically, causing congenital abnormalities. Pfizer's employees were expressing concerns about ████████████████████████████████████████████ ████████████████████████████████████ Tellingly, the documents also show

that Pfizer's epidemiologists were utilizing the same methodology for which Pfizer criticizes Dr. Bérard - considering SSRIs as a class.



Specifically, he advised her that

In another email,



It is apparent that when Pfizer is using a methodology to evaluate Zoloft epidemiology internally in the corporation, its methodology recognizes a class effect and considers SSRIs as a class, as does the scientific community. But in the litigation context, it strategically denies this methodology so that it can claim the epidemiology on Zoloft alone is insubstantial. This same litigation methodology by Pfizer has been rejected in the past. *See In re Neurontin Mktg., Sales*

*Practices & Prods. Liab. Litig.,* 612 F. Supp. 2d 116, 141 (D. Mass. 2009) ("[T]he fact that there is no statistically significant information about Neurontin alone is not dispositive, particularly since there is statistically significant information about the class of drugs and other indicia of reliability.")  Moreover, Pfizer's internal communications are entitled to significant weight, and provide "good grounds" to support general causation. ("Significantly, Pfizer has, in both internal and external communications over the course of many years, repeatedly acknowledged that gabapentin has been shown to reduce the release of monoamine neurotransmitters. ...There is therefore, in the peer reviewed scientific literature and Pfizer's own literature, "good grounds" to support testimony that gabapentin causes a decrease in monoamines like serotonin.) *Id.* at 150.





On



At some point, this email was printed out by ████████████████████

Later that day, ████████████████

On ████████████████████



He told ████████████████████████████████████████████

████████████████████ ██ ██████████████████████████████

█████████████████████████ ██ ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ██

████████████████████████████████████████████████████████

Pfizer documents also show that the company was  put on direct notice in 2005 of potential problems of Zoloft and other SSRIs causing birth defects. ██ ██ ██ ██ ████████



Pfizer was put on notice of the potential for birth defects caused by Zoloft, but turned a blind eye to the issue in stark contrast with GSK, the marketer of Paxil. In other words, Pfizer failed to use the GSK methodology. This GSK methodology is consistent with Dr. Bérard's methods used and recommended in her report.

In *confidential internal documents* Pfizer has privately acknowledged that ████████

10

Pfizer states in the company's Core Data Sheet for Zoloft that,  The Core Data Sheet for Zoloft sets forth what Pfizer believes is the essential safety information regarding Zoloft.

Pfizer internally admitted that,

Unlike here in the United States, in several other countries Pfizer warns that Zoloft should only be taken by women who may become pregnant if they are also using some form of birth control. In New Zealand, Pfizer warns that "Women of childbearing potential should employ an adequate method of contraception if taking sertraline." *See* Ex. 18 (2013 New Zealand Zoloft Data Sheet, at p. 9). Now, in litigation, Pfizer denies what it has admitted in its own labels in other countries.

In the U.S.A. however, Pfizer did not warn of the increased risk of birth defects associated with Zoloft, nor did it warn that women who may become pregnant should use a form of contraception.

**C.      MedWatch Reports**

In the label for Zoloft in the United States, Pfizer essentially states that it is *unknown* whether prenatal exposure to Zoloft increases the risk of birth defects, stating "[t]here are no adequate and well-controlled studies in pregnant women[,]" and therefore, "Zoloft (sertraline hydrochloride) should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus." Ex. 3 (Ex. 14 to Chow Dep., Zoloft Label, at p. 25). The label for Zoloft in the United States includes a section where Pfizer lists adverse events reported subsequent to the marketing of Zoloft regardless of a causal association. (*Id.* at pp. 36-37). The label lists no reports of adverse events involving any type of Pfizer-known birth defects or fetal abnormalities: not a single one.

The documents also show that Pfizer consistently withheld and suppressed knowledge of fetal adverse events associated with the use of Zoloft in pregnancy. Pfizer was aware of ███ ███ ████████████████████ ██ ██████████████████████████████████ ██ ████████████ ███ ██ █ █ ██████████████ Pfizer made a decision not to add these ████████████████ to the Zoloft label.

However, Pfizer has received hundreds of reports of children being born with birth defects and other reports of fetal deaths and anomalies. Exhibits 20 and 21 are compilations of data purchased from the National Technical Information Service which were originally submitted between 1991 and 2012 in MedWatch Reports to the FDA (supplied directly to Pfizer by the FDA) relating to Zoloft. Exhibit 20 is a compilation of reports relating specifically to birth defects. Although there are 2,850 reports, because these include initial and the follow-ups reports, the actual number of unique reported defects is actually approximately 1200. Exhibit 21 is a compilation of 158 reported spontaneous abortions and pregnancy terminations associated with congenital malformations incompatible with life. (e.g. anencephaly.) "Through MedWatch - the FDA's "adverse event reporting" program - medical providers tell the FDA and the drug manufacturer about pharmaceutical problems." *Winter v. Novartis Pharm. Corp.*, 739 F.3d 405, 411 (8th Cir. 2014); "MedWatch reports are submitted voluntarily to the FDA and/or a drug manufacturer by healthcare professionals and consumers, to report possible adverse effects of medications and medical devices." *Goldstein v. Centocor*, 2007 WL 7428597, *1 (S.D. Fla. May 14, 2007). Adverse event reports provide support for general causation opinions. *See Stambolian v. Novartis Pharm. Corp.,* 2013 WL 6345566, *13 (C.D. Cal. Dec. 6, 2013) (denying motion to preclude expert's general causation testimony based upon adverse event reports he had not reviewed); *Earp v. Novartis Pharm. Corp.*, 2013 WL 4854488, *3 (E.D.N.C. Sept. 11, 2013) (finding expert had a reliable basis to offer testimony regarding "general causation based on adverse event reports"); *Wells v. Allergan, Inc.,* 2013 WL 7208337, *3 (W.D. Okla. Feb. 7, 2013) (denying motion to exclude general causation testimony based in part upon adverse event reports).

### D.    Pfizer Cannot Hide Behind the FDA

Pfizer filed a *Daubert* report written by ex FDA senior official Dr. Thomas Laughren, which attempts to discredit Dr. Bérard's opinions, inferring that her opinions were inconsistent with the FDA's view of the birth defect risks associated with Zoloft.

Courts have recognized that FDA approval is not the last word on a drug's safety. *In re Chantix (Varenicline) Prods. Liab. Litig.*, 889 F. Supp. 2d 1272, FN8, 2012 WL 3871562 (N.D. Ala. 2012). While Pfizer attempts to analogize Zoloft to Bendectin, a comparison with Thalidomide is more appropriate. As the *In re Chantix* court explained:

> Approval by the FDA is not evidence of the safety of a medication. The court takes judicial notice of such things as that at one time, thalidomide was used for morning sickness in pregnant women. Unfortunately, 10,000 children were born with birth defects from it before it was banned. And 50 years elapsed before doctors understood why thalidomide caused limbs to disappear. Similarly, the fact that the FDA at one time approved Vioxx did not prevent the same being removed from the market due to growing concerns that it increased the risk of heart attacks and strokes. Hence, initial approval by the FDA is not proof of the safety of a medication.

*See also Wyeth v. Levine*, 555 U.S. 555, 579, 129 S. Ct. 1187, 1203, 173 L. Ed. 2d 51 (2009) (noting the limited ability of the FDA to ensure drug safety, and the role of tort suits in consumer protection):

> "In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs, especially in the postmarketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation."

Adding to the problem of the FDA's limited resources, Pfizer knew that it could "take advantage" of its relationship with the Food and Drug Administration ("FDA") and its close ties

with key FDA personnel like Pfizer's *Daubert* expert Thomas Laughren (who has since retired from the FDA and almost immediately started working as a consultant for Pfizer regarding Zoloft and Forest Laboratories, in connection with its SSRIs, Celexa and Lexapro).   For example, in one internal Pfizer document, some of the company's highest ranking executives boasted in 2003 that:



Pfizer succeeded in ███████████████████████ ██ ███████████████████ ████████████████████████████████████ including Dr. Laughren, which benefitted Pfizer's position in the United States regarding Zoloft.  While at the FDA, Dr. Laughren (who is now testifying as an expert for Pfizer), was the Division Director and was directly responsible for regulating the safety of Zoloft. Ex. 23 (Laughren Report, at p. 1).  *See*

*also* ███████████████████████████████████████

██████████████  By his own admission, Dr. Laughren, who worked at the FDA until

December 2012,[1] describes his new role as a consultant:

> "I have 29 years of experience at the FDA in *assisting pharmaceutical companies*
> with psychiatric drug development programs, and *I hope to continue in this effort
> as an independent consultant*." Ex. 26 (Laughren LinkedIn Profile, at p. 1).
> (emphasis added)

Just as Dr. Laughren assisted Pfizer with Zoloft while at the FDA, he continues to assist

Pfizer in this case.  Given Pfizer's success in influencing the FDA and finding an eager partner in

Mr. Laughren, Pfizer's argument that Zoloft must be safe because the FDA has not said that it is

unsafe is a weak argument, at best.  The FDA has made clear that Dr. Laughren does not speak

on its behalf and his testimony does not represent the position of the FDA.  *See* Ex. 27 (Ex. 5 to

Laughren Dep.).  In a November 22, 2013 letter, Howard Philips, the Deputy Director of the

Division of Information Disclosure Policy at the FDA stated that "Dr. Laughren's personal

opinions are his alone and they do not reflect the official position of the FDA." *Id.*  Yet, even if

Dr. Laughren's personal views did reflect the official position of the FDA, it does not logically

follow, as Pfizer argues, that the testimony of any of Plaintiffs' experts, including Dr. Anick

Bérard, are unreliable or should be discounted.

The FDA is not and has never been the final word.  For example, GlaxoSmithKline

("GSK") voluntarily changed the label for its SSRI, Paxil, in late 2005 to warn that human

epidemiological studies showed that prenatal exposure increased the risk of birth defects,

particularly cardiac malformations.  Likewise, Forest Laboratories, Inc., the manufacturer of

Celexa and Lexapro, raised a similar issue in a Missouri federal court case, *In re Celexa/Lexapro

Prods. Liab. Litig.*, 927 F. Supp. 2d 758, 764 (E.D. Mo. 2013):

> I cannot and will not exclude one expert's opinion simply because it disagrees
> with another's, even if that 'other' expert is the FDA. Forest is free to argue its
> point of view to the jury - that the FDA and/or Dr. Concato are the 'real' experts -

---

[1] Federal law imposes restrictions on certain government employees from engaging in private
employment involving the subject of their government work for particular matters, including
matters that the government employee had personal involvement. *See* 18 U.S.C. § 207.

15

but there is no requirement that, to be admissible, an expert's opinion must agree with everything the FDA says. Moreover, Dr. Healy clearly was familiar with the FDA study and discussed it in his report, but he explained in his deposition and his report why he discounted the FDA's conclusions when analyzing the data. Forest may disagree with Dr. Healy's decision to discount the FDA's findings, but it is up to a jury, not me, to decide whether Dr. Healy's decision was a sound one.

In short, Dr. Bérard's opinions are consistent with Pfizer's Medical Information Letters, internal Pfizer documents, and hundreds of adverse event reports.

## III.    STANDARD OF REVIEW

### A.    Daubert Generally

"The Third Circuit has explained that 'Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, i.e., reliability; and (3) the expert's testimony must assist the trier of fact, i.e., fit.'" *In re Asbestos Prods. Liab. Litig.*, 714 F.Supp.2d 535, 539 (E.D. Pa. 2010) (quoting *United States v. Schiff*, 602 F.3d 152, 172-73 (3d Cir. 2010)). "A trial court should consider several factors in evaluating whether a particular methodology is reliable. These factors, enunciated in *Daubert* and this Court's decision in *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985), may include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48, (3d Cir. 2008), citing *In re Paoli.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) These factors "are neither exhaustive nor applicable in every case." *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 806-07 (3d Cir. 1997).

The Third Circuit has emphasized that the *Daubert/Paoli* factors may be adapted to allow for consideration of other things. *Pineda*, 520 F.3d at 248. For example, "whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation[,]" and "whether the expert is being as careful as he would be in his

professional work outside of the litigation context" may also be considered. *See, e.g., Citizens Fin. Gp., Inc. v. The Citizens Nat'l Bank of Evans City*, 2003 WL 24010950, *2 (W.D. Pa. Apr. 23, 2003). "Rule 702 has 'a liberal policy of admissibility.'" *Zaprala v. USI Servs. Gp., Inc.*, 2013 WL 1148335, *6 (E.D. Pa. Mar. 20, 2013) (quoting *Pineda*, 520 F.3d at 243). "[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda*, 520 F.3d at 244 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)). "Accordingly, the focus of the Court's inquiry is on the methodology used by the expert, not the conclusions reached." *Zaprala*, 2013 WL 1148335, at *6. "Exclusion of expert testimony is the exception rather than the rule because 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting Fed. R. Evid. 702 (Advisory Committee Notes)). "Significantly, the Court's role as a gatekeeper is 'tempered by the liberal thrust of the Federal Rules of Evidence and the 'presumption of admissibility.'" *Canino v. HRP, Inc.*, 105 F.Supp.2d 21, 28 (N.D.N.Y. 2000). Any doubts "should be resolved in favor of admissibility." *Id.*

### B.    General Acceptance Is Not Required

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993):

> "Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, rather than wholesale exclusion under an uncompromising 'general acceptance' standard, is the appropriate means by which evidence based on valid principles may be challenged." *Id.* at 580.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 406 (3d Cir.2003) (holding that exclusion of expert's testimony in medical malpractice action was abuse of discretion, and noting that expert theories are not required to gain general acceptance or be subject to peer review to be admissible under Rule 702):

> "Indeed, in *Daubert*, the Supreme Court specifically held that Rule 702 overruled the requirement that an opinion must gain general acceptance in order to qualify as admissible expert testimony; instead general acceptance and peer review are only two of

the factors that a district court should consider when acting as gatekeeper. *See Daubert,* 509 U.S. at 589, 113 S.Ct. 2786 ("Given the [Federal Rules of Evidence's] permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention "'general acceptance,'" the assertion that the Rules somehow assimilated [*Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)] is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony."). Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point."

Admissibility does not require certainty or even consensus. *See In re Baycol Prods. Litig.,* 532 F.Supp.2d 1029, 1066 (D.Minn.2007) ("Other courts have recognized that science is constantly evolving, and the fact that a theory is new or in the process of becoming generally accepted does not prevent its admission in court.") "Rule 702 does not require consensus, only valid methodology." *United States v. Trala,* 162 F.Supp.2d 336, 351 (D. Del. 2001) ("Thus, contrary to the defendant's assertion, the court finds that this challenge is more an issue of weight and not an issue of admissibility."). *See also In re Prempro Prods. Liab. Litig.,* 2008 WL 3285183, *1 (E.D. Ark. Aug. 7, 2008) ("Although Defendants refer to many studies that have a different conclusion, this, again, goes to the weight of the evidence and credibility of the experts. . . .").

### C.    Statistical Significance Is Not Required

*Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1320, 179 L. Ed. 2d 398 (2011):

"A lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events. ... We note that courts frequently permit expert testimony on causation based on evidence other than statistical significance. *See, e.g., Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171, 178 (C.A.6 2009); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 263-264 (C.A.4 1999) (citing cases); *Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 744-745 (C.A.11 1986). ... It suffices to note that, as these courts have recognized, "medical professionals and researchers do not limit the data they consider to the results of randomized clinical trials or to statistically significant evidence."

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig., supra*:
"Epidemiologic studies, while considered to be "powerful evidence of causation," are not required to prove causation in a pharmaceutical personal injury case. *See, e.g., Rider,* 295 F.3d at 1198-99 (citing Eighth, Tenth, and Eleventh Circuit decisions holding that epidemiology is not required to prove causation in a toxic tort case); *In re Meridia Prods. Liab. Litig.,* 328 F.Supp.2d 791, 800-01 (N.D.Ohio 2004) (surveying the pre- and post-

Daubert landscape and concluding that "no court has held that epidemiological evidence is necessary to establish general causation when other methods of proof are available"), aff'd, 447 F.3d 861 (6th Cir.2006)...." *Id.* at 132.

"Moreover, the Reference Guide on Epidemiology suggests that a meta-analysis can itself be deemed an epidemiological study. See Reference Guide on Epidemiology, supra, at 380." *Id.* at 137.

"Accordingly, in these circumstances, the fact that there is no statistically significant information about Neurontin alone is not dispositive, particularly since there is statistically significant information about the class of drugs and other indicia of reliability." *Id.* at 141.

*In re Chantix (Varenicline) Products Liab. Litig.*, 889 F. Supp. 2d 1272, 1286, 2012 WL 3871562 (N.D. Ala. 2012) :

"While the defendant repeatedly harps on the importance of statistically significant data, the United States Supreme Court recently stated that "[a] lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events .... medical experts rely on other evidence to establish an inference of causation." *Matrixx Initiatives, Inc. v. Siracusano*, - U.S. -, 131 S.Ct. 1309, 1319, 179 L.Ed.2d 398 (2011). .... Hence, the court does not find the defendant's argument that Dr. Furberg "cannot establish a valid statistical association between Chantix and serious neuropsychiatric events" to be a persuasive reason to exclude his opinion, even if the court found the same to be true. *See* defendant's memorandum (doc. 584) at 13.

The *Matrixx* Court recognized that the FDA often considers a variety of factors in determining whether to take regulatory action, stating that the FDA "does not apply any single metric for determining when additional inquiry or action is necessary." *Matrixx*, 131 S.Ct. at 1320. The Court continued

Not only does the FDA rely on a wide range of evidence of causation, it sometimes acts on the basis of evidence that suggests, but does not prove, causation .... the FDA may make regulatory decisions against drugs based on postmarketing evidence that gives rise to only a suspicion of causation."

**D.      The Authorities Relied Upon by Pfizer Are Unavailing And Inapposite**

The cases most heavily relied upon by Pfizer are for the most part factually inapposite extremes, and/or rely on outdated authority.  For example, *Soldo v. Sandoz Pharms. Corp.,* 244 F.Supp.2d 434, 465 (W.D.Pa.2003),  cited no less than half a dozen times by Pfizer, was an action alleging that a lactation-inhibiting prescription drug could cause postpartum stroke. The

court granted summary judgment, finding that the opinions of the plaintiffs' experts on causation were not scientifically reliable. The plaintiffs' two testifying experts both relied upon an epidemiologic study where one woman out of over 280,000 delivering babies had suffered a stroke and had been on the drug (¶ 133). The Court noted that neither of the plaintiffs' experts was an epidemiologist (¶¶ 193, 470), but that the plaintiff's own expert epidemiologist , who was designated but was not called to testify,(¶ 101), had  rejected their opinions in his deposition. (¶ 102); (¶ 515); "Plaintiff's epidemiologist, Dr. Macones, opines that there is *no* evidence that Parlodel <sup>®</sup> increases the risk of postpartum stroke." (¶ 224); "According to Dr. Macones, "there is no evidence" that Parlodel <sup>®</sup> increases the risk of postpartum stroke." (¶ 618)

Similarly, *Wade-Greaux v. Whitehall Lab.*, 874 F.Supp. 1441, 1483 (D.Vi.1994), cited by Pfizer throughout its brief, is also off point. The plaintiffs there alleged that an over-the-counter nasal decongestant caused malformations of the upper limbs and other skeletal defects in a child whose mother had used the product during pregnancy. Notably, none of the experts was an expert in epidemiology. However, the court's opinion cited over 40 times to the testimony of the only epidemiologist in the case - a perinatal epidemiologist for the defense. *Id.* at n.7. The defense epidemiologist testified that the studies relied upon by the plaintiff's experts all had express limitations and cautions advising that one should not rely upon the observations as conclusions, and that neither an epidemiologist nor any other teratologic investigator would reasonably rely upon any of those studies to draw a conclusion that those ingredients can cause limb defects in humans at therapeutic doses. (¶¶ 46,103).  The court concluded that "[t]he opinions of each of plaintiff's expert witnesses, therefore, is based upon little more than data from in vitro studies in which chick embryos and chick cells were bombarded with abnormal dosages of the ingredients of Primatene®—dosages far in excess of what a pregnant woman would take to treat an attack of asthma." *Id.* at 1482.

Notably, Dr. Bérard is the only perinatal epidemiologist for either side in this case, the only epidemiologist with a Ph.D., and the only one who has actually performed research in this specific area concerning the class of drugs in question.  Moreover, *Wade-Greaux* was decided only a year after *Daubert,* and almost twenty years before the Supreme Court's holding in

20

*Matrixx Initiatives, Inc., supra,* which specifically rejected the premise of the ruling in *Wade-Greaux* that an expert may not rely upon studies without statistical significance.

## IV.    DR. BÉRARD'S QUALIFICATIONS, METHODOLOGY AND OPINIONS

### A.    Dr. Bérard's Qualifications

Dr. Anick Bérard is one of the foremost perinatal epidemiologists in the world today. She has dedicated her professional career to the research and study of prenatal exposure to drugs and medications during pregnancy and congenital birth defects. *See* Ex. 28 (Bérard Expert Report, at App. A). She holds a Ph.D. in Epidemiology and Biostatics from McGill University and was a post doctorate Fellow in Pharmacoepidemiology from Harvard Medical School. *Id.* She teaches at the University of Montreal and is the Director of the Medications, Pregnancy and Lactation Unit at the CHU Sainte-Justine Research Center in Canada. *Id.* Dr. Bérard has spent over a decade researching the association between the use of antidepressant drugs, particularly Selective Serotonin Reuptake Inhibitors ("SSRIs") during pregnancy and birth defects. *Id.* She has conducted studies and authored peer-reviewed publications regarding the increased risk of birth defects as a result of prenatal exposure to SSRIs and has received multiple awards and distinctions from the scientific and public health community as a result of her work. *See id.*

Dr. Bérard is integrally involved in professional societies, including chairing the Medicines and Pregnancy section of the International Society of Pharmacoepidemiology and the annual OTIS (Organization of Teratology Information Service ) conference in 2012. *Id.* at App. A. She has also organized scientific conferences that focus on medication in pregnancy, including being the president three times of the annual Symposium of Medications and Pregnancy. *Id.* Dr. Bérard currently holds fifteen (15) operating grants to pursue research in the field of epidemiology, including grants from the FDA and the Ministry of Health & Social Services. *Id.* In addition to her current fifteen (15) operating grants, Dr. Bérard has also held 38 grants in the past. *Id.* She has been an author on 106 published papers. *Id.* Dr. Bérard has presented 199 abstracts and participated in 28 symposiums and holds two patents. *Id.*

Her professional experience includes significant specific work and research that informs her opinions and renders her uniquely qualified. As stated in her report: "As part of my clinical

practice I have also conducted research and published on the subject of antidepressants and adverse pregnancy outcomes. These peer-reviewed publications, in addition to my extensive experience, research and publication in the field of antidepressants and adverse pregnancy outcomes, reflect a more complete listing of materials I rely upon for my opinions as stated below." Bérard Expert Report, at pp. 12-13. Dr. Bérard has experience in a wide variety of epidemiology, including genomic association where she did a study with OTIS, the Organization of Teratology Information Service. Ex. 29 (Bérard 11.15.13 Dep., at 59:22-61:1). She has presented findings on SSRI and birth defects at conferences set up to monitor birth defects, which includes individuals from the CIHR and the University of South Florida. *Id.* at 77:25-79:24. She has conducted research involving pregnancy and medication exposure for over a decade as part of her daily work and has reviewed numerous studies in the course of her job as an epidemiologist for University of Montreal, researcher for the Canadian government, and editor for multiple peer-reviewed journals involving pharmacoepidemiology, all of which she stated she considered in formulating her opinions for this case.

In short, she is a world-class expert in perinatal epidemiology, which is no doubt why Pfizer provided funding to her for 4 years. Dr. Bérard received annual grants from Pfizer, Canada for the years 2007-2011 to fund the Annual Symposium on Medications and Pregnancy for which she was the President of the Organizing Committee. Apparently, Pfizer had no problem with her studies and methodologies before now.

**B.      Summary Of Dr. Bérard's Opinions And Methodology**

It is Dr. Bérard's expert opinion that SSRIs as a class, including Zoloft specifically, "cause an increased risk of adverse pregnancy outcomes, including spontaneous abortion and congenital malformations in multiple organ systems (including cardiac defects, craniosynostosis, pulmonary/respiratory defects, gastrointestinal defects (omphalocele, gastroschisis, pyloric stenosis, anal atresia), anencephaly, cleft lip and palate, neural tube defects, limb reduction defects, club foot, and PPHN." Ex. 28 (Bérard Expert Report, at pp. 6, 19-30, App. B). Dr. Bérard has relied on 139 studies, literature, documents, and reports in connection with her opinions. *See generally Id.* at App. B. In her deposition testimony, Dr. Bérard explained that it

22

was her aim to be fair and objective in coming to her opinions. Ex. 29 (Bérard 11.15.13 Dep., at 35:16-19). Her opinions are based upon a thorough and critical evaluation of the pertinent and available medical and scientific data and publications. *Id.* at 36:10-14. Dr. Bérard reviewed and considered all of the literature. *See* Ex. 30 (Bérard 11.14.13 Dep., at 21:13-16, 124:11-16; 278:21-279:3, 286:6-13, 293:8-18).

She analyzed the totality of the literature and data in order to compare findings between studies. *Id.* at 73:1-7. Dr. Bérard used generally accepted epidemiological methods to identify valid studies and presented those in her report. *Id.* at 126:15-25. She analyzed standard methodological issues in order to rate the strength of each study, including study design, comparison group, data sources, exposure definition and time-window of interest, definition of outcome, quantification of risk, confidence intervals, statistical significance, statistical power, bias, confounding factors, replication of findings, and publication bias. *See* Ex. 28 (Bérard Expert Report, at pp. 6-11); *see also* Ex. 30 (Bérard 11.14.13 Dep., at 185:2-186:1). Dr. Bérard placed more weight on studies that had a more inclusive study population, better representation of the whole population of users, better exposure classification and outcome classification, and considered confounding and trends. Ex. 29 (Bérard 11.15.13 Dep., at 42:16-43:7). In addition to the epidemiological studies, Dr. Bérard also analyzed the available pre-clinical data, animal studies, case reports, including adverse event reports, and internal company documents. *Id.* at 319:5-321:25; *see also* Ex. 28 (Bérard Expert Report, at App. B).

Dr. Bérard followed the Bradford-Hill criteria in forming her opinions. Ex. 28 (Bérard Expert Report, at pp. 11-12); *see also* Ex. 29 (Bérard 11.15.13 Dep., at 318:22-321:25). Dr. Bérard based her opinions on the studies and data that she considered to have the most scientific quality. Ex. 30 (Bérard 11.14.13 Dep., at 32:19-33:1). For example, although she understood and considered Nordeng 2012 in forming her opinions, she did not cite to it in her report because she determined it was not epidemiologically valid. *See Id.* at 170:21-171:15. After reviewing the totality of the literature, Dr. Bérard presented the studies that were valid in her report. Ex. 29 Bérard 11.15.13 Dep., at 44:4-45:2, 46:13-47:8, 158:8-159:15. Dr. Bérard acknowledged that

there are some studies that she did not include in her report. After all, it is impossible to include the entire body of scientific literature regarding SSRI use and the increased risk of birth defects.[2]

Dr. Bérard's opinions in this case are based on her review of the available data as well has her education, training and experience in the fields of biostatistics, pharmacoepidemiology and teratology. Ex. 28 (Bérard Expert Report, at p. 6). Dr. Bérard considered the totality of the evidence in forming her opinions and included all of the studies that, in her opinion, were scientifically valid and supportive of her opinions in her report. Ex. 29 (Bérard 11.15.13 Dep., at 53:23-55:15). In fact, the objectivity of Dr. Bérard's analysis is underscored by the fact that she actually excluded some studies that were *supportive* of her opinions. *Id.* at 55:17-56:1.

### C.  The Methodology That Dr. Bérard Has Used In Forming Her Opinions Is Generally Accepted

### 1.  Dr. Bérard Followed The Bradford-Hill Criteria

The methodology that Dr. Bérard has used to form her opinions is certainly generally accepted. As referenced in her expert report and discussed in her deposition testimony, Dr. Bérard followed the Bradford-Hill criteria in forming her opinions in this matter. *See* Ex. 28 (Bérard Expert Report, at pp. 11-12); *see also* Ex. 29 (Bérard 11.15.13 Dep., at 318:22-321:25). This Court has previously observed:

> Bradford-Hill criteria are used to assess whether an established association between two variables actually reflects a causal relationship. Because these criteria are so well established in epidemiological research, it appears that experts often consider these factors without citation to Bradford-Hill. .... An expert need not consider or satisfy every criteria in order to support a causal inference.

*In re Avandia Mktg., Sales Prac. & Prods. Liab., Litig.*, 2011 WL 13576,*3 (E.D. Pa. Jan. 4, 2011).

---

[2] For example, one of Pfizer's experts, Dr. Simeon Boyd, testified that he reviewed and considered all approximately "half a million" papers on PubMed regarding the teratogenity of Zoloft, Ex. 31 (Boyd Dep., at 152:12-153:2), in the "probably 100 hours" that he spent working as an expert in this case, *see id.* at 19:15-21 (equating to prodigious reading rate of 5,000 papers per hour), despite only referencing a handful of studies and publications in his expert report.

As, Dr. Bérard stated in her report, "The Hill criteria (listed below) are useful tools or principles to assist the researcher in evaluating causality between an exposure and an outcome. Although these criteria are useful in assessing causation, not all of the criteria are required to establish general causation. While each of these criteria are valuable in supporting a causal association, they are not mandatory" which is the accepted way to use the Hill criteria in assessing a causal association. Ex. 28 (Bérard Expert Report, at pp. 11-12). Contrary to Pfizer's position, the mere fact that Dr. Bérard may not have followed the Teratology Society's general list of causation principles, (*see* Pfizer's Mtn to Exclude., at p. 33), does not warrant exclusion of her expert testimony in this case. Dr. Bérard has used reliable methods to find an association between SSRIs, including Zoloft, and has adequately explored the Bradford-Hill criteria before drawing causal conclusions from that association. Ex. 29 (Bérard 11.15.13 Dep., at 318:22-321:25). According to Dr. Bérard, the epidemiological data shows a strong association between prenatal exposure to SSRIs, including Zoloft, and birth defects, and the association is not the result of chance, bias, or confounding factors. Ex. 28 (Bérard Expert Report, at pp. 30-31). She has assessed other factors, including the Bradford-Hill criteria to draw conclusions about whether SSRIs as a class and Zoloft actually causes birth defects. Thus, the methodology that Dr. Bérard has used in forming her opinions is reliable.

### 2. Dr. Bérard Considered The Totality Of The Available Data

In evaluating the admissibility of expert testimony on general causation, courts do not look at individual pieces of evidence in isolation. Rather, they look at the totality of the available evidence. *Brasher v. Sandoz Pharm. Corp.*, 160 F.Supp.2d 1291, 1296-1297 (N.D. Ala. 2001). (Medical testimony that strokes suffered by women were caused by cerebral arterial spasms arising from vasoconstrictive effects of medication women were taking immediately after giving birth was sufficiently reliable to warrant its admission, even though no epidemiological studies existed and there were possible other causes of strokes) ("Although it is true that none of these bits of evidence establish conclusively that Parlodel can cause vasoconstriction and vasospasm, taken together they present a compelling picture, one which can support a reasonable scientific inference. *Daubert* does not require proof to a certainty, or even proof convincing to the trial

judge."); *In re Chantix (Varenicline) Products Liab. Litig.*, 889 F. Supp. 2d 1272, 1292-1293, 2012 WL 3871562 (N.D. Ala. 2012) (denying motion to exclude general causation opinions in MDL involving allegations that prescription smoking cessation drug causes depression and psychiatric disorders) ("Additionally, as pointed out by the plaintiffs, defendant's attempt to isolate individual pieces of evidence as a basis to exclude all of Dr. Kramer's testimony has been rejected by other courts. *See* plaintiff's memorandum, at 27, citing *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F.Supp.2d 1230, 1242 (W.D.Wash.2003). That court stated Defendants isolate these sources, rather than considering the whole.")

Dr. Bérard in her deposition on Nov. 14 and 15, 2013, explains her methodology and how she considered the totality of the evidence:

```
185
2   Q   Please tell me with precision, detail, and
3   completeness your inclusion and exclusion criteria for
4   the articles you cited in Section VIII of your report.
5     MR. ROBINSON:  You are wide open.
6     THE WITNESS:  Okay.
7     MR. ROBINSON:  Tell him what the answer is.  Wide
8   open.
9     THE WITNESS:  So I reviewed the whole literature on
10  antidepressant use, including SSRI use in pregnancy.  I
11  looked at how -- well, first of all, how the subjects
12  were selected, what were the inclusion and exclusion
13  criteria.
14       I looked at how the measure of the exposition
15  was done, what was the control group, that nonexposed
16  group.  I looked at how major congenital malformation
17  was defined:  ICD-9 codes, you know, grid of
18  geneticists, such as the National Birth Defects
19  Prevention Study.
20       I looked at -- I looked at which confounders
21  were being listed, were being adjusted on.
22       So I looked at all of that.  And I looked at
23  the quality of the data.  So once I did that -- I
24  considered the whole literature.  Once I did that, I
25  selected the study.  I looked at everything.  The

186
1        studies you see here are those supporting my opinion.
```
Ex. 30 (Bérard 11.14.13 Dep., at 185:2-186:1)

42:16 Q All right. I'm going to withdraw it
17 and restate it. There are things that are not in
18 Exhibit 6 because you don't think they were
19 sufficiently valid or reliable for you to rely upon,
20 correct?
21 A Well, we have to understand we're in
22 the observational mode, so each one -- each individual
23 studies are -- have potential biases. We're not in the
24 randomized controlled trial mode here. But I tried to
25 put more weight, okay, in the studies that I felt had,
43: 1 you know, more inclusive study population, better
2 representation of the whole population of users, better
3 exposure classification and outcome classification. I
4 also considered confounding and trends finding. I -- I
5 considered that and, you know, so in reviewing the
6 whole literature what I felt were the best study on a
7 topic, here being SSRIs, are there.
Ex. 29 (Bérard 11.15.13 Dep., at 42:16-43:7)

318:22 Q Do you believe that if biological
23 plausibility exists, you'd no longer need statistical
24 significance?
25 MR. ROBINSON: For what? For -- for
319: 1 like a causation opinion?
2 MR. SCHACHTMAN: Yeah. For a causation
3 opinion.
4 MR. ROBINSON: Go on.
5 THE WITNESS: My causation opinion is
6 -- is made this way: I -- I said it yesterday.
7 I'm going to repeat it. I look at all the
8 literature. I look -- and I don't want to -- I
9 look at all the evidence. I look at
10 everything. And once that is done, I will
11 analyze each study separately. But also I will
12 consider, you know -- so I analyze each study
13 separately and then I analyze the whole
14 literature. So I love forest plots, I make lot
15 of them.
16 Once that is done, I look at the
17 defects. And I look, first of all, if there's
18 consistency in findings. Of course, you know,
19 if you have 100 studies, they won't give you
20 exactly the same thing. We all agree on that.
21 Different population, different baseline

27

22 susceptibility to start with. Like you
23 mentioned, in Quebec we have higher rates of
24 birth defects, right? So we have -- we -- we
25 look at the overall literature. We don't
320: 1 expect every estimate of risk to be the same.
2 I look at consistency, overall consistency.
3 And once that is done, because we have
4 a lot of studies, statistical significance is
5 less of an issue. And I'm going to tell you
6 why. Because each study taken separately is
7 lacking. Some do not adjust for depressive
8 status, some do not adjust for smoking, some do
9 not adjust for multiple things. Might have
10 recall bias. Might, you know -- non-valid
11 measure of -- of outcome. So taking all of
12 this into consideration, I look at the
13 evidence. So if I see consistency --
14 regardless of depression has been adjusted, yes
15 or no, certain other confounders have been
16 adjusted, yes or no, if I see overall
17 consistency, then it reassures me that it is an
18 effect. Once that is done -- obviously, epi is
19 my field. But once that is done, I look, is
20 there preclinical data, is there animal data
21 that will support what I've seen in humans?
22 Okay? Because what happens many times is that
23 we see effect in humans for which we have no
24 real animal studies that would lead us to -- to
25 go there. Thalidomide is the biggest example.
321: 1 I know nobody likes this word, but this is a
2 fact. And many times some animal studies, we
3 have to understand when the animals were
4 slaughtered so maybe we don't see some defects
5 in animals because of the experiment itself.
6 It didn't allow us to -- to see the defect.
7 So going back, I have my epi, I've got
8 consistency, I have temporality, exposure
9 precedes outcome, and once that is done, I look
10 at biological plausibility. Is there any
11 evidence that would make me believe that what I
12 see in humans is biologically plausible? So
13 this is how I do it.
14 BY MR. SCHACHTMAN:
15 Q I appreciate that. I heard that.
16 A And statistical significance is
17 fantastic. It's great individual study. But given

28

18 that we're looking at extremely rare events and that
19 the cohort sometimes that are studied have various
20 sample size, very low sample size sometimes. So
21 obviously you start with a strike when you have a
22 cohort of 200 women, so I take this into consideration.
23 This is taken into consideration with the -- the
24 confidence interval. So some estimates are
25 significant, statistically significant, some are not.
*Id.* at 318:22-321:25

As can be seen, a review of Dr. Bérard's testimony demonstrates that she engaged in a thorough and comprehensive study of the literature, and considered, evaluated and took into account all of the various factors which Pfizer claims she did not.

**D.    Perinatal Epidemiologist Dr. Anick Bérard vs. M.D. Cardiologist With A Master's Degree in Epidemiology, Dr. Kimmel**

Dr. Kimmel is an M.D. cardiologist with a master's degree in general epidemiology. He is clearly not anywhere near a Ph.D. perinatal epidemiologist. Dr. Bérard is a Ph.D. perinatal epidemiologist. She has only testified in one previous lawsuit- an SSRI case.

Dr. Kimmel has not testified in an SSRI case. However, he has testified in a number of drug cases on behalf of drug and medical device manufacturers, including *e.g.* Fosamax, Viagra, Ephedra, Coronary Stents, Tegarsod (Novartis irritable bowel), Omapatrilat (angiotensin block). Dr. Kimmel has never conducted research nor published on the subject of antidepressants and pregnancy. Dr. Bérard has been doing antidepressant research for a decade as part of her job. Dr. Bérard is the only perinatal epidemiologist for either side in this case, the only epidemiologist with a Ph.D., and the only one who has actually performed research in this specific area concerning the class of drugs in question.

**V.    THE  SCIENTIFIC  COMMUNITY,  THE  FDA  AND  PFIZER  HAVE CONSISTENTLY ANALYZED AND EVALUATED SSRI'S AS A CLASS**

For a quarter of a century the SSRI manufacturers have sold the SSRIs as a class of drugs to government safety agencies the world over (including the FDA in the U.S.). They have sold the selective serotonin reuptake inhibition mechanism as the common core method of action for this class of drugs.  Now, in a litigation setting, Pfizer seeks to cut its ties with the class mechanism by calling each SSRI a different "chemical." However, Pfizer cannot escape the fact

that it rode on the back of Prozac's approval in the 1980s in order to facilitate FDA approval for Zoloft. The FDA and the manufacturers have always considered SSRIs as a class. This is a fact which has been recognized by other courts addressing similar issues in SSRI litigation. See *In re Celexa and Lexapro Products Liability Litigation, supra* at 762-763 ("[g]iven that SSRIs are commonly treated as class by the scientific and medical communities" expert opinion "considering research regarding SSRIs generally in support of his conclusions" was appropriate). This different "chemical" distinction raised by Pfizer is not a *Daubert* issue. The study of SSRIs as a class is clearly recognized by the scientific community and the manufacturers themselves.

### A.    Zoloft, Paxil, Prozac, Celexa And Lexapro Are In The Same Class Of SSRI Antidepressant Drugs

Pfizer urges that Dr. Bérard's expert testimony is unreliable because she has analyzed Zoloft together with all SSRIs, including Paxil, Prozac, Celexa, and Lexapro, as a class. *See* Pfizer Mot., at pp. 26-31. Paxil, Prozac and "Zoloft, like Celexa and Lexapro, is in the class of antidepressant medications known as SSRIs (Selective Serotonin Reuptake Inhibitors)." *In re Celexa/Lexapro Prods. Liab. Litig., supra* at n.4. All SSRIs have the same mechanism of action. "SSRIs operate by adjusting the manner in which the neurotransmitter serotonin is processed by brain cells." *Id.* However, Dr. Bérard is not alone in relying upon data from other SSRI drugs in forming opinions about Zoloft and SSRIs as a class. In fact, as stated in her report, the United States FDA has applied the same methodology and utilized data for this class of SSRI drugs in determining there is a class effect for adverse effects attributable to all SSRIs including neonatal withdrawal syndrome, PPHN, and suicide. In addition, the numerous researchers who have conducted epidemiologic research on whether or not an SSRI is associated with congenital malformations have studied the class of drugs in each study, including the studies defense expert Dr. Kimmel relies upon.

### B.    It Is Common For Experts To Rely On Data Applicable To The Same Class Of Drugs

It is common for experts to rely on data about the class of drugs involved. *See, e.g., In re Neurontin Mktg., Sales Prac. & Prods. Liab. Litig., supra* at 141. ("[T]he fact that there is no

statistically significant information about Neurontin alone is not dispositive, particularly since there is statistically significant information about the class of drugs and other indicia of reliability."); *In re PPA Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1241 (W.D. Wash. 2003); *In re Celexa/Lexapro Prods. Liab. Litig.*, *supra*, at 762-763:

> "Although Celexa and Lexapro are unique chemical compounds, I am not persuaded that Dr. Healy's use of extrapolation or his reliance on data for SSRIs as a class renders his methodology in and of itself unreliable. 'Notably here, although the FDA has recognized a variation in risk of suicidality amongst SSRIs, it has handled the drugs as a class, going so far as to ... requir[e] ... a class-wide label in May 2007.' *Id*. In addition, 'SSRIs are discussed as a class in a majority of the articles and studies relied on by the parties' experts. . . .' *Id*. Given that SSRIs are commonly treated as class by the scientific and medical communities, like Judge Hamilton I also find that Dr. Healy did not undermine the admissibility of his expert opinion by considering research regarding SSRIs generally in support of his conclusions about Celexa and Lexapro. Forest is certainly entitled to attack Dr. Healy's methods and conclusions with vigorous cross-examination and contrary evidence on this basis (including pointing out any differences between SSRIs), but Dr. Healy's opinion of general causation is not inadmissible for this reason.'"

**C.    The Published Literature Has Consistently Analyzed All SSRIs, Including Zoloft, Within The Same Class**

Pfizer's attempt to avoid analysis of Zoloft along with other SSRIs together ignores the fact that the scientific community has consistently analyzed all SSRIs, including Zoloft, within the same class. Pfizer alleges that it is improper for Dr. Bérard to rely on data for other drugs, yet the literature in the field points to there being a class effect among all SSRIs due to their shared mechanism. The most current scientific literature confirms Dr. Bérard's methodologies of looking at SSRIs generally as part of her analysis. The SSRIs on the market "exhibit similar therapeutic efficacies and similar adverse reaction profiles..." Ex. 32 (Hiemke et al., "Pharmacokinetics of selective serotonin reuptake inhibitors," Pharmacology & Therapeutics 2000, at p. 22). This occurs because of the shared mechanism among SSRIs, in which the drugs "induce an increase in extracellular serotonin (5-hydroxytryptamine, 5-HT) concentrations by acutely blocking the specific serotonin transport (SERT)." Ex. 33 (Diaz et al.,"5-HT2B receptors

are required for serotonin-selective antidepressant actions," Molecular Psychiatry 2012, at p. 154).

It is exactly this shared mechanism that creates the risk in pregnancy for SSRIs. "The identification of targets of SSRIs and serotonin releasers during embryonic and early postnatal life helps understanding the very diverse physiological consequences of administration of these drugs during development." Ex. 34 (Narboux-Neme et al., "Serotonin transporter transgenic (SERT[cre]) mouse line reveals developmental targets of serotonin specific reuptake inhibitors (SSRIs)," Neuropharmacology 2008, at p. 994). "Given the widespread expression of SERT in development, one may question the safety of administration of SSRIs during pregnancy or infancy in humans." *Id.* at 1003. "Therefore, increased stimulation or suppression of 5HT receptors by agonists and antagonists may cause birth defects." Ex. 35 (Marleen et al., "Teratogenic mechanisms of medical drugs," Human Reproduction Update 2010, at p. 386).

It is not surprising, then, that epidemiologists both study SSRIs as a class and warn against their use in pregnancy as a class. For example, results have suggested "a class effect on the SSRI on heart defects." Ex. 36 (Pedersen, et al., "Selective serotonin reuptake inhibitors in pregnancy and congenital malformations: population based cohort study," BMJ 2009, at p. 5). Increased risk of spontaneous abortions from use of SSRIs also pointed to an "overall class effect of selective serotonin reuptake inhibitors." Ex. 37 (Nakhai-Pour, "Use of antidepressants during pregnancy and the risk of spontaneous abortion," CMAJ 2010, at p. 1036). "The risks of SSRIs as a group favor non-pharmacologic treatment of depression during pregnancy." Ex. 38 (Tango et al., "Selective serotonin reuptake inhibitors (SSRIs) in pregnancy," Rev Med Suisse 2006, at p. 9). Dr. Bérard's views, methods, and conclusions regarding the class effect among SSRIs are consistent with the accepted science and peer-reviewed literature.

## D.    The FDA Has Treated All SSRIs Together As A Class

As noted in Dr. Bérard's report, the FDA defines an established pharmacologic class as represented by a term or phrase that is scientifically valid and clinically meaningful according to the following definitions:

A scientifically valid pharmacologic class is supported by documented and submitted empiric evidence showing that the drug's pharmacologic class is known, not theoretical, and relevant and specific to the indication.

A clinically meaningful pharmacologic class term or phrase enhances the ability of professionals to understand physiologic effects related to the indication or to anticipate undesirable effects that may be associated with the drug or pharmacologic class.

Ex. 39 (FDA Guidance on Determining Established Pharmacologic Class for Use in the Highlights of Prescribing Information, 2009, at p. 3); Ex. 28 (Bérard Expert Report, at pp. 4-5).

The FDA has regularly put its knowledge of class effect to use in its regulation of SSRIs and Zoloft. In the Zoloft label, last revised December 2012, there are at least twelve examples of adverse events warnings common to the class of SSRIs: suicidality in children and adolescents, MAOIs, abnormal bleeding, hyponatremia, angle-closure glaucoma, neonatal withdrawal, PPHN, serotonin syndrome, triptan, sumatriptan, male and female sexual dysfunction, and priapism. Ex. 3 (Ex. 14 to Chow Dep., 2012 Zoloft Label).

Further, when an adverse event arose for one SSRI, the FDA would commonly request the sponsors of other SSRIs to investigate such an adverse event in their own drugs. For example, prompted by ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████ Like the FDA, Plaintiff experts use their understanding and knowledge of the pharmacologic class of SSRIs to better understand the effects of prenatal use of Zoloft.

**E.  Drug Companies, Including Pfizer, Have Internally Recognized That There Is A Class Effect**

As previously discussed, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██ ██ ███████████████████████████████████████████████████████████████ Pfizer is no stranger to literature and studies discussing pregnancy and SSRIs as a class. In fact, Pfizer regularly created its own ████████████████████████████████████████████

██████████████████ ███ ████████████████████████████████

Pierre Raillard, who served for eleven years as Pfizer's Senior Medical Director, testified that

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Kornum et al. and Merlob et

al., which conclude there is an increased risk for heart defects in all SSRIs. ███████████████

████████████ █ █████████████████████████████████████████████

█████████████ ███

Pfizer internally reports and relies on the very same scientific sources Dr. Bérard relies

upon in analyzing the risk of SSRI use in pregnancy. In this litigation, Pfizer denies the

existence of a class effect and protests to the use of data on the class of SSRIs as a whole.

However, this is far from Pfizer's opinion outside the realm of this litigation. Pfizer has been

consistent in its opinion that SSRIs are a class with shared effects and adverse events. In a 1985

patent for sertraline, the scientific name for Zoloft, Pfizer wrote "[i]t is also becoming a widely

held view in the medicinal chemistry field that drugs capable of blocking the pre-synaptosomal

uptake of serotonin in the brain will comprise another major category of antidepressant agents."

Ex. 42 (US Patent 4556676). The next year, in 1986, Pfizer submitted to the FDA ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████

Although not the case in this litigation, when Pfizer stands to gain from the concept of a

class effect, they argue that a class effect does indeed exist. In fact, Pfizer stated ███████████

████████████████████████████████████████████████████████████

█████████████████████████████ Pfizer believes ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ ██ ███████ Further, Pfizer argues ██████████████

████████████████████████████████████████████████████████████

██████████████████ ██ █████████ ████████████████████████████████

34



At pages 4-6 of this brief, Pfizer epidemiologist ███████████████

████████████████████████████████████████████

████████████████████████████████████████ Pierre Raillard, who served for

eleven years as Pfizer's Senior Medical Director, testified that ███████████

████████████████████████████████████████████

█████████████████████ Similarly, Gretchen Dieck, former Senior Vice President of

Risk Management Strategy at Pfizer, testified that ████████████████

████████████████████████████████ Gail Farfel, the worldwide

medical director, requested █████████████████████████

████████████████████████████████████████████

█████████████████████████

**F.    Pfizer's Experts Admit That There Is A Class Effect**

Pfizer's own experts, in utilizing class data, are doing exactly what Pfizer itself does in its

regular course of business.  Pfizer's experts admit that SSRIs have shared mechanism of action

that creates a class effect. When asked if he believes that the SSRIs as a class have a class effect

with regard to their mechanism, John DeSesso stated they do because they all affect the SERT

transporter.

340:17  Do you believe that the SSRIs as a class
340:18  have a class effect with regard to their shared
340:19  mechanism of action?
340:20        MR. MYERS:  Objection to form.
340:21        THE WITNESS:  To the extent that your
340:22  question is asking me are they affecting the SERT
340:23  transporter, yes.
Ex. 49 (DeSesso Dep., at 340:17-23).

35

Defense expert Ronald Hood also admitted there was a class effect among SSRIs related to their mechanism.

```
100:9   Q   Okay.  The class of drugs' common mechanism of
100:10  action on SERT renders them to have a common class
100:11  effect; true?
100:12      MR. MYERS:  Objection.  Form.
100:13      THE WITNESS:  In that regard, some of them are more
100:14  potent than others and so forth.
100:15  BY MS. GARBER:
100:16  Q   Okay.  But the answer to my question is "yes"?
100:17      MR. MYERS:  Objection to form.
100:18      THE WITNESS:  Yes.
```
Ex. 50 (Hood Dep., at 100:9-18).

Defense expert Deepak Srivastava concurs that the SSRIs are in the same class of drugs due to their having the same mechanism of action. Ex. 51 (Srivastava 12.6.13 Dep., at 20:22-21:3, 22:17-22:20, 138:8-10, and 142:2-9).

When taken as a whole, the evidence convincingly supports Dr. Bérard's use of SSRI class data as reliable and accepted in the field of pharmaceutical drugs.  Pfizer attempts to undermine the reliability of Dr. Bérard's opinions by suggesting that she has previously made statements in testimony in a single Paxil case, which Pfizer claims are inconsistent with her opinions and conclusions regarding Zoloft and SSRIs as a class in this litigation.  Pfizer's attack on Dr. Bérard's credibility is misplaced, inaccurate and fails to warrant exclusion of her expert testimony. *In re Diet Drugs (Phen-Fen) Prods. Liab. Litig.*, 890 F.Supp.2d 552 (E.D. Pa. 2012) ("While Wyeth points to various statements of [the plaintiff's experts] which one might argue show some inconsistency . . ., these statements simply go to their credibility and do not undermine the reliability of their methodology in determining causation.").

To the extent Pfizer truly believes that Dr. Bérard has previously made statements which are inconsistent with her opinions in this case, cross-examination as opposed to exclusion of her expert testimony is appropriate. *Id.* And such cross-examination will show nothing that casts any doubt on her credibility, or the consistency of her methodology. This is because at the time of her 2007 publication many if not most of the peer-reviewed studies, including those relied upon by Dr. Kimmel, on the association between SSRIs and birth defects had not been published.

When pressed at her deposition as to why Dr. Bérard did not include her 2007 Paxil study in her expert report, she explained "because this was a subgroup – this study was performed on a subgroup of very, very ill women to start with…this study has an active comparator…it was not comparable to the other…I considered it in my opinion, but I didn't list it in the report…at the time we had – almost everybody was taking Paxil for some reason, so we had very, very few data. It didn't add – and made – you know, very sick people, all with psychiatric disorders, and an active comparator, there were no nonusers in that study." Ex. 30 (Bérard 11.14.13 Dep. at 245:25-246:14).

## VI.    DR. BÉRARD'S REPORT BELIES PFIZER'S CLAIM OF NO STATISTICALLY SIGNIFICANT FINDINGS

Pfizer claims that Dr. Bérard relies on non-statistically significant data regarding Zoloft and SSRIs. Pfizer also claims she picked only a few non-representative findings to support her opinions.  The record shows just the opposite. Not only did Dr. Bérard consider all of the evidence, but the available epidemiological data overwhelmingly shows that there is an increased risk of birth defects associated with prenatal exposure to SSRIs, including Zoloft. When the Court looks at Dr. Bérard's expert report it will find a significant group of studies with statistically significant findings of odds ratios for increased risk of birth defects for the Zoloft/SSRI class of drugs. In fact, the vast majority of the ORs that Dr. Bérard has included in her analysis are statistically significant.  The chart below includes both the representative studies Dr. Bérard used in her actual report (highlighted in yellow) as well as studies from Appendix B, her list of reference materials for the report:

| Study | Drug | OR/RR | CI | Risk For |
|-------|------|-------|-----|----------|
| GSK 2005 | Paxil | 1.84 (adjusted) | (1.16-2.91) | Congenital malformations |
| GSK 2005 | Paxil | 2.26 (adjusted) | (1.17-4.33) | Cardiovascular malformations |
| Chambers 2006 | SSRIs as a class | 6.1 (adjusted) | (2.2-16.8) | PPHN |
| Kallen 2006 | Paxil | 2.22 | (1.39-3.55) | Any cardiac defect |
| Rahimi 2006 | SSRIs | 1.7 | (1.28-2.24) | Spontaneous Abortion |

| | | | | |
|---|---|---|---|---|
| Wogelius 2006 | SSRIs as a class | 1.84 (adjusted) | (1.25-2.71) | All congenital malformations for babies whose mothers redeemed a prescription for SSRIs during the second or third month after conception |
| Alwan 2007 | SSRIs as a class | 2.4 (adjusted) | (1.1-5.1) | Anencephaly |
| Alwan 2007 | SSRIs as a class | 2.5 (adjusted) | (1.5-4.0) | Craniosynostosis |
| Alwan 2007 | SSRIs as a class | 2.8 (adjusted) | (1.3-5.7) | Omphalocele |
| Alwan 2007 | Prozac | 1.9 (adjusted) | (1.0-4.0) | Birth defects previously identified as associated with SSRI use-- anencephaly, craniosynostosis, and omphalocele |
| Alwan 2007 | Zoloft | 2.0 (adjusted) | (1.0-3.9) | Birth defects previously identified as associated with SSRI use-- anencephaly, craniosynostosis, and omphalocele |
| Alwan 2007 | Paxil | 4.2 (adjusted) | (2.1-8.5) | Birth defects previously identified as associated with SSRI use-- anencephaly, craniosynostosis, and omphalocele |
| Alwan 2007 | Celexa | 4.0 (adjusted) | (1.3-11.9) | Birth defects previously identified as associated with SSRI use-- anencephaly, craniosynostosis, and omphalocele |
| Bérard 2007 | Paxil | 2.23 (adjusted) | (1.19-4.17) | Major malformation |
| Bérard 2007 | Paxil | 3.07 (adjusted) | (1.0-9.42) | Major cardiac malformations (25 mg/day) |
| Cole 2007 | Paxil | 1.89 (adjusted) | (1.2-2.98) | All congenital malformations |
| Cole 2007 | Mono- or Polytherapy | 1.76 (adjusted) | (1.18-2.64) | All congenital malformations |
| Davis 2007 | Any SSRI | 1.16 | (1.06-1.26) | One or more perinatal event of interest |
| Davis 2007 | Any SSRI | 6 | (1.88-19.18) | Fetal Distress |
| Davis 2007 | Any SSRI | 29.35 | (3.30-261.08) | Polyhydramnios |
| Davis 2007 | Any SSRI | 8.34 | (1.94-35.80) | Polyhydramnios and oligohydramnios |
| Davis 2007 | Any SSRI | 1.42 | (1.05-1.93) | Complications of delivery, including malpresentation and malformation |

38

| Davis 2007 | Any SSRI | 1.51 | (1.04-2.20) | Birth trauma |
|---|---|---|---|---|
| Davis 2007 | Any SSRI | 1.97 | (1.65-2.35) | Respiratory distress syndrome and other respiratory conditions |
| Davis 2007 | Any SSRI | 1.61 | (1.15-2.27) | Endocrine and metabolic disturbances specific to newborn, including neonatal hypoglycemia |
| Davis 2007 | Any SSRI | 1.56 | (1.06-2.31) | Disorders of temperature regulation, including hypothermia |
| Davis 2007 | Any SSRI | 2.6 | (1.16-5.84) | Convulsions in the newborn |
| Davis 2007 | Any SSRI | 1.41 | (1.12-1.78) | Other conditions |
| Davis 2007 | Any SSRI | 2.22 | (1.70-2.90) | Observation and evaluation of newborns for suspected condition not found |
| Davis 2007 | Paxil | 2.36 | (1.20-4.66) | Congenital anomalies of eye |
| Kallen 2007 | SSRIs as a class | 3.5 (adjusted) | (1.6-6.65) | Cystic kidney |
| Kallen 2007 | Paxil | 1.63 (adjusted) | (1.05-2.53) | Any cardiac malformation |
| Louik 2007 | SSRIs as a class | 2 (adjusted) | (1.1-3.6) | RVOTO |
| Louik 2007 | Zoloft | 5.7 (adjusted) | (1.6-20.7) | Omphalocele |
| Louik 2007 | Paxil | 3.3 (adjusted) | (1.3-8.8) | RVOTO |
| Louik 2007 | Zoloft | 2 (adjusted) | (1.2-4.0) | Septal defects |
| Louik 2007 | SSRIs as a class | 2.2 (adjusted) | (1.4-3.6) | Club foot |
| Louik 2007 | Paxil | 5.8 (adjusted) | (2.6-12.8) | Club foot |
| Louik 2007 | Paxil | 3.3 (adjusted) | (1.1-10.4) | Neural-tube defects |
| Louik 2007 | Zoloft | 4.4 (adjusted) | (1.2-16.4) | Anal atresia |
| Louik 2007 | Zoloft | 3.9 (adjusted) | (1.1-13.5) | Limb reduction defects |
| Diav-Citrin 2008 | Prozac | 4.47 (adjusted) | (1.31-15.27) | Cardiovascular anomalies |
| Einarson 2008 | Paxil | 1.5 | (1.1-2.1) | Cardiovascular birth defects |
| Kallen 2008 | SSRIs as a class | 2.01 (adjusted) | (1.0-3.6) | PPHN in all infants exposed in early pregnancy |
| Kallen 2008 | SSRIs as a class | 2.38 (adjusted) | (1.19-4.25) | PPHN exposed in early pregnancy >= 34 weeks |
| Kallen 2008 | SSRIs as a class | 2.36 (adjusted) | (1.08-4.78) | PPHN exposed in early pregnancy >= 37 weeks |
| Kallen 2008 | SSRIs as a class | 3.57 (adjusted) | (1.16-8.33) | PPHN exposed in early pregnancy with known exposure also in late pregnancy >= 34 weeks |
| Kallen 2008 | SSRIs as a class | 3.7 (adjusted) | (1.01-9.48) | PPHN exposed in early pregnancy with known exposure also in late pregnancy >= 37 weeks |

| | | | | |
|---|---|---|---|---|
| Oberlander 2008 | Citalopram | 3.96 | (1.55-9.74) | Major congenital anomaly |
| Oberlander 2008 | Fluoxetine | 3.29 | (2.16-4.98) | Major congenital anomaly |
| Oberlander 2008 | Paroxetine | 2.92 | (2.05-4.16) | Major congenital anomaly |
| Oberlander 2008 | Sertraline | 2.4 | (1.10-5.14) | Major congenital anomaly |
| Oberlander 2008 | Citalopram | 2.97 | (1.02-8.37) | Cardiovascular Congenital Defects |
| Merlob 2009 | SSRIs as a class | 2.17 | (1.07-4.39) | Cardiac malformations: VSD, bicuspid aortic valve, left superior vena cava to coronary sinus |
| Nakhai-Pour 2009 | SSRIs | 1.61 | (1.28-2.04) | Spontaneous Abortion |
| Nakhai-Pour 2009 | Paroxetine | 1.75 | (1.31-2.34) | Spontaneous Abortion |
| Pedersen 2009 | Citalopram | 2.52 | (1.04-6.1) | Septal heart defects |
| Pedersen 2009 | Sertraline | 3.25 | (1.21-8.75) | Septal heart defects |
| Bakker 2010 (From Tuccori 2010) | Paxil | 5.7 (adjusted) | (1.4-23.7) | Atrial septal defects |
| Kornum 2010 | SSRIs as a class | 1.3 (adjusted) | (1.1-1.6) | Any malformation |
| Kornum 2010 | SSRIs as a class | 1.2 (adjusted) | (1.0-1.6) | Noncardiac malformations |
| Kornum 2010 | Celexa | 1.4 (adjusted) | (1.0-2.0) | Any malformation |
| Kornum 2010 | Lexapro | 2.3 (adjusted) | (1.0-4.9) | Any malformation |
| Kornum 2010 | Celexa | 1.4 (adjusted) | (1.0-2.1) | Noncardiac malformations |
| Kornum 2010 | SSRIs as a class | 1.7 (adjusted) | (1.1-2.5) | Cardiac malformations |
| Kornum 2010 | Zoloft | 3 (adjusted) | (1.4-6.4) | Cardiac malformations |
| Kornum 2010 | Zoloft | 3.3 (adjusted) | (1.5-7.5) | Septal heart defects |
| Kornum 2010 | Lexapro | 4.2 (adjusted) | (1.0-17.1) | Septal heart defects |
| Reis & Kallen 2010 (From Tuccori 2010) | SSRIs as a class | 2.39 (adjusted) | (1.09-4.54) | Cystic Kidney |
| Reis & Kallen 2010 (From Tuccori 2010) | Prozac | 1.29 (adjusted) | (1.0-1.67) | Relatively severe malformation |
| Reis & Kallen 2010 (From Tuccori 2010) | Paxil | 1.66 (adjusted) | (1.09-2.53) | Any cardiovascular defect |

| Reis & Kallen 2010 (From Tuccori 2010) | Paxil | 2.45 (adjusted) | (1.12-4.64) | Hypospadias |
|---|---|---|---|---|
| Wurst 2010 (From Sadler 2011) | Paroxetine | 1.24 | (1.08-1.43) | aggregated congenital defects |
| Wurst 2010 (From Sadler 2011) | Paroxetine | 1.46 | (1.17-1.82) | heart defects |
| Colvin 2011 | SSRIs as a class | 1.6 | (1.10-2.31) | Cardiovascular defects |
| Colvin 2011 | SSRIs as a class | 2.73 | (1.26-5.89) | Ostium secundum type ASD |
| Colvin 2011 | SSRIs as a class | 2.91 | (1.82-4.65) | Other congenital anomaly of circulatory system |
| Colvin 2011 | SSRIs as a class | 3.48 | (1.87-6.47) | Patent ductus arteriosus |
| Colvin 2011 | SSRIs as a class | 5.61 | (1.95-16.13) | Anomalies of pulmonary artery |
| Colvin 2011 | SSRIs as a class | 4.38 | (1.55-12.40) | Other anomalies of peripheral vascular system |
| Colvin 2011 | SSRIs as a class | 2.83 | (1.14-7.04) | Cystic kidney disease |
| Colvin 2011 | SSRIs as a class | 4.2 | (1.27-13-93) | Other anomalies of lower limb |
| Malm 2011 | Prozac | 1.40 (adjusted) | (1.01-1.95) | All major cardiovascular anomalies |
| Malm 2011 | Prozac | 1.49 (adjusted) | (1.0-2.2) | Ventricular septal defects |
| Malm 2011 | Prozac | 2.03 (adjusted) | (1.28-3.21) | Isolated ventricular septal defects |
| Malm 2011 | Prozac | 2.47 (adjusted) | (1.5-4.07) | Isolated ventricular septal defects excluding offspring in neonatal care unit treatment |
| Malm 2011 | Paxil | 4.68 (adjusted) | (1.48-14.74) | Right ventricular outflow tract defects |
| Malm 2011 | Paxil | 5.18 (adjusted) | (1.64-16.34) | Right ventricular outflow tract defects excluding major chromosomal anomalies |
| Malm 2011 | SSRIs as a class | 1.85 (adjusted) | (1.07-3.2) | Neural tube defects |
| Malm 2011 | Celexa | 2.46 (adjusted) | (1.2-5.07) | Neural tube defects |
| Jimenez-Solem 2012 | SSRIs as a class | 1.33 (adjusted) | (1.16-1.53) | Major malformations |

41

| Jimenez-Solem 2012 | SSRIs as a class | 2.01 (adjusted) | (1.6-2.53) | Congenital malformations of the heart |
|---|---|---|---|---|
| Jimenez-Solem 2012 | SSRIs as a class | 2.04 (adjusted) | (1.53-2.72) | Septal defects |
| Jimenez-Solem 2012 | SSRIs as a class | 1.62 (adjusted) | (1.05-2.5) | Ventricular septal defects |
| Jimenez-Solem 2012 | SSRIs as a class | 2.6 (adjusted) | (1.84-3.68) | Atrial septal defects |
| Jimenez-Solem 2012 | SSRIs as a class | 1.8 (adjusted) | (1.04-3.12) | Congenital malformations of the digestive system |
| Jimenez-Solem 2012 | SSRIs as a class | 1.26 (adjusted) | (1.05-1.51) | Major malformations (low dose) |
| Jimenez-Solem 2012 | SSRIs as a class | 1.44 (adjusted) | (1.15-1.79) | Major malformations (high dose) |
| Jimenez-Solem 2012 | SSRIs as a class | 1.83 (adjusted) | (1.35-2.48) | Congenital malformations of the heart (low dose) |
| Jimenez-Solem 2012 | SSRIs as a class | 2.26 (adjusted) | (1.6-3.19) | Congenital malformations of the heart (high dose) |
| Kieler 2012 | SSRIs as a class | 1.4 (adjusted) | (1.0-2.0) | PPHN (exposure before gestational week 8) |
| Kieler 2012 | Celexa | 1.8 (adjusted) | (1.1-3.0) | PPHN (exposure before gestational week 8) |
| Nikfar 2012 | SSRIs as a class | 1.87 | (1.5-2.33) | Spontaneous abortion |
| Nikfar 2012 | SSRIs as a class | 1.272 | (1.098-1.474) | Major malformations |

All of the above show statistically significant findings of odds ratios for increased risk of birth defects for the Zoloft/SSRI class of drugs. Additionally, much of Pfizer's criticism regarding statistical significance results from Pfizer isolating portions of Dr. Bérard's testimony while ignoring others. For example, Pfizer criticizes Dr. Bérard, inter alia, for "relying upon findings that are not statistically significant to support her causation opinions." Pfizer's MTN to Exclude at p. 23. Indeed, Pfizer alleges she based her opinion that "Zoloft causes craniosynostosis solely upon a non-statistically significant finding from a single study." *Id.* This is a far cry from the truth. What Dr. Bérard actually wrote in her report is "Louik et al. have shown that Zoloft use during pregnancy increased the risk of craniosynostosis by 80% (OR=1.8; 95% CI 0.2, 14.9). Although the estimate did not reach statistical significance, likely due to insufficient power (only 1 exposed case), it is consistent with the increase seen with overall SSRI use." Ex. 28 (Bérard Expert Report, at p. 24).

Pfizer conveniently left out the previous page of discussion where Dr. Bérard analyzed Alwan et al., 2007 and Jiminez-Solem et al. 2012, which found a statistically significant increased risk between the mother's use of an SSRI and the baby being born with craniosynostosis.

Pfizer cites to the Myles and Margulis studies that came out after Dr. Bérard wrote her *Daubert* report, but Dr. Bérard said in her deposition that she reviewed both studies and would answer questions on both studies. Ex. 30 (Bérard 11.14.13 dep. at 205:19-206:3; 225:8-13). Pfizer chose not to question her on these recent studies. The Myles study did not include the data from Jimenez-Solem, et al. or the Kornum et al. (2010) (risk of congenital malformations with Zoloft use: OR=1.4; risk of cardiac defect with Zoloft use: OR=3.0; risk of VSD with Zoloft use: OR=3.3.) The Margulis study was limited in that the SSRI exposure data is based on prescription writing by general practitioners, the pregnancy duration could not be assessed with precision, and the mother-baby link is problematic as many mother-baby pairs were excluded and many included infants were potentially linked to the wrong mother.

Moreover, to the extent Pfizer incorrectly suggests that the only relevant data from the epidemiological studies are those odds ratios which are statistically significant, its position is clearly at odds *with Matrixx Initiatives, Inc. v. Siracusano*, -- U.S. --, 131 S.Ct. 1309, 1319-1320 (2011) ("Matrixx's argument rests on the premise that statistical significance is the only reliable indication of causation. This premise is flawed.") *See also In re Diet Drugs Prods. Liab. Litig.*, 890 F.Supp.2d 552, 561 (E.D. Pa. 2012); *In re Neurontin Mktg., Sales. Prac. & Prods. Liab. Litig.*, *supra* at 141. The assertion that statistical significance is required for evaluation of causality is a gross misunderstanding of generally accepted epidemiologic methodology. Indeed, as explained in Modern Epidemiology, 3rd Edition, "The use of a single P value – or worse dichotomization at the P value into significant or non-significant – obscures these features so that the focus of measurement is lost." "As we have seen, results that are not significant may be compatible with substantial effects. Lack of significance alone provides no evidence against such effects." Ex. 52 (Rothman et al., "Modern Epidemiology," 3rd Edition, 2008, at pp. 159-160.)

In forming her opinions in this case, Dr. Bérard applied methodology both taught and utilized in her daily conduct of research on the issue of antidepressants and pregnancy. Her

methodology is also consistent with the utilization of "statistical significance" as stated in the Reference Manual on Scientific Evidence, 3rd Edition, a resource cited by Pfizer in its Motion to Exclude Dr. Bérard's testimony. "To recapitulate the logic of significance testing: If $p$ is small, the observed data are far from what is expected under the null hypothesis—*too far to be readily explained by the operations of chance*. That discredits the null hypothesis…Statistical significance is determined by comparing $p$ to a preset value, called the significance level. The null hypothesis is rejected when $p$ falls below this level. In practice, statistical analysts typically use levels of 5% and 1%. The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure." Ex. 53 (Reference Manual on Scientific Evidence, 3rd Edition, at p. 251) (emphasis added). "How can a highly significant difference be practically insignificant? The reason is simple: $p$ depends not only on the magnitude of the effect, but also on the sample size (among other things). *Id.* at p. 252. "Many a sample has been praised for its statistical significance or blamed for its lack thereof. Technically, this makes little sense. Statistical significance is about the difference between observations and expectations. *Id.* at p. 253. "Power is the chance that a statistical test will declare an effect when there is an effect to be declared. This chance depends on the size of the effect and the size of the sample. Discerning subtle differences requires large samples; small samples may fail to detect substantial differences. When a study with low power fails to show a significant effect, the results may therefore be more fairly described as inconclusive than negative. The proof is weak because power is low." *Id.* at p. 254.

Pfizer's claims of "cherry-picking" are meritless. An actual review of Dr. Bérard's deposition testimony shows that she did not ignore the studies cited by Pfizer, and even attempted to explain why they neither contradict nor undermine her opinion. But counsel for Pfizer chose to ignore her explanations as to why those studies are flawed and why she discounted them. In fact, not only did Pfizer ignore her explanations, it made every effort to suppress them. As a deliberate maneuver to distinguish Dr. Bérard from the experts in the *Avandia* case, whenever she did attempt to explain her reasons for not mentioning the studies counsel for Pfizer immediately moved to strike her testimony, accused her of "speech-making" and repeatedly suggested that he would bring the

matter to the attention of the Court if she persisted. *See, e.g.*, Ex. 30 (Bérard 11.14.13 Dep., at 231:14-232:18, 146:13-147:11; 169:12-170:20; 245:25-246:19). Even when Dr. Bérard pointed out how one study relied upon by Pfizer which she had not mentioned in her report actually supported her opinion, counsel for Pfizer moved to strike only that portion of her answer, did not follow up on her opinion in that regard, and immediately moved on to another document. *Id.* at 189:22-190:13.

It is ironic that Pfizer accuses Dr. Bérard of "cherry picking" when it has selectively isolated excerpts of her deposition testimony while wholly excluding those portions of her testimony in which she clearly explained that she did, in fact, consider the totality of the data and studies in forming her opinions. Contrary to Pfizer's claim, Dr. Bérard did not ignore any scientific studies or data that do not support her opinions. The same type of "cherry-picking" claims Pfizer is making here have been rejected by other courts as being wholly irrelevant to reliability. *In re Chantix (Varenicline) Prods. Liab. Litig.*, supra, at 1292. ("Dr. Kramer did no such thing. Rather, she reviewed all of the information, including the studies and trials defendant chose not to publish.") *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 633 (8th Cir. 2012) ("There may be several studies supporting Wyeth's contrary position, but it is not the province of the court to choose between the competing theories when both are supported by reliable scientific evidence.")

Pfizer points to various imperfections in a handful of studies that Dr. Bérard has relied upon in support of her opinions, and argues that chance, bias, and confounding affect the studies that Dr. Bérard relies on. Where an expert's methodology is otherwise appropriate, to the extent that the expert has relied on a study that is claimed to be flawed, "any flaws that might exist go to the weight . . . not its admissibility." *Id. In re Chantix (Varenicline) Prods. Liab.*, supra at 1282. Pfizer contends that Dr. Bérard cannot permissibly offer any opinion that "exceeds the bounds of the cited studies." Pfizer Mot., at p. 25. However, the fact that an expert has used the data of others and reaches different conclusions is not grounds for exclusion of her opinions. *In re Celexa and Lexapro Products Liability Litigation, supra* at 764-765 ("There is no requirement that Dr. Healy reach the same conclusion as Dr. Kahn just because he relied on Dr. Kahn's data."); *In re Chantix, supra* at 1288. ("Why Dr. Kramer chose to include or exclude data from specific clinical trials is a matter for cross-examination, not exclusion under *Daubert.*"); *In re PPA Prods. Liab. Litig., supra*

at 1240, citing Fed. Jud. Ctr., Ref. Manual on Scientific Evid. 337 (2d ed. 2000) ("It is important to recognize that most studies have flaws. Some flaws are inevitable given the limits of technology and resources.").

Regardless of Pfizer's attacks on the individual studies, Dr. Bérard has applied an accepted, factually thorough and scientifically valid methodology, utilizing the totality of the evidence, to arrive at her conclusions. Pfizer's complaints all go to the weight of her testimony and not to its admissibility. Inconsistencies over time and flaws in conclusions "go to weight, not admissibility." *In re Avandia, supra,* at *9.

## VII.    CONCLUSION

Dr. Bérard is exceptionally and uniquely qualified. Her opinions are based upon the application of reliable scientific methodology, and are amply supported by the totality of the evidence. Pfizer's arguments and its disagreements with her conclusions, in addition to being contradicted by the evidence, all go to the weight of Dr. Bérard's testimony, and not to its admissibility. For the foregoing reasons, Pfizer's motion to exclude her testimony should be denied.

Dated:  February 22, 2014                          Respectfully Submitted,

/s/  Mark P. Robinson, Jr.          /s/  Dianne M. Nast
Mark P. Robinson, Jr.               Dianne M. Nast
Kevin F. Calcagnie


### *PLAINTIFFS' EXECUTIVE COMMITTEE*

/s/  Mark P. Robinson, Jr.          /s/ Dianne M. Nast
Mark P. Robinson, Jr.               Dianne M. Nast
ROBINSON CALCAGNIE ROBINSON         NastLaw LLC
SHAPIRO DAVIS, INC.                 1101 Market Street
19 Corporate Plaza Drive            Aramark Tower, Suite 2801
Newport Beach, CA 92660             Philadelphia, PA 19107
Tel.:  949-720-1288; Fax:  949-720-1292   Tele: 215-923-9300
Beachlawyer51@hotmail.com           Fax: 215-923-9302
                                    dnast@nastlaw.com

/s/ Joseph J. Zonies
Joseph J. Zonies
Reilly Pozner LLP
1900 Sixteenth St., 17th Floor
Denver, CO 80202
Tele: 303-893-6100
jzonies@rplaw.com

/s/ Stephen A. Corr
Stephen A. Corr
Stark & Stark
777 Township Line Road, Suite 120
Yardley, PA 19067-5559
T: 267.759.9684; F: 267.907.9659
scorr@Stark-Stark.com

/s/ Sean Patrick Tracey
Sean Patrick Tracey
Tracey Law Firm
440 Louisiana, Suite 1901
Houston, TX 77002
Tele: 713-495-2330
stracey@traceylawfirm.com

### PLAINTIFFS' STEERING COMMITTEE

/s/ Bryan F. Aylstock
Bryan F. Aylstock
Aylstock Witkin Kreis & Overholtz, PLLC
17 E. Main Street, Ste. 200
Pensacola, FL 32502
baylstock@awkolaw.com

/s/ Andy D. Birchfield, Jr.
Andy D. Birchfield, Jr.
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
234 Commerce Street
Montgomery, AL 36103-4160
andy.birchfield@beasleyallen.com

/s/ Edward Braniff
Edward Braniff
Weitz & Luxemberg
700 Broadway
New York, NY 10003
ebraniff@weitzlux.com

/s/ Kimberly D. Barone Baden
Kimberly D. Barone Baden
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
kbarone@motleyrice.com

/s/ Edward F. Blizzard
Edward F. Blizzard
Blizzard, McCarthy & Nabers
440 Louisiana, Suite 1710
Houston, TX 77002-1689
eblizzard@blizzardlaw.com

/s/ Thomas P. Cartmell
Thomas P. Cartmell
Wagstaff & Cartmell
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
tcartmell@wcllp.com

/s/ Christopher L. Coffin
Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
ccoffin@pbclawfirm.com


/s/ Arnold Levin
Arnold Levin
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
alevin@lfsblaw.com


/s/ Stephanie O'Connor
Stephanie O'Connor
Douglas & London, P.C.
111 John Street # 1400
New York, NY 10038-3101
soconnor@douglasandlondon.com

/s/ Jayne Conroy
Jayne Conroy
Hanly Conroy Bierstein Sheridan
Fisher & Hayes LLP
112 Madison Ave., 7th Floor
New York, NY 10016
jconroy@hanlyconroy.com


/s/ David F. Miceli
David F. Miceli
Simmons Browder Gianaris
Angelides and Barnerd, LLC
One Court Street
Alton, IL 62002
dmiceli@simmonsfirm.com


/s/ Christopher A. Seeger
Christopher A. Seeger
Seeger Weiss LLP
77 Water Street
New York, NY 10004
cseeger@seegerweiss.com