```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF PENNSYLVANIA
 2
    IN RE:                   )   2:12-md-02342-CMR
 3                           )
    ZOLOFT (SERTRALINE       )   September 2, 2015
 4  HYDROCHLORIDE) PRODUCTS  )   A.M. SESSION
    LIABILITY LITIGATION     )   10:05 a.m.-12:49 p.m.
 5  J. RETTENMAIER USA LP    )   Philadelphia, PA
 6                    DAUBERT HEARING
            BEFORE THE HONORABLE CYNTHIA M. RUFE
 7
    APPEARANCES:
 8
    Plaintiff's Steering      DIANNE NAST, ESQ.
 9  Committee Co-Lead         NASTLAW LLC
    Counsel:
10                            MARK P. ROBINSON, JR., ESQ.
                              KEVIN F. CALCAGNIE
11                            ROBINSON CALCAGNIE
12                            JOSEPH ZONIES, ESQ.
                              REILLY POZNER LLP
13                            SEAN TRACEY, ESQ.
                              TRACEY LAW FIRM
14                            STEPHEN A. CORR, ESQ.
                              STARK & STARK
15
    Defendants' Lead and      MARK CHEFFO, ESQ.
16  Liaison Counsel:          SHEILA L. BIRNBAUM, ESQ.
                              BERT L. WOLFF, ESQ.
17                            JONATHAN S. TAM, ESQ.
                              QUINN EMANUEL
18
                              PAMELA YATES, ESQ.
19                            BERT L. SLONIM, ESQ.
                              AARON H. LEVINE, ESQ.
20                            KAYE SCHOLER LLP
21                            JAMES E. HOOPER, JR., ESQ.
                              ANDREW H. MEYERS, ESQ.
22                            WHEELER TRIGG O'DONNELL LLP
23        Veritext National Court Reporting Company
                    Mid-Atlantic Region
24         1801 Market Street - Suite 1800
                  Philadelphia, PA 19103
25                  1-888-777-6690
```

1                           I N D E X

2     WITNESS              DIRECT    CROSS   REDIRECT   RECROSS

3     Nicholas Jewell                 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3         (Call to Court)

4              THE COURT:  Good morning, everyone.

5              ALL:  Good morning, Your Honor.

6              THE COURT:  Please be seated.  Did we

7    give everyone a chance to set up the electronics and

8    everything else?

9              MS. YATES:  I believe so, Your Honor.

10             THE COURT:  All right.  Dr. Jewell.

11             MR. ZONIES:  Your Honor, may I approach

12   with --

13             THE COURT:  Oh, yes, thank you, Mr.

14   Zonies.  Dr. Jewell, please resume the stand.  Thank

15   you.  Good morning.

16             THE WITNESS:  Good morning.

17             THE COURT:  All right.  You remain

18   under oath, Dr. Jewell.  Please be seated.  Ms. Yates,

19   cross-examination, please.

20             MS. YATES:  Thank you, Your Honor.

21                  CROSS-EXAMINATION

22   BY MS. YATES:

23        Q.   Good morning, Dr. Jewell.  Nice to meet you.

24        A.   Good morning.

25        Q.   Doctor, I wanted to start by talking a

1    little bit about overlapping populations.  And I'd

2    like to start our conversation to see if you agree

3    that if one study is a subset of another study,

4    there's really only one study to consider, correct?

5         A.   Well, it depends on the context of the

6    question.  If, as we were discussing yesterday, one

7    study is subsumed in another because a second study

8    follows a new set of women for a new set of years,

9    then there's no -- the information in the first study

10   is entirely contained in the second.  But on the other

11   hand, as I discussed yesterday, there's still interest

12   in seeing if the information from an earlier period of

13   time is confirmed by independent information in the

14   same population at a different point or different

15   interval in time.

16        Q.   Let me be a little more specific, Doctor.

17   I'm specifically referring to the two Swedish studies,

18   Callen and Reis Callen (ph), 2010 -- 2007 and 2010,

19   Doctor, and you have previously testified that Callen

20   2007 is a subset of Reis Callen 2010 and there's

21   really only one study to consider, correct?

22        A.   Yes, in that case, in the Swedish case, one

23   is completely subsumed in the other.

24        Q.   Okay.

25        A.   As I just described here.

1                    MS. YATES:  And, Your Honor, may I move

2        around again.

3                    THE COURT:  Yes.

4                    MS. YATES:  Thank you.

5        BY MS. YATES:

6            Q.   And I think, Doctor, sorry, this is what

7        we're referring to, right, that Callen is a complete

8        subset of Reis-Callen, and those are the two studies

9        we're specifically referring to, correct?

10           A.   I pronounce it Collin, but --

11           Q.   And I think Collin pronounces it even more

12       complicated, okay.

13                Okay.  Let's move from Sweden, Doctor, to

14       Denmark and I think we have your graphics up, by the

15       way if I -- is it better if I pull this a little

16       further forward?

17           A.   Sure.

18           Q.   I think this is your graphic on the three

19       Danish studies, Doctor, Cornum, Pedersen and Jimenez-

20       Solem; is that correct?

21           A.   That is correct.

22           Q.   All right.  And you testified a little bit

23       yesterday about these studies, and you do agree, sir,

24       that certainly there are some overlap in these

25       populations, correct?

1      A.   Absolutely.

2      Q.   Now, yesterday you said that Cornum was the

3  first step, and that -- and that's four counties,

4  right?

5      A.   Well, I actually misspoke I think yesterday.

6  I think Pedersen's paper predates the Cornum paper.

7      Q.   Correct, you did misspeak yesterday.

8      A.   The order is Pedersen followed by Cornum,

9  followed by Jimenez-Solem.

10      Q.   Right.  So when yesterday you said Cornum

11  was the first step, but Pedersen tried to replicate.

12      A.   The other way around.

13      Q.   You were wrong.

14      A.   It was the other way around, yes.

15      Q.   Well, so Pedersen was the entire country and

16  then Cornum was just four counties.

17      A.   That is correct.

18      Q.   Okay.  Now, let's take a little look.

19  Cornum covers 1991 through 2007, correct?

20      A.   That looks roughly right from the graphic,

21  yes.

22      Q.   Yeah, it's a little late on dates, isn't it,

23  Doctor, it's a little closer to 1990.  If we divide

24  that area in five, it's probably closer to here,

25  right, if we divide it in five?  '91, '92, '93, '94,

1    fair?  So we go a little too long on your chart,

2    right?

3         A.   I can't remember, if I went back to the

4    original paper if it was 1991 or 1990.  That looks

5    like 1990 there from the graphics.

6         Q.   Well, should we -- would you like to check

7    Cornum, do you have your binder of studies?

8         A.   I do, yeah, I'd be happy to.

9         Q.   Let's check Cornum.

10              MS. YATES:  And, Your Honor, I have

11   another binder of studies that I don't know if it's

12   identical to Dr. Jewell's, so if I may provide the

13   Court one and the witness, just so we're on the same

14   page.

15              THE COURT:  You certainly may.

16              MS. YATES:  Just in case there's one

17   not in the binder.  Thank you.

18              THE WITNESS:  Okay.

19   BY MS. YATES:

20         Q.   Can you confirm that Cornum is actually

21   1991?

22         A.   Yes, 1991 I think to 2007.

23         Q.   Right.

24         A.   So that green line, I'm happy to move it

25   over a little bit, if you would like.

1    Q.   A little too far over, right?  It doesn't

2    cover 1990.

3    A.   It doesn't, apparently not.

4    Q.   Okay.  Pedersen is 1996 to 2003.

5    A.   I'd have to check but that's approximately

6    what I remember.

7    Q.   Okay.  And Jimenez-Solem 1997 to 2009,

8    correct?

9    A.   I'd have to check, but that sounds

10   reasonable according to my memory.

11   Q.   Doctor, if you want to check.

12   A.   It's up to you.  I don't mind checking if

13   you like, but I'd had to take your word for it.

14   Q.   Okay.  All right.  So you will agree, sir,

15   that for the years 1996 to 2003, Cornum is a subset of

16   Pedersen, right?

17   A.   Correct.  And the Cornum covered just a

18   geographic region of Denmark and Pedersen had the

19   whole national registry at that point.

20   Q.   Right.  So we've got a subset in that

21   section, right?

22   A.   Correct.

23   Q.   And so there's no new data under the Reis,

24   Callen-Reis analogy, that's overlap, correct?

25   A.   Sorry, I didn't --

1          Q.   For those years?

2          A.   I don't understand your question.

3          Q.   These two studies, Cornum is a subset of

4    Pedersen for these years.

5          A.   For those specific years, yes, but Cornum

6    has these additional years as you've pointed out.

7          Q.   I understand.  If we move to Pedersen,

8    Pedersen is a complete subset of Jimenez-Solem, except

9    one year, '96 to '97, correct?

10         A.   That is correct.

11         Q.   Okay.  So let's take a look at the Cornum

12   '91 to '96 non-overlapping date, okay, Doctor?

13         A.   Not overlapping with Pedersen or with

14   Jimenez-Solem or?

15         Q.   It doesn't look like it overlaps anything,

16   right?

17         A.   I'm not sure.  I'm sorry, I just don't

18   understand.  You want to look at one piece of the

19   Cornum data that's not in either Pedersen and Jimenez-

20   Solem; is that correct?

21         Q.   Right.

22         A.   Okay.

23         Q.   This right here, this green part --

24         A.   Okay.

25         Q.   -- that we --

1          A.    Okay.

2          Q.    Sure.  Okay.  Now, Cornum looked at four

3     counties in Denmark, correct?

4          A.    Yes, that's my memory.

5          Q.    Sir, did they look at all four counties for

6     all years of their study?

7          A.    I'd have to go back and look at the paper to

8     have that level of detail.  I remember it was not the

9     entire country.

10         Q.    All right.  Well, let's go to Cornum page

11    30, sir, and see what counties they studied for the

12    years '91 to '96.

13         A.    Yes, they studied some different counties

14    depending on the year.  They covered North Jutland

15    County from 1991 to 2007.  They covered Aarhus from

16    1996 to 2007, and then they covered Ringkjobing and

17    Viborg Counties from 1998 to 2007.  So there's overlap

18    in the years there, but not all those counties were

19    covered for the entire 1991 to 2007 period.

20         Q.    All right.  Let me take you back, Doctor, to

21    the little area we were talking about, '91 to '96,

22    sir.  The only county they studied in that time frame

23    is North Jutland, correct?

24         A.    If -- yes, in that -- if, in that particular

25    left-hand part of the green there, that is -- sorry, I

1    lost your train of thought there.  Are you saying

2    North Jutland County was the only county in 1991 to

3    1996?

4         Q.   Yes.

5         A.   Yes.  Then I agree.

6         Q.   Okay.  And they added the other counties

7    that finally made up the four after 1996, correct?

8         A.   That is correct.  And the non-overlap with

9    Pedersen to the right involved more counties than the

10   overlap --

11        Q.   Okay.

12        A.   -- non-overlap to the left.

13        Q.   So this number on the left, by the way,

14   represents the total number of women in the entire

15   study, right?

16        A.   That is correct.

17        Q.   And we know that number is not right for

18   this one county for five years, correct?

19        A.   No, of course not.

20        Q.   Okay.  This is the whole bar, so --

21        A.   Correct.

22        Q.   -- you know, it's one county, it's a small

23   percentage of that, right?

24        A.   Correct.

25        Q.   Okay.  And we know that in the entire Cornum

1    study, there were 352 patients who took Zoloft,

2    correct?

3         A.   In the entire study?

4         Q.   Yes.

5         A.   Again, I don't have those numbers in my

6    memory, but I can take your word for it.

7         Q.   Well, we can go to -- or we can go to page

8    33, table 2, Doctor.

9         A.   Fine.

10        Q.   352 patients using Zoloft --

11        A.   Sorry, could you go a little slower when

12   you're checking?

13        Q.   Absolutely.

14        A.   Thank you.  Or put it up on the screen,

15   that's even better.

16        Q.   Sure.

17        A.   Except --

18        Q.   Table --

19        A.   -- it needs to be focused.

20        Q.   -- 2, page 33.

21        A.   Can you focus it?

22             THE COURT:  It's too small.

23             MS. YATES:  Yeah, he's searching for

24   the pull out I think.

25             THE WITNESS:  There we go.

1                    THE COURT:  Is that better?

2                    THE WITNESS:  That's better, much

3     better, thank you.

4     BY MS. YATES:

5          Q.   Okay.  Right, Doctor, the study, length of

6     study 352 sertraline which is Zoloft users, right?

7          A.   Correct.

8          Q.   And that's four counties over 17 years that

9     got that total.

10         A.   Correct.

11         Q.   Sir, do you know the birth rate in North

12    Jutland for the years 1991 to 1996?

13         A.   I certainly don't know that from my memory,

14    no.

15         Q.   Do you know the population of North Jutland

16    1991 to 1996?

17         A.   Not precisely, no, not off the top of my

18    head.

19         Q.   All right.  I assume it would be important

20    for you to know when Zoloft was approved for use in

21    Denmark, sir.  That way you can figure out if women in

22    Cornum actually got Zoloft, right?

23         A.   Well, I -- the table you just put up

24    described the number of individuals in the Cornum

25    study who took Zoloft.

1        Q.    Slightly different question, Doctor.

2        A.    Uh-huh.

3        Q.    I assume it would be important for you to

4    know what year Zoloft was approved for use in Denmark,

5    so that you can actually figure out the timeframe that

6    women could have been exposed to it, true?

7        A.    No.  I was just referring back to the

8    original author's Cornum and their description over

9    those time periods over the number of pregnancies, for

10   which they had out -- birth defect outcomes and their

11   subcategories of how many of those women were exposed

12   to Zoloft.

13       Q.    Right, Doctor, but I'm talking about non-

14   overlapping data right now, so let's stay focused.  '9

15   to '96, we already know it's one county not four,

16   right?

17       A.    Yes.  But if you're going to talk about non-

18   overlapping data, you have to put in the right-hand

19   side where you're comparing Cornum and Pedersen.

20       Q.    Sir, I promise you I'm going to cover this

21   entire chart, stick with me.

22       A.    Okay.

23       Q.    I have to break it down into sections, okay.

24       A.    Okay.  I'm just going to point out that when

25   it takes us off track.

1        Q.    '91 to '96 were one county.

2        A.    Correct.

3        Q.    Right.  Now, wouldn't it be important for

4    you to know what year Zoloft was approved in Denmark

5    to find out when women could've been first exposed to

6    Zoloft?

7        A.    Not with regard to the overlap, no.

8        Q.    Okay.  Let's take out the overlap then.

9    Wouldn't you like to know when Zoloft was approved, so

10   that you can determine whether the women exposed in a

11   certain timeframe could've taken Zoloft?

12       A.    I took the data as reported by the authors

13   of the study that when they said a woman took Zoloft,

14   I had to take that at face value.  I could not

15   undercut their reporting of the data.

16       Q.    All right.  Let's try a different approach.

17   You're familiar with a document called the PSUR?

18       A.    Periodic Safety Update Report, yes.

19       Q.    Right.  You refer to it in the appendix of

20   your report?

21       A.    Yes, I probably do.

22       Q.    Okay.  Well, let's go to page 523 of that

23   document that you refer to in the appendix of your

24   report, and let's just look when Zoloft was approved –

25   – sorry, and when Zoloft was approved in Denmark.

1    Approval 2nd of July 1993, correct?

2        A.   You need to focus it just a little better

3    for my eyes.

4        Q.   Not even the pull-out?

5        A.   Not even the pull-out, it's blurry.  Maybe

6    it's just me.

7        Q.   I think you said you wanted it to be blurry

8    yesterday.  Was that your --

9        A.   When I'm reading words, I actually don't

10   like them blurry.  Okay.  So that's the date of

11   approval you're telling me there, so --

12       Q.   Right.

13       A.   -- date of approval of Zoloft in --

14       Q.   Denmark.

15       A.   Okay.

16       Q.   Okay.  So if that's the date of approval,

17   Doctor, women before that date could not have been

18   exposed to Zoloft, correct?

19       A.   I assume that is correct, yes.

20       Q.   All right.  Now, you're familiar with after

21   approval, there's also usually a launch date when the

22   medicine goes on the market, correct?

23       A.   Correct.

24       Q.   Okay.  Do you know the launch date in

25   Denmark for Zoloft?

1        A.    No.

2        Q.    Okay.  Let's look.  Launch date in Denmark

3    January 17, 1994.  Do you see that?

4        A.    I do.

5        Q.    Okay.  So in the Cornum population, the non-

6    overlapping one county, we know that prior to January

7    1994, none of those women could have been exposed to

8    Zoloft, right?

9        A.    That is the assumption, yes.

10       Q.    Okay.  So no -- okay.  And then we do know

11   that for one county, for that one year, some of the

12   352 from the entire study could have received Zoloft,

13   right?

14       A.    That is the assumption, yes.

15       Q.    Okay.  Let's move to the Pedersen data, and

16   this '96 to '97, there's no overlap, right?

17       A.    I'm sorry, I'm lost with you now.  You said

18   there's no overlap between '96 and '97?

19       Q.    In the Pedersen data --

20       A.    Oh, with Jimenez-Solem, we've switched now,

21   is that --

22       Q.    '96 to '97, no overlap with Jimenez-Solem,

23   right?

24       A.    Okay.  So you just have to be precise,

25   because we were talking about Cornum and Pedersen up

1    to now, and now we've flipped to Pedersen to Jimenez-

2    Solem.

3         Q.   All right.  Stick with me, Doctor.

4         A.   Okay.

5         Q.   The reason I'm referring here to Pedersen

6    and Jimenez is they use the entire country's registry,

7    right?

8         A.   Correct.

9         Q.   So there is some overlap Cornum and

10   Pedersen, but only four counties, let's set that to

11   one side, okay?

12        A.   Okay.

13        Q.   We know that these two, Jimenez-

14   Solem/Pedersen looking at the same registry, no

15   overlap, one year.  With me?

16        A.   No overlap on the left for one year, and no

17   overlap on the right for several other years.

18        Q.   Got it.  Let's stick on the left for now,

19   Doctor, okay?

20        A.   Uh-huh.

21        Q.   All right.  And in Pedersen, for the study

22   years '96 to 2003, so the entire study there were 527

23   women who filled two or more prescriptions.  Do you

24   remember that?

25        A.   I don't remember off the top of my head, the

1    actual raw numbers from the papers.

2         Q.   Would you like to confirm?

3         A.   It's -- I'm completely within your hands,

4    whatever you would prefer.

5         Q.   Okay.  Well, if ever you want to check

6    anything, you just let me know because that's table 3,

7    page 2, okay?

8         A.   Of Pedersen?

9         Q.   Of Pedersen.

10        A.   Okay.

11        Q.   Okay.  All right.  And then it's a lower

12   number for one prescription, 259, but two or more 527,

13   one prescription 259, right?

14        A.   Okay.

15        Q.   Okay.  And that total number of exposed

16   women is for eight years, correct?

17        A.   I believe so, yes.

18        Q.   All right.  Now, from '97 all the way up to

19   2009, certainly those years with Pedersen and those

20   years with Cornum are subsets of Jimenez-Solem,

21   correct?

22        A.   That is the understanding, yes.

23        Q.   Now, another study came out, also looking at

24   Denmark, it looked at beyond Denmark, Finland, Iceland

25   and Norway and Sweden, right, and that's Furu.

1        A.    That is correct.

2        Q.    And that came out in 2015?

3        A.    Yes.

4        Q.    Studied about 2.3 million women.

5        A.    Correct.

6        Q.    And the years that Furu studied are 1996 to

7    2010, correct?

8        A.    That is my memory, but again I'm relying on

9    memory now.

10       Q.    Okay.  So Furu starts '96 and if we go up to

11   -- if we use your scale for Furu, the total number of

12   women in that study goes way off your chart, right,

13   2.3 million?

14       A.    It's much -- well, it's -- yeah, it's about

15   50 percent higher.

16       Q.    Fifty percent, this is a hundred and --

17   well, 1.4 million, right?

18       A.    And 2.3 is a little more than 50 percent

19   higher, yeah.

20       Q.    We've got to get a little bit up there,

21   right?

22       A.    Yeah.

23       Q.    2.3.  And we know it goes to what, 2010.  I

24   did not go to art school.  So that's Furu, right?

25       A.    Except it's not just Denmark as you pointed

1    out, it's --

2         Q.   It's bigger.

3         A.   It's not only bigger as you've indicated,

4    it's different countries.

5         Q.   Okay.  And they look to the Danish registry

6    as well as others, so Jimenez-Solem and Pedersen are

7    complete subsets of Furu on the Danish data, correct?

8         A.   Correct.

9         Q.   Okay.  And then Cornum, what do we have,

10   also a complete subset with the exception of this --

11        A.   Correct.

12        Q.   -- two years that people could have got

13   Zoloft in --

14        A.   Correct.

15        Q.   -- one county.

16             Now, in your report, Doctor, you say --

17   strike that.

18             Let's stick with Furu for a minute.  Furu,

19   this big 2.3 million women, found no statistically

20   significant association between Zoloft for several

21   cardiac findings, correct?

22        A.   That is my memory.  Again, I can't read off

23   the numbers from the top of my head.

24        Q.   All right.  Well, let's go through them.  I

25   think it's page 7.  Or page 5, Figure 2, sorry.  Okay.

1          MS. YATES:  Yeah, you're definitely

2     going to have to enlarge that.

3          Q.   So Furu found no statistically significant

4     association between Zoloft and any cardiac defect,

5     correct?

6          A.   Again, it's too blurry for me to read.

7          Q.   Yeah, we --

8          A.   Can you point me to the --

9          Q.   We're going to pull it out, Doctor.

10         A.   Okay.

11         Q.   Also, you have a hard copy in front of you

12    if that's --

13         A.   That's what I was trying to go to, but it's

14    a little hard to listen and look things up at the same

15    time.  Where is it in the binder you just gave me?

16         Q.   It should be in alphabetical order under F

17    for Furu.

18              THE COURT:  And you said page 5?

19              MS. YATES:  Page 5, Your Honor, table -

20    - at Figure 2.

21              THE WITNESS:  Okay.  Now, I've got the

22    hard copy in front of me.  It's much easier for me to

23    --

24    BY MS. YATES:

25         Q.   All right.  No statistically significant

1    finding for any cardiac defect, correct?

2         A.   You're talking about for sertraline?

3         Q.   Yes.

4         A.   Yes.  It's -- yes, the odds ratio, just to

5    make sure we're looking at the same thing, I'm reading

6    an odds ratio of 1.28.  You want the adjusted odds

7    ratio, I assume.

8         Q.   Oh, I think we want the adjusted, don't we,

9    Doctor?

10        A.   Yeah, well, I just want -- I just need to

11   know exactly where you're talking about, because there

12   are a lot of numbers on this table.

13             So you're talking about the 1.13, 13 percent

14   increase in risk associated with Zoloft with a

15   confidence symbol going from .93 to 1.38.  Are we

16   talking about the same number?

17        Q.   Yes.  That would be not statistically

18   significant, Doctor, right?

19        A.   At the 5 percent level, that is correct.

20        Q.   Okay.  An atrial -- Furu found non-

21   statistically significant finding, atrial and

22   ventricular septal defects, correct?

23        A.   For atrial and ventricular septal for

24   sertraline, yeah, the odds ratio was a 5 percent

25   increase in risk, but with a confidence integral going

1     from .82 to 1.35, yeah, that's on the screen.

2          Q.   1.05, right?

3          A.   1.35.

4          Q.   1. -- no, I meant the odds ratio.

5          A.   Oh, the odds ratio is 1.05, yes, correct.

6          Q.   Okay.  Dr. Furu found no statistically

7     significant association between conotruncal and major

8     arch anomalies, correct?  Odds ratio 1.02, confidence

9     intervals .48 to 2.15.

10         A.   Correct.

11         Q.   Furu found no statistically significant

12    finding for an atrial ventricular septal defects,

13    correct?

14         A.   Yes, there we have a much bigger odds ratio,

15    but much wider confidential interval, correct.  That's

16    what's correct is what's on the screen.

17         Q.   And same question, non-statistically

18    significant finding for right ventricular outflow

19    tract obstructions, correct?

20         A.   Yes.  Again, 40 percent increase in risk,

21    but the confidence interval as described there.

22         Q.   And Furu found a non-statistically

23    significant finding for left ventricular outflow tract

24    obstructions, correct?  Oh, did I just do that one, I

25    apologize.  Did I do right and left?

1          A.    No, you did right and left.

2          Q.    Okay.  Sorry.

3          A.    That's okay.

4          Q.    So, Doctor, while we're talking --

5                MS. YATES:  You can take that down.

6          Q.    While we're talking results and conclusions,

7     let's turn to Jimenez-Solem for a minute.  Jimenez-

8     Solem concluded that the significant odds ratio that

9     they reported were not the results of ingestion of

10    Zoloft, correct?

11         A.    Yes.  They believed it was due to a sort of

12    unknown confinder associated with filling

13    prescriptions, which I think is a little -- we could

14    talk about that in detail, we didn't --

15         Q.    You disagree with that peer review published

16    opinion.

17         A.    I disagree with that interpretation of the

18    results, yes, as I described yesterday.  I think they

19    made the comparison both indirectly instead of

20    directly comparing the pause to the non-pause, which I

21    think gets more directly at the confounding by

22    indication phenomenon.

23         Q.    You disagree with the authors?

24         A.    I disagree with the authors on that

25    interpretation, yes.

1         Q.   Right.  Doctor, let's move to Louik.  A lot

2    was talked about Louik, corrections.  Mr. Zonies, I

3    thought I interpreted as saying, let's just take it

4    out.  I say let's leave it in, what do you think?

5         A.   I don't understand what you mean by either

6    what he meant by take it out or leave it in.

7         Q.   I think he said there's so many mistakes in

8    it, just to push it to one side.

9         A.   No, I don't -- I didn't get that from what

10   he said.  I certainly don't believe it should be

11   entirely ignored just because of that transcription

12   error.

13        Q.   Okay.  So then let's look.  You did a --

14   well, we saw a few forest plots yesterday, now the

15   Court has the benefit of -- and you were kind enough

16   to provide us one, but a large sheet with all those

17   old cardiac findings.  That was the forest plot that

18   you went to yesterday; is that right?

19        A.   Yeah, I would call it a visualization rather

20   than a forest plot, but I don't mind if you -- I

21   understand.

22        Q.   Visualization.

23        A.   Yeah.

24        Q.   Now, I may have misheard yesterday.  I

25   thought you said that you were not using it for

1    consistency, but isn't that only what you're using it

2    for?

3         A.   I -- if I said that, that's not what I

4    intended.  I wanted it to -- I think what I said

5    yesterday was I wanted a way to put all of the results

6    on a single sheet of paper for ease of reference, and

7    to see the overall span of findings, whether it's for

8    every finding or just the -- all cardiac findings or

9    some of the subcategory findings.

10        Q.   All right.  And so I'm clear, you're not

11   using it to support your causation opinion.

12        A.   I'm not using the plot itself, no, I'm using

13   all that data that's on the plot obviously that's

14   going into the opinion.

15        Q.   All right.  Now, when you did your first

16   expert report, you had a different forest plot; is

17   that right?

18        A.   I think I had an expert report for a state

19   case, the very first one I wrote that I had a

20   different visualization, that is correct.

21        Q.   Right.

22        A.   I just didn't have it on the log scale, and

23   then I -- we discussed that at deposition, and I

24   agreed that it was better to change it to the log

25   scale.

1          Q.   So let's look at that first forest plot.  It

2    was from the Robinson case, which was the case that

3    was tried in the PCCP.

4          A.   I don't remember which case it was actually,

5    I just know it was a state case.

6          Q.   You testified in that case, right?

7          A.   I did, but I've been deposed I think two or

8    three times.  I lose track of the cases, it makes no

9    difference to me.

10         Q.   No, but I mean, you were sitting in a

11   witness chair in front of a jury in that case.  Do you

12   remember that?

13         A.   You know, I can't even remember the name of

14   the plaintiff, individual plaintiff.

15         Q.   Okay, fine.  All right.  So this is your

16   first forest plot that was in your state court case

17   report.  Does that look familiar?

18         A.   Yes.  I still can't see it because it's

19   blurry.  It's more blurry than it was yesterday, I

20   don't know why, but I take your word for it.  It looks

21   familiar.

22         Q.   It looks familiar.  And as you said, that

23   was on a linear scale, right?

24         A.   That was on a linear scale, the

25   visualization, yes.

1        Q.   And, Doctor, it was pointed out to you that

2    a linear scale can distort things even further to the

3    right, right?

4        A.   Well, the point was made when we discussed

5    this at deposition that the area of protection, that's

6    the area on the X axis from 0 to 1 is compressed,

7    because of the asymmetry.  And so I agreed with that

8    and was perfectly happy, in fact, a Pfizer lawyer

9    produced the equivalent to this on the log scale, and

10   I was perfectly happy to discuss that one.  And now I

11   have got around that, put all of these on the log

12   scale.

13       Q.   Right.  Because the linear scale distorts

14   it, doesn't it?

15       A.   Well, it makes it harder for the eye,

16   because if you're going to try and use this in the way

17   I was describing yesterday, with the eye, it's

18   asymmetric between 0 and 1 and 1 to 10, and in this

19   case 1 to 7.

20       Q.   All right.  And then actually, you removed

21   the forest plot altogether from your MDL report,

22   right?

23       A.   I think I probably took it out, yes, but I

24   used it as an exhibit I believe in the trial on the

25   log scale.

1    Q.   Right, okay.  Now, let me talk about Louik

2    and the correction.  Doctor, the correction in Louik

3    had a statistically significant finding of 1.2

4    corrected to a non-statistically finding, non-

5    statistically significant finding of 1.0, correct?

6    A.   No, that's not correct.

7    Q.   That's not correct?

8    A.   No.

9    Q.   Confidence interval.

10    A.   I know the words, do you want to restate

11    your question?

12    Q.   Sure.  It's going to be a long day, Doctor,

13    because I am not a mathematician.

14         The confidence, the change and correction

15    that was made in Louik, I apologize, the lower

16    confidence interval went from a 1.2 to a 1.0.

17    A.   Yes, the odds ratio stayed the same, and it

18    was the lower bound of the confidence, and the upper

19    bound stayed the same, but the lower bound was changed

20    from 1.2 to 1.0.

21    Q.   Right.  And the New England Journal of

22    Medicine when they were corresponding with the authors

23    wanted them to remove all reference to significance,

24    because that finding was no longer statistically

25    significant.

1          A.    There certainly was discussion about

2     changing the emphasis on that.  I don't want to say

3     that was their exact words, but I don't think they

4     wanted to remove all mention of it, but I think they

5     felt bound by the fact that it now -- the confidence

6     interval contained one to change the emphasis away

7     from stating it as a statistically significant result,

8     that is correct.

9          Q.    It's more than changing an emphasis, sir.

10    It's removing a word that says statistically

11    significant, because it's no longer statistically

12    significant.  That's the standard the Journal uses,

13    correct?

14         A.    Well, we certainly could look at the e-mails

15    and look at their exact language back to Dr. Louik, I

16    don't remember it word-for-word.  But they were caught

17    by the fact that their description of how you should

18    emphasize results in papers is influenced by whether

19    the result is statistically significant formulated --

20    formula.  And that's what -- they didn't want just to

21    publish the change in the number.  They also wanted to

22    change a little bit of the emphasis of how it was

23    spoken about in the paper.

24         Q.    Right.

25         A.    And we should probably, if we're really

1    going to discuss that into detail, we should probably

2    put the e-mail up from the New England Journal,

3    because that gives explicitly what they were and

4    explicitly the reaction of the authors to that, which

5    they thought that was crazy, but they still -- the

6    editor thought it was crazy, but they still had to do

7    it.

8        Q.   Right.  Because that is --

9        A.   You shouldn't take my word for it, just put

10   the e-mails up.

11       Q.   Actually, sir, why don't we go straight to

12   the correction published by the New England Journal of

13   Medicine.  I will -- there was debate in the e-mails

14   about .98 or 1.02 and rounding to 1, right?  And that

15   revealed that actually the 1 has been rounded up from

16   .98, correct?

17       A.   Yes.  Well, that would be standard in that

18   case.

19       Q.   Right, that's standard.  As is the New

20   England Journal of Medicine saying remove the word

21   significance when it's no longer statistically

22   significant, correct?

23       A.   I think that is the standard of the New

24   England Journal, yes.

25       Q.   And that's what the correction -- set aside

1    the e-mails, we saw them, the correction removes the

2    word significance because it was no longer

3    statistically significant, correct?

4         A.    In the judgment of the Journal that is

5    correct, yes.

6         Q.    Not in the judgment of the Journal, sir,

7    using the standard they use.

8         A.    If you read the e-mails from every

9    statistician involved in that debate, including the

10   authors of the papers, they believe that distinction

11   to be meaningless.  The Journal has a formal standard

12   and I -- that's what they use, for better, for worse,

13   that's what they use.

14          Everyone else in that debate agreed that it

15   was a meaningless distinction.  I don't have any

16   debate.  The results is not statistically significant.

17   My opinion does not hang on it being statistically

18   significant.

19          The confidence interval goes from 1.0 to 3.

20   something, 3.8 or whatever it was, the upper band.

21   The entire set of values of the odds ratio that are

22   compatible with the data, in an interpretation of the

23   confidence also has the risk is raised.

24          Statisticians do not hinge opinions,

25   therefore, in a case where there are multiple pieces

1    of data on that single statistical significance.  I

2    thought we discussed that effectively yesterday.

3        Q.   Do you remember my question?

4        A.   Well, you can certainly ask it again, that's

5    fine.

6        Q.   I'm just asking if you remember it, Doctor.

7        A.   You asked me about whether the Journal said

8    it was statistically significant or not, and I said,

9    no, they said it wasn't statistically significant

10   anymore.

11       Q.   And I think you also said that it really

12   doesn't make much difference, if any, to your opinion

13   because you don't rely on statistical significance.

14       A.   No, that's not what I said.  Let me say what

15   I did say, which is in a single study, the issue of

16   statistical significance plays a much greater role

17   because it's the only information we have at that

18   point.  And the role of chance has to be addressed.

19            When you're looking at the Louik paper now

20   in the big picture in that entire list of studies,

21   that's not the sole source of statistical

22   significance, nor the sole source of information about

23   that particular subcategory.  And it's important to

24   remember here, we've moved to talking not about all

25   cardiac, but to a subcategory where results are more

1    variable.

2            So in that bigger context, the change of a

3    confidence interval lower bound from 1.2 to 1 is

4    important to correct.  It did change my viewing of the

5    data, it had to because it changed, but it did not in

6    the end affect my overall opinions.

7        Q.   Okay.  I think you said yesterday it had a

8    very slight impact on your opinion.

9        A.   Yes, because as I pointed out yesterday if

10   you look at all of the data on one piece of paper, and

11   then you change -- before the change and after the

12   change, it's almost undetectable to the human eye the

13   impact that change makes.

14       Q.   And the subcategory that changed was all

15   septal, right?

16       A.   That is correct.

17       Q.   And as you've told us several times, your

18   focus was all cardiac.

19       A.   That is correct.

20       Q.   Now, I just want to address something else.

21   There was another correction that the authors are

22   either submitting or proposing to submit, but that has

23   nothing to do with the results, the risk estimates or

24   the confidence intervals, correct?

25       A.   No, that is incorrect.

1          Q.   Okay.  Let's put up the e-mail then to Mr.

2    Zonies of August 31.

3               MS. YATES:  Do we have that?

4          (Pause)

5               MS. YATES:  No, that's not it, so I can

6    find it in the slides?  Sorry.

7          (Pause)

8               MS. YATES:  It's the one that says New

9    England Journal of Medicine correction again.  Okay.

10         Q.   This is the e-mail.  Doctor, can you read

11   that?  Is that clear enough for you?

12         A.   Yes, I can read that one fine, thank you.

13         Q.   All right.  So this is the -- this is from

14   Mr. Zonies' slide, this is the most recent correction.

15   And the authors in this e-mail state clearly, "We wish

16   to state clearly, the risk estimates in confidence

17   intervals in the LGA which we provided on July 27,

18   2015 in response to subpoena are correct."  Did I read

19   that correctly?

20         A.   You read that correctly, yes.

21         Q.   All right.  So -- and what they're

22   correcting is something about some of the descriptions

23   that talked about the variables, correct?

24         A.   They're describing which variables were used

25   in the adjustments for confounding that produced the

1    confidence in all they reported in the New England

2    Journal.

3        Q.   Right.  So that's a descriptive error, but

4    they're standing by their results, even though all

5    those variables were not specified in the article,

6    correct?

7        A.   They're standing by the results they

8    provided for -- from a re-analysis of the data in

9    July, which we readjusted the data for a slightly

10   different set of confounders than from the set they

11   described in the original journal article.  That was

12   the error I detected when I saw the logistic

13   regression.

14            This is slightly different.  Now, it's not a

15   big deal to me.  We pointed out because we wanted to

16   get the right results with all this fuss about the

17   confidence interval.

18            Had they adjusted for exactly the variables

19   they said they did in the article, the confidence

20   interval would change.  That's why I'm saying, okay,

21   now they've said, ah, well, actually what we did in

22   July of this year was what we are saying we actually

23   did five years ago, and now we want to go back and

24   change the article from five years ago, and said

25   actually we didn't quite adjust for those variables

Page 38

1   the way we described them five years ago.  We want to

2   change that.  That's what that e-mail describes.

3             It doesn't matter to me.  What it does point

4   out is that if one changed back to the variables that

5   they said they adjusted for, that confidence bound,

6   lower bound could easily be above 1 now.  So it's a

7   moving target, it's not a very important moving target

8   for the reasons we've discussed at length.

9             But this whole fixation about 1 is

10  illustrated again by the fact that if you, in fact,

11  use slightly different sets of variables that lower

12  confidence bound is going to change, not much, but it

13  could go from 1.0 to .99.

14       Q.   Doctor, that is rank speculation on your

15  part.

16       A.   No, it's not speculation.  It could easily

17  go from 1 to 1.01, I agree, we don't know, and if you

18  take out -- in and out variables, those lower bounds

19  will change.  That is not speculation, that is

20  absolute hard statistical fact, it will not stay the

21  same --

22       Q.   Well --

23       A.   -- if you change the variables.

24       Q.   Let's see if we can breakdown this e-mail

25  because what they're saying is in the process of

1    reviewing the original regression analysis, which we

2    retrieved in response to the subpoena dated July 15th,

3    2015, and which was provided on July 27th, we

4    discovered some inconsistencies between what was

5    included in that analysis and what appeared in the New

6    England Journal of Medicine report, right?

7         A.    That's what they said.  Yes, actually I

8    discovered the inconsistency and pointed it out, but

9    this is what they are sending back to the Journal now.

10        Q.    I got it.  They're saying, here's our data

11   based on variables, here's our results based on those

12   variables, but the variables that are actually stated

13   in the New England Journal of Medicine there's a few

14   missing.

15        A.    Yes, that is correct, and the way they

16   described one other set of variables was not correct

17   in the paper, that's described later on about the

18   variable where they described the history of a birth

19   defect in a first degree relative that was wrong,

20   taking their word for it.  That should've read history

21   of a cardiac defect in a first degree relative, so

22   that's a little different.  I assume they mean cardiac

23   birth defect.

24              And the way they described the adjustment

25   for the year of lost menstrual period was sloppy in

1    the New England Journal, and they regretted that they

2    didn't get that more accurately described, you know,

3    but basically, they didn't get the description of the

4    variables in the article to correspond to the

5    description of the variables in the analysis they

6    provided to the Court.

7          Q.   Right.  But the -- so they're going to now

8    make sure the description does match.  We don't even

9    know if the New England Journal of Medicine is going

10   to correct it, do we?

11         A.   I have no idea, no.  This is fairly recent,

12   so I don't know.  And by the way, this is completely

13   insufficient, because in principle, does that mean

14   that all the numbers in that table, forget sertraline

15   and septal, all the other SSRIs, do they also need to

16   have those adjustment variables changed.  Were all the

17   analysis done with this new set of variables that they

18   produced in July or not, I don't know.

19         Q.   Doctor --

20         A.   Only they know.

21         Q.   -- I'm not sure if we're just not connecting

22   or you're misinterpreting, but they get -- they do the

23   data analysis based on a set of variables, right?  And

24   they have those results, and they stand by those

25   results.

1        A.    This is the analysis done in July, yes.

2        Q.    Correct?

3        A.    Correct.

4        Q.    Now, they go to their paper and it doesn't –

5   – some of the variables are missing in the

6   description.

7        A.    Correct and misstated also.

8        Q.    And so they stand by their risk estimates

9   and confidence intervals.

10       A.    They –– what they say ––

11       Q.    They say that.

12       A.    What they say here is in the confidence

13   intervals provided in July are the variables they wish

14   to now adjust for, and they don't correspond with the

15   variables, they said they adjusted for back then.  I

16   think what –– to the best spin on it, they're saying

17   that's what we meant to say five years ago in the

18   paper.  These were the variables we intended to adjust

19   for, we got it wrong in our description of the table,

20   we made a transcription error.  We also got the

21   description of the confounding variables incorrect,

22   and now we have to change that.  That's the most

23   positive spin I can put on it.

24             And I assume that in fact, that change in

25   the list of confounding variables applies to every

Page 42

1      number in that table, because there are a lot more

2      numbers in that table than simply the Zoloft or the

3      septal heart defect number.

4          Q.   If they did their analysis on variables A

5      through J, but H, A, B, and D are not reported, and

6      now they're just going to clean up the reporting and

7      make sure they're all in there.  That does not affect

8      the results they found, sir.  It is correcting the

9      description of what they looked at.

10         A.   That is the most positive spin, but it makes

11     the point that had they produced an analysis in July,

12     that corresponded to what they claimed they were

13     adjusting for in -- five years ago in the New England

14     Journal, that lower confidence bound will change a

15     little, not importantly.

16              But that's why in a sense, this is all a

17     tempest in a tea cup.  Because if you put in or leave

18     out one of these variables, that confidence interval

19     bound may well slip below 1.  The confidence interval

20     for the original reporting of this data differed from

21     what they produced in the New England Journal.

22              Confidence interval bounds change a little

23     bit, not just because the data is changing, but as you

24     put in a confounding variable or not, even if that

25     confounding variable is irrelevant, it will change

1    them a little bit.  And that's why statisticians don't

2    put a tremendous amount of emphasis on the upper and

3    lower bounds of a confidence interval.  It's misplaced

4    emphasis.

5              And, in fact, to be frank, this whole

6    discussion is a misplaced emphasis on not where the

7    truth is, but on the periphery.  It's not important,

8    but it does make a point that which variables you put

9    in, will change the confidence interval, and it may

10   make it a little bigger, it may make it a little

11   smaller.  That's why the exact value isn't that

12   crucial.

13             And none of these, by the way, are changing

14   the actual estimate of the increased risk, which has

15   remained at 2 pretty much throughout their reporting

16   of their data.

17        Q.   Do you remember my question?

18        A.   I think I answered the question.

19        Q.   No, do you remember my question, sir?

20        A.   Well, we can go back and you can read it to

21   me again.

22        Q.   No, I'm trying -- we have an amount of time,

23   and I'm --

24        A.   I'm happy to stay here as long as you want.

25        Q.   Well --

1      A.   And if it helps you to reread the question,

2   it sure helps me, so please do.

3      Q.   If the examination -- the analysis was done

4   on a data set A through K and they have the results,

5   and we have those results, but what is actually in the

6   article is missing B, C and D, and now they're going

7   to correct the description.

8           Correcting the description does not change

9   the results of their analysis, yes or no?

10      A.   No, it doesn't change the results.  The

11   results correspond to a specific set of confounding

12   variables.  What does change is if you change the

13   choice of the confounding variables.  And the choice

14   of the confounding variables is different in the paper

15   than in the analysis they ran for the Court.  That's

16   the only point this e-mail is dealing with.

17      Q.   I must -- I'm going to move on, I must not

18   be communicating.

19           Let's go to your forest plot that was used I

20   believe in the Robinson trial and the one that you

21   used obviously has been in here has been updated,

22   right?  There are more studies, right?

23      A.   There is some new studies, yes.

24           MS. YATES:  And I may need to pull this

25   a little closer, Your Honor, I apologize.

1                    THE COURT:  yes.

2                    MS. YATES:  May I just --

3                    THE COURT:  You may hold it there, if

4     you can pick up everyone's voice.

5     BY MS. YATES:

6          Q.   So on this one, appropriately so, we have

7     Louik at that time, because it was showing a

8     statistically significant result, right?

9          A.   Correct.  It was -- the 1.2 is what's

10    changed.

11         Q.   Right.  And now it's gone down into the

12    black zone.

13         A.   I moved it down because it's not significant

14    anymore --

15         Q.   Right.

16         A.   -- according to the New England Journal.

17    And I've of course moved the 1.2 to 1 so it just clips

18    the line at 1, as we saw yesterday.

19         Q.   Okay.  Now, this is a log scale, right?

20         A.   Correct.

21         Q.   And when you do a log scale, the odds ratio

22    is right in the middle of the confidence intervals,

23    correct?

24         A.   Correct.

25         Q.   And if we look at Louik, it's not, is it?

Page 46

1      A.   That's very slightly off center, and that's

2   I think what Dr. Kimmel noted and that's what led to

3   that discovery.

4      Q.   Right.  But you didn't notice that out of

5   all of these studies, there was something wrong with

6   the Louik data, based on your own forest plot.

7      A.   No, I confess, my eyes are not that good, I

8   did not see that asymmetry, no, in that one particular

9   confidence interval.  It's not very asymmetric, but it

10  is a little bit.

11     Q.   It sort of jumps out, doesn't it, Doctor?

12     A.   Well, I guess it didn't to me.  It may have

13  to you.  And it's corrected now, so I --

14     Q.   Okay.  The good news when I turn pages means

15  that we've covered it.  All right.  At the time of

16  this earlier forest plot, sir, Louik was the only

17  statistically significant finding on septal defects

18  that was -- that replicated something from the Denmark

19  studies, correct?

20     A.   Yes.  If you lump all three, there were the

21  Danish studies which have some form of replication as

22  I discussed yesterday and we discussed earlier, but if

23  you put those altogether, then the only other study of

24  the ten or so that were in there at that point was the

25  Louik one with regard to all septal.

1      Q.   Okay.  Well, we didn't talk about

2  replication, Doctor, we talked about overlap, right,

3  two different concepts.

4      A.   Well, the whole point of the overlap is the

5  idea of replication and whether we're getting any new

6  information from separate studies of this overlapping

7  populations.

8      Q.   All right.  Doctor, let's change subjects.

9  Let's go to Berard 2015 paper, okay.

10     A.   Sure.

11     Q.   You recall testifying in February 2015 Frye

12  hearing before Judge Bernstein?

13     A.   I do remember the experience, yes.

14     Q.   You were asked about Dr. Berard's study.

15     A.   I was by the Pfizer lawyer, yes.

16     Q.   And you were asked whether you could check

17  Dr. Berard's calculation from her paper, right?

18     A.   Correct.

19     Q.   You were asked if you could calculate the

20  odds ratio.

21     A.   I was.

22     Q.   And you testified you could do that.

23     A.   I did.

24     Q.   And, in fact, during the break in a hearing,

25  you calculated the crude (indiscernible) ratio to be

Page 48

1    1.3, correct?

2        A.   Well, I don't remember the actual number.

3    It depends on -- I think there were several in her

4    paper, but I did one that they were asking me to do at

5    the hearing during a break, and I confirmed her

6    calculation.

7        Q.   No, well, let me show you your testimony.

8    You don't remember that it was 1.35?

9        A.   No, I don't remember the numbers.

10       Q.   All right.

11            MS. YATES:  Let's bring up the

12   transcript.

13            THE COURT:  Do I really care what Dr.

14   Berard says and whether he can calculate her numbers?

15            MS. YATES:  Well, if there's a mistake

16   in her paper and it's the only other statistically

17   significant finding, Your Honor, I don't know.

18            THE COURT:  Unless he depends on it.

19   BY MS. YATES:

20       Q.   Doctor, let me --

21            MS. YATES:  You know what, Your Honor,

22   let me cut to the chase.

23       Q.   We've seen that there are two findings

24   within Dr. Berard's paper that are statistically

25   significant, but that there is certainly debate as to

1    whether there are mistakes in those two numbers,

2    right?

3         A.    There was a debate in those two numbers, and

4    those are the two that changed the most from the crude

5    calculations that were done based on raw data from the

6    paper that Dr. Kimmel most specifically did the whole

7    set.

8              As I discussed at some length yesterday, the

9    dispute is about the confidence intervals, and

10   therefore the level of statistical significance.  Dr.

11   Berard claims in her paper to have used a more

12   sophisticated statistical methodology for calculating

13   the confidence intervals that she's forced to do

14   because of the multiple pregnancies for women that --

15   that doesn't occur in almost all these other studies.

16   There's a little bit about that in Furu by the way

17   that we could discuss.

18             That's -- there's no debate about that as

19   far as I'm aware.  I've, as I said, told people that's

20   the reason why there is this discrepancy between these

21   crude calculations that everyone is doing, and what

22   Dr. Berard and her team have reported.  And she was

23   explicit about checking the numbers, pointing this out

24   that, in fact, she had to deal with this issue with

25   multiple pregnancies.  And I don't believe there's any

Page 50

1    debate about that, as yet, that --

2         Q.   All right.  Are you aware --

3              MS. YATES:  And, sorry, Your Honor, I

4    do have to go into it apparently.

5         Q.   Let me show you a slide that I believe was

6    used in opening by Mr. Cheffo and this is Dr. Berard's

7    2015 paper, I'm trying to -- so let's just look at the

8    title.  All of the Zoloft findings match and are

9    confirmed as non-significant, okay.

10             So when you go to OpenEpi, every other

11   result in Dr. Berard's 2015 publication, you plug in

12   her numbers on an OpenEpi and they're correct.

13        A.   Well, they're not correct.  They coincide

14   with Dr. Berard's calculations using the more

15   complicated software.

16        Q.   They coincide.

17        A.   Correct.

18        Q.   Okay.  And then we come to the two

19   statistically significant findings in her paper and

20   they don't coincide on OpenEpi, right?

21        A.   No, the OpenEpi here, if her description of

22   her data is correct, would be an incorrect statistical

23   procedure to use for this data because it doesn't deal

24   with the issue of variability correctly when there are

25   multiple pregnancies per women.

1        Q.    Doctor, are you aware that Dr. Berard did an

2    abstract in 2013?

3        A.    I think I am aware, and I think in there,

4    she had crude results that she subsequently updated in

5    her paper.

6        Q.    And that abstract is the paper that later

7    was published, right?

8        A.    Well, it's a precursor.  I mean, the --

9    usually papers change a little bit from an abstract

10   and it did in this case, is my memory.

11       Q.    Okay.  And all of her numbers in the

12   abstract except those two findings that become

13   statistically significant match the other paper,

14   right?

15       A.    I'd have to check.  But my memory is the use

16   of the generalized estimating equation approach

17   probably happened between her abstract and her paper.

18   That would be my guess.

19       Q.    And that's a guess, right, Doctor, because

20   you don't know?

21       A.    Well, all I know is that Dr. Berard herself

22   said that she had pointed out that people were

23   misinterpreting her papers' results by applying

24   OpenEpi calculations because they were not paying

25   attention to the multiple pregnancy issue, and that

1      she had indeed used a more sophisticated piece of

2      software and had rerun the analysis on request, and

3      checked the results of the paper.

4            As I testified yesterday, beyond that I have

5      no way of checking --

6      Q.    Right.

7      A.    -- if Dr. Berard is either telling the truth

8      or if --

9      Q.    If the data is accurate.

10     A.    Well, let alone whether the data is

11     accurate, whether she did the analysis correctly from

12     raw data, I haven't got access to that data.

13     Q.    All right.  So you think we have the

14     abstract and then she does this GEE modeling, right,

15     for the paper and that's what changes the two results

16     according to Dr. Berard.

17     A.    Well, you would expect it to change --

18     Q.    No, no, please, Doctor, just answer my

19     question.  That's what Dr. Berard says, right?  We

20     have the abstract, and then in the paper she uses the

21     DEE model and that changes these two findings and they

22     are no longer -- they no longer coincide with OpenEpi,

23     because she used this modeling, right?

24     A.    That's the speculation of the difference

25     between the abstract and the paper, yes.

1      Q.    Okay.  Let's go to tab 203, please.  Doctor

2      --

3                  MS. YATES:  Show the title, please.

4      Q.    This is Dr. Berard's 2013 abstract, sir.

5      Okay.

6      A.    Okay.

7      Q.    She used the GEE model in her abstract,

8      didn't she, sir?

9      A.    Apparently.  So my speculation of why there

10     might be a difference between the abstract, so we are

11     back to the beginning of saying she used the GEE

12     models, I have to take the paper as the -- the peer

13     review paper as the final version.  I can't -- you

14     have to ask Dr. Berard why there's a difference in the

15     abstract, I don't know.  I've done my best to

16     speculate.

17     Q.    Right.  And in fact, Dr. Berard, in her

18     abstract, came up with numbers that matched OpenEpi

19     didn't she, using the GEE model?

20     A.    I haven't checked that, but I believe that's

21     correct, yeah.

22     Q.    Okay.

23     A.    That's what made me speculate that, that it

24     looked like OpenEpi but --

25     Q.    All right.  So you asked for Dr. Hubrix's

1    data, have you asked for Dr. Berard's data to try and

2    confirm what she did?

3         A.   No, I asked her to confirm and she did, but

4    I have not gotten that data myself.  I would get it

5    for the same reasons that I haven't been allowed to

6    get Dr. Hubrix data.  I'd love to have the data for

7    all of these studies, the raw data, but that would be

8    a two-year project to confirm the results of every

9    single paper in the peer reviewed literature.

10        Q.   Okay.  My question was just did you ask for

11   her raw data?

12        A.   And as I indicated and answered, I asked for

13   her to confirm the results, which she claims she did.

14   Actually she claimed her statistician confirmed the

15   results.

16        Q.   All right.  Let's move on a little bit,

17   Doctor.  Your qualifications are in mathematics,

18   correct?

19        A.   No.

20        Q.   Don't you have a degree -- a Ph.D. in

21   mathematics?

22        A.   I do, but I don't believe that's -- Ph.D. is

23   the sole total of my qualifications.  God forbid.

24        Q.   I didn't say that, but, Dr. --

25        A.   Didn't you ask me that my qualifications

1    were only in mathematics?

2         Q.   I don't think I said only.

3         A.   Oh, well they're not in mathematics solely

4    either --

5         Q.   Okay.

6         A.   -- they're -- I have some qualifications in

7    mathematics, less and less as I age.

8         Q.   You're a self-taught statistician, right?

9         A.   I sometimes describe myself as that.  That's

10   a little unfair to people whose lectures I sat in in

11   my post-doctoral training where I got very good

12   mentoring.

13        Q.   So are you --

14        A.   I think that's a little bit egotistical to

15   put it as completely self-taught.

16        Q.   I'm using your words, Doctor.

17        A.   I indicated I often describe myself that way

18   because I didn't take -- do a graduate program in

19   statistics.

20        Q.   Okay.  And your opinions that you're

21   offering today of Zoloft can cause or contribute to

22   all cardiovascular birth defects, correct?

23        A.   Correct.

24        Q.   You're not a teratologist?

25        A.   No, I'm not.

1      Q.   You don't know what the teratology community

2  requires before concluding there's causation?

3      A.   I've been given documents like that at

4  deposition, but I certainly couldn't repeat them word

5  for word, and it's not my community, that is correct.

6      Q.   No medical training, not a medical doctor?

7      A.   I'm not a medical doctor, no.

8      Q.   Birth defects is not your area.

9      A.   Well, I have no specific area, but certainly

10  I have not worked in birth defects as my specific area

11  of application, no.

12      Q.   And outside of your work as a litigation

13  expert on behalf of plaintiffs suing Pfizer, you have

14  not opined that Zoloft causes congenital heart

15  defects, correct?

16      A.   No, I'm trying to do that now with a joint

17  paper with Hubrix, but that remains to be seen if I

18  can succeed.

19      Q.   Right.  Did she get back to you after her

20  polite too busy?

21      A    She said no, she did get back to me as we

22  described yesterday, said she thought she would try

23  and get some of her team to help, but we haven't

24  connected since then.

25      Q.   Right.  You started working on the Zoloft

1    litigation before Dr. Berard actually submitted her

2    report in the MDL, right?  You were already consulting

3    with the plaintiffs?

4         A.   That I can't swear to.  I don't -- I was not

5    involved in that first MDL as far as I'm aware --

6         Q.   Right.

7         A.   -- so I don't know the timing of when I was

8    contacted, vis-à-vis, that hearing.

9         Q.   Okay.  Can we go to tab 154 -- oh, so we're

10   mixing apples and oranges, Doctor.  I didn't say

11   hearing --

12        A.   Oh.

13        Q.   -- you were already an expert for plaintiffs

14   when those reports, including Dr. Berard's, went in in

15   the MDL, correct?

16        A.   That I don't recall, I may well have been, I

17   just don't -- I wasn't paying attention to those dates

18   of her reports as to when I was contacted.

19        Q.   Do I need to check?

20        A.   No, no, I take your word for it.

21        Q.   All right.

22        A.   If you have the dates there, I --

23        Q.   Okay.

24        A.   -- you have them.

25        Q.   All right.  You've not published any

Page 58

1      articles regarding congenital heart defects?

2           A.   No, that's not my area of -- my personal

3      area of research.

4           Q.   You've not published regarding any other

5      types of birth defects?

6           A.   No, as I indicated, that's not my personal

7      area of research.

8           Q.   You've not published regarding Zoloft or any

9      other SSRI?

10          A.   No, I publish about GEE, not about birth

11     defects.

12          Q.   Right, that model.

13          A.   Correct.

14          Q.   Okay.

15          A.   That model.

16          Q.   Popular paper though.

17          A.   It is a very --

18          Q.   Correct?

19          A.   -- highly cited paper, yes.

20          Q.   That's what I heard.

21               You don't claim to be an expert in the field

22     of cardiovascular medicine?

23          A.   No, I'm a statistician.

24          Q.   And you don't claim expertise to be able to

25     tell the Court whether or not heart defects are

1   anatomically, clinically, or developmental

2   heterogeneous, correct?

3        A.   No, that's not my -- you should talk to a

4   cardiologist or an expert if you want to get into the

5   fine details of those conditions.

6        Q.   But what you do agree from your perspective,

7   is that it is important to perform sub-analyses on

8   specific heart defects, correct?

9        A.   As part of my methodology as I described

10  yesterday, you have this conundrum when facing a

11  question of risk when you're dealing with a rare

12  outcome, and we discussed that length yesterday, I'm

13  happy to go over it again, which determines the level

14  of subcategorization that seems reasonable to the

15  experts -- not to the statisticians, but to the

16  experts -- and yet provides enough data for the

17  statisticians to say we can get some level of

18  definitive estimates of risk.  And that's how I use

19  it.  And then only when you find something of interest

20  in the larger subgroup where you've got some level of

21  statistical precision to say something does it make

22  sense to look at the subcategories and say, yes, I

23  believe we have a signal here with regard to the

24  larger category.  Now as a next step in the

25  methodology let's look at the subcategories to

Page 60

1    determine whether in fact systematically one

2    subcategory does not mirror that association you

3    already determined.  That's the methodology.

4         Q.   Doctor, do you agree that it is important to

5    perform sub-analyses on specific heart defects?

6         A.   Only in the sense -- that only makes sense

7    to me if you've determined a priori that there is a

8    signal in the larger group.  Otherwise it doesn't make

9    sense to go down one, because if you find positive

10   findings in the subgroup they're going to be very

11   statistically imprecise.  If you don't find anything

12   you're no further forward.

13            So my feeling is you look at the subgroup

14   where you have some level of statistical precision and

15   then you go and look at the subgroups.

16        Q.   Okay.  So you look at the subgroups to the

17   extent the data permits it?

18        A.   Yes, I think --

19        Q.   All right.

20        A.   -- fair description.

21        Q.   Doctor, you agree that replication is a

22   crucial part of assessing causation?

23        A.   Yes.

24        Q.   And you agree that consistency is also an

25   important part of assessing causation?

1        A.    It is a part, yes.

2        Q.    And it's -- you agree that it's also

3    important to assess potential biases, including

4    confounding, especially when the evidence is coming

5    from observational studies, correct?

6        A.    Correct.

7        Q.    And that's what we have with Zoloft, right?

8        A.    Correct.

9        Q.    Couldn't do a randomized control trial could

10   me?

11       A.    No, unfortunately -- well from a

12   statistician it's unfortunate, from a women's

13   perspective maybe it's fortunate.  It's not ethically

14   possible.

15       Q.    Doctor, I need to shift gears a little bit

16   to talk about meta-analyses.

17             You rejected the Miles and McDonagh peer

18   reviewed published meta-analyses in your report on

19   Zoloft, correct?

20       A.    Well, I didn't reject them.  I don't find

21   them particularly scientifically reliable or helpful

22   in addressing the overall question.  I discuss them in

23   the MDL report.

24       Q.    You discussed and you rejected as forming

25   part of your opinion, correct?

1      A.   That is correct.  It did not influence my

2   opinion, and I think that is fair to say

3      Q.   And in Prozac you focused your attention on

4   the available meta-analyses, correct?

5      A.   Yes, as I discussed yesterday in the Prozac

6   case it started for me with the fact that Eli Lilly

7   themselves, the manufacturer, had done their own meta-

8   analyses, which I focused on, not specifically the

9   large one, though it's -- Prozac is discussed in the

10   large meta-analysis.  So the manufacturer there had

11   already done as part of their protocols a full meta-

12   analysis of the question of whether Prozac raises the

13   risk of certain kinds of birth defects.

14      Q.   So that was a yes?

15      A.   Yes, and that's not available to me here,

16   because as far as I'm aware Pfizer has not done a

17   meta-analysis, they did not consider that to be part

18   of their methodology of addressing this question.  And

19   I can't speak for Pfizer obviously as to why they

20   choose not to use a meta-analysis.  But there is no

21   one that I'm aware of.

22      Q.   You do agree, sir, that both Miles and

23   McDonagh are both published peer reviewed meta-

24   analyses that looked at Zoloft and cardiac birth

25   defects, right?

1        A.   Yes, certainly Miles is, and I think that

2    McDonagh was part of a very large report, which was

3    published.  I don't remember the peer review status of

4    McDonagh.

5        Q.   All right.  Let's -- we'll come to it.

6    Let's take a look at Miles.  And let's look at their

7    objective, okay?  And that's from the Miles abstract.

8    And we'll put it out.

9            Miles' objective was to determine the

10   strength of the association between individual SSRIs

11   and major/minor and cardiac malformation among infants

12   born to women taking these medicines, right?

13       A.   You read it correctly.

14       Q.   And they followed a specific method, right,

15   called Moose (ph)?

16       A.   They did.

17       Q.   Okay.  And if we go to the -- continue on

18   the abstract.  The study found -- the meta-analysis

19   found that for Zoloft and Celexa that they were not

20   significantly associated with congenital malformation,

21   correct?

22       A.   Yeah, I'm sorry, I can't follow on the

23   screen, it's just blurred.

24       Q.   It's Miles' abstract.  There it is.  It just

25   takes us a minute to pull it out, Doctor.

Page 64

1      A.   Okay.  That's fine.  It's just when you're

2   reading I can't -- I just wanted to let you know I

3   can't follow along with you.

4      Q.   Okay.  So Sertraline and Citalopram were not

5   significantly associated with congenital

6   malformations, correct?

7      A.   You read that correctly, yes.

8      Q.   All right.  And in their section on page

9   1007 reporting the results of cardiac malformations

10   the report states that Zoloft was not significantly

11   associated with increased odds of cardiac

12   malformations, correct?

13      A.   Sertraline.  Sertraline, yes.

14      Q.   Well you know Sertraline is Zoloft, correct?

15      A.   Yes, that's correct.

16      Q.   All right.  But it did show that some of the

17   individual agents, Paroxetine was significantly

18   associated, correct?

19      A.   Paroxetine.  I've lost Paroxetine in this

20   paragraph.  I'm sorry, I'm not following you.

21      Q.   I think it's right above.

22           THE COURT:  Read the first sentence.

23           THE WITNESS:  Oh, there it is.  Yes,

24   it's -- I was looking for the ones at the bottom where

25   the drugs are highlighted.

1    BY MS. YATES:

2         Q.    I apologize, Doctor.

3         A.    That's okay.  Yes, Paroxetine was

4    significantly associated in their meta-analysis with

5    cardiac malformation.

6         Q.    And that's Prozac?

7         A.    That's Prozac, correct.

8         Q.    All right.  And the others were not,

9    including Sertraline, which is Zoloft?

10        A.    Correct.

11        Q.    Okay.  And in fact the authors conclude --

12   well let's just take a look at figure 2, if we can.

13   The meta-analysis reported an odds ratio of 0.931 for

14   Zoloft and cardiac malformations, correct?

15        A.    This is -- yeah, I'm not sure what you're

16   pulling out here.  You've got Pederson on the left

17   there with numbers for CHD.  Is that the Pederson

18   results?  And then underneath that, is that the meta-

19   analysis?

20        Q.    So, Doctor, these are all the study names,

21   right?  You know how meta-analysis goes, right?

22        A.    I -- to be frank I just can't read this, the

23   page.

24                    THE COURT:  I think he needs to refer

25   to the hard copy.

Page 66

1                    THE WITNESS:  Yeah, why not--

2                    MS. YATES:  All right.  I think that's

3      a good idea.

4                    THE WITNESS:  Sure.  That's --

5      BY MS. YATES:

6          Q.   Why don't you pull out the hard copy,

7      Doctor.

8                    THE COURT:  And it is an appropriate

9      time to take a brief recess in the morning, so we'll

10     do that now, and come back with hard copies for all of

11     us.

12                   THE WITNESS:  All right.  Thank you.

13         (Recessed at 11:20 a.m.; reconvened at 11:43

14     a.m.)

15                   THE COURT:  All set?

16     CROSS-EXAMINATION, CONTD.

17     BY MS. YATES:

18         Q.   Hello again, Dr. Jewell.

19         A.   Hi.

20         Q.   Now you met with the lawyers during the

21     break, but I assume you didn't talk about your

22     testimony because you know you're under cross-

23     examination, correct?

24         A.   Do I have to say what I talked about?

25         Q.   Well if you talked about your testimony you

1    weren't supposed to.

2         A.   I asked the way to the bathroom and they --

3    in the side there.

4         Q.   No problem.  You didn't know that from

5    yesterday?

6         A.   This is a big place, I'm not paying

7    attention to the location of the restrooms.

8         Q.   Okay.  But you didn't talk about your

9    testimony?

10        A.   No.

11        Q.   Okay.  We left off, Doctor, at Miles, figure

12   2 and the result for Zoloft.  So, I think you have

13   that now in hard copy, but we also were able to pull

14   it out.  All the studies are listed, right, Doctor,

15   with the results, and they plot the odds ratios and

16   the confidence intervals, rights, and then they have a

17   final result for Zoloft, correct?

18        A.   Correct.

19        Q.   And that odds ratio for Zoloft is .931,

20   correct?

21        A.   Correct.

22        Q.   And that's cardiac malformations?

23        A.   Correct.

24        Q.   And in fact if we turn to page 1011 you said

25   yourself that when the studies are done you've got

1    your statisticians and then you've got your medical

2    people, right?

3         A.   I don't know in this particular case who's

4    involved.

5         Q.   Okay.  Well we could look, right?

6         A.   Well we know the authors names, yes.

7         Q.   Right.  And some of those are medical

8    doctors?

9         A.   You know I haven't looked, I don't know.  I

10   don't know -- these are from New Zealand I think.  I

11   don't know them.

12        Q.   Right.  They have doctors in New Zealand,

13   right?

14        A.   I assume.

15        Q.   Assume some of them -- do we need to look to

16   see if there are medical doctors on Miles?

17        A.   It's up to you, I'm in your hands.  Whatever

18   you would like.

19        Q.   Why don't you look.

20        A.   So it doesn't tell me on the authors who's a

21   doctor and who isn't.

22        Q.   But it usually has a little reference, and

23   then you see their institutions they're associated

24   with or M.D., Ph.D.

25        A.   Yeah, it's -- well --

1      Q.   Doctor, it doesn't -- I went down that track

2   because I didn't think we were going to debate it.

3      A.   Okay.

4      Q.   If you can't find it --

5      A.   I found it now, yes.

6      Q.   Okay.  All right.  And there are doctors?

7      A.   They're from the departments of medicine and

8   then from obstetrics and gynecology and from

9   psychiatry in -- actually they're in Australia, so we

10  ought to correct that, they're not from New Zealand.

11     Q.   Okay.  All right.  So if we go to page 1011

12  some of those -- the authors of the study, including

13  people from the department of obstetrics, gynecology,

14  and psychiatry actually conclude -- page 1011 -- that

15  the alternative first line SSRI medications,

16  Sertraline of Citalopram, should be considered as

17  first line SSRI treatments in pregnancy and women of

18  child-bearing age.  Did I read that correctly?

19     A.   You did.

20     Q.   And in the Miles meta-analysis following

21  their peer reviewed published methodology that's the

22  conclusion they made, correct?

23     A.   I assume they made that conclusion since

24  it's in the paper.

25     Q.   And you disagree with them?

1        A.    No, I don't disagree with that necessarily.

2        Q.    All right.  Let's move to McDonagh.

3        A.    I'd be happy to explain why, but -- that

4    particular sentence is not something that intersects

5    with my report that much.

6        Q.    Okay.  Let's move to McDonagh.  July 2014

7    the agency for health care research and qualify,

8    that's a branch of the Department of Health and Human

9    Services, right?

10       A.    That is correct.

11       Q.    And this is a meta-analysis that examined,

12   among other things, the risk of cardiac malformations

13   associated with Zoloft use during pregnancy?

14       A.    It did, briefly, yes.

15       Q.    All right.  And if we go to table 6, Doctor,

16   and I think we've seen this before.  Table 6, the

17   meta-analysis found -- actually page 45, I'm sorry.  A

18   quote from page 45.  Found that they pooled analysis

19   --

20       A.    Sorry, can I just --

21       Q.    Yeah.

22       A.    -- interpret you for a second?

23       Q.    Sure.

24       A.    You said page 45, but there is no table on

25   page 45, so if you --

1      Q.   Right.  We're going to come back to table 6.

2      A.   Oh, I'm sorry.

3      Q.   I apologize.

4      A.   You've moved around here, okay.

5      Q.   I absolutely did.

6      A.   Great.

7      Q.   Page 45, Sertraline.

8      A.   Yes.

9      Q.   With me?  This meta-analysis first found

10   that pooled analysis of the seven studies that

11   reported adjusted odds ratios resulted in no increased

12   risk of cardiac malformations (table 6) but with

13   statistical heterogeneity.  Did I read that correctly?

14     A.   You read that correctly.

15     Q.   And so McDonagh actually did a further

16   analysis to try to account for and look into this

17   heterogeneity, right?

18     A.   She tried to -- or she or he tried to remove

19   it by doing a sensitivity analysis by looking at fewer

20   studies.

21     Q.   Right.

22     A.   Which will of course inevitably reduce

23   heterogeneity systematically as you peel them off.

24     Q.   So they got that right.  They're looking to

25   reduce heterogeneity and they followed what you said

1    is a way to reduce heterogeneity.

2         A.   Not really.  It depends very much on how you

3    select your approach to reducing heterogeneity.

4         Q.   Okay.

5         A.   My report says the right way to look at the

6    statistical heterogeneity is try and determine the

7    factors that explain the heterogeneity, because then

8    you will have some knowledge about what the

9    characteristics are of women in studies who show an

10   increased risk and what the different characteristics

11   might be in studies which show no risk, and that's not

12   what they're doing.

13        Q.   Well let's --

14        A.   So this is not exactly what I would do, no.

15        Q.   Not exactly what you'd do, but it's what

16   they did?

17        A.   It is what they did apparently, yes.

18        Q.   And they published it and they subjected it

19   to peer review, correct?

20        A.   Yes, they --

21        Q.   All right.

22        A.   -- some -- as I said this -- early this

23   morning, I'm not sure of the level of peer review on

24   this publication.

25        Q.   Okay.  Let's look at the next sentence where

1    we talk about this sensitivity analysis, okay, Doctor?

2              Sensitivity analysis, first removing two

3    studies that did not adjust for at least three of the

4    four potential confounding factors identified for this

5    review, resulted in a pooled estimate suggesting a

6    reduced risk of cardiac anomalies with Sertraline

7    (pooled adjusted odds ratio .76, 95 percent confidence

8    interval, .59 to .97), but further limiting to the

9    four studies that also indicated efforts to identify

10   serious cardiac malformations yielded a pooled

11   estimate of .76, 95 percent confidence interval, .57

12   to 1.0 P value .51.  Actually that should be .051,

13   right, Doctor?

14        A.   It's certainly wrong, but that sounds

15   plausible that it's just clipping -- it's just not

16   significant.

17        Q.   Okay.  So the McDonagh authors concluded no

18   increased risk or suggested a reduced risk for cardiac

19   anomalies with Zoloft, correct?

20        A.   That is correct, that's what they claimed.

21        Q.   And you disagree with them?

22        A.   I do disagree.  Not so much with the

23   findings per se, I disagree with the methodology that

24   they used and the data they applied to reach that

25   conclusion in light of what I myself have done, yes.

1          Q.    Okay.  Now if we go to table 6 now, which is

2     page 44, the title of this table is, best evidence on

3     risk of cardiac malformations with selective Serotonin

4     reuptake inhibitors compared with non-exposure.  Did I

5     read that correctly?

6          A.    Correct.

7          Q.    And their finding for Sertraline or Zoloft

8     is 1.08, confidence interval is .70 to 1.65, correct?

9          A.    Yes, that is correct, you read it correctly.

10         Q.    And because of the heterogeneity they did

11    the sensitivity analysis, correct?

12         A.    They did a sensitivity analysis, correct.

13         Q.    And that yields the result of an odd ratio

14    of .76, confidence intervals .57 to 1.0, correct?

15         A.    Correct.

16         Q.    All right.

17         A.    That's the same number I think that you just

18    read in the paragraph a minute ago.

19         Q.    And so the table corresponds with the

20    statements that they made is accurate?

21         A.    That is correct.

22         Q.    Okay.  There's another meta-analysis, right,

23    Dr. Wang 2015?

24         A.    Yes.

25         Q.    This one God smacked you?

1        A.    It did.

2        Q.    All right.  Do we need to talk about Wang?

3        A.    Well you -- I'm in your hands.

4        Q.    Okay.

5        A.    I'm happy to talk about it if you want.

6        Q.    Let's briefly talk about Wang.  Three

7    studies, right?

8        A.    Three studies, correct.

9        Q.    Peer reviewed and published?

10        A.    Correct.

11        Q.    And you disagree with it?

12        A.    Again, it's not so much the results, it's

13    the fact that there are only three studies included in

14    the meta-analysis with no real explanation of why all

15    the other studies, including some of the major ones

16    we've discussed at length, were excluded.

17        Q.    Okay.  And you disagree with -- it adds

18    nothing to you?

19        A.    Well of course a meta-analysis I can do it

20    of those three studies myself, so from that point of

21    view it doesn't add anything new -- they don't provide

22    any new statistical insights into the data about those

23    three studies that I was not aware of before.  So from

24    that perspective, yes, it doesn't provide a lot, and

25    it's so incomplete.

1        Q.    Incomplete because there's a bunch of

2   studies and they only did three, right?

3        A.    And the particular choice of those three too

4   in terms of where they sit in terms of updates and

5   overlaps, yes.

6        Q.    All right.  Let's move to your report in the

7   Prozac litigation, Doctor, because there you did focus

8   your review on numerous meta-analyses that reviewed

9   and analyzed data relating to maternal exposure to

10  Prozac during pregnancy, right?

11       A.    Well as I just discussed before the break I

12  focused my analysis initially -- or my analysis began

13  with in a sense the meta-analysis that was provided by

14  Eli Lilly themselves in their own documents.  And

15  there are others, as I indicated earlier, that I also

16  looked at, including Miles, for example, and I think

17  even McDonagh was -- commented about Prozac also.  So

18  those were also discussed in the report.

19       Q.    Doctor, do you agree or disagree with the

20  following statement.  You focused your review on

21  numerous meta-analyses that reviewed and analyzed data

22  related to maternal exposure to Prozac during

23  pregnancy?

24       A.    I put -- I just answered that question, I

25  believe.  I focused my analysis initially on the Eli

1    Lilly meta-analysis, which is more complete than

2    Miles, and then of course I included data from studies

3    that were newer that were not incorporated in that.

4    So, I focused my analysis on the entire body of

5    evidence regarding the association between Prozac and

6    cardiac birth defects.

7         Q.   Tab 19, please.  Doctor, this is page 5 of

8    your Prozac report.  Can we pull it out so everybody

9    can read it, please.

10        A.   Uh-huh.

11        Q.   Let me know if I'm reading this correctly.

12             I focused my review on numerous meta-

13   analyses that reviewed and analyzed data related to

14   maternal exposure to Prozac during pregnancy.  Did I

15   read that correctly, sir?

16        A.   You read that correctly.

17        Q.   All right.  And your review of meta-analyses

18   included Miles and McDonagh?

19        A.   Yes, as I just said, yeah.

20        Q.   Okay.  And let's look at your Prozac report

21   on your findings from the Miles investigators.  It's

22   page 20 of your Prozac report.  Okay.  All right.

23             You say, existing -- these are the findings

24   of Miles -- or at least this is based on the findings

25   of Miles, right?

1           The existing research appears to implicate

2    Fluoxetine and Paroxetine.  This suggested that

3    neither Paroxetine nor Fluoxetine should be used

4    electively as first line antidepressant therapy, and

5    those wishing to become pregnant or in the first

6    trimester of pregnancy.

7           Did I read that correctly?

8        A.   Yes, this is a quote from Miles, if I

9    understand it correctly.

10       Q.   Quote from Miles.

11       A.   In my report, yes.

12       Q.   Right.

13       A.   Okay.

14       Q.   And then you've got a dot, dot, dot, right?

15       A.   Correct.

16       Q.   And Mr. Zonies told us yesterday that the

17   dot, dot, dot is very important, so let's look at

18   what's --

19       A.   Sure.

20       Q.   -- dot, dot, dot.  Let's go to Miles.  And

21   the dot, dot, dot actually says, "When Sertraline or

22   Citalopram might equally be prescribed."  Right?

23       A.   It does, yes.

24       Q.   Okay.

25       A.   I don't see the point there.  It's -- this

1      is a report about Prozac.  I think the sentence is

2      perfectly clear, but be that as it may.

3          Q.   Okay.  You in fact comment that that's quite

4      a strong statement.  It's significant enough for those

5      authors to make that statement.  In order words saying

6      don't use these as first line, use these, right?  You

7      said that's a strong statement.

8          A.   That's the statement the authors made, yes.

9          Q.   All right.  Now we heard this briefly so I'm

10     going to try and just sum it up, Doctor, but instead

11     of focusing on meta-analysis in your Zoloft report

12     like you do in your Prozac report, one of the reasons

13     that you don't focus on Miles in Zoloft is the

14     methodological flaws, correct?

15         A.   Correct.  Correct.

16         Q.   And you say in your report you don't find

17     Miles scientifically reliable, right?

18         A.   In terms of the results that you've spent

19     some time reading a minute ago I think they're

20     misleading to the Court and to people listening,

21     because they're not reliable in the context of the

22     whole body of evidence.

23         Q.   All right.  So actually if they're

24     misleading in this court and you think they've gotten

25     them wrong they're out in the peer reviewed published

1    literature, so anybody who picks it up is going to be

2    misled by a peer reviewed published meta-analysis done

3    by Miles.  That's your opinion?

4          A.   I think if they're interested specifically

5    in the question of Zoloft and cardiac defects there's

6    more room for misinterpretation because of the

7    heterogeneity that we discussed yesterday.  There's

8    less room for misinterpretation with regard to Prozac,

9    because there's far less heterogeneity in the results

10   that Miles presents for Prozac.

11         So again, it's a contextual answer.  The

12   whole paper is not entirely misleading from beginning

13   to end, and as I said, anyone can do their own meta-

14   analyses of the studies that Miles considered, should

15   they wish.

16         Q.   And, Doctor, in the Prozac litigation, in

17   that report, you refer to methodological limitations

18   of Miles, correct?

19         A.   Yes.  And as we discussed yesterday, there

20   was this confusion about the inclusion/exclusion

21   criteria that Miles used that still remains

22   uncorrected, as far as I'm aware, and the issue of

23   heterogeneity.

24         Q.   Sir, there's an affidavit from Dr. Large,

25   one of the coauthors of the Miles study, saying they

1    used the appropriate inclusion/exclusion criteria and

2    you got it wrong, right?  You've seen that affidavit?

3         A.   I did.  And as I pointed out at the

4    deposition when that was presented to me, that his

5    statements -- and I think we discussed this yesterday

6    -- his statements and the statements in the paper are

7    contradictory.  He has now apparently, I didn't know

8    this, but from emails between your counsel, and he has

9    agreed that it was written badly.  We should look at

10   the emails to use his language, but he has written it

11   badly and maybe he should send a correction.  I think

12   that's the last I've heard of the story, but I don't

13   know if a correction has appeared or not.

14        Q.   So it's wrong in the peer-reviewed published

15   and he got it wrong again when he said you were wrong?

16        A.   In the affidavit, because as we discussed

17   yesterday the paper specifically says the exclusion

18   referred to excluding studies where some of the women

19   in the control group were exposed to other

20   antidepressants, in the affidavit he claimed that the

21   inclusion/exclusion criteria used/excluded only

22   studies where all of the women in the control group

23   were not exposed to antidepressants.  So it doesn't --

24   and as I've said many times, it doesn't really -- you

25   know, it's essential, I'd just like him to tell me

1    what the actual inclusion/exclusion criteria area.   To

2    some extent, with all the new studies that have

3    appeared Miles it's somewhat moot, because one

4    wouldn't do a meta-analysis today, even if that were

5    appropriate, on the studies that Miles used.

6         Q.   Doctor, let's go back to McDonagh.  Let's go

7    to page 22 of your Prozac report, if we can, and how

8    you describe McDonagh.

9         (Pause)

10        Q.   All right.  Again, this is your Prozac

11   report referring to McDonagh.  This is a report issued

12   in July, 2014 and its stated objectives were "to

13   conduct a systematic review to evaluate the benefits

14   and harms of various pharmacological treatment options

15   for depression during pregnancy and the post-partum

16   period compared with each other with non-

17   pharmacological treatments and with usual care or no

18   treatment.  I focused my evaluation and review on the

19   Prozac-specific findings related to cardiac

20   malformations and somewhat to major malformations

21   overall.  The sources of data review and study

22   selection process were done through literature

23   searches and review of abstracts and publications.

24   Case reports, case series and single-group studies

25   were excluded from the evaluation."

1            Did I read that correctly?

2        A.    You read that correctly.

3        Q.    Now, that's not how you describe McDonagh in

4    your Zoloft report, correct?  Let's look at that.

5        A.    Actually, I don't think McDonagh was in my

6    original report at all, but --

7        Q.    That's fair.  We discussed it and it came

8    back --

9        A.    Yes.

10        Q.    -- and came in later.

11        A.    Yes, because people wanted me to say

12    something about McDonagh.

13        Q.    Okay.  Well, let's look at what you say on

14    McDonagh and in your Zoloft report, in your updated

15    report.  "An additional meta-analysis was also carried

16    out by McDonagh 2014 for the Agency for Healthcare

17    Research and Quality.  This is another meta-analysis

18    suffering from methodological problems regarding how

19    studies were included and excluded.  Due to the

20    study's brief section on Sertraline and cardiac birth

21    defects consisting of only three sentences, it is

22    impossible to fully assess the author's methodology."

23            Did I read that correctly?

24        A.    That is correct.

25        Q.    All right.  Well, let's go and look at the

Page 84

1    section on -- part of the reason you reject it on

2    Zoloft is there's only three sentences.  What on earth

3    can we conclude from three sentences, right?

4         A.   No, I just am trying to point out there --

5    and I'm not a big fan of McDonagh, I don't think

6    that's a surprise to anyone in this room --

7         Q.   It's no surprise to me.

8         A.   -- whether I'm talking about Prozac or

9    talking about Zoloft -- what I'm pointing out there,

10   it's a very brief part of a much larger report.

11        Q.   Right.

12        A.   And to be fair to the authors, they were

13   trying to study many, many questions, and so they were

14   not able to describe their methodology in detail in

15   the way you would expect in a paper like Miles, for

16   example, or Wang for that matter, and they only have

17   three sentences to do it.  If you go into the body of

18   the report, you can -- in the Prozac I said this is

19   how they came up, as far as I understand it, with

20   their studies, seven in the case of Prozac, that's all

21   I'm saying.

22        Q.   So it was brief, it was three sentences, not

23   enough for you to evaluate, right?

24        A.   Well, I think it's -- when you're reviewing

25   a meta-analysis, as we've just spent some time talking

1    about with Miles, you would like to understand the

2    inclusion/exclusion.

3                    Now, as it happened with Zoloft, I was

4    sufficiently familiar with all of the studies that

5    could have gone into a meta-analysis to recognize in

6    the references and their footnotes the seven studies

7    they were using, but they don't describe why these

8    seven, they don't tell me in the reduction that you

9    spent some time going down when they did a sensitivity

10   analysis, they're not explicit about how they -- which

11   studies they removed.  And so that actually made it

12   hard to reproduce on my own any meta-analysis that

13   could reproduce McDonagh as a result, because it's

14   just -- they don't have enough space and they haven't

15   described it.  That usually wouldn't be satisfactory

16   if you had a paper about Zoloft and cardiac birth

17   defects.

18       Q.   I understand.  So not enough information on

19   Zoloft, but you did have enough information on Prozac

20   to --

21       A.   There's the same --

22       Q.   -- at least assess, right?

23       A.   There's the same information in both, it's

24   got the same level of quality.  The fundamental

25   difference in both Miles and in McDonagh comparing

1    Zoloft and Prozac is the heterogeneity of the

2    information.  The heterogeneity of the information is

3    clearly statistically significant in Miles, it's not

4    in Miles for Prozac.  That's the difference, the

5    fundamental difference.  But with regard to the

6    quality of the meta-analysis per se, it's the same for

7    both.  I have never tried to claim anything other than

8    that.

9         Q.   Are we talking about McDonagh or Miles?

10        A.   We were talking about Miles.  If you want to

11   say McDonagh, there's the same issue occurs in

12   McDonagh too.

13        Q.   Okay, Doctor, I think this is referring to

14   McDonagh when you talk about the three sentences.

15        A.   Yes.  Now, if you turn to table 6 on page

16   44, if you could put that up on the screen for us?

17        Q.   Already been there.

18        A.   Could you put it up on the screen so I

19   can --

20        Q    Sure, absolutely.  The table 6 that we

21   already discussed that has the two results, one before

22   the sensitivity --

23        A.   Table 6 on page 44.  It was up a minute ago.

24        Q.   Doctor, I promise you, I won't talk over

25   you, if you won't talk over me.

1        A.   That's fine.  I'm just asking for table 6 on

2    page 44, it's --

3        Q.   Right.  And table 6 is the "Best evidence"

4    table, right, that one?

5        A.   It's the one you just put up to read and

6    comment on.

7        Q.   Let's put it up again.

8             MS. YATES:  If they're relying on me to

9    find something, Your Honor, we're in trouble.  It is -

10   -

11            THE WITNESS:  Well, I can read from it,

12   if you want.  I have it right in front of me.

13            MS. YATES:  No, let's put it up, so the

14   Court can see it as well.

15            THE COURT:  Well, I'm looking at a hard

16   copy too.

17            MS. YATES:  Are you?  Okay.

18            THE WITNESS:  Okay, great.  So --

19            THE COURT:  My eyes are not adjusting

20   to the filmy program, it's very hard to read this.

21            MS. YATES:  It's hard to read on --

22   yeah.

23            THE COURT:  It's much harder than

24   yesterday and I don't know if it's just a programming

25   issue with working through the court system or not,

1    but it's hard.  So I've resorted to paper, just like

2    our witness.

3                   MS. YATES:  And I'm struggling a little

4    bit, Your Honor, as you can tell when I look at the

5    screen.  So I'm tending to multitask here.  Okay.

6                   THE WITNESS:  There it is.

7    BY MS. YATES:

8         Q.   So table 6 that we already discussed, right,

9    Doctor?

10        A.   Yes.  Now --

11        Q.   And this is --

12        A.   Wait a minute, I was --

13        Q.   I'm sorry, I get to ask questions.

14        A.   I think I was making the point, though.  I

15   wasn't waiting for a question, I wanted to bring this

16   back up --

17        Q.   Oh, I'm sorry.

18        A.   -- in reference to my answer, and my answer

19   was, the fundamental difference in Miles was the

20   heterogeneity and you said -- interrupted and then

21   said, but that's Miles, we're talking about McDonagh.

22   So here's the table, it gives us information about

23   heterogeneity from McDonagh.  And you can see in the

24   right-hand column, the heterogeneity, I won't bore you

25   with what the i-squared statistic is, but it's -- the

1     larger it is, the more heterogeneity there is.

2                    For Sertraline, you can 68 percent in

3     that column, meaning the results that led to that

4     meta-analytic odds ratio vary substantially, there's

5     some much lower than 1.08 and there's some much

6     higher.  And you can see from Prozac or Fluoxetine,

7     the heterogeneity is zero percent, it's actually also

8     zero percent for Paroxetine and Paxil, meaning there's

9     very little heterogeneity.  That's fundamentally the

10    reason why you might treat the data differently for

11    Zoloft than you might for Prozac or, for that matter,

12    for Paxil.

13        Q.   And, Doctor, we went through this, but just

14    to be clear, the reason there is a sensitivity

15    analysis under Sertraline is because of the finding of

16    heterogeneity, correct?

17        A.   That's one reason they did it, it's not the

18    reason they -- the sole reason they did it.

19        Q.   Okay, one of the reasons.

20        A.   Correct.

21        Q.   And when they did the sensitivity analysis,

22    the heterogeneity goes to zero percent, correct,

23    Doctor?

24        A.   Well, do you really think that's a plausible

25    way to deal with heterogeneity?  The issue -- how they

1    dealt with heterogeneity here is they simply took the

2    low values of the odds ratio, the ones that were most

3    alike, of course the heterogeneity goes away.  A grade

4    school student could do that, just put the red blocks

5    together.  That's not a statistically sophisticated or

6    appropriate way to deal with heterogeneity.  Let's

7    just find a way to get the results in the meta-

8    analysis to a point where they all look alike and

9    throw the other ones out, that is not to me an

10   appropriate methodology.  Anyone could do that.  As I

11   said, as you remove studies, systematically that 68

12   percent there, as you go from seven to six, will go

13   down.  Whatever one you pick, if you take two out, it

14   will go down some more.  It will go down a lot if you

15   hand pick -- I'm not going to say cherry pick, but if

16   you hand pick the studies, in this case I think it was

17   four of the seven, they picked -- or they ended up

18   with the four that were the most similar, so the

19   heterogeneity is gone.  That's why they get this kind

20   of strange result that Zoloft is protective for

21   cardiac birth defects.  There's not a single other

22   paper that I have read that suggests anywhere that

23   Zoloft reduces the risk of a cardiac birth defect by

24   24 percent.

25                   So it's just not a plausible

1    methodology in this meta-analysis to hand pick four

2    studies that look the same, that all have low values,

3    and get rid of the heterogeneity.  That's actually

4    what I was trying to get at yesterday where averaging

5    can really obscure the truth.  It's just not

6    appropriate methodology.

7         Q.   Sir, I'm not a mathematician, I couldn't do

8    this, and if I look at sensitivity analysis that is in

9    the table you wanted me to bring up, I see a zero

10   percent heterogeneity after the sensitivity analysis.

11   Did I read that correctly?

12        A.   As I indicated, you read that correctly.

13   And I think you understand now why I feel so strongly

14   that that's an inappropriate way to deal with

15   heterogeneity.

16        Q.   Have you written to the journal saying this

17   is wrong, this is ridiculous, a grade school student

18   could do it?

19        A.   I'm working my way through the places that

20   Pfizer suggests I write to.  It would be much more

21   powerful, in my opinion, if Pfizer themselves, now

22   that you understand why this is misleading, if Pfizer

23   themselves would take on this, it would have much more

24   weight than I.  I've already -- I'm working my through

25   it.  I've contacted the FDA, I'm contacting

1    Huybrechts.  I will get to this if you wish me to, but

2    I'm -- you know, I have 24 hours a day.

3           Q.    You've contacted the FDA?

4           A.    I have asked for my report to be sent to the

5    FDA, yes, because Pfizer urged -- asked me that same

6    question at trial.  You feel strongly about this, you

7    have an opinion about causation, have you told the

8    FDA?  I answered truthfully that I had not at that

9    point.  As soon as the trial was over, I asked counsel

10   if they would be willing to release my report to the

11   FDA, which I believe they did.

12          Q.    Do you know if counsel has released your

13   report to the FDA, sir?

14          A.    You would have to ask counsel to confirm

15   that, not me, because I didn't physically put it in an

16   envelope, but I asked them to do so.  Now, they told

17   me they did, but you'd have to confirm with them.

18          Q.    Do you have a communication from counsel

19   indicating that they have sent it to the FDA?

20          A.    You'd have to ask counsel the

21   communications.

22          Q.    No, I'm asking --

23          A.    They've told me verbally.

24          Q.    I'm asking you if you have written

25   communication from counsel confirming that they've

1    submitted your report to the FDA?

2         A.   They have told me verbally on multiple times

3    when I have asked.

4         Q.   So you don't have anything written?

5         A.   I don't have anything written, they may well

6    have something written.

7         Q.   All right, let's go back to where we were

8    before we went back to table 6.  So we were back

9    discussing the fact that you're clearly critical of

10   the methodology in McDonagh and part of your criticism

11   was also that there's only three sentences on it,

12   right --

13        A.   But I'm not a big --

14        Q.   -- we were there?

15        A.   -- I'm not a big fan of the meta-analysis

16   for either Prozac or for Zoloft, that is correct.

17        Q.   All right.  Well, let's take a look at

18   McDonagh and the section on Prozac, because you did

19   review and comment on it in your report on Prozac as

20   part of your review.  So if we go to Fluoxetine,

21   Prozac, that's the entire section, Doctor, on

22   Fluoxetine, correct?

23        A.   Is this a quote or from my report?  I'm

24   sorry, I lost you a little bit.

25        Q.   I'm sorry, this is actually from McDonagh.

Page 94

1    So if you want the hard copy, it's under M for

2    McDonagh.

3         A.   Your Honor, I have the paper, is that -- I

4    can't read the page numbers.

5              THE COURT:  Isn't that the same page as

6    table 6?

7              MS. YATES:  Your Honor, that's a very

8    good question.

9              THE COURT:  I think it is.

10             MS. YATES:  44 to 45, yes, it is.

11   BY MS. YATES:

12        Q.   Doctor, you should be there.

13        A.   I'm on 46 with the table, but --

14             THE COURT:  Right below it.

15             MS. YATES:  Right below it.

16             THE WITNESS:  Okay.

17   BY MS. YATES:

18        Q.   That is the entire section --

19        A.   Oh, table 6.  Okay, I got it.  Thank you.

20        Q.   That's the entire section in McDonagh on

21   Prozac, correct?

22        A.   Correct.

23        Q.   All right.  I counted five sentences.

24        A.   On Prozac?

25        Q.   Yes.

1          A.    Yes.

2          Q.    I actually counted 128 words.  Are you with

3    me?

4          A.    I'm sure.

5          Q.    Okay.  Let's look at the Sertraline or

6    Zoloft section from McDonagh.  That's the entire

7    section on Sertraline, right?

8          A.    Correct.

9          Q.    Three long sentences?

10         A.    As I indicated, yes.

11         Q.    All right.

12         A.    I did that counting.

13         Q.    143 words, I did that counting.

14         A.    I didn't do that one.

15         Q.    All right.

16         A.    Key distinction, heterogeneity.  Just think

17    heterogeneity every time you go back to Prozac and

18    Zoloft.

19              THE COURT:  I think we're going to wait

20    for a question.

21    BY MS. YATES:

22         Q.    I'm not thinking heterogeneity, Doctor, I'm

23    thinking what happens when they do a sensitivity

24    analysis because of heterogeneity, right?  They

25    recognized the issue and they did something to try and

Page 96

1    correct for it, that's what's in my mind.

2         A.   Yes, but you have to do it appropriately.

3         Q.   They did it wrong?

4         A.   You have to use the appropriate methodology.

5         Q.   Understood.  You think they did it wrong?

6         A.   I think it's misleading the way they did it,

7    yes.

8         Q.   Now, if I'm just -- if I applied your

9    methodology and I looked at Miles and McDonagh, you

10   know, if I focused on meta-analyses, as you did in

11   Prozac, but now I'm going to do it in Zoloft, you

12   would not be able to conclude that Zoloft increases

13   cardiac -- the risk of cardiac defects, correct, if we

14   just looked at the meta-analyses?

15        A.   At the individual studies in the meta-

16   analysis or just the summary results?

17        Q.   The meta-analyses.

18        A.   The summary results.

19        Q.   The meta-analyses.

20        A.   Well, the meta-analyses involve individual

21   studies.  Are you saying if I just focused on the

22   summary results in --

23        Q.   The results that refer to the studies in the

24   meta-analyses, correct.

25        A.   If you -- let me put it in my own words.  If

1    you relied solely on the summary results, the meta-

2    analytic averages that Miles and McDonagh report, you

3    certainly would not conclude that Zoloft causes

4    cardiac birth defects.  If you looked deeper at the

5    individual studies, you might come to a somewhat less

6    definitive opinion.  And when you looked at all the

7    data, including the studies that are not included in

8    Miles and McDonagh, which there are several major

9    studies now, you would come I think to my opinion, at

10   least I would come to my opinion.

11       Q.   But you agree, Doctor, that the studies on

12   Zoloft are equivocal, right?  You've testified to

13   that.

14       A.   Well, there's no question, it's not every

15   study coming in with the risk doubling and clear, I

16   suspect we wouldn't be here if it was unequivocal.

17       Q.   Right.

18       A.   You must believe it's equivocal or you

19   wouldn't be spending your time here.  So of course the

20   evidence is equivocal, that's why you need a

21   statistician to assess and make inference from data

22   which has uncertainty attached to it.  That's what I'm

23   trained to do and that's what I've tried to do in this

24   case using appropriate methodology.

25       Q.   Doctor, you testified with regard to

1        Avandia, correct, you sat in the witness chair?

2            A.   Well, I couldn't remember exactly, as I said

3        yesterday, but I did testify in a hearing about

4        Avandia, yes.

5            Q.   And in the Avandia litigation you also

6        looked at meta-analyses, correct?

7            A.   I did.  And in that case there was a major

8        meta-analysis -- now, this is -- my memory is now --

9        this is going back quite a ways -- there was a meta-

10       analysis, if I recall, by GSK, the manufacturer of

11       Avandia, on -- they had several randomized clinical

12       trials and they had done at various points meta-

13       analyses as they got more trials in.  And then there

14       were some published meta-analyses in the literature by

15       authors outside of GSK that were looking at similar

16       questions, the Nissan (ph) meta-analysis and the Seng

17       and Ferburg (ph) meta-analysis of Avandia and the risk

18       of heart attacks and stroke.

19           Q.   And in the Avandia hearing you told the

20       court that "meta-analyses are useful because they are

21       an appropriate way to combine information to see if

22       there's a persistent pattern that adds up to something

23       of concern that reaches statistical significance,"

24       correct?

25           A.   Yes.  And in the context of randomized

1    clinical trials, that's certainly a true statement.

2    As I testified yesterday, the value of meta-analysis

3    in randomized clinical trials is that in a sense all

4    studies are on an equal footing, at least with regard

5    to compounding, because randomization removes the

6    possibility of compounding, at least to some

7    considerable extent because of the randomization.

8    That's one thing.

9              The other issue in the Avandia case

10   that was clear is these were all small trials.  None

11   of the Avandia trials that I testified about were

12   designed to look at the issue of does Avandia increase

13   the risk of heart attacks.  This is not similar to the

14   current case where most of the papers we've been

15   discussing have been targeted specifically, in fact

16   you read out the objectives of some of them, that

17   they're specifically looking at the safety of SSRIs

18   and birth defects.  The trials in the Avandia meta-

19   analysis were not designed to do that.  They were

20   small efficacy trials to measure the effect of Avandia

21   in treating diabetic patients, so you get very few

22   heart attacks.  And I went through this at great

23   length in that litigation.  That's where meta-analysis

24   now starts to play a quite different role than it does

25   here.

1              So there are clear distinctions between

2    the use of meta-analysis in the Avandia and the use of

3    meta-analysis here.  In both cases they should be done

4    appropriately, of course, and any methodology can be

5    misappropriated.

6         Q.   Doctor, do you remember my question?

7         A.   I do.  You asked me about my testimony and

8    using -- did I use meta-analyses in my work on

9    Avandia, and I said yes and here's what I did and why

10   I used meta-analyses in that litigation.

11        Q.   Let me ask my question again, because that

12   wasn't my question.  Didn't you tell the court in

13   Avandia that "meta-analyses are useful because they

14   are an appropriate way to combine information to see

15   if there is a persistent pattern that adds up to

16   something of concern that reaches statistical

17   significance"?

18        A.   Yes, and that's as I -- I did hear your

19   question correctly and that's what I answered.  In the

20   context of that report where you're reading from,

21   that's a context of randomized clinical trials, all

22   small, with regards to detection of heart attacks.  If

23   you -- I don't know if the Judge's memory is any

24   better than mine or yours, but in the Avandia

25   litigation most of the clinical trials or many of them

1    had zero heart attacks.  That would be equivalent in

2    this litigation of looking at a study --

3         Q.   Doctor --

4         A.   -- of Zoloft and cardiac birth defects in

5    which there were no cardiac birth defects observed.

6    So it's a quite different context.  In the context of

7    randomized clinical trials, each of which have very

8    little information on the outcome, very few heart

9    attacks in the Avandia case, you're almost obligated

10   to turn to something like a meta-analysis.  All I'm

11   saying in addressing your question is that's the

12   context where that statement it's useful to use meta-

13   analysis to combine studies, many of which have zero

14   outcomes, into seeing whether there's something

15   signal.  That was the approach done by GSK, by Nissan

16   and by Seng and Ferburg.  That's a different context

17   from where we are today in this particular litigation.

18        Q.   So in Avandia you relied on and analyzed

19   meta-analyses, in Prozac you relied on and analyzed

20   meta-analyses, and in Zoloft you looked at them and

21   you said no, correct?

22        A.   No, that's I would say a mischaracterization

23   of my methodology.  I looked at the meta-analysis in

24   the Zoloft litigation, they're covered in my report.

25        Q.   And you've said in your testimony you've

1    rejected them?

2         A.    If you could just let me finish and then --

3    that would be okay?

4         Q.    Absolutely.

5         A.    So you said I did something differently in

6    the three settings, Avandia, Prozac and Zoloft.  In

7    all three of them, there were meta-analyses done by

8    other individuals.  In Avandia, I actually did my own

9    meta-analysis in addition.  In all three of them I

10   took accounting of their methodology, their findings,

11   their insights.  And in sum, as I discussed at the end

12   of my testimony yesterday, you ought to be situational

13   to the extent you can tell the different between

14   context, you ought to be able to tell the difference

15   between in Avandia you're dealing with randomized

16   clinical trials and in Zoloft you're dealing with

17   observational studies.

18              You shouldn't treat meta-analyses and

19   interpret them as a statistician exactly the same way

20   in both those contexts, any more than, as you pointed

21   out earlier this morning, you shouldn't treat an

22   observational study the same way as you would treat a

23   randomized clinical trial.  You're going to use

24   different statistics.  It doesn't mean I ignored the

25   meta-analyses in any one of these litigations or in

1    any of my other professional work, it's just you've

2    got to interpret them and take account of their value

3    and quality in the context.

4         Q.   Doctor, there were also observational

5    studies in Avandia that you looked at?

6         A.   Well, we're going back about ten years.  My

7    memory is I didn't look at the observational studies

8    in Avandia.  But I'm happy to be corrected, but that

9    was my memory.

10        Q.   Let's go to -- let me just show you some

11   testimony and see if it refreshes your recollection,

12   in Avandia.

13        A.   Sure.

14        Q.   Let me see if I can do this.

15             MS. YATES:  Your Honor, may I approach?

16             THE COURT:  You may.

17   BY MS. YATES:

18        Q.   It's tiny print, I apologize, but this was

19   your Avandia testimony before Judge Rufe, In re

20   Avandia.  And so you're talking about, "We are

21   fortunate because there are randomized controlled

22   trials," right?  We talked about that.  And then

23   subsequently, "then I would go on and look for

24   information about the observational studies."  Does

25   that refresh your recollection that there are a number

1    of observational studies?

2         A.   Oh, there certainly were, I have no -- there

3    are certainly a number of observational studies about

4    Avandia, but the body of my report and my testimony

5    before Judge Rufe was about the randomized clinical

6    trials.

7         Q.   Oh, but you did review them, right?

8         A.   I did review them, but I didn't put them in

9    my report.  I focused my report, to use your words, on

10   the randomized clinical trial information, for which

11   there was a lot, there were a lot of random -- there

12   were close to 50, if my memory is correct, of

13   randomized clinical trials.  That was the focus of my

14   report and that's my memory.  I didn't spend any of my

15   report discussing the observational study information,

16   they're clearly is some.

17        Q.   Right.  And so -- okay, I'm not going to

18   belabor it.

19              All right, let's go back to see if we

20   can agree.  You advised the Court in Avandia that

21   "there are formal techniques in a meta-analysis that

22   are designed to make sure studies are weighted

23   properly."  You agree with that, right?

24        A.   Yes, there's -- meta-analysis is an

25   averaging processing, as I indicated, and it's going

1      to weight different studies --

2            Q.    Right.

3            A.    -- differently because of the -- you know,

4      for example, sample sizes can be substantially

5      different.

6            Q.    Because the little guys don't have the same

7      weight as the big studies?

8            A.    That's a nice way of putting it, yes.

9            Q.    Okay.  "And these techniques make sure that

10     you don't make the improper mistakes of averaging

11     results, so that no study has an undue influence,"

12     correct?

13           A.    It should have its influence based on the

14     weighting scheme, which is usually a sample-size

15     driven scheme, but not always, sometimes it's a little

16     bit more sophisticated.

17           Q.    And you've testified in this case that you

18     can't do a meta-analysis because of this

19     heterogeneity, correct?

20           A.    Well, I'm not saying you can't do it, you

21     can, it's just you have to be very careful in

22     interpreting it because the averaging that is

23     involved, weighting or not, can mislead you when you

24     rely on the results of the summary when there's

25     substantial variation in the individual trials.

1          Q.   I just want to be accurate here.

2          (Pause)

3          Q.   All right.  Do you agree, Doctor, that based

4     on the heterogeneity the problem that you have in

5     Zoloft is that the averaging that meta-analyses does

6     pretty much gets you nowhere, that's your opinion?

7          A.   No, that's -- maybe -- that's not my words.

8     I wouldn't say gets you nowhere, it's just you have to

9     pay attention to the heterogeneity in interpreting the

10    results that it gives.  As I tried to make this clear

11    yesterday, if you have two studies, one of which shows

12    an odds ratio of two and one of which shows an odds

13    ratio of 0.5, let's say equally weighted to make it

14    simple, and you do a meta-analysis and you come out

15    and report in the literature an odds ratio of 1 and

16    interpret no risk, first of all, that's incorrect, an

17    incorrect statistical interpretation, and it's clearly

18    misleading because half of your women in the study had

19    an odds ratio of 2.  No one had an odds ratio of 1, as

20    it happened.  So that's why it's misleading.  And, I

21    mean, I can go on in greater detail as to why it's so

22    misleading, but I thought that made it clear that in

23    those kind of situations you can't resort to meta-

24    analysis to resolve the inconsistency or the

25    heterogeneity of the two studies.

1       Q.   So let's take a look at your deposition.  Do

2    you remember having your deposition taken in a Zoloft

3    case called Trace Foster?  It was pending in St.

4    Louis.

5       A.   I don't recall, again, the details of the

6    specific depositions.

7                MS. YATES:  Your Honor, would you also

8    like a copy of the transcript?

9                THE COURT:  If you have it, yes.

10   (Pause)

11               THE WITNESS:  Thank you.

12               MS. YATES:  And we can put it up on the

13   screen.

14   BY MS. YATES:

15      Q.   And if you turn to page 103, Doctor,

16   starting at line 7.  Question, "You're perfectly

17   capable of searching PubMed and a priori to find set

18   of inclusion/exclusion criteria and accumulating the

19   data the same way Miles and the same way McDonagh did,

20   correct?"

21               Answer -- and the answer goes on for a

22   bit, so bear with me -- "Well, but you're

23   misinterpreting my answer.  That certainly was not the

24   obstacle.  The obstacle is the data itself does not

25   lend itself for a meta-analysis to be useful.  The

1    meta-analysis is an averaging process.  If you want to

2    take an apple and an orange and average it, there's no

3    obstacle to doing it, you can do it.  You can take

4    orange juice and apple juice and mix them together,

5    there's no physical obstacle to doing it.  Does it

6    make sense?  Sometimes averaging does.  I've lived

7    most of my life where averaging is terribly valuable,

8    but the statisticians that have known for a long time

9    that averaging can be horribly misleading.  And in

10   this case, with this amount of heterogeneity across

11   studies, averaging gets you pretty much nowhere. So

12   this is not a prime candidate for doing an effective

13   meta-analysis, in my view."

14              Did I read that correctly?

15        A.   You read that correctly and that's exactly

16   what I said yesterday.

17        Q.   Doctor, so you said there, when you've got

18   this heterogeneity problem, it's like mixing apples

19   and oranges, right?

20        A.   Yeah, that would be like the 0.5 and the 2

21   in my hypothetical example.

22        Q.   Right.  Do you recall that in Avandia you

23   were asked about heterogeneity and whether it was like

24   mixing apples and oranges?

25        A.   I can't recall the details of the discussion

1    ten years ago.

2         Q.   Isn't it true, sir, that you told the Court

3    that it's not like mixing apples and oranges, but

4    rather mixing different types of apples?

5         A.   Well, I'd have to see the testimony.

6         Q.   Okay.

7         A.   It does sound like something I would say.

8    And that would refer to -- the idea of apple and an

9    orange is heterogeneity, right?  An apple is quite

10   different.  If I held them in my hand, you could tell

11   the difference, right?

12        Q.   I sure hope so.

13        A.    If I held two different varieties of an

14   apple in my hand, could you tell the difference?

15        Q.   Possibly.

16        A.   But maybe not, right?

17        Q.   I could tell the difference in those wine

18   glasses.

19        A.   Yeah, but that's an apple and orange.  Let's

20   not change the metaphor.  If I had two apples,

21   distinct varieties of apples, you probably couldn't --

22   well, maybe they look enough the same, maybe I can

23   combine these.  That's exactly what I'm saying in this

24   testimony here, that's exactly what I said yesterday,

25   that's exactly what I'm saying now.  When you're doing

1    a meta-analysis averaging, it's fine in all other

2    things being equal to do it when you have no

3    heterogeneity, because then the averaging is valuable,

4    you're not mixing a 0.5 and a 2 and coming out with

5    this distorted in-between value that no one

6    experiences.  And the value of meta-analysis, as in

7    Avandia, is you get the increased precision that you

8    get from combining multiple small studies.

9              So it's not that meta-analysis in

10   itself is supposed to give you a magical different

11   answer from the studies, that's not the purpose of

12   meta-analysis.  The purposes of meta-analysis, if done

13   correctly, is to take homogeneous phenomena, each of

14   which is imprecise, average them, and then you get a

15   measure of the phenomena you're interested in, an odds

16   ratio, but with much more precision.  That's the point

17   of averaging always, that's the point of meta-

18   analysis, but you don't do it and mislead people when

19   there's so much heterogeneity.  That's what I said in

20   this you just read me, that's what I said back in the

21   Avandia case, that's what I said yesterday, and that's

22   what I'm saying today.

23        Q.   All right, Doctor, let's go to, I believe

24   it's the same transcript, page 31.

25              MS. YATES:  Is it the same transcript?

1                UNIDENTIFIED SPEAKER:  No, that's

2    (indiscernible).

3                MS. YATES:  Oh, I'm sorry.  It's not

4    the same transcript, so I need another transcript.

5    BY MS. YATES:

6        Q.   Doctor, we're now going to the Avandia

7    transcript.

8        A.   Okay.

9        Q.   If you would turn to page 31, line 6.

10   Question, "The other thing I wanted to ask you, is it

11   like" --

12       A.   I'm sorry, could you -- which page was it?

13       Q.   I am so sorry.  Page 31 --

14       A.   31, thank you.

15       Q.   -- line 6.

16       A.   Thank you.

17       Q.   And actually we can -- you'll see on the

18   middle of page 30, "Yesterday the word heterogeneity

19   came up, right?  So let's just give a little bit of

20   context there."

21                Now we can go to page 31, line 6.

22   Question, "The other thing I wanted to ask you about,

23   is it like mixing apples and oranges?"

24                Answer, "Well, of course the key thing

25   in a well-conducted meta-analysis, one of the

1    limitations I think I refer to here is that the

2    clinical trials that you are combining or

3    observational studies, if it's a meta-analysis of

4    observational studies, are not identical, they don't

5    in fact one -- you can view that as a strength and a

6    weakness.  They are not identical population, they are

7    not sampling from exactly the same population.  The

8    eligibility criteria for the trial that was designed

9    for an efficacy reason may vary from trial to trial

10   somewhat, they are done in different places.

11            "As I say, this is a weakness because

12   you are now trying to mix things that were collected

13   in different places.  It's also a strength because, as

14   we heard yesterday, one of the important issues in

15   causation is seeing is a phenomena, is there any idea

16   of a risk replicated in different populations, because

17   that is going to strengthen your belief that this is

18   something causal and not peculiar to a particular

19   trial or a particular population.

20            "So one of the limitations, as I said,

21   and strength is you are mixing these things.  It's not

22   mixing apples and oranges, however, if I can use that

23   analogy, it's mixing different varieties of apples.

24   All of these studies have the same drugs applied to

25   the treatment arm, they were all by and large, with

1    some notable exceptions, studying diabetics, they were

2    all essentially, when the data was pulled out on

3    adverse events, they were -- all these investigators

4    were honestly, I think, trying to get at the same

5    question.  So this was not really trying to pull

6    things from out of a hat and sort of jam them

7    together, this was -- most of these meta-analyses, not

8    all of them, but most of them were well conducted,

9    thoughtfully, and trying to answer the question and

10   summarize the information."

11              Did I read that correctly?

12       A.   I think you did.

13       Q.   Thank you.

14       (Pause)

15       Q.   Now, Doctor, I think we're well aware of

16   your criticisms of the meta-analyses on Zoloft, but

17   you did a mini-meta-analysis, right?

18       A.   I did, as I described yesterday, in the

19   "paused" analysis we had two major studies that

20   allowed you to independently look at the question of

21   comparing women on Zoloft and comparing those who

22   continued to use Zoloft during the first trimester by

23   some definition versus those who didn't, and I

24   combined those two in front of the Court yesterday.

25       Q.   Right.  So there's a couple of steps here,

1    let's see if we can go one at a time.  You performed a

2    calculation or a reanalysis of some of the Huybrechts

3    data comparing, what you say, women who filled the

4    prescription in the first trimester and women who did

5    not fill a prescription in the first trimester, right?

6         A.   One or more prescriptions filled, yes.

7         Q.   And this analysis or calculation is not part

8    of the peer-reviewed published study of Huybrechts,

9    right?

10        A.   Well, the data are there in the peer-

11   reviewed publication, that particular calculation is

12   not.

13        Q.   Right, that was my question.  And it's not

14   part of the investigator's methods, correct?

15        A.   I don't know if it's -- the investigator

16   certainly deliberately tried to separate out these

17   women that had at least one prescription filled during

18   pregnancy, because I believe in their sensitivity

19   analysis they believed that was a more rock-hard

20   measure of exposure if you actually filled a

21   prescription.  You not only were exposed in that you

22   had a previous prescription that took you through the

23   first days after conception, but then you also filled

24   one.  From their sensitivity analysis perception, they

25   thought that was a more definitive measure of exposure

1    and that's what they used it for.  And I used the same

2    data, but in a slightly different way.

3         Q.   Sir, your calculation was not part of the

4    investigator's methods set forth in the peer-reviewed

5    published article?

6         A.   As I just indicated, yeah, the data was

7    there in the supplement, but not that particular

8    calculation, that is new, yes.

9         Q.   And in fact Dr. Huybrechts has referred to

10   reanalysis as a post hoc subgroup analysis, correct?

11        A.   As well as referencing it as interesting.

12        Q.   And after the fact, post hoc -- I took a

13   little bit of Latin -- means after the fact, right?

14        A.   I actually took a little bit more Latin than

15   you --

16        Q.   There you go.

17        A.   -- but I'm surprised you didn't.

18        Q.   I rejected it.  I looked at it and rejected

19   it.  You haven't published your reanalysis, sir?

20        A.   No, I've asked -- as I indicated yesterday,

21   I believe to take the data from someone else's paper

22   without approaching that author directly and asking

23   them to collaborate would be -- not be my scientific

24   approach.  So I have asked the author if she would be

25   willing to publish them with me, because it's her data

1    and she knows that data, and I think that would be the

2    right way.  And as we discussed yesterday, we're en

3    route somewhere, I don't know how it will play out in

4    the end.  She may not wish to be involved given how

5    much contact she's had from lawyers in this case.

6         Q.   She politely declined, right?

7         A.   No, at the last email she actually indicated

8    that she would maybe see if some of her team could

9    help.

10        Q.   Let me back up.  When you asked her to be a

11   coauthor, that email politely declined, correct?

12        A.   Yes, she said she had too many other

13   projects.  If you want to look at the emails, please

14   do.  And then at the last email, when we had worked

15   through what I was getting at, she said that's an

16   interesting possibility or something, and then I'll

17   see -- I'll bring it up to my team and see if someone

18   else can.  I assume she's too busy.

19        Q.   That was your request for the data?

20        A.   No, that was the request to publish the data

21   -- well, that was my request for them to run the

22   analysis --

23        Q.   Right.

24        A.   -- adjusting for compounding.  I assumed if

25   they did that they would be willing to stand behind

1    their work and co-publish, but I can't --

2        Q.    That wasn't the question, was it --

3        A.    -- I can't --

4        Q.    -- Doctor?

5        A.    If you could just let me finish.  I couldn't

6    -- I can't speak to that.  We're in the middle of

7    something here.  I wrote to Dr. Huybrechts saying

8    here's an interesting analysis, it's your data, would

9    you coauthor?  She said, I'm too busy, and anyway it

10   doesn't adjust for compounding.  I said, exactly,

11   that's why I need your help and would you be -- I need

12   the raw data.  She said, I'm too busy, I'll see if my

13   team can help.  Now, whether that leads to a

14   publication that they want to be associated with or

15   not, that's for the future to decide.

16       Q.    You have no idea right now, right?

17       A.    Whether it will be done?  Well, I can't do

18   it and I have no control, I think is a better way of

19   putting it, yeah.

20       Q.    And the data you extracted was from the

21   supplement of the Huybrechts study, right?

22       A.    That's right, the online supplement.

23       Q.    And you defined some users in that

24   supplement as "paused"?

25       A.    And I put paused in quotes because --

1          Q.   So did I.

2          A.   Yes, and so did you, because the word paused

3     comes from Jimenez-Solem paper and --

4          Q.   I'm coming to that, I promise.

5          A.   I understand.  I --

6          Q.   I'm just trying to do this -- right now the

7     questions are this long and the answers are really

8     long, Doctor, and I really would appreciate it if you

9     could focus a little bit more on my question.  I will

10    get there and then your counsel has a chance to do a

11    redirect.

12         A.   I'm sorry, I'm a teacher, I can't help it, I

13    can't turn it off.  That's why I put the word paused

14    in quotes, it's a slightly different definition than

15    what's used in Jimenez-Solem --

16         Q.   Precisely.

17         A.   -- where they use the word paused.

18         Q.   So, number one, Dr. Huybrechts did not

19    define this population as "paused," correct?

20         A.   She didn't use that word, that is correct.

21         Q.   And, number two, your definition of paused

22    is different from the Jimenez-Solem definition, right?

23         A.   Yes, as I just indicated, yes.

24         Q.   And as you said, Dr. Huybrechts pointed out,

25    you haven't adjusted for compounding, correct?

1        A.    And we discussed that yesterday and the rest

2    of the story.

3        Q.    Doctor, yesterday there were a couple of

4    slides, pie charts -- and I'm sorry, I only have

5    black-and-white, but if I can use the Elmo, maybe

6    that's easier to see.  Okay, let's see if I can --

7    this pie chart was shown.  This is your reanalysis of

8    the Huybrechts data.  And I apologize, that's my

9    handwriting, "Jewell's definition of paused," we've

10   already gone through that.  And you have an odds ratio

11   of 1.87, confidence level is 1.07 to 2.39, p value of

12   0.02, right, that's what you showed us yesterday?

13       A.    Yes, I showed two of these, I believe, and

14   this is the one, to be precise, that refers to the,

15   quote, "paused group," I mean, the exposed as filling

16   one or more prescriptions.

17       Q.    Right.  There was another one that talked

18   about, after Dr. Gibbons commented, you went and did

19   two or more, right?

20       A.    Correct.

21       Q.    But then we saw another slide, "Meta-

22   analysis, Huybrechts and Jimenez-Solem."  Huybrechts

23   scored odds ratio 1.9, confidence level of 1.1 to 3.3.

24       A.    Could you show me the previous slide, just

25   so I can --

1      Q.   Yeah.

2      A.   -- because that's where I think you're

3   going.  Yeah, that doesn't look right.

4      Q.   It doesn't look right, does it, Doctor?

5      A.   Yeah, that's -- one of those is --

6      Q.   Do we know which one is wrong?

7      A.   Well, it will take a minute, because if I

8   could take logs I could do the symmetry.  Maybe Dr.

9   Kimmel can do it for me, he's better at that with his

10  eye.  I can't tell with -- I think to be fair, I

11  should correct one of those slides after I've had a

12  chance to be in a dark room for two minutes.

13     Q.   Okay, all right.  One of them is wrong, we

14  don't know which one?

15     A.   Yes.  The upper bound there looks incorrect

16  on one of those.

17     Q.   Okay.  And just so we're clear, based on

18  your communications with Dr. Huybrechts, you did not

19  mean your unpublished reanalysis to supersede Dr.

20  Huybrechts' big published study, right?

21     A.   No, and I told her that of course, I didn't

22  intend that.

23     Q.   Right.  When you did your meta-analysis, do

24  you know if you used the correct numbers?

25     A.   Which meta-analysis?

1          Q.   So you --

2          A.   Oh, you mean the two studies?

3          Q.   Yeah.

4          A.   I would have used the raw data itself, not

5     the summary results.  So I did it myself using the raw

6     data, not -- so it's a transcription error in one of

7     those upper bounds.

8          Q.   All right.

9               MS. YATES:  Your Honor, I am about to

10    move on and I can hopefully tighten things up.  I am

11    happy to go on or I'm not sure --

12              THE COURT:  Well, it is a lunch break

13    time.

14              MS. YATES:  Lunch break?  Okay.

15              THE COURT:  And I think we should take

16    the hour again.  If that's not enough, let me know,

17    because we can easily come back at 2:00, but it is

18    appropriate to break now for our lunch recess.

19              So why don't we get back here in an

20    hour and assess where we are, and that would be ten

21    minutes to 2:00.

22              MS. YATES:  Thank you, Your Honor.

23    (Proceedings recessed at 12:49 p.m.)

24                   *  *  *  *  *  *

25

1

CERTIFICATIONS

2

3        I, Sheila G. Orms, certify that the

4    foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the

6    above-entitled matter.

7

    Dated:  September 1, 2015

8

9

10

11

    Signature of Approved Transcriber

12

13

14

15

    DAWN SOUTH

16

17

18

19

20

    TRACEY WILLIAMS

21

    AAERT Certified Electronic Transcriber CET**00152

22

23

24

25

**A**

**AAERT** 122:21
**Aarhus** 10:15
**AARON** 1:19
**able** 58:24 67:13
  84:14 96:12
  102:14
**above-entitled**
  122:6
**absolute** 38:20
**absolutely** 6:1
  12:13 71:5 86:20
  102:4
**abstract** 51:2,6,9
  51:12,17 52:14,20
  52:25 53:4,7,10
  53:15,18 63:7,18
  63:24
**abstracts** 82:23
**access** 52:12
**account** 71:16
  103:2
**accounting** 102:10
**accumulating**
  107:18
**accurate** 52:9,11
  74:20 106:1
**accurately** 40:2
**actual** 19:1 43:14
  48:2 82:1
**add** 75:21
**added** 11:6
**addition** 102:9
**additional** 9:6
  83:15
**address** 35:20
**addressed** 34:18
**addressing** 61:22
  62:18 101:11
**adds** 75:17 98:22
  100:15
**adjust** 37:25 41:14
  41:18 73:3 117:10
**adjusted** 23:6,8
  37:18 38:5 41:15
  71:11 73:7 118:25

**adjusting** 42:13
  87:19 116:24
**adjustment** 39:24
  40:16
**adjustments** 36:25
**adverse** 113:3
**advised** 104:20
**affect** 35:6 42:7
**affidavit** 80:24
  81:2,16,20
**age** 55:7 69:18
**agency** 70:7 83:16
**agents** 64:17
**ago** 37:23,24 38:1
  41:17 42:13 74:18
  79:19 86:23 109:1
**agree** 4:2 5:23 8:14
  11:5 38:17 59:6
  60:4,21,24 61:2
  62:22 76:19 97:11
  104:20,23 106:3
**agreed** 27:24 29:7
  33:14 81:9
**ah** 37:21
**alike** 90:3,8
**allowed** 54:5
  113:20
**alphabetical** 22:16
**alternative** 69:15
**altogether** 29:21
  46:23
**amount** 43:2,22
  108:10
**analogy** 8:24
  112:23
**analyses** 62:8,24
  77:13 80:14 98:13
**analysis** 39:1,5
  40:5,17,23 41:1
  42:4,11 44:3,9,15
  52:2,11 62:12
  65:19 70:18 71:10
  71:16,19 73:1,2
  74:11,12 76:12,12
  76:25 77:4 85:10
  89:15,21 90:8
  91:8,10 95:24

96:16 98:10 99:19
  101:13 106:24
  110:18 113:19
  114:7,19,24
  115:10 116:22
  117:8 119:22
**analytic** 97:2
**analyzed** 76:9,21
  77:13 101:18,19
**anatomically** 59:1
**ANDREW** 1:21
**anomalies** 24:8
  73:6,19
**answer** 52:18 80:11
  88:18,18 107:21
  107:21,23 110:11
  111:24 113:9
**answered** 43:18
  54:12 76:24 92:8
  100:19
**answers** 118:7
**antidepressant**
  78:4
**antidepressants**
  81:20,23
**anybody** 80:1
**anymore** 34:10
  45:14
**anyway** 117:9
**apologize** 24:25
  30:15 44:25 65:2
  71:3 103:18 119:8
**apparently** 8:3
  50:4 53:9 72:17
  81:7
**APPEARANCES**
  1:7
**appeared** 39:5
  81:13 82:3
**appears** 78:1
**appendix** 15:19,23
**apple** 108:2,4 109:8
  109:9,14,19
**apples** 57:10
  108:18,24 109:3,4
  109:20,21 111:23
  112:22,23

**application** 56:11
**applied** 73:24 96:8
  112:24
**applies** 41:25
**applying** 51:23
**appreciate** 118:8
**approach** 3:11
  15:16 51:16 72:3
  101:15 103:15
  115:24
**approaching**
  115:22
**appropriate** 66:8
  81:1 82:5 90:6,10
  91:6 96:4 97:24
  98:21 100:14
  121:18
**appropriately** 45:6
  96:2 100:4
**approval** 16:1,11
  16:13,16,21
**approved** 13:20
  14:4 15:4,9,24,25
  122:11
**approximately** 8:5
**arch** 24:8
**area** 6:24 10:21
  29:5,6 56:8,9,10
  58:2,3,7 82:1
**arm** 112:25
**art** 20:24
**article** 37:5,11,19
  37:24 40:4 44:6
  115:5
**articles** 58:1
**aside** 32:25
**asked** 34:7 47:14
  47:16,19 53:25
  54:1,3,12 67:2
  92:4,5,9,16 93:3
  100:7 108:23
  115:20,24 116:10
**asking** 34:6 48:4
  87:1 92:22,24
  115:22
**assess** 61:3 83:22
  85:22 97:21

121:20
**assessing** 60:22,25
**associated** 23:14
  25:12 63:20 64:5
  64:11,18 65:4
  68:23 70:13
  117:14
**association** 21:20
  22:4 24:7 60:2
  63:10 77:5
**assume** 13:19 14:3
  16:19 23:7 39:22
  41:24 66:21 68:14
  68:15 69:23
  116:18
**assumed** 116:24
**assumption** 17:9,14
**asymmetric** 29:18
  46:9
**asymmetry** 29:7
  46:8
**atrial** 23:20,21,23
  24:12
**attached** 97:22
**attacks** 98:18 99:13
  99:22 100:22
  101:1,9
**attention** 51:25
  57:17 62:3 67:7
  106:9
**August** 36:2
**Australia** 69:9
**author** 115:22,24
**authors** 15:12
  25:23,24 30:22
  32:4 33:10 35:21
  36:15 65:11 68:6
  68:20 69:12 73:17
  79:5,8 84:12
  98:15
**author's** 83:22
**author's** 14:8
**available** 62:4,15
**Avandia** 98:1,4,5
  98:11,17,19 99:9
  99:11,12,18,20
  100:2,9,13,24

101:9,18 102:6,8
102:15 103:5,8,12
103:19,20 104:4
104:20 108:22
110:7,21 111:6
**average** 108:2
110:14
**averages** 97:2
**averaging** 91:4
104:25 105:10,22
106:5 108:1,6,7,9
108:11 110:1,3,17
**aware** 49:19 50:2
51:1,3 57:5 62:16
62:21 75:23 80:22
113:15
**axis** 29:6
**a.m** 1:4,4 66:13,14

**B**

**B** 42:5 44:6
**back** 7:3 10:7,20
14:7 31:15 37:23
38:4 39:9 41:15
43:20 53:11 56:19
56:21 66:10 71:1
82:6 83:8 88:16
93:7,8,8 95:17
98:9 103:6 104:19
110:20 116:10
121:17,19
**badly** 81:9,11
**band** 33:20
**bar** 11:20
**based** 39:11,11
40:23 46:6 49:5
77:24 105:13
106:3 120:17
**basically** 40:3
**bathroom** 67:2
**bear** 107:22
**began** 76:12
**beginning** 53:11
80:12
**behalf** 56:13
**belabor** 104:18
**belief** 112:17

**believe** 3:9 19:17
26:10 29:24 33:10
44:20 49:25 50:5
53:20 54:22 59:23
76:25 92:11 97:18
110:23 114:18
115:21 119:13
**believed** 25:11
114:19
**benefit** 26:15
**benefits** 82:13
**Berard** 47:9 48:14
49:11,22 51:1,21
52:7,16,19 53:14
53:17 57:1
**Berard's** 47:14,17
48:24 50:6,11,14
53:4 54:1 57:14
**Bernstein** 47:12
**BERT** 1:16,19
**best** 41:16 53:15
74:2 87:3
**better** 5:15 12:15
13:1,2,3 16:2
27:24 33:12
100:24 117:18
120:9
**beyond** 19:24 52:4
**biases** 61:3
**big** 21:19 34:20
37:15 67:6 84:5
93:13,15 105:7
120:20
**bigger** 21:2,3 24:14
35:2 43:10
**binder** 7:7,11,17
22:15
**BIRNBAUM** 1:16
**birth** 13:11 14:10
39:18,23 55:22
56:8,10 58:5,10
62:13,24 77:6
83:20 85:16 90:21
90:23 97:4 99:18
101:4,5
**bit** 4:1 5:22 7:25
20:20 31:22 42:23

43:1 46:10 49:16
51:9 54:16 55:14
61:15 88:4 93:24
105:16 107:22
111:19 115:13,14
118:9
**black** 45:12
**black-and-white**
119:5
**blocks** 90:4
**blurred** 63:23
**blurry** 16:5,7,10
22:6 28:19,19
**body** 77:4 79:22
84:17 104:4
**bore** 88:24
**born** 63:12
**bottom** 64:24
**bound** 30:18,19,19
31:5 35:3 38:5,6
38:12 42:14,19
120:15
**bounds** 38:18
42:22 43:3 121:7
**branch** 70:8
**break** 14:23 47:24
48:5 66:21 76:11
121:12,14,18
**breakdown** 38:24
**brief** 66:9 83:20
84:10,22
**briefly** 70:14 75:6
79:9
**bring** 48:11 88:15
91:9 116:17
**bunch** 76:1
**busy** 56:20 116:18
117:9,12

**C**

**C** 3:1 44:6
**CALCAGNIE** 1:10
1:11
**calculate** 47:19
48:14
**calculated** 47:25
**calculating** 49:12

**calculation** 47:17
48:6 114:2,7,11
115:3,8
**calculations** 49:5
49:21 50:14 51:24
**call** 3:3 26:19
**called** 15:17 63:15
107:3
**Callen** 4:18,18,19
4:20 5:7
**Callen-Reis** 8:24
**candidate** 108:12
**can't** 94:4 105:18
105:20 106:23
108:25 117:1,3,6
117:17 118:12,13
120:10
**capable** 107:17
**cardiac** 21:21 22:4
23:1 26:17 27:8
34:25 35:18 39:21
39:22 62:24 63:11
64:9,11 65:5,14
67:22 70:12 71:12
73:6,10,18 74:3
77:6 80:5 82:19
83:20 85:16 90:21
90:23 96:13,13
97:4 101:4,5
**cardiologist** 59:4
**cardiovascular**
55:22 58:22
**care** 48:13 70:7
82:17
**careful** 105:21
**carried** 83:15
**case** 4:22,22 7:16
27:19 28:2,2,4,5,6
28:11,16 29:19
32:18 33:25 51:10
62:6 68:3 82:24
82:24 84:20 90:16
97:24 98:7 99:9
99:14 101:9
105:17 107:3
108:10 110:21
116:5

**cases** 28:8 100:3
**category** 59:24
**caught** 31:16
**causal** 112:18
**causation** 27:11
56:2 60:22,25
92:7 112:15
**cause** 55:21
**causes** 56:14 97:3
**Celexa** 63:19
**center** 46:1
**certain** 15:11 62:13
**certainly** 5:24 7:15
13:13 19:19 26:10
31:1,14 34:4
48:25 56:4,9 63:1
73:14 97:3 99:1
104:2,3 107:23
114:16
**CERTIFICATI...**
122:1
**Certified** 122:21
**certify** 122:3
**CET** 122:21
**chair** 28:11 98:1
**chance** 3:7 34:18
118:10 120:12
**change** 27:24 30:14
31:6,21,22 35:2,4
35:11,11,12,13
37:20,24 38:2,12
38:19,23 41:22,24
42:14,22,25 43:9
44:8,10,12,12
47:8 51:9 52:17
109:20
**changed** 30:19 35:5
35:14 38:4 40:16
45:10 49:4
**changes** 52:15,21
**changing** 31:2,9
42:23 43:13
**characteristics**
72:9,10
**chart** 7:1 14:21
20:12 119:7
**charts** 119:4

chase 48:22
CHD 65:17
check 7:6,9 8:5,9
  8:11 19:5 47:16
  51:15 57:19
checked 52:3 53:20
checking 8:12
  12:12 49:23 52:5
Cheffo 1:15 50:6
cherry 90:15
child-bearing
  69:18
choice 44:13,13
  76:3
choose 62:20
Citalopram 64:4
  69:16 78:22
cited 58:19
claim 58:21,24 86:7
claimed 42:12
  54:14 73:20 81:20
claims 49:11 54:13
clean 42:6
clear 27:10 36:11
  79:2 89:14 97:15
  99:10 100:1
  106:10,22 120:17
clearly 36:15,16
  86:3 93:9 104:16
  106:17
CLERK 3:2
clinical 98:11 99:1
  99:3 100:21,25
  101:7 102:16,23
  104:5,10,13 112:2
clinically 59:1
clipping 73:15
clips 45:17
close 104:12
closer 6:23,24
  44:25
coauthor 116:11
  117:9
coauthors 80:25
coincide 50:13,16
  50:20 52:22
collaborate 115:23

collected 112:12
Collin 5:10,11
column 88:24 89:3
combine 98:21
  100:14 101:13
  109:23
combined 113:24
combining 110:8
  112:2
come 50:18 63:5
  66:10 71:1 97:5,9
  97:10 106:14
  121:17
comes 118:3
coming 61:4 97:15
  110:4 118:4
comment 79:3 87:6
  93:19
commented 76:17
  119:18
Committee 1:9
communicating
  44:18
communication
  92:18,25
communications
  92:21 120:18
community 56:1,5
Company 1:23
compared 74:4
  82:16
comparing 14:19
  25:20 85:25
  113:21,21 114:3
comparison 25:19
compatible 33:22
complete 5:7 9:8
  21:7,10 77:1
completely 4:23
  19:3 40:12 55:15
complicated 5:12
  50:15
compounding 99:5
  99:6 116:24
  117:10 118:25
compressed 29:6
conception 114:23

concepts 47:3
concern 98:23
  100:16
conclude 65:11
  69:14 84:3 96:12
  97:3
concluded 25:8
  73:17
concluding 56:2
conclusion 69:22
  69:23 73:25
conclusions 25:6
conditions 59:5
conduct 82:13
conducted 113:8
confess 46:7
confidence 23:15
  23:25 24:8,21
  30:9,14,16,18
  31:5 33:19,23
  35:3,24 36:16
  37:1,17,19 38:5
  38:12 41:9,12
  42:14,18,19,22
  43:3,9 45:22 46:9
  49:9,13 67:16
  73:7,11 74:8,14
  119:11,23
confidential 24:15
confinder 25:12
confirm 7:20 19:2
  54:2,3,8,13 92:14
  92:17
confirmed 4:13
  48:5 50:9 54:14
confirming 92:25
confounders 37:10
confounding 25:21
  36:25 41:21,25
  42:24,25 44:11,13
  44:14 61:4 73:4
confusion 80:20
congenital 56:14
  58:1 63:20 64:5
connected 56:24
connecting 40:21
conotruncal 24:7

consider 4:4,21
  62:17
considerable 99:7
considered 69:16
  80:14
consistency 27:1
  60:24
consisting 83:21
consulting 57:2
contact 116:5
contacted 57:8,18
  91:25 92:3
contacting 91:25
contained 4:10
  31:6
CONTD 66:16
context 4:5 35:2
  79:21 98:25
  100:20,21 101:6,6
  101:12,16 102:14
  103:3 111:20
contexts 102:20
contextual 80:11
continue 63:17
continued 113:22
contradictory 81:7
contribute 55:21
control 61:9 81:19
  81:22 117:18
controlled 103:21
conundrum 59:10
conversation 4:2
copies 66:10
copy 22:11,22
  65:25 66:6 67:13
  87:16 94:1 107:8
Cornum 5:19 6:2,6
  6:8,10,16,19 7:7,9
  7:20 8:15,17 9:3,5
  9:11,19 10:2,10
  11:25 13:22,24
  14:8,19 17:5,25
  18:9 19:20 21:9
CORR 1:14
correct 4:4,21 5:9
  5:20,21,25 6:7,17
  6:19 8:8,17,22,24

9:9,10,20 10:3,23
  11:7,8,16,18,21
  11:24 12:2 13:7
  13:10 15:2 16:1
  16:18,19,22,23
  18:8 19:16,21
  20:1,5,7 21:7,8,11
  21:14,21 22:5
  23:1,19,22 24:5,8
  24:10,13,15,16,19
  24:24 25:10 27:20
  30:5,6,7 31:8,13
  32:16,22 33:3,5
  35:4,16,19,24
  36:18,23 37:6
  39:15,16 40:10
  41:2,3,7 44:7 45:9
  45:20,23,24 46:19
  47:18 48:1 50:12
  50:13,17,22 53:21
  54:18 55:22,23
  56:5,15 57:15
  58:13,18 59:2,8
  61:5,6,8,19,25
  62:1,4 63:21 64:6
  64:12,14,15,18
  65:7,10,14 66:23
  67:17,18,20,21,23
  69:10,22 70:10
  72:19 73:19,20
  74:6,8,9,11,12,14
  74:15,21 75:8,10
  78:15 79:14,15,15
  80:18 83:4,24
  89:16,20,22 93:16
  93:22 94:21,22
  95:8 96:1,13,24
  98:1,6,24 101:21
  104:12 105:12,19
  107:20 114:14
  115:10 116:11
  118:19,20,25
  119:20 120:11,24
  122:4
corrected 30:4
  46:13 103:8
correcting 36:22

42:8 44:8
**correction** 30:2,2
  30:14 32:12,25
  33:1 35:21 36:9
  36:14 81:11,13
**corrections** 26:2
**correctly** 36:19,20
  50:24 52:11 63:13
  64:7 69:18 71:13
  71:14 74:5,9
  77:11,15,16 78:7
  78:9 83:1,2,23
  91:11,12 100:19
  108:14,15 110:13
  113:11
**correspond** 40:4
  41:14 44:11
**corresponded**
  42:12
**corresponding**
  30:22
**corresponds** 74:19
**couldn't** 91:7 98:2
  109:21 117:5
**could've** 15:5,11
**counsel** 1:9,16 81:8
  92:9,12,14,18,20
  92:25 118:10
**counted** 94:23 95:2
**counties** 6:3,16
  10:3,5,11,13,17
  10:18 11:6,9 13:8
  18:10
**counting** 95:12,13
**countries** 21:4
**country** 6:15 10:9
**country's** 18:6
**county** 10:15,22
  11:2,2,18,22
  14:15 15:1 17:6
  17:11 21:15
**couple** 113:25
  119:3
**course** 11:19 45:17
  71:22 75:19 77:2
  90:3 97:19 100:4
  111:24 120:21

**court** 1:1,23 3:3,4,6
  3:10,13,17 5:3
  7:13,15 12:22
  13:1 22:18 26:15
  28:16 40:6 44:15
  45:1,3 48:13,18
  58:25 64:22 65:24
  66:8,15 79:20,24
  87:14,15,19,23,25
  94:5,9,14 95:19
  98:20 100:12
  103:16 104:20
  107:9 109:2
  113:24 121:12,15
**cover** 8:2 14:20
**covered** 8:17 10:14
  10:15,16,19 46:15
  101:24
**covers** 6:19
**Co-Lead** 1:9
**co-publish** 117:1
**crazy** 32:5,6
**criteria** 80:21 81:1
  81:21 82:1 107:18
  112:8
**critical** 93:9
**criticism** 93:10
**criticisms** 113:16
**cross** 2:2 66:22
**cross-examination**
  3:19,21 66:16
**crucial** 43:12 60:22
**crude** 47:25 49:4
  49:21 51:4
**cup** 42:17
**current** 99:14
**cut** 48:22
**CYNTHIA** 1:6

**D**
**D** 2:1 3:1 42:5 44:6
**Danish** 5:19 21:5,7
  46:21
**dark** 120:12
**data** 8:23 9:19
  14:14,18 15:12,15
  17:15,19 21:7

27:13 33:22 34:1
  35:5,10 37:8,9
  39:10 40:23 42:20
  42:23 43:16 44:4
  46:6 49:5 50:22
  50:23 52:9,10,12
  52:12 54:1,1,4,6,6
  54:7,11 59:16
  60:17 73:24 75:22
  76:9,21 77:2,13
  82:21 89:10 97:7
  97:21 107:19,24
  113:2 114:3,10
  115:2,6,21,25
  116:1,19,20 117:8
  117:12,20 119:8
  121:4,6
**date** 9:12 16:10,13
  16:16,17,21,24
  17:2
**dated** 39:2 122:7
**dates** 6:22 57:17,22
**DAUBERT** 1:6
**DAWN** 122:15
**day** 30:12 92:2
**days** 114:23
**deal** 37:15 49:24
  50:23 89:25 90:6
  91:14
**dealing** 44:16 59:11
  102:15,16
**dealt** 90:1
**debate** 32:13 33:9
  33:14,16 48:25
  49:3,18 50:1 69:2
**decide** 117:15
**declined** 116:6,11
**DEE** 52:21
**deeper** 97:4
**defect** 14:10 22:4
  23:1 39:19,21,23
  42:3 90:23
**defects** 23:22 24:12
  46:17 55:22 56:8
  56:10,15 58:1,5
  58:11,25 59:8
  60:5 62:13,25

77:6 80:5 83:21
  85:17 90:21 96:13
  97:4 99:18 101:4
  101:5
**Defendants** 1:15
**define** 118:19
**defined** 117:23
**definitely** 22:1
**definition** 113:23
  118:14,21,22
  119:9
**definitive** 59:18
  97:6 114:25
**degree** 39:19,21
  54:20
**deliberately** 114:16
**Denmark** 5:14 8:18
  10:3 13:21 14:4
  15:4,25 16:14,25
  17:2 19:24,24
  20:25 46:18
**department** 69:13
  70:8
**departments** 69:7
**depending** 10:14
**depends** 4:5 48:3
  48:18 72:2
**deposed** 28:7
**deposition** 27:23
  29:5 56:4 81:4
  107:1,2
**depositions** 107:6
**depression** 82:15
**describe** 55:9,17
  82:8 83:3 84:14
  85:7
**described** 4:25
  13:24 24:21 25:18
  37:11 38:1 39:16
  39:17,18,24 40:2
  56:22 59:9 85:15
  113:18
**describes** 38:2
**describing** 29:17
  36:24
**description** 14:8
  31:17 40:3,5,8

41:6,19,21 42:9
  44:7,8 50:21
  60:20
**descriptions** 36:22
**descriptive** 37:3
**designed** 99:12,19
  104:22 112:8
**detail** 10:8 25:14
  32:1 84:14 106:21
**details** 59:5 107:5
  108:25
**detected** 37:12
**detection** 100:22
**determine** 15:10
  60:1 63:9 72:6
**determined** 60:3,7
**determines** 59:13
**developmental**
  59:1
**diabetic** 99:21
**diabetics** 113:1
**DIANNE** 1:8
**didn't** 81:7 92:15
  95:14 100:12
  103:7 104:8,14
  113:23 115:17
  118:20 120:21
**differed** 42:20
**difference** 28:9
  34:12 52:24 53:10
  53:14 85:25 86:4
  86:5 88:19 102:14
  109:11,14,17
**different** 4:14,14
  10:13 14:1 15:16
  21:4 27:16,20
  37:10,14 38:11
  39:22 44:14 47:3
  72:10 99:24 101:6
  101:16 102:13,24
  105:1,5 109:4,10
  109:13 110:10
  112:10,13,16,23
  115:2 118:14,22
**differently** 89:10
  102:5 105:3
**DIRECT** 2:2

**directly** 25:20,21
  115:22
**disagree** 25:15,17
  25:23,24 69:25
  70:1 73:21,22,23
  75:11,17 76:19
**discovered** 39:4,8
**discovery** 46:3
**discrepancy** 49:20
**discuss** 29:10 32:1
  49:17 61:22
**discussed** 4:11
  27:23 29:4 34:2
  38:8 46:22,22
  49:8 59:12 61:24
  62:5,9 75:16
  76:11,18 80:7,19
  81:5,16 83:7
  86:21 88:8 102:11
  116:2 119:1
**discussing** 4:6 93:9
  99:15 104:15
**discussion** 31:1
  43:6 108:25
**dispute** 49:9
**distinct** 109:21
**distinction** 33:10
  33:15 95:16
**distinctions** 100:1
**distort** 29:2
**distorted** 110:5
**distorts** 29:13
**DISTRICT** 1:1,1
**divide** 6:23,25
**doctor** 3:25 4:16,19
  5:6,13,19 6:23
  8:11 9:12 10:20
  12:8 13:5 14:1,13
  16:17 18:3,19
  21:16 22:9 23:9
  23:18 25:4 26:1
  29:1 30:2,12 34:6
  36:10 38:14 40:19
  46:11 47:2,8
  48:20 51:1,19
  52:18 53:1 54:17
  55:16 56:6,7

57:10 60:4,21
  61:15 63:25 65:2
  65:20 66:7 67:11
  67:14 68:21 69:1
  70:15 73:1,13
  76:7,19 77:7
  79:10 80:16 82:6
  86:13,24 88:9
  89:13,23 93:21
  94:12 95:22 97:11
  97:25 100:6 101:3
  103:4 106:3
  107:15 108:17
  110:23 111:6
  113:15 117:4
  118:8 119:3 120:4
**doctors** 68:8,12,16
  69:6
**document** 15:17,23
**documents** 56:3
  76:14
**doesn't** 81:23,24
  102:24 117:10
  120:3,4
**doing** 49:21 71:19
  72:12 108:3,5,12
  109:25
**don't** 81:12 83:5
  84:5 85:7,8,14
  87:24 93:4,5
  100:23 105:6,10
  107:5 110:18
  112:4 114:15
  116:3 120:14
  121:19
**dot** 78:14,14,14,17
  78:17,17,20,20,20
  78:21,21,21
**doubling** 97:15
**Dr** 3:10,14,18,23
  7:12 24:6 31:15
  46:2 47:14,17
  48:13,24 49:6,10
  49:22 50:6,11,14
  51:1,21 52:7,16
  52:19 53:4,14,17
  53:25 54:1,6,24

57:1,14 66:18
  74:23 80:24 115:9
  117:7 118:18,24
  119:18 120:8,18
  120:19
**driven** 105:15
**drugs** 64:25 112:24
**due** 25:11 83:19

---

**E**

**E** 1:21 2:1 3:1,1
**earlier** 4:12 46:16
  46:22 76:15
  102:21
**early** 72:22
**earth** 84:2
**ease** 27:6
**easier** 22:22 119:6
**easily** 38:6,16
  121:17
**EASTERN** 1:1
**editor** 32:6
**effect** 99:20
**effective** 108:12
**effectively** 34:2
**efficacy** 99:20
  112:9
**efforts** 73:9
**egotistical** 55:14
**eight** 19:16
**either** 9:19 26:5
  35:22 52:7 55:4
  93:16
**electively** 78:4
**electronic** 122:5,21
**electronics** 3:7
**Eli** 62:6 76:14,25
**eligibility** 112:8
**Elmo** 119:5
**else's** 115:21
**email** 116:7,11,14
**emails** 81:8,10
  116:13
**EMANUEL** 1:17
**emphasis** 31:2,6,9
  31:22 43:2,4,6
**emphasize** 31:18

**en** 116:2
**ended** 90:17
**England** 30:21
  32:2,12,20,24
  36:9 37:1 39:6,13
  40:1,9 42:13,21
  45:16
**enlarge** 22:2
**entire** 6:15 10:9,19
  11:14,25 12:3
  14:21 17:12 18:6
  18:22 33:21 34:20
  77:4 93:21 94:18
  94:20 95:6
**entirely** 4:10 26:11
  80:12
**envelope** 92:16
**equal** 99:4 110:2
**equally** 78:22
  106:13
**equation** 51:16
**equivalent** 29:9
  101:1
**equivocal** 97:12,18
  97:20
**error** 26:12 37:3,12
  41:20 121:6
**especially** 61:4
**ESQ** 1:8,10,12,13
  1:14,15,16,16,17
  1:18,19,19,21,21
**essential** 81:25
**essentially** 113:2
**estimate** 43:14 73:5
  73:11
**estimates** 35:23
  36:16 41:8 59:18
**estimating** 51:16
**ethically** 61:13
**evaluate** 82:13
  84:23
**evaluation** 82:18
  82:25
**events** 113:3
**everybody** 77:8
**everyone's** 45:4
**evidence** 61:4 74:2

77:5 79:22 87:3
  97:20
**exact** 31:3,15 43:11
**exactly** 23:11 37:18
  72:14,15 98:2
  102:19 108:15
  109:23,24,25
  112:7 117:10
**examination** 44:3
  66:23
**examined** 70:11
**example** 76:16
  84:16 105:4
  108:21
**exception** 21:10
**exceptions** 113:1
**excluded** 75:16
  82:25 83:19
**excluding** 81:18
**exclusion** 81:17
**exhibit** 29:24
**existing** 77:23 78:1
**expect** 52:17 84:15
**experience** 47:13
**experiences** 110:6
**expert** 27:16,18
  56:13 57:13 58:21
  59:4
**expertise** 58:24
**experts** 59:15,16
**explain** 70:3 72:7
**explanation** 75:14
**explicit** 49:23 85:10
**explicitly** 32:3,4
**exposed** 14:6,11
  15:5,10 16:18
  17:7 19:15 81:19
  81:23 114:21
  119:15
**exposure** 76:9,22
  77:14 114:20,25
**extent** 60:17 82:2
  99:7 102:13
**extracted** 117:20
**eye** 29:15,17 35:12
  120:10
**eyes** 16:3 46:7

87:19
**e-mail** 32:2 36:1,10
36:15 38:2,24
44:16
**e-mails** 31:14 32:10
32:13 33:1,8

**F**

**F** 1:10 22:16
**face** 15:14
**facing** 59:10
**fact** 29:8 31:5,17
38:10,10,20 41:24
43:5 47:24 49:24
53:17 60:1 62:6
65:11 67:24 75:13
79:3 93:9 99:15
112:5 115:9,12,13
**factors** 72:7 73:4
**fair** 7:1 60:20 62:2
83:7 84:12 120:10
**fairly** 40:11
**familiar** 15:17
16:20 28:17,21,22
85:4
**fan** 84:5 93:15
**far** 8:1 49:19 57:5
62:16 80:9,22
84:19
**FDA** 91:25 92:3,5,8
92:11,13,19 93:1
**February** 47:11
**feel** 91:13 92:6
**feeling** 60:13
**felt** 31:5
**Ferburg** 98:17
101:16
**fewer** 71:19
**field** 58:21
**Fifty** 20:16
**figure** 13:21 14:5
21:25 22:20 65:12
67:11
**fill** 114:5
**filled** 18:23 114:3,6
114:17,20,23
**filling** 25:12 119:15

**filmy** 87:20
**final** 53:13 67:17
**finally** 11:7
**find** 15:5 36:6
59:19 60:9,11
61:20 69:4 79:16
87:9 90:7 107:17
**finding** 23:1,21
24:12,18,23 27:8
30:3,4,5,24 46:17
48:17 74:7 89:15
**findings** 21:21
26:17 27:7,8,9
48:23 50:8,19
51:12 52:21 60:10
73:23 77:21,23,24
82:19 102:10
**fine** 12:9 28:15
34:5 36:12 59:5
64:1 87:1 110:1
**finish** 102:2 117:5
**Finland** 19:24
**FIRM** 1:13
**first** 4:9 6:3,11 15:5
27:15,19 28:1,16
39:19,21 57:5
64:22 69:15,17
71:9 73:2 78:4,5
79:6 106:16
113:22 114:4,5,23
**five** 6:24,25 11:18
37:23,24 38:1
41:17 42:13 94:23
**fixation** 38:9
**flaws** 79:14
**flipped** 18:1
**Fluoxetine** 78:2,3
89:6 93:20,22
**focus** 12:21 16:2
35:18 76:7 79:13
104:13 118:9
**focused** 12:19
14:14 62:3,8
76:12,20,25 77:4
77:12 82:18 96:10
96:21 104:9
**focusing** 79:11

**follow** 63:22 64:3
**followed** 6:8,9
63:14 71:25
**following** 64:20
69:20 76:20
**follows** 4:8
**footing** 99:4
**footnotes** 85:6
**forbid** 54:23
**forced** 49:13
**foregoing** 122:4
**forest** 26:14,17,20
27:16 28:1,16
29:21 44:19 46:6
46:16
**forget** 40:14
**form** 46:21
**formal** 33:11
104:21
**forming** 61:24
**formula** 31:20
**formulated** 31:19
**forth** 115:4
**fortunate** 61:13
103:21
**forward** 5:16 60:12
**Foster** 107:3
**found** 21:19 22:3
23:20 24:6,11,22
42:8 63:18,19
69:5 70:17,18
71:9
**four** 6:3,16 10:2,5
11:7 13:8 14:15
18:10 73:4,9
90:17,18 91:1
**frame** 10:22
**frank** 43:5 65:22
**front** 22:11,22
28:11 87:12
113:24
**Frye** 47:11
**full** 62:11
**fully** 83:22
**fundamental** 85:24
86:5 88:19
**fundamentally**

89:9
**further** 5:16 29:2
60:12 71:15 73:8
**Furu** 19:25 20:6,10
20:11,24 21:7,18
21:18 22:3,17
23:20 24:6,11,22
49:16
**fuss** 37:16
**future** 117:15

**G**

**G** 3:1 122:3
**gears** 61:15
**GEE** 52:14 53:7,11
53:19 58:10
**generalized** 51:16
**geographic** 8:18
**getting** 47:5 116:15
**Gibbons** 119:18
**give** 3:7 110:10
111:19
**given** 56:3 116:4
**gives** 32:3 88:22
106:10
**glasses** 109:18
**go** 7:1 10:7,10 12:7
12:7,11,25 15:22
20:10,24 21:24
22:13 32:11 37:23
38:13,17 41:4
43:20 44:19 47:9
50:4,10 53:1 57:9
59:13 60:9,15
63:17 69:11 70:15
74:1 78:20 82:6,6
83:25 84:17 90:12
90:12,14,14 93:7
93:20 95:17
103:10,23 104:19
106:21 110:23
111:21 114:1
115:16 121:11
**God** 54:23 74:25
**goes** 16:22 20:12,23
33:19 65:21 89:22
90:3 107:21

**going** 14:17,20,24
22:2,9 23:15,25
27:14 29:16 30:12
32:1 38:12 40:7,9
42:6 44:6,17
60:10 69:2 71:1
79:10 80:1 85:9
90:15 95:19 96:11
98:9 102:23 103:6
104:17,25 111:6
112:17 120:3
**good** 3:4,5,15,16,23
3:24 46:7,14
55:11 66:3 94:8
**gotten** 54:4 79:24
**grade** 90:3 91:17
**graduate** 55:18
**graphic** 5:18 6:20
**graphics** 5:14 7:5
**great** 71:6 87:18
99:22
**greater** 34:16
106:21
**green** 7:24 9:23
10:25
**group** 60:8 81:19
81:22 119:15
**GSK** 98:10,15
101:15
**guess** 46:12 51:18
51:19
**guys** 105:6
**gynecology** 69:8,13

**H**

**H** 1:19,21 42:5
**half** 106:18
**hand** 4:11 90:15,16
91:1 109:10,14
**hands** 19:3 68:17
75:3
**handwriting** 119:9
**hang** 33:17
**happened** 51:17
85:3 106:20
**happens** 95:23
**happy** 7:8,24 29:8

29:10 43:24 59:13 70:3 75:5 103:8 121:11
**hard** 22:11,14,22 38:20 65:25 66:6 66:10 67:13 85:12 87:15,20,21 88:1 94:1
**harder** 29:15 87:23
**harms** 82:14
**hat** 113:6
**haven't** 85:14 115:19 118:25
**head** 13:18 18:25 21:23
**health** 70:7,8
**Healthcare** 83:16
**hear** 100:18
**heard** 58:20 79:9 81:12 112:14
**hearing** 1:6 47:12 47:24 48:5 57:8 57:11 98:3,19
**heart** 42:3 56:14 58:1,25 59:8 60:5 98:14 99:13,22 100:22 101:1,8
**held** 109:10,13
**Hello** 66:18
**help** 56:23 116:9 117:11,13 118:12
**helpful** 61:21
**helps** 44:1,2
**here's** 88:22 100:9 117:8
**heterogeneity** 71:13,17,23,25 72:1,3,6,7 74:10 80:7,9,23 86:1,2 88:20,23,24 89:1 89:7,9,16,22,25 90:1,3,6,19 91:3 91:10,15 95:16,17 95:22,24 105:19 106:4,9,25 108:10 108:18,23 109:9 110:3,19 111:18

**heterogeneous** 59:2
**he's** 120:9
**Hi** 66:19
**higher** 20:15,19 89:6
**highlighted** 64:25
**highly** 58:19
**hinge** 33:24
**history** 39:18,20
**hoc** 115:10,12
**hold** 45:3
**homogeneous** 110:13
**honestly** 113:4
**Honor** 3:5,9,11,20 5:1 7:10 22:19 44:25 48:17,21 50:3 87:9 88:4 94:3,7 103:15 107:7 121:9,22
**HONORABLE** 1:6
**HOOPER** 1:21
**hope** 109:12
**hopefully** 121:10
**horribly** 108:9
**hour** 121:16,20
**hours** 92:2
**Hubrix** 54:6 56:17
**Hubrix's** 53:25
**human** 35:12 70:8
**hundred** 20:16
**Huybrechts** 92:1 114:2,8 115:9 117:7,21 118:18 118:24 119:8,22 119:22 120:18,20
**HYDROCHLO...** 1:4
**hypothetical** 108:21

**I**
**Iceland** 19:24
**idea** 40:11 47:5 66:3 109:8 112:15 117:16
**identical** 7:12

112:4,6
**identified** 73:4
**identify** 73:9
**ignored** 26:11 102:24
**illustrated** 38:10
**impact** 35:8,13
**implicate** 78:1
**important** 13:19 14:3 15:3 34:23 35:4 38:7 43:7 59:7 60:4,25 61:3 78:17 112:14
**importantly** 42:15
**impossible** 83:22
**imprecise** 60:11 110:14
**improper** 105:10
**inappropriate** 91:14
**included** 39:5 75:13 77:2,18 83:19 97:7
**including** 33:9 57:14 61:3 65:9 69:12 75:15 76:16 97:7
**inclusion/exclusion** 80:20 81:1,21 82:1 85:2 107:18
**incomplete** 75:25 76:1
**inconsistencies** 39:4
**inconsistency** 39:8 106:24
**incorporated** 77:3
**incorrect** 35:25 41:21 50:22 106:16,17 120:15
**increase** 23:14,25 24:20 99:12
**increased** 43:14 64:11 71:11 72:10 73:18 110:7
**increases** 96:12
**independent** 4:13

**independently** 113:20
**indicated** 21:3 54:12 55:17 58:6 73:9 76:15 91:12 95:10 104:25 115:6,20 116:7 118:23
**indicating** 92:19
**indication** 25:22
**indirectly** 25:19
**indiscernible** 47:25 111:2
**individual** 28:14 63:10 64:17 96:15 96:20 97:5 105:25
**individuals** 13:24 102:8
**inevitably** 71:22
**infants** 63:11
**inference** 97:21
**influence** 62:1 105:11,13
**influenced** 31:18
**information** 4:9,12 4:13 34:17,22 47:6 85:18,19,23 86:2,2 88:22 98:21 100:14 101:8 103:24 104:10,15 113:10
**ingestion** 25:9
**inhibitors** 74:4
**initially** 76:12,25
**insights** 75:22 102:11
**institutions** 68:23
**insufficient** 40:13
**integral** 23:25
**intend** 120:22
**intended** 27:4 41:18
**interest** 4:11 59:19
**interested** 80:4 110:15
**interesting** 115:11 116:16 117:8

**interpret** 70:22 102:19 103:2 106:16
**interpretation** 25:17,25 33:22 106:17
**interpreted** 26:3
**interpreting** 105:22 106:9
**interrupted** 88:20
**intersects** 70:4
**interval** 4:15 24:15 24:21 30:9,16 31:6 33:19 35:3 37:17,20 42:18,19 42:22 43:3,9 46:9 73:8,11 74:8
**intervals** 24:9 35:24 36:17 41:9 41:13 45:22 49:9 49:13 67:16 74:14
**investigator** 114:15
**investigators** 77:21 113:3
**investigator's** 114:14 115:4
**involve** 96:20
**involved** 11:9 33:9 57:5 68:4 105:23 116:4
**in-between** 110:5
**irrelevant** 42:25
**Isn't** 94:5 109:2
**issue** 34:15 49:24 50:24 51:25 80:22 86:11 87:25 89:25 95:25 99:9,12
**issued** 82:11
**issues** 112:14
**it's** 81:14,25 82:3 84:7,10,24 85:13 85:23 86:3,6 87:2 87:5,20,21,23,24 88:1,25 89:7,17 90:25 91:5 94:1 96:6 97:14,18 101:6,12 103:1,18

104:25 105:15,21
106:8,17,20,21
108:18 109:3
110:1,9,24 111:3
112:3,13,21,23
114:13,15 115:25
117:8 118:14
121:6
**I'd** 81:25 109:5
**I'll** 116:16,17
117:12
**I'm** 80:22 84:5,8,9
84:21 87:1,15
88:3,5,13,17
90:15 91:7,19,24
91:25 92:2,22,24
93:13,15,23,25
94:13 95:4,22,22
96:8,11 97:22
101:10 103:8
104:17 105:20
109:23,25 110:22
111:3,12 115:17
117:9,12 118:4,6
118:12,12 119:4
121:11
**I've** 81:12,24 88:1
91:24,25 97:23
108:6 115:20
120:11
**i-squared** 88:25

**J**

**J** 1:5 42:5
**jam** 113:6
**JAMES** 1:21
**January** 17:3,6
**Jewell** 2:3 3:10,14
3:18,23 66:18
**Jewell's** 119:9
**Jewell's** 7:12
**Jimenez** 5:19 9:19
18:1,6,13 25:7
**Jimenez-Solem** 6:9
8:7 9:8,14 17:20
17:22 19:20 21:6
25:7 118:3,15,22

119:22
**joint** 56:16
**JONATHAN** 1:17
**JOSEPH** 1:12
**journal** 30:21
31:12 32:2,12,20
32:24 33:4,6,11
34:7 36:9 37:2,11
39:6,9,13 40:1,9
42:14,21 45:16
91:16
**JR** 1:10,21
**Judge** 47:12 103:19
104:5
**Judge's** 100:23
**judgment** 33:4,6
**juice** 108:4,4
**July** 16:1 36:17
37:9,22 39:2,3
40:18 41:1,13
42:11 70:6 82:12
**jumps** 46:11
**jury** 28:11
**Jutland** 10:14,23
11:2 13:12,15

**K**

**K** 44:4
**KAYE** 1:20
**KEVIN** 1:10
**key** 95:16 111:24
**Kimmel** 46:2 49:6
120:9
**kind** 26:15 90:19
106:23
**kinds** 62:13
**know** 7:11 11:17,22
11:25 13:11,13,15
13:20 14:4,15
15:4,9 16:24 17:6
17:10 18:13 19:6
20:23 23:11 28:5
28:13,20 30:10
38:17 40:2,9,12
40:18,20 48:17,21
51:20,21 53:15
56:1 57:7 64:2,14

65:21 66:22 67:4
68:3,6,9,9,10,11
77:11 81:7,13,25
87:24 92:2,12
96:10 100:23
105:3 114:15
116:3 120:6,14,24
121:16
**knowledge** 72:8
**known** 108:8
**knows** 116:1

**L**

**L** 1:16,16,19
**language** 31:15
81:10
**large** 26:16 62:9,10
63:2 80:24 112:25
**larger** 59:20,24
60:8 84:10 89:1
**late** 6:22
**Latin** 115:13,14
**launch** 16:21,24
17:2
**LAW** 1:13
**lawyer** 29:8 47:15
**lawyers** 66:20
116:5
**Lead** 1:15
**leads** 117:13
**leave** 26:4,6 42:17
**lectures** 55:10
**led** 46:2 89:3
**left** 11:12,13 18:16
18:18 24:23,25
25:1 65:16 67:11
**left-hand** 10:25
**lend** 107:25
**length** 13:5 38:8
49:8 59:12 75:16
99:23
**let's** 82:6,6 83:4,13
83:25 87:7,13
90:6 93:7,17 95:5
103:10 104:19
106:13 107:1
109:19 110:23

111:19 114:1
119:6
**let's** 5:13 6:18 7:9
9:11 10:10 14:14
15:8,16,22,24
17:2,15 18:10,18
21:18,24 25:7
26:1,3,4,13 28:1
36:1 38:24 44:19
47:8,9 48:11 50:7
53:1 54:16 59:25
63:5,6,6 65:12
70:2,6 72:13,25
75:6 76:6 77:20
78:17,20
**level** 10:8 23:19
49:10 59:13,17,20
60:14 72:23 85:24
119:11,23
**LEVINE** 1:19
**LGA** 36:17
**LIABILITY** 1:4
**Liaison** 1:16
**life** 108:7
**light** 73:25
**Lilly** 62:6 76:14
77:1
**limitations** 80:17
112:1,20
**limiting** 73:8
**line** 7:24 45:18
69:15,17 78:4
79:6 107:16 111:9
111:15,21
**linear** 28:23,24
29:2,13
**list** 34:20 41:25
**listed** 67:14
**listen** 22:14
**listening** 79:20
**literature** 54:9 80:1
82:22 98:14
106:15
**litigation** 1:4 56:12
57:1 76:7 80:16
98:5 99:23 100:10
100:25 101:2,17

101:24
**litigations** 102:25
**little** 4:1,16 5:15,22
6:18,22,23 7:1,25
8:1 10:21 12:11
16:2 20:18,20
22:14 25:13 31:22
39:22 42:15,22
43:1,10,10 44:25
46:10 49:16 51:9
54:16 55:10,14
61:15 68:22 88:3
89:9 93:24 101:8
105:6,15 111:19
115:13,14 118:9
**lived** 108:6
**LLC** 1:9
**LLP** 1:12,20,22
**location** 67:7
**log** 27:22,24 29:9
29:11,15 45:19,21
**logistic** 37:12
**logs** 120:8
**long** 7:1 30:12
43:24 95:9 108:8
118:7,8
**longer** 30:24 31:11
32:21 33:2 52:22
52:22
**look** 6:18 9:11,15
9:18 10:5,7 15:24
17:2 21:5 22:14
26:13 28:1,17
31:14,15 35:10
45:25 50:7 59:22
59:25 60:13,15,16
63:6,6 65:12 68:5
68:15,19 71:16
72:5,25 77:20
78:17 81:9 83:4
83:13,25 88:4
90:8 91:2,8 93:17
95:5 99:12 103:7
103:23 107:1
109:22 113:20
116:13 120:3,4
**looked** 10:2 19:24

42:9 53:24 62:24
68:9 76:16 96:9
96:14 97:4,6 98:6
101:20,23 103:5
115:18
**looking** 18:14
19:23 23:5 34:19
64:24 71:19,24
87:15 98:15 99:17
101:2
**looks** 6:20 7:4
28:20,22 120:15
**lose** 28:8
**lost** 11:1 17:17
39:25 64:19 93:24
**lot** 23:12 26:1 42:1
75:24 90:14
104:11,11
**Louik** 26:1,2 30:1,2
30:15 31:15 34:19
45:7,25 46:6,16
46:25
**Louis** 107:4
**love** 54:6
**low** 90:2 91:2
**lower** 19:11 30:15
30:18,19 35:3
38:6,11,18 42:14
43:3 89:5
**LP** 1:5
**lump** 46:20
**lunch** 121:12,14,18

---

**M**

**M** 1:6 94:1
**magical** 110:10
**major** 24:7 75:15
82:20 97:8 98:7
113:19
**major/minor** 63:11
**making** 88:14
**malformation**
63:11,20 65:5
**malformations**
64:6,9,12 65:14
67:22 70:12 71:12
73:10 74:3 82:20

82:20
**manufacturer** 62:7
62:10 98:10
**MARK** 1:10,15
**market** 1:24 16:22
**match** 40:8 50:8
51:13
**matched** 53:18
**maternal** 76:9,22
77:14
**mathematician**
30:13 91:7
**mathematics** 54:17
54:21 55:1,3,7
**matter** 38:3 84:16
89:11 122:6
**McDonagh** 61:17
62:23 63:2,4 70:2
70:6 71:15 73:17
76:17 77:18 82:6
82:8,11 83:3,5,12
83:14,16 84:5
85:13,25 86:9,11
86:12,14 88:21,23
93:10,18,25 94:2
94:20 95:6 96:9
97:2,8 107:19
**MDL** 29:21 57:2,5
57:15 61:23
**mean** 26:5 28:10
39:22 40:13 51:8
102:24 106:21
119:15 120:19
121:2
**meaning** 89:3,8
**meaningless** 33:11
33:15
**means** 46:14
115:13
**meant** 24:4 26:6
41:17
**measure** 99:20
110:15 114:20,25
**medical** 56:6,6,7
68:1,7,16
**medications** 69:15
**medicine** 16:22

30:22 32:13,20
36:9 39:6,13 40:9
58:22 69:7
**medicines** 63:12
**meet** 3:23
**memory** 8:10 10:4
12:6 13:13 20:8,9
21:22 51:10,15
98:8 100:23 103:7
103:9 104:12,14
**menstrual** 39:25
**mention** 31:4
**mentoring** 55:12
**met** 66:20
**meta** 62:7,11,23
65:18 77:12 80:13
90:7 96:15 97:1
98:9,12 99:18
101:12 106:23
110:17 119:21
**metaphor** 109:20
**meta-analyses**
61:16,18 62:4
76:8,21 77:17
96:10,14,17,19,20
96:24 98:6,14,20
100:8,10,13
101:19,20 102:7
102:18,25 106:5
113:7,16
**meta-analysis**
62:10,17,20 63:18
65:4,13,21 69:20
70:11,17 71:9
74:22 75:14,19
76:13 77:1 79:11
80:2 82:4 83:15
83:17 84:25 85:5
85:12 86:6 91:1
93:15 98:8,16,17
99:2,23 100:2,3
101:10,23 102:9
104:21,24 105:18
106:14 107:25
108:1,13 110:1,6
110:9,12,12
111:25 112:3

120:23,25
**meta-analytic** 89:4
**method** 63:14
**methodological**
79:14 80:17 83:18
**methodology** 49:12
59:9,25 60:3
62:18 69:21 73:23
83:22 84:14 90:10
91:1,6 93:10 96:4
96:9 97:24 100:4
101:23 102:10
**methods** 114:14
115:4
**MEYERS** 1:21
**middle** 45:22
111:18 117:6
**Mid-Atlantic** 1:23
**Miles** 61:17 62:22
63:1,6,7,9,24
67:11 68:16 69:20
76:16 77:2,18,21
77:24,25 78:8,10
78:20 79:13,17
80:3,10,14,18,21
80:25 82:3,5
84:15 85:1,25
86:3,4,9,10 88:19
88:21 96:9 97:2,8
107:19
**million** 20:4,13,17
21:19
**mind** 8:12 26:20
96:1
**mine** 100:24
**mini-meta-analysis**
113:17
**minute** 21:18 25:7
63:25 74:18 79:19
86:23 88:12 120:7
**minutes** 120:12
121:21
**mirror** 60:2
**misappropriated**
100:5
**mischaracterizat...**
101:22

**misheard** 26:24
**misinterpretation**
80:6,8
**misinterpreting**
40:22 51:23
107:23
**mislead** 105:23
110:18
**misleading** 79:20
79:24 80:12 91:22
96:6 106:18,20,22
108:9
**misled** 80:2
**misplaced** 43:3,6
**missing** 39:14 41:5
44:6
**misspeak** 6:7
**misspoke** 6:5
**misstated** 41:7
**mistake** 48:15
**mistakes** 26:7 49:1
105:10
**mix** 108:4 112:12
**mixing** 57:10
108:18,24 109:3,4
110:4 111:23
112:21,22,23
**model** 52:21 53:7
53:19 58:12,15
**modeling** 52:14,23
**models** 53:12
**Moose** 63:15
**moot** 82:3
**morning** 3:4,5,15
3:16,23,24 66:9
72:23 102:21
**move** 5:1,13 7:24
9:7 17:15 26:1
44:17 54:16 70:2
70:6 76:6 121:10
**moved** 34:24 45:13
45:17 71:4
**moving** 38:7,7
**multiple** 33:25
49:14,25 50:25
51:25 93:2 110:8
**multitask** 88:5

**M.D** 68:24

**N**

**N** 2:1 3:1
**name** 28:13
**names** 65:20 68:6
**NAST** 1:8
**NASTLAW** 1:9
**national** 1:23 8:19
**necessarily** 70:1
**need** 16:2 23:10
  40:15 44:24 57:19
  61:15 68:15 75:2
  97:20 111:4
  117:11,11
**needs** 12:19 65:24
**neither** 78:3
**never** 86:7
**new** 4:8,8 8:23
  30:21 32:2,12,19
  32:23 36:8 37:1
  39:5,13 40:1,9,17
  42:13,21 44:23
  45:16 47:5 68:10
  68:12 69:10 75:21
  75:22 82:2 115:8
**newer** 77:3
**news** 46:14
**nice** 3:23 105:8
**Nicholas** 2:3
**Nissan** 98:16
  101:15
**non** 14:13,17 17:5
  23:20 30:4 82:16
**non-exposure** 74:4
**non-overlap** 11:8
  11:12
**non-overlapping**
  9:12
**non-pause** 25:20
**non-significant**
  50:9
**non-statistically**
  24:17,22 30:4
**North** 10:14,23
  11:2 13:11,15
**Norway** 19:25

**notable** 113:1
**noted** 46:2
**notice** 46:4
**number** 11:13,14
  11:17 13:24 14:9
  19:12,15 20:11
  23:16 31:21 42:1
  42:3 48:2 74:17
  103:25 104:3
  118:18,21
**numbers** 12:5 19:1
  21:23 23:12 40:14
  42:2 48:9,14 49:1
  49:3,23 50:12
  51:11 53:18 65:17
  94:4 120:24
**numerous** 76:8,21
  77:12

**O**

**O** 3:1
**oath** 3:18
**objective** 63:7,9
**objectives** 82:12
  99:16
**obligated** 101:9
**obscure** 91:5
**observational** 61:5
  102:17,22 103:4,7
  103:24 104:1,3,15
  112:3,4
**observed** 101:5
**obstacle** 107:24,24
  108:3,5
**obstetrics** 69:8,13
**obstructions** 24:19
  24:24
**obviously** 27:13
  44:21 62:19
**occur** 49:15
**occurs** 86:11
**odd** 74:13
**odds** 23:4,6,6,24
  24:4,5,8,14 25:8
  30:17 33:21 45:21
  47:20 64:11 65:13
  67:15,19 71:11

73:7 89:4 90:2
  106:12,12,15,19
  106:19 110:15
  119:10,23
**offering** 55:21
**official** 122:4
**oh** 3:13 17:20 23:8
  24:5,24 55:3 57:9
  57:12 64:23 71:2
  88:17 94:19 104:2
  104:7 111:3 121:2
**okay** 4:24 5:12,13
  6:18 7:18 8:4,7,14
  9:11,12,22,24
  10:1,2 11:6,11,20
  11:25 13:5 14:22
  14:23,24 15:8,22
  16:10,15,16,24
  17:2,5,10,10,15
  17:24 18:4,11,12
  18:19 19:5,7,10
  19:11,14,15 20:10
  21:5,9,25 22:10
  22:21 23:20 24:6
  25:2,3 26:13
  28:15 30:1 35:7
  36:1,9 37:20
  45:19 46:14 47:1
  47:9 50:9,18
  51:11 53:1,5,6,22
  54:10 55:5,20
  57:9,23 58:14
  60:16 63:7,17
  64:1,4 65:3,11
  67:8,11 68:5 69:3
  69:6,11 70:6 71:4
  72:4,25 73:1,17
  74:1,22 75:4,17
  77:20,22 78:13,24
  79:3 83:13 86:13
  87:17,18 88:5
  89:19 94:16,19
  95:5 102:3 104:17
  105:9 109:6 111:8
  119:6 120:13,17
  121:14
**old** 26:17

**ones** 64:24 75:15
  90:2,9
**online** 117:22
**OpenEpi** 50:10,12
  50:20,21 51:24
  52:22 53:18,24
**opening** 50:6
**opined** 56:14
**opinion** 25:16
  27:11,14 33:17
  34:12 35:8 61:25
  62:2 80:3 91:21
  92:7 97:6,9,10
  106:6
**opinions** 33:24
  35:6 55:20
**options** 82:14
**orange** 108:2,4
  109:9,19
**oranges** 57:10
  108:19,24 109:3
  111:23 112:22
**order** 6:8 22:16
  79:5
**original** 7:4 14:8
  37:11 39:1 42:20
  83:6
**Orms** 122:3
**ought** 69:10 102:12
  102:14
**outcome** 59:12
  101:8
**outcomes** 14:10
  101:14
**outflow** 24:18,23
**outside** 56:12 98:15
**overall** 27:7 35:6
  61:22 82:21
**overlap** 5:24 8:24
  10:17 11:10 15:7
  15:8 17:16,18,22
  18:9,15,16,17
  47:2,4
**overlapping** 4:1
  9:13 14:14,18
  17:6 47:6
**overlaps** 9:15 76:5

**ones** — *see above*

**O'DONNELL** 1:22

**P**

**p** 1:10 3:1 73:12
  119:11
**PA** 1:5,24
**page** 7:14 10:10
  12:7,20 15:22
  19:7 21:25,25
  22:18,19 64:8
  65:23 67:24 69:11
  69:14 70:17,18,24
  70:25 71:7 74:2
  77:7,22 82:7
  86:15,23 87:2
  94:4,5 107:15
  110:24 111:9,12
  111:13,18,21
**pages** 46:14
**PAMELA** 1:18
**paper** 6:6,6 7:4
  10:7 27:6 31:23
  34:19 35:10 39:17
  41:4,18 44:14
  47:9,17 48:4,16
  48:24 49:6,11
  50:7,19 51:5,6,13
  51:17 52:3,15,20
  52:25 53:12,13
  54:9 56:17 58:16
  58:19 69:24 80:12
  81:6,17 84:15
  85:16 88:1 90:22
  94:3 115:21 118:3
**papers** 19:1 31:18
  33:10 51:9,23
  99:14
**paragraph** 64:20
  74:18
**Paroxetine** 64:17
  64:19,19 65:3
  78:2,3 89:8
**part** 9:23 10:25
  38:15 59:9 60:22
  60:25 61:1,25
  62:11,17 63:2
  84:1,10 93:10,20

114:7,14 115:3
**particular** 10:24
34:23 46:8 68:3
70:4 76:3 101:17
112:18,19 114:11
115:7
**particularly** 61:21
**patients** 12:1,10
99:21
**pattern** 98:22
100:15
**pause** 25:20 36:4,7
82:9 106:2 107:10
113:14
**paused** 113:19
117:24,25 118:2
118:13,17,19,21
119:9,15
**Paxil** 89:8,12
**pay** 106:9
**paying** 51:24 57:17
67:6
**PCCP** 28:3
**peculiar** 112:18
**Pedersen** 5:19 6:8
6:11,15 8:4,16,18
9:4,7,8,13,19 11:9
14:19 17:15,19,25
18:1,5,10,21 19:8
19:9,19 21:6
**Pedersen's** 6:6
**Pederson** 65:16,17
**peel** 71:23
**peer** 25:15 53:12
54:9 61:17 62:23
63:3 69:21 72:19
72:23 75:9 79:25
80:2 114:10
**peer-reviewed**
81:14 114:8 115:4
**pending** 107:3
**PENNSYLVANIA**
1:1
**people** 21:12 49:19
51:22 55:10 68:2
69:13 79:20 83:11
110:18

**percent** 20:15,16
20:18 23:13,19,24
24:20 73:7,11
89:2,7,8,22 90:12
90:24 91:10
**percentage** 11:23
**perception** 114:24
**perfectly** 29:8,10
79:2 107:16
**perform** 59:7 60:5
**performed** 114:1
**period** 4:12 10:19
39:25 82:16
**Periodic** 15:18
**periods** 14:9
**periphery** 43:7
**permits** 60:17
**persistent** 98:22
100:15
**personal** 58:2,6
**perspective** 59:6
61:13 75:24
**Pfizer** 29:8 47:15
56:13 62:16,19
91:20,21,22 92:5
**ph** 4:18 63:15
98:16,17
**pharmacological**
82:14,17
**phenomena** 110:13
110:15 112:15
**phenomenon** 25:22
**Philadelphia** 1:5,24
**physical** 108:5
**physically** 92:15
**Ph.D** 54:20,22
68:24
**pick** 45:4 90:13,15
90:15,16 91:1
**picked** 90:17
**picks** 80:1
**picture** 34:20
**pie** 119:4,7
**piece** 9:18 35:10
52:1
**pieces** 33:25
**place** 67:6

**places** 91:19 112:10
112:13
**plaintiff** 28:14,14
**plaintiffs** 56:13
57:3,13
**Plaintiff's** 1:8
**plausible** 73:15
89:24 90:25
**play** 99:24 116:3
**plays** 34:16
**please** 3:6,14,18,19
44:2 52:18 53:1,3
77:7,9 116:13
**plot** 26:17,20 27:12
27:13,16 28:1,16
29:21 44:19 46:6
46:16 67:15
**plots** 26:14
**plug** 50:11
**point** 4:14 8:19
14:24 22:8 29:4
34:18 38:3 42:11
43:8 44:16 46:24
47:4 75:20 78:25
84:4 88:14 90:8
92:9 110:16,17
**pointed** 9:6 20:25
29:1 35:9 37:15
39:8 51:22 81:3
102:20 118:24
**pointing** 49:23 84:9
**points** 98:12
**polite** 56:20
**politely** 116:6,11
**pooled** 70:18 71:10
73:5,7,10
**Popular** 58:16
**population** 4:14
13:15 17:5 112:6
112:7,19 118:19
**populations** 4:1
5:25 47:7 112:16
**positive** 41:23
42:10 60:9
**possibility** 99:6
116:16
**possible** 61:14

**Possibly** 109:15
**post** 115:10,12
**post-doctoral**
55:11
**post-partum** 82:15
**potential** 61:3 73:4
**powerful** 91:21
**POZNER** 1:12
**precise** 17:24
119:14
**precisely** 13:17
118:16
**precision** 59:21
60:14 110:7,16
**precursor** 51:8
**predates** 6:6
**prefer** 19:4
**pregnancies** 14:9
49:14,25 50:25
**pregnancy** 51:25
69:17 70:13 76:10
76:23 77:14 78:6
82:15 114:18
**pregnant** 78:5
**prescribed** 78:22
**prescription** 19:12
19:13 114:4,5,17
114:21,22
**prescriptions** 18:23
25:13 114:6
119:16
**presented** 81:4
**presents** 80:10
**pretty** 43:15 106:6
108:11
**previous** 114:22
119:24
**previously** 4:19
**prime** 108:12
**principle** 40:13
**print** 103:18
**prior** 17:6
**priori** 60:7 107:17
**probably** 6:24
15:21 29:23 31:25
32:1 51:17 109:21
**problem** 67:4 106:4

108:18
**problems** 83:18
**procedure** 50:23
**proceedings** 121:23
122:5
**process** 38:25
82:22 108:1
**processing** 104:25
**produced** 29:9
36:25 40:18 42:11
42:21
**PRODUCTS** 1:4
**professional** 103:1
**program** 55:18
87:20
**programming**
87:24
**project** 54:8
**projects** 116:13
**promise** 14:20
86:24 118:4
**pronounce** 5:10
**pronounces** 5:11
**properly** 104:23
**proposing** 35:22
**protection** 29:5
**protective** 90:20
**protocols** 62:11
**provide** 7:12 26:16
75:21,24
**provided** 36:17
37:8 39:3 40:6
41:13 76:13
**provides** 59:16
**Prozac** 62:3,5,9,12
65:6,7 76:7,10,17
76:22 77:5,8,14
77:20,22 79:1,12
80:8,10,16 82:7
82:10 84:8,18,20
85:19 86:1,4 89:6
89:11 93:16,18,19
93:21 94:21,24
95:17 96:11
101:19 102:6
**Prozac-specific**
82:19

PSUR 15:17
psychiatry 69:9,14
publication 50:11
    72:24 114:11
    117:14
publications 82:23
publish 31:21
    58:10 115:25
    116:20
published 25:15
    32:12 51:7 57:25
    58:4,8 61:18
    62:23 63:3 69:21
    72:18 75:9 79:25
    80:2 81:14 98:14
    114:8 115:5,19
    120:20
PubMed 107:17
pull 5:15 12:24
    22:9 44:24 63:25
    66:6 67:13 77:8
    113:5
pulled 113:2
pulling 65:16
pull-out 16:4,5
purpose 110:11
purposes 110:12
push 26:8
put 12:14 13:23
    14:18 27:5 29:11
    32:2,9 36:1 41:23
    42:17,24 43:2,8
    46:23 55:15 63:8
    76:24 86:16,18
    87:5,7,13 90:4
    92:15 96:25 104:8
    107:12 117:25
    118:13
putting 105:8
    117:19
p.m 1:4 121:23

Q

qualifications
    54:17,23,25 55:6
qualify 70:7
quality 83:17 85:24

86:6 103:3
question 4:6 9:2
    14:1 24:17 30:11
    34:3 43:17,18,19
    44:1 52:19 54:10
    59:11 61:22 62:12
    62:18 76:24 80:5
    88:15 92:6 94:8
    95:20 97:14 100:6
    100:11,12,19
    101:11 107:16
    111:10,22 113:5,9
    113:20 114:13
    117:2 118:9
questions 84:13
    88:13 98:16 118:7
QUINN 1:17
quite 37:25 79:3
    98:9 99:24 101:6
    109:9
quote 70:18 78:8
    78:10 93:23
    119:15
quotes 117:25
    118:14

R

R 3:1
raised 33:23
raises 62:12
ran 44:15
random 104:11
randomization
    99:5,7
randomized 61:9
    98:11,25 99:3
    100:21 101:7
    102:15,23 103:21
    104:5,10,13
rank 38:14
rare 59:11
rate 13:11
ratio 23:4,6,7,24
    24:4,5,8,14 25:8
    30:17 33:21 45:21
    47:20,25 65:13
    67:19 73:7 74:13

89:4 90:2 106:12
    106:13,15,19,19
    110:16 119:10,23
ratios 67:15 71:11
raw 19:1 49:5
    52:12 54:7,11
    117:12 121:4,5
reach 73:24
reaches 98:23
    100:16
reaction 32:4
read 21:22 22:6
    33:8 36:10,12,18
    36:20 39:20 43:20
    63:13 64:7,22
    65:22 69:18 71:13
    71:14 74:5,9,18
    77:9,15,16 78:7
    83:1,2,23 87:5,11
    87:20,21 90:22
    91:11,12 94:4
    99:16 108:14,15
    110:20 113:11
reading 16:9 23:5
    64:2 77:11 79:19
    100:20
readjusted 37:9
real 75:14
really 4:4,21 31:25
    34:11 48:13 72:2
    81:24 89:24 91:5
    113:5 118:7,8
reanalysis 114:2
    115:10,19 119:7
    120:19
reason 18:5 49:20
    84:1 89:10,14,17
    89:18,18 112:9
reasonable 8:10
    59:14
reasons 38:8 54:5
    79:12 89:19
recall 47:11 57:16
    98:10 107:5
    108:22,25
received 17:12
recess 66:9 121:18

recessed 66:13
    121:23
recognize 85:5
recognized 95:25
recollection 103:11
    103:25
reconvened 66:13
recording 122:5
RECROSS 2:2
red 90:4
redirect 2:2 118:11
reduce 71:22,25
    72:1
reduced 73:6,18
reduces 90:23
reducing 72:3
reduction 85:8
refer 15:19,23
    65:24 80:17 96:23
    109:8 112:1
reference 27:6
    30:23 68:22 88:18
references 85:6
referencing 115:11
referred 81:18
    115:9
referring 4:17 5:7
    5:9 14:7 18:5
    82:11 86:13
refers 119:14
refresh 103:25
refreshes 103:11
regard 15:7 46:25
    59:23 80:8 86:5
    97:25 99:4
regarding 58:1,4,8
    77:5 83:18
regards 100:22
region 1:23 8:18
registry 8:19 18:6
    18:14 21:5
regression 37:13
    39:1
regretted 40:1
REILLY 1:12
Reis 4:18,20 8:23
Reis-Callen 5:8

reject 61:20 84:1
rejected 61:17,24
    102:1 115:18,18
related 76:22 77:13
    82:19
relating 76:9
relative 39:19,21
release 92:10
released 92:12
reliable 61:21
    79:17,21
relied 97:1 101:18
    101:19
rely 34:13 105:24
relying 20:8 87:8
remain 3:17
remained 43:15
remains 56:17
    80:21
remember 7:3 8:6
    10:8 18:24,25
    28:4,12,13 31:16
    34:3,6,24 43:17
    43:19 47:13 48:2
    48:8,9 63:3 98:2
    100:6 107:2
remove 30:23 31:4
    32:20 71:18 90:11
removed 29:20
    85:11
removes 33:1 99:5
removing 31:10
    73:2
repeat 56:4
replicate 6:11
replicated 46:18
    112:16
replication 46:21
    47:2,5 60:21
report 15:18,20,24
    21:16 27:16,18
    28:17 29:21 39:6
    57:2 61:18,23
    63:2 64:10 70:5
    72:5 76:6,18 77:8
    77:20,22 78:11
    79:1,11,12,16

80:17 82:7,11,11
83:4,6,14,15
84:10,18 92:4,10
92:13 93:1,19,23
97:2 100:20
101:24 104:4,9,9
104:14,15 106:15
**reported** 15:12
25:9 37:1 42:5
49:22 65:13 71:11
**reporting** 1:23
15:15 42:6,20
43:15 64:9
**reports** 57:14,18
82:24
**represents** 11:14
**reproduce** 85:12,13
**request** 52:2
116:19,20,21
**requires** 56:2
**reread** 44:1
**rerun** 52:2
**research** 58:3,7
70:7 78:1 83:17
**resolve** 106:24
**resort** 106:23
**resorted** 88:1
**response** 36:18
39:2
**rest** 119:1
**restate** 30:10
**restrooms** 67:7
**result** 31:7,19 45:8
50:11 67:12,17
74:13 85:13 90:20
**resulted** 71:11 73:5
**results** 25:6,9,18
27:5 31:18 33:16
34:25 35:23 37:4
37:7,16 39:11
40:24,25 42:8
44:4,5,9,10,11
51:4,23 52:3,15
54:8,13,15 64:9
65:18 67:15 75:12
79:18 80:9 86:21
89:3 90:7 96:16

96:18,22,23 97:1
105:11,24 106:10
121:5
**resume** 3:14
**retrieved** 39:2
**RETTENMAIER**
1:5
**reuptake** 74:4
**revealed** 32:15
**review** 25:15 53:13
63:3 72:19,23
73:5 76:8,20
77:12,17 82:13,18
82:21,23 93:19,20
104:7,8
**reviewed** 54:9
61:18 62:23 69:21
75:9 76:8,21
77:13 79:25 80:2
114:11
**reviewing** 39:1
84:24
**re-analysis** 37:8
**rid** 91:3
**ridiculous** 91:17
**right** 3:10,17 5:7,22
6:4,10,20,25 7:2
7:23 8:1,14,16,20
8:21 9:16,21,23
10:10,20 11:9,15
11:17,23 13:5,6
13:19,22 14:13,14
14:16 15:3,16,19
16:12,20 17:8,13
17:16,23 18:3,7
18:17,21 19:11,13
19:18,25 20:12,17
20:21,24 21:24
22:25 23:18 24:2
24:18,25 25:1
26:1,18 27:10,15
27:17,21 28:6,15
28:23 29:3,3,13
29:20,22 30:1,21
31:24 32:8,14,19
35:15 36:13,21
37:3,16 39:6 40:7

40:23 44:22,22
45:8,11,15,19,22
46:4,15 47:2,8,17
48:10 49:2 50:2
50:20 51:7,14,19
52:6,13,14,19,23
53:17,25 54:16
55:8 56:19,25
57:2,6,21,25
58:12 60:19 61:7
62:25 63:5,12,14
64:8,16,21 65:8
65:21,21 66:2,12
67:14 68:2,5,7,12
68:13 69:6,11
70:2,9,15 71:1,17
71:21,24 72:5,21
73:13 74:16,22
75:2,7 76:2,6,10
77:17,22,25 78:12
78:14,22 79:6,9
79:17,23 81:2
82:10 83:25 84:3
84:11,23 85:22
87:3,4,12 88:8
93:7,12,17 94:14
94:15,23 95:7,11
95:15,24 97:12,17
103:22 104:7,17
104:19,23 105:2
106:3 108:19,22
109:9,11,16
110:23 111:19
113:17,25 114:5,9
114:13 115:13
116:2,6,23 117:16
117:16,21,22
118:6,22 119:12
119:17,19 120:3,4
120:13,20,23
121:8
**rights** 67:16
**right-hand** 14:18
88:24
**Ringkjobing** 10:16
**rise** 3:2
**risk** 23:14,25 24:20

33:23 35:23 36:16
41:8 43:14 59:11
59:18 62:13 70:12
71:12 72:10,11
73:6,18,18 74:3
90:23 96:13 97:15
98:17 99:13
106:16 112:16
**Robinson** 1:10,11
28:2 44:20
**rock-hard** 114:19
**role** 34:16,18 99:24
**room** 80:6,8 84:6
120:12
**roughly** 6:20
**rounded** 32:15
**rounding** 32:14
**route** 116:3
**Rufe** 1:6 103:19
104:5
**run** 116:21

─────────────

### S

**S** 1:17 3:1
**safety** 15:18 99:17
**sample** 105:4
**sample-size** 105:14
**sampling** 112:7
**sat** 55:10 98:1
**satisfactory** 85:15
**saw** 26:14 33:1
37:12 45:18
119:21
**saying** 11:1 26:3
32:20 37:20,22
38:25 39:10 41:16
53:11 79:5 80:25
84:21 91:16 96:21
101:11 105:20
109:23,25 110:22
117:7
**says** 31:10 36:8
48:14 52:19 72:5
78:21 81:17
**scale** 20:11 27:22
27:25 28:23,24
29:2,9,12,13,25

45:19,21
**scheme** 105:14,15
**SCHOLER** 1:20
**school** 20:24 90:4
91:17
**scientific** 115:23
**scientifically** 61:21
79:17
**scored** 119:23
**screen** 12:14 24:1
24:16 63:23 86:16
86:18 88:5 107:13
**se** 73:23 86:6
**SEAN** 1:13
**searches** 82:23
**searching** 12:23
107:17
**seated** 3:6,18
**second** 4:7,10
70:22
**section** 8:21 64:8
83:20 84:1 93:18
93:21 94:18,20
95:6,7
**sections** 14:23
**see** 4:2 10:11 17:3
27:7 28:18 38:24
46:8 68:16,23
78:25 87:14 88:23
89:6 91:9 98:21
100:14 103:11,14
104:19 109:5
111:17 114:1
116:8,17,17
117:12 119:6,6
**seeing** 4:12 101:14
112:15
**seen** 48:23 56:17
70:16 81:2
**select** 72:3
**selection** 82:22
**selective** 74:3
**self-taught** 55:8,15
**send** 81:11
**sending** 39:9
**Seng** 98:16 101:16
**sense** 42:16 59:22

60:6,6,9 76:13
99:3 108:6
sensitivity 71:19
73:1,2 74:11,12
85:9 86:22 89:14
89:21 91:8,10
95:23 114:18,24
sent 92:4,19
sentence 64:22 70:4
72:25 79:1
sentences 83:21
84:2,3,17,22
86:14 93:11 94:23
95:9
separate 47:6
114:16
septal 23:22,23
24:12 35:15 40:15
42:3 46:17,25
September 1:3
122:7
series 82:24
serious 73:10
Serotonin 74:3
sertraline 1:3 13:6
23:2,24 40:14
64:4,13,13,14
65:9 69:16 71:7
73:6 74:7 78:21
83:20 89:2,15
95:5,7
Services 70:9
SESSION 1:4
set 3:7 4:8,8 18:10
32:25 33:21 37:10
37:10 39:16 40:17
40:23 44:4,11
49:7 66:15 107:17
115:4
sets 38:11
settings 102:6
seven 71:10 84:20
85:6,8 90:12,17
sheet 26:16 27:6
Sheila 1:16 122:3
she's 116:5,18
shift 61:15

shouldn't 102:18
102:21
should've 39:20
show 48:7 50:5
53:3 64:16 72:9
72:11 103:10
119:24
showed 119:12,13
showing 45:7
shown 119:7
shows 106:11,12
side 14:19 18:11
26:8 67:3
signal 59:23 60:8
101:15
Signature 122:11
significance 30:23
32:21 33:2 34:1
34:13,16,22 49:10
98:23 100:17
significant 21:20
22:3,25 23:18,21
24:7,11,18,23
25:8 30:3,5,25
31:7,11,12,19
32:22 33:3,16,18
34:8,9 45:8,13
46:17 48:17,25
50:19 51:13 73:16
79:4 86:3
significantly 63:20
64:5,10,17 65:4
similar 90:18 98:15
99:13
simple 106:14
simply 42:2 90:1
single 27:6 34:1,15
54:9 90:21
single-group 82:24
sir 5:23 8:14 10:5
10:11,22 13:11,21
14:20 31:9 32:11
33:6 42:8 43:19
46:16 53:4,8
62:22 77:15 80:24
91:7 92:13 109:2
115:3,19

sit 76:4
sitting 28:10
situational 102:12
situations 106:23
six 90:12
sizes 105:4
slide 36:14 50:5
119:21,24
slides 36:6 119:4
120:11
slight 35:8
slightly 14:1 37:9
37:14 38:11 46:1
115:2 118:14
slip 42:19
SLONIM 1:19
sloppy 39:25
slower 12:11
smacked 74:25
small 11:22 12:22
99:10,20 100:22
110:8
smaller 43:11
software 50:15
52:2
sole 34:21,22 54:23
89:18
solely 55:3 97:1
Solem 5:20 9:20
18:2 25:8
Solem/Pedersen
18:14
somewhat 82:3,20
97:5 112:10
soon 92:9
sophisticated 49:12
52:1 90:5 105:16
sorry 5:6 8:25 9:17
10:25 12:11 15:25
17:17 21:25 25:2
36:6 50:3 63:22
64:20 70:17,20
71:2 88:13,17
93:24,25 111:3,12
111:13 118:12
119:4
sort 25:11 46:11

113:6
sound 109:7 122:5
sounds 8:9 73:14
source 34:21,22
sources 82:21
SOUTH 122:15
space 85:14
span 27:7
speak 62:19 117:6
SPEAKER 111:1
specific 4:16 9:5
44:11 56:9,10
59:8 60:5 63:14
107:6
specifically 4:17
5:9 49:6 62:8
80:4 81:17 99:15
99:17
specified 37:5
speculate 53:16,23
speculation 38:14
38:16,19 52:24
53:9
spend 104:14
spending 97:19
spent 79:18 84:25
85:9
spin 41:16,23 42:10
spoken 31:23
SSRI 58:9 69:15,17
SSRIs 40:15 63:10
99:17
St 107:3
stand 3:14 40:24
41:8 116:25
standard 31:12
32:17,19,23 33:7
33:11
standing 37:4,7
STARK 1:14,14
start 3:25 4:2
started 56:25 62:6
starting 107:16
starts 20:10 99:24
state 27:18 28:5,16
36:15,16
stated 39:12 82:12

statement 76:20
79:4,5,7,8 99:1
101:12
statements 74:20
81:5,6,6
states 1:1 64:10
stating 31:7
statistic 88:25
statistical 34:1,13
34:16,21 38:20
49:10,12 50:22
59:21 60:14 71:13
72:6 75:22 98:23
100:16 106:17
statistically 21:19
22:3,25 23:17,21
24:6,11 30:3,5,24
31:7,10,11,19
32:21 33:3,16,17
34:8,9 45:8 46:17
48:16,24 50:19
51:13 60:11 86:3
90:5
statistician 33:9
54:14 55:8 58:23
61:12 97:21
102:19
statisticians 33:24
43:1 59:15,17
68:1 108:8
statistics 55:19
102:24
status 63:3
stay 14:14 38:20
43:24
stayed 30:17,19
Steering 1:8
step 6:3,11 59:24
STEPHEN 1:14
steps 113:25
stick 14:21 18:3,18
21:18
story 81:12 119:2
straight 32:11
strange 90:20
Street 1:24
strength 63:10

112:5,13,21
**strengthen** 112:17
**strike** 21:17
**stroke** 98:18
**strong** 79:4,7
**strongly** 91:13 92:6
**struggling** 88:3
**student** 90:4 91:17
**studied** 10:11,13,22
  20:4,6
**studies** 4:17 5:8,19
  5:23 7:7,11 9:3
  34:20 44:22,23
  46:5,19,21 47:6
  49:15 54:7 61:5
  67:14,25 71:10,20
  72:9,11 73:3,9
  75:7,8,13,15,20
  75:23 76:2 77:2
  80:14 81:18,22
  82:2,5,24 83:19
  84:20 85:4,6,11
  90:11,16 91:2
  96:15,21,23 97:5
  97:7,9,11 99:4
  101:13 102:17
  103:5,7,24 104:1
  104:3,22 105:1,7
  106:11,25 108:11
  110:8,11 112:3,4
  112:24 113:19
  121:2
**study** 4:3,3,4,7,7,9
  4:21 10:6 11:15
  12:1,3 13:5,6,25
  15:13 17:12 18:21
  18:22 19:23 20:12
  34:15 46:23 47:14
  63:18 65:20 69:12
  80:25 82:21 84:13
  97:15 101:2
  102:22 104:15
  105:11 106:18
  114:8 117:21
  120:20
**studying** 113:1
**study's** 83:20

**subcategories**
  14:11 59:22,25
**subcategorization**
  59:14
**subcategory** 27:9
  34:23,25 35:14
  60:2
**subgroup** 59:20
  60:10,13 115:10
**subgroups** 60:15
  60:16
**subjected** 72:18
**subjects** 47:8
**submit** 35:22
**submitted** 57:1
  93:1
**submitting** 35:22
**subpoena** 36:18
  39:2
**subsequently** 51:4
  103:23
**subset** 4:3,20 5:8
  8:15,20 9:3,8
  21:10
**subsets** 19:20 21:7
**substantial** 105:25
**substantially** 89:4
  105:4
**subsumed** 4:7,23
**sub-analyses** 59:7
  60:5
**succeed** 56:18
**suffering** 83:18
**sufficiently** 85:4
**suggested** 73:18
  78:2
**suggesting** 73:5
**suggests** 90:22
  91:20
**suing** 56:13
**Suite** 1:24
**sum** 79:10 102:11
**summarize** 113:10
**summary** 96:16,18
  96:22 97:1 105:24
  121:5
**supersede** 120:19

**supplement** 115:7
  117:21,22,24
**support** 27:11
**supposed** 67:1
  110:10
**sure** 5:17 9:17 10:2
  12:16 23:5 30:12
  40:8,21 42:7 44:2
  47:10 65:15 66:4
  70:23 72:23 78:19
  86:20 95:4 103:13
  104:22 105:9
  109:12 121:11
**surprise** 84:6,7
**surprised** 115:17
**suspect** 97:16
**swear** 57:4
**Sweden** 5:13 19:25
**Swedish** 4:17,22
**switched** 17:20
**symbol** 23:15
**symmetry** 120:8
**system** 87:25
**systematic** 82:13
**systematically** 60:1
  71:23 90:11

---

**T**

**tab** 53:1 57:9 77:7
**table** 12:8,18 13:23
  19:6 22:19 23:12
  40:14 41:19 42:1
  42:2 70:15,16,24
  71:1,12 74:1,2,19
  86:15,20,23 87:1
  87:3,4 88:8,22
  91:9 93:8 94:6,13
  94:19
**take** 6:18 8:13 9:11
  10:20 12:6 15:8
  15:14 25:5 26:3,6
  28:20 32:9 38:18
  53:12 55:18 57:20
  63:6 65:12 66:9
  90:13 91:23 93:17
  103:2 107:1 108:2
  108:3 110:13

115:21 120:7,8
  121:15
**taken** 15:11 107:2
**takes** 14:25 63:25
**talk** 14:17 25:14
  30:1 47:1 59:3
  61:16 66:21 67:8
  73:1 75:2,5,6
  86:14,24,25
**talked** 26:2 36:23
  47:2 66:24,25
  103:22 119:17
**talking** 3:25 10:21
  14:13 17:25 23:2
  23:11,13,16 25:4
  25:6 34:24 84:8,9
  84:25 86:9,10
  88:21 103:20
**TAM** 1:17
**target** 38:7,7
**targeted** 99:15
**tea** 42:17
**teacher** 118:12
**team** 49:22 56:23
  116:8,17 117:13
**techniques** 104:21
  105:9
**tell** 58:25 68:20
  81:25 85:8 88:4
  100:12 102:13,14
  109:10,14,17
  120:10
**telling** 16:11 52:7
**tempest** 42:17
**ten** 46:24 103:6
  109:1 121:20
**tending** 88:5
**teratologist** 55:24
**teratology** 56:1
**terms** 76:4,4 79:18
**terribly** 108:7
**testified** 4:19 5:22
  28:6 47:22 52:4
  97:12,25 99:2,11
  105:17
**testify** 98:3
**testifying** 47:11

**testimony** 48:7
  66:22,25 67:9
  100:7 101:25
  102:12 103:11,19
  104:4 109:5,24
**thank** 3:13,14,20
  5:4 7:17 12:14
  13:3 36:12 66:12
  94:19 107:11
  111:14,16 113:13
  121:22
**that's** 81:12 83:3,7
  84:6,20 86:4 87:1
  88:21 89:9,17,24
  90:5,19 91:3,14
  93:21 94:7,20
  95:6 96:1 97:20
  97:22,23 99:1,8
  99:23 100:18,19
  100:21 101:11,16
  101:22 104:14
  105:8 106:6,7,7
  106:16,20 108:15
  109:19,23,24,25
  110:11,16,17,19
  110:20,21,21
  111:1 115:1
  116:15 117:11,15
  117:22 118:13
  119:6,8,12 120:2
  120:5 121:16
**therapy** 78:4
**there's** 80:24 84:2
  85:21,23 86:11
  89:4,5,8 90:21
  93:11 97:14 98:22
  101:14 104:24
  105:24 108:2,5
  110:19 113:25
**they're** 85:10 87:8
  99:17 101:24
  104:16
**they've** 92:23,25
**thing** 23:5 99:8
  111:10,22,24
**things** 22:14 29:2
  70:12 110:2

112:12,21 113:6
121:10
think 5:6,11,14,18
  6:5,6 7:22 12:24
  16:7 21:25 23:8
  25:13,18,21 26:4
  26:7 27:4,18 28:7
  29:23 31:3,4
  32:23 34:11 35:7
  41:16 43:18 46:2
  48:3 51:3,3 52:13
  55:2,14 60:18
  62:2 63:1 64:21
  65:24 66:2 67:12
  68:10 69:2 70:16
  74:17 76:16 79:1
  79:19,24 80:4
  81:5,11 83:5 84:5
  84:24 86:13 88:14
  89:24 90:16 91:13
  94:9 95:16,19
  96:5,6 97:9 112:1
  113:4,12,15 116:1
  117:18 120:2,10
  121:15
thinking 95:22,23
thought 11:1 26:3
  26:25 32:5,6 34:2
  56:22 106:22
  114:25
thoughtfully 113:9
three 5:18 28:8
  46:20 73:3 75:6,8
  75:13,20,23 76:2
  76:3 83:21 84:2,3
  84:17,22 86:14
  93:11 95:9 102:6
  102:7,9
throw 90:9
tighten 121:10
time 4:13,15 10:22
  14:9 22:15 43:22
  45:7 46:15 66:9
  79:19 84:25 85:9
  95:17 97:19 108:8
  114:1 121:13
timeframe 14:5

15:11
times 28:8 35:17
  81:24 93:2
timing 57:7
tiny 103:18
title 50:8 53:3 74:2
today 55:21 82:4
  101:17 110:22
told 35:17 49:19
  78:16 92:7,16,23
  93:2 98:19 109:2
  120:21
top 13:17 18:25
  21:23
total 11:14 13:9
  19:15 20:11 54:23
Trace 107:3
TRACEY 1:13,13
  122:20
track 14:25 28:8
  69:1
tract 24:19,23
train 11:1
trained 97:23
training 55:11 56:6
Transcriber
  122:11,21
transcript 48:12
  107:8 110:24,25
  111:4,4,7 122:4
transcription 26:11
  41:20 121:6
treat 89:10 102:18
  102:21,22
treating 99:21
treatment 82:14,18
  112:25
treatments 69:17
  82:17
tremendous 43:2
trial 29:24 44:20
  61:9 92:6,9
  102:23 104:10
  112:8,9,9,19
trials 98:12,13 99:1
  99:3,10,11,18,20
  100:21,25 101:7

102:16 103:22
  104:6,13 105:25
  112:2
tried 6:11 28:3
  71:18,18 86:7
  97:23 106:10
  114:16
TRIGG 1:22
trimester 78:6
  113:22 114:4,5
trouble 87:9
true 14:6 99:1
  109:2
truth 43:7 52:7
  91:5
truthfully 92:8
try 15:16 29:16
  54:1 56:22 71:16
  72:6 79:10 95:25
trying 22:13 43:22
  50:7 56:16 84:4
  84:13 91:4 112:12
  113:4,5,9 118:6
turn 25:7 46:14
  67:24 86:15
  101:10 107:15
  111:9 118:13
two 4:17 5:8 9:3
  18:13,23 19:12
  21:12 28:7 47:3
  48:23 49:1,3,4
  50:18 51:12 52:15
  52:21 73:2 86:21
  90:13 106:11,12
  106:25 109:13,20
  113:19,24 118:21
  119:13,19 120:12
  121:2
two-year 54:8
types 58:5 109:4

U

Uh-huh 14:2 18:20
  77:10
uncertainty 97:22
uncorrected 80:22
undercut 15:15

underneath 65:18
understand 9:2,7
  9:18 26:5,21 78:9
  84:19 85:1,18
  91:13,22 118:5
understanding
  19:22
Understood 96:5
undetectable 35:12
undue 105:11
unequivocal 97:16
unfair 55:10
unfortunate 61:12
unfortunately
  61:11
UNIDENTIFIED
  111:1
UNITED 1:1
unknown 25:12
unpublished
  120:19
Update 15:18
updated 44:21 51:4
  83:14
updates 76:4
upper 30:18 33:20
  43:2 120:15 121:7
urged 92:5
USA 1:5
use 13:20 14:4 18:6
  20:11 29:16 33:7
  33:12,13 38:11
  50:23 51:15 59:18
  62:20 70:13 79:6
  79:6 81:10 96:4
  100:2,2,8 101:12
  102:23 104:9
  112:22 113:22
  118:17,20 119:5
used/excluded
  81:21
useful 98:20 100:13
  101:12 107:25
users 13:6 117:23
uses 31:12 52:20
usual 82:17
usually 16:21 51:9

68:22 85:15
  105:14

V

valuable 108:7
  110:3
value 15:14 43:11
  73:12 99:2 103:2
  110:5,6 119:11
values 33:21 90:2
  91:2
variability 50:24
variable 35:1 39:18
  42:24,25
variables 36:23,24
  37:5,18,25 38:4
  38:11,18,23 39:11
  39:12,12,16 40:4
  40:5,16,17,23
  41:5,13,15,18,21
  41:25 42:4,18
  43:8 44:12,13,14
variation 105:25
varieties 109:13,21
  112:23
various 82:14
  98:12
vary 89:4 112:9
ventricular 23:22
  23:23 24:12,18,23
verbally 92:23 93:2
Veritext 1:23
version 53:13
versus 113:23
Viborg 10:17
view 75:21 108:13
  112:5
viewing 35:4
visualization 26:19
  26:22 27:20 28:25
vis-à-vis 57:8
voice 45:4

W

wait 88:12 95:19
waiting 88:15
Wang 74:23 75:2,6

84:16
**want** 8:11 9:18
19:5 23:6,8,10
30:10 31:2,20
35:20 37:23 38:1
43:24 59:4 75:5
86:10 87:12 94:1
106:1 108:1
116:13 117:14
**wanted** 3:25 16:7
27:4,5 30:23 31:4
31:21 37:15 64:2
83:11 88:15 91:9
111:10,22
**wasn't** 88:15
100:12 117:2
**wasn't** 34:9 57:17
**way** 5:15 6:12,14
11:13 13:21 19:18
20:12 27:5 29:16
38:1 39:15,24
40:12 43:13 49:16
52:5 55:17 67:2
72:1,5 84:15
89:25 90:6,7
91:14,19 96:6
98:21 100:14
102:19,22 105:8
107:19,19 115:2
116:2 117:18
**ways** 98:9
**weakness** 112:6,11
**weight** 91:24 105:1
105:7
**weighted** 104:22
106:13
**weighting** 105:14
105:23
**well-conducted**
111:25
**went** 7:3 26:18
30:16 57:14 69:1
89:13 93:8 99:22
119:18
**weren't** 67:1
**we're** 87:9 88:21
95:19 103:6 111:6

113:15 116:2
117:6 120:17
**we've** 84:25 99:14
119:9
**we'll** 63:5,8 66:9
**we're** 5:7,9 7:13
22:9 23:5 25:4,6
31:25 40:21 47:5
57:9 71:1
**we've** 8:20 17:20
18:1 20:20 34:24
38:8 46:15 48:23
70:16 75:16
**what's** 96:1 118:15
**WHEELER** 1:22
**wider** 24:15
**WILLIAMS**
122:20
**willing** 92:10
115:25 116:25
**wine** 109:17
**wish** 36:15 41:13
80:15 92:1 116:4
**wishing** 78:5
**witness** 2:2 3:16
7:13,18 12:25
13:2 22:21 28:11
64:23 66:1,4,12
87:11,18 88:2,6
94:16 98:1 107:11
**WOLFF** 1:16
**woman** 15:13
**women** 4:8 11:14
13:21 14:6,11
15:5,10 16:17
17:7 18:23 19:16
20:4,12 21:19
49:14 50:25 63:12
69:17 72:9 81:18
81:22 106:18
113:21 114:3,4,17
**women's** 61:12
**won't** 86:24,25
88:24
**word** 8:13 12:6
28:20 31:10 32:9
32:20 33:2 39:20

56:4,5 57:20
111:18 118:2,13
118:17,20
**words** 16:9 30:10
31:3 55:16 79:5
95:2,13 96:25
104:9 106:7
**word-for-word**
31:16
**work** 56:12 100:8
103:1 117:1
**worked** 56:10
116:14
**working** 56:25
87:25 91:19,24
**worse** 33:12
**wouldn't** 82:4
85:17 97:16,19
106:8
**wouldn't** 15:3,9
**write** 91:20
**written** 81:9,10
91:16 92:24 93:4
93:5,6
**wrong** 6:13 39:19
41:19 46:5 73:14
79:25 81:2,14,15
81:15 91:17 96:3
96:5 120:6,13
**wrote** 27:19 117:7

---
**X**

**X** 2:1 29:6

---
**Y**

**Yates** 1:18 3:9,18
3:20,22 5:1,4,5
7:10,16,19 12:23
13:4 22:1,19,24
25:5 36:3,5,8
44:24 45:2,5
48:11,15,19,21
50:3 53:3 65:1
66:2,5,17 87:8,13
87:17,21 88:3,7
94:7,10,11,15,17
95:21 103:15,17

107:7,12,14
110:25 111:3,5
121:9,14,22
**yeah** 6:22 7:8 12:23
20:14,19,22 22:1
22:7 23:10,24
24:1 26:19,23
53:21 63:22 65:15
66:1 68:25 70:21
77:19 87:22
108:20 109:19
115:6 117:19
120:1,3,5 121:3
**year** 9:9 10:14 14:4
15:4 17:11 18:15
18:16 37:22 39:25
**years** 4:8 8:15 9:1,4
9:5,6 10:6,12,18
11:18 13:8,12
18:17,22 19:16,19
19:20 20:6 21:12
37:23,24 38:1
41:17 42:13 103:6
109:1
**yesterday** 4:6,11
5:23 6:2,5,7,10
16:8 25:18 26:14
26:18,24 27:5
28:19 29:17 34:2
35:7,9 45:18
46:22 49:8 52:4
56:22 59:10,12
62:5 67:5 78:16
80:7,19 81:5,17
87:24 91:4 98:3
99:2 102:12
106:11 108:16
109:24 110:21
111:18 112:14
113:18,24 115:20
116:2 119:1,3,12
**yielded** 73:10
**yields** 74:13
**you'd** 92:17,20
**you'll** 111:17
**you're** 84:24 93:9
100:20 101:9

102:15,16,23
103:20 107:16,22
109:25 110:4,15
120:2
**you've** 81:2 92:3
97:12 101:25,25
103:1 105:17
108:17

---
**Z**

**Zealand** 68:10,12
69:10
**zero** 89:7,8,22 91:9
101:1,13
**Zoloft** 1:3 12:1,10
13:6,20,22,25
14:4,12 15:4,6,9
15:11,13,24,25
16:13,18,25 17:8
17:12 21:13,20
22:4 23:14 25:10
42:2 50:8 55:21
56:14,25 58:8
61:7,19 62:24
63:19 64:10,14
65:9,14 67:12,17
67:19 70:13 73:19
74:7 79:11,13
80:5 83:4,14 84:2
84:9 85:3,16,19
86:1 89:11 90:20
90:23 93:16 95:6
95:18 96:11,12
97:3,12 101:4,20
101:24 102:6,16
106:5 107:2
113:16,21,22
**zone** 45:12
**Zonies** 1:12 3:11,14
26:2 36:2,14
78:16

---
**0**

**0** 29:6,18
**0.02** 119:12
**0.5** 106:13 108:20
110:4

**0.931** 65:13
**00152** 122:21
**051** 73:12

**1**

**1** 24:4 29:6,18,18
  29:19 32:14,15
  35:3 38:6,9,17
  42:19 45:17,18
  106:15,19 122:7
**1-888-777-6690**
  1:25
**1.0** 30:5,16,20
  33:19 38:13 73:12
  74:14
**1.01** 38:17
**1.02** 24:8 32:14
**1.05** 24:2,5
**1.07** 119:11
**1.08** 74:8 89:5
**1.1** 119:23
**1.13** 23:13
**1.2** 30:3,16,20 35:3
  45:9,17
**1.28** 23:6
**1.3** 48:1
**1.35** 24:1,3 48:8
**1.38** 23:15
**1.4** 20:17
**1.65** 74:8
**1.87** 119:11
**1.9** 119:23
**10** 29:18
**10:05** 1:4
**1007** 64:9
**1011** 67:24 69:11
  69:14
**103** 107:15
**11:20** 66:13
**11:43** 66:13
**12:49** 1:4 121:23
**128** 95:2
**13** 23:13
**143** 95:13
**15th** 39:2
**154** 57:9
**17** 13:8 17:3

**1800** 1:24
**1801** 1:24
**19** 77:7
**19103** 1:24
**1990** 6:23 7:4,5 8:2
**1991** 6:19 7:4,21,22
  10:15,19 11:2
  13:12,16
**1993** 16:1
**1994** 17:3,7
**1996** 8:4,15 10:16
  11:3,7 13:12,16
  20:6
**1997** 8:7
**1998** 10:17

**2**

**2** 1:3 12:8,20 19:7
  21:25 22:20 43:15
  65:12 67:12
  106:19 108:20
  110:4
**2nd** 16:1
**2.15** 24:9
**2.3** 20:4,13,18,23
  21:19
**2.39** 119:11
**2:00** 121:17,21
**2:12-md-02342-...**
  1:2
**20** 77:22
**2003** 8:4,15 18:22
**2007** 4:18,20 6:19
  7:22 10:15,16,17
  10:19
**2009** 8:7 19:19
**2010** 4:18,18,20
  20:7,23
**2013** 51:2 53:4
**2014** 70:6 82:12
  83:16
**2015** 1:3 20:2 36:18
  39:3 47:9,11 50:7
  50:11 74:23 122:7
**203** 53:1
**22** 82:7
**24** 90:24 92:2

**259** 19:12,13
**27** 36:17
**27th** 39:3

**3**

**3** 2:3 19:6 33:19
**3.3** 119:23
**3.8** 33:20
**30** 10:11 111:18
**31** 36:2 110:24
  111:9,13,14,21
**33** 12:8,20
**352** 12:1,10 13:6
  17:12

**4**

**40** 24:20
**44** 74:2 86:16,23
  87:2 94:10
**45** 70:17,18,24,25
  71:7 94:10
**46** 94:13
**48** 24:9

**5**

**5** 21:25 22:18,19
  23:19,24 77:7
**50** 20:15,18 104:12
**51** 73:12
**523** 15:22
**527** 18:22 19:12
**57** 73:11 74:14
**59** 73:8

**6**

**6** 70:15,16 71:1,12
  74:1 86:15,20,23
  87:1,3 88:8 93:8
  94:6,19 111:9,15
  111:21
**68** 89:2 90:11

**7**

**7** 21:25 29:19
  107:16
**70** 74:8
**76** 73:7,11 74:14

**8**

**82** 24:1

**9**

**9** 14:14
**91** 6:25 9:12 10:12
  10:21 15:1
**92** 6:25
**93** 6:25 23:15
**931** 67:19
**94** 6:25
**95** 73:7,11
**96** 9:9,12 10:12,21
  14:15 15:1 17:16
  17:18,22 18:22
  20:10
**97** 9:9 17:16,18,22
  19:18 73:8
**98** 32:14,16
**99** 38:13