```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          - - -
        IN RE:                    :  2:12-md-02342-CMR
 3                                :  PHILADELPHIA, PA
        ZOLOFT                    :
 4      (SERTRALINE HYDROCHLORIDE):  September 2, 2015
     PRODUCTS LIABILITY LITIGATION :
 5                          - - -

 6              TRANSCRIPT OF DAUBERT HEARING DAY 3
             BEFORE THE HONORABLE CYNTHIA M. RUFE
 7                 UNITED STATES DISTRICT JUDGE

 8    APPEARANCES:

 9    Plaintiff's Steering      DIANNE NAST, ESQ.
      Committee Co-Lead         RODANAST P.C.
10    Counsel:                  801 ESTELLE DRIVE
                                LANCASTER, PA 17601
11
                                JOSEPH ZONIES, ESQ.
12                              STEPHEN CORR, ESQ.
                                SEAN TRACEY, ESQ.
13

14    Defendants' Lead and      MARK S. CHEFFO, ESQ.
      Liaison Counsel:          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
15                              FOUR TIMES SQUARE
                                NEW YORK, NEW YORK 10036
16
      AUDIO OPERATOR:           CSR OPERATOR
17    TRANSCRIBER:              JANINE THOMAS
                                NOTARY PUBLIC
18
      (Proceedings recorded by electronic sound recording,
19    transcript produced by transcription service.)

20          VERITEXT NATIONAL COURT REPORTING COMPANY
                    MID-ATLANTIC REGION
21            1801 Market Street - Suite 1800
              Philadelphia, Pennsylvania  19103
22                  (888) 777-6690

23

24

25
```

Page 2

1                          I N D E X

Page

2

3     WITNESS                  DIRECT       CROSS     REDIRECT    RECROSS
      NICHOLAS JEWELL               3       98        114
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.    Let's go to -- doctor let me show you some testimony,

2    see if it refreshes your recollection in Avandia.

3    A.    Sure.

4    Q.    See if we can do this.

5              MS. YATES:  Your Honor, may I approach.

6              THE COURT:  You may.

7    BY MS. YATES:

8    Q.    Tiny print, I apologize.  But this was your Avandia

9    testimony, Judge Rufe in re Avandia.  Okay.  And so you're

10   talking about, "We are fortunate because there are randomized

11   controlled trials;" right?

12   A.    Uh-huh.

13   Q.    We talked about that, "And then subsequently then I

14   would go on and look for information about the observational

15   studies."  Does that refresh your recollection?  There are a

16   number of observation studies?

17   A.    There certainly were.  I know -- memory there are

18   certainly a number of observational studies about Avandia, but

19   the body of my report and my testimony before Judge Rufe was

20   about the, the randomized clinical trials.

21   Q.    Oh, but you did review them; right?

22   A.    I did review them, but I didn't put them in my report.

23   I focused my report to use your words on the randomized

24   clinical trial information for which there was a lot and there

25   were a lot of -- there were close to 50 if my memory is

1    correct of randomized clinical trials.  That was the focus of

2    my report.  That's my memory, I didn't spend any of my report

3    discussing the observational study information.  There

4    certainly is some.

5    Q.    Right.  And so, okay.  I'm not going to belabor it.

6    All right.  Let's go back to see if we can agree.  You advised

7    the Court and Avandia that there are formal techniques in a

8    meta-analysis that are designed to make sure studies are

9    weighted properly, you agree with that; right?

10   A.    Yes.  There's, meta-analysis is an averaging process as

11   I indicated and it's going to weight it, different studies

12   differently because of the, you know, for example the sample

13   sizes can be substantially different.

14   Q.    Because the little guys don't have the same weight as

15   the big studies.

16   A.    That's a nice way of putting it, yes.

17   Q.    Okay.  And these techniques make sure that you don't

18   make the improper mistakes of averaging results so that no

19   study has an undue influence; correct?

20   A.    It should have its influence based on the weighting

21   scheme which is usually a sample size driven scheme, but not

22   always.  Sometimes it's a little bit more sophisticated.

23   Q.    And you've testify in this case that you can't do a

24   meta-analysis because of this heterogeneity; correct?

25   A.    I'm not saying you can't do it, you can it's just you

1   have to be very careful in interpreting it, because the

2   averaging involved weighting or not can mislead you when you

3   rely on the results of the summary when there's substantial

4   variation in the individual trials.

5   Q.    All right.  Do you agree doctor that based on the

6   heterogeneity the problem that you have in Zoloft is that the

7   averaging that meta-analysis does pretty gets you nowhere,

8   that's your opinion.

9   A.    No.  That's maybe, that's not my words.  I wouldn't say

10  get you nowhere.  It's just you have to pay attention to the

11  heterogeneity in interpreting the results that it gives.  As I

12  tried to make this clear yesterday if you have two studies one

13  of which shows an odds ratio of two and one of which shows

14  odds ratio of .5, let's say equally weighted to make it simple

15  and you do a meta-analysis and you come out and report in the

16  literature and an odds ratio of 1.0 and interpret no risk,

17  first of all that's an incorrect statistical interpretation

18  and it's clearly misleads, because of your women in the study

19  had an odds ratio of 2.  No one had an odds ratio of 1 as it

20  happens, so that's why it's misleading and I can go on in

21  greater detail as to why it's misleading, but I thought that

22  made it clear that in those kinds of situations you can't

23  resort to meta-analysis to resolve the inconsistency or the

24  heterogeneity of the two studies.

25  Q.    So, let's take a look at your deposition.  Do you

1  remember having your deposition taken in a Zoloft case called

2  Trace Foster it was pending in St. Louis?

3  A.    I don't recall again, the details of the specific

4  depositions.

5  Q.    And we can put it up on the screen.  If you turn to

6  page 103, doctor, starting at line 7.

7       Q:  You're perfectly capable of searching pub med [ph]

8  and [indiscernible] defined set of inclusion, exclusion

9  criteria and accumulating the data the same way Miles and the

10  same way McDonough [ph] did; correct?  And the answer goes on

11  for a bit, so bear with me.

12       A:  Well, but your misinterpreting my answer.  That

13  certainly was not the obstacle.  The obstacle is the data

14  itself does lend itself for a meta-analysis to be useful.  A

15  meta-analysis is an averaging process.  If you want to take an

16  apple and an orange and average it, there's no obstacle to

17  doing it.  You can do it.  You can take orange juice and apple

18  juice and mix them together.  There's no physical obstacle to

19  doing.  Does it make sense?  Sometimes averaging does.  I've

20  lived most of my life where average is terribly valuable, but

21  the statisticians that have known for a long time that

22  averaging can be horribly misleading and in this case with

23  this amount of heterogeneity cross studies averaging gets you

24  pretty much nowhere.  So this is not a prime candidate of

25  doing an effective meta-analysis in my view.

1    Q.    Did I read that correctly?

2    A.    You read that correctly and that's exactly what I said

3    yesterday.

4    Q.    Doctor, so you said there when you got this

5    heterogeneity problem it's like mixing apples and oranges;

6    right?

7    A.    That would be the like the .5 and the 2 in my

8    hypothetical example.

9    Q.    Right.  Do you recall that in Avandia you were asked

10   about heterogeneity and whether it was like mixing apples and

11   oranges?

12   A.    I can't recall the details of the discussion 10 years

13   ago.

14   Q.    Isn't it true sir, that you told the Court that it's

15   not like mixing apples and oranges, but rather mixing

16   different types of apples?

17   A.    Well, idea have to see the testimony.

18   Q.    Okay.

19   A.    It does sound like something I would say and that would

20   refer -- the idea of apple and an orange is heterogeneity

21   right?  An apple's quite different.  If I held it in my hand

22   you could tell the difference; right?

23   Q.    I sure hope so.

24   A.    If I held two different varieties of an apple in my

25   hand could you tell the difference?

1    Q.    Possibly.

2    A.    But maybe not; right.

3    Q.    I could tell the difference in those wine glasses.

4    A.    Yes, but that's an apple and an orange.  Let's not

5    change the metaphor.  If I have two apples, distinct varieties

6    of apples you probably couldn't, well maybe they look enough

7    the same.  Maybe I can combine these.  That's exactly what I'm

8    saying in this testimony here and that's exactly what I said

9    yesterday, that's exactly what I'm saying now.

10        When you're doing an meta-analysis averaging it's fine

11   in all other things being equal to do it when you have no

12   heterogeneity, because then the averaging is voluble, you're

13   not mixing a .5 and a 2 and coming out with this distorted in

14   between value that no one experiences.  And the value of

15   meta-analysis as an Avandia is you get the increased precision

16   that you get from combining multiple small studies.

17        So it's not that meta-analysis in itself is supposed to

18   give you a magical different answer from the studies, that's

19   not the purpose of meta-analysis.  The purchase of

20   meta-analysis if done correctly is to take homogeneous

21   phenomenon each of which is imprecise average them and then

22   you get a measure of the phenomenon you're interested in an

23   odds ratio but with much more precision.  That's the point of

24   averaging always.  That's the point of meta-analysis, but you

25   don't do it and mislead people when they're so much

1    heterogeneity.  That's what I said in this, you just read me,

2    that's what I said back in the Avandia case.  That's what I

3    said yesterday and that's what I'm saying today.

4    Q.    All right, doctor.  Let's go to I believe it's the same

5    transcript page 31.  Oh, I'm sorry, it's not the same

6    transcript.  So we're now going to the Avandia transcript?

7    A.    Okay.

8    Q.    Okay?  If you turn to page 31, line 6.

9              Q:  Another thing I wanted to ask you --

10   A.    Sorry, could you just -- which page was it?

11   Q.    I am so sorry.  Page 31.

12   A.    31, thank you.

13   Q.    Line 6.

14   A.    Thank you.

15   Q.    And actually we can -- you'll see on the middle of page

16   30 yesterday the word heterogeneity came up; right?  So, let's

17   just give a little bit of context there.  Now we can go to

18   page 31 line 6.

19              Q:  The other thing I wanted to ask you about is it

20   like mixing apples and oranges?

21              A:  Well, of course a key thing in a well conducted

22   meta-analysis one of the limitations I think I refer to here

23   is that the clinical trials that you are combining or

24   observational studies if it's a meta-analysis of observational

25   studies are not identical.  They don't in fact one, you can

1   view that as a strength and a weakness.  They are not at all

2   identical population.  They are not sampling from exactly the

3   same population.  The eligibility criteria for the trial that

4   was designed for an efficacy reason may vary from trial to

5   trial somewhat.  They are done in different places.  As I say,

6   this is a weakness because you are now trying to mix things

7   that were collected in different places.  It's also a strength

8   because as we heard yesterday one of the important issues in

9   causation is seeing is a phenomena.  Is there any idea of a

10  risk replicated in different populations, because that is

11  going to strengthen your belief that this is something causal

12  but not peculiar to a particular trial or a particular

13  population?  So one of the limitations as I said and strength

14  is you are mixing these things.  It's not mixing apples and

15  oranges, however, if I can use that analogy, it's mixing

16  different varieties of apples.  All of these studies have the

17  same drugs applied to the treatment arm.  They were all by in

18  large with some notable exceptions studying diabetics.  They

19  were all essentially when the data was pulled out on adverse

20  events they were all these investigators were honestly, I

21  think trying to get at the same question.  So this was not

22  really trying to pull things from out of a hat and sort of jam

23  them together, this was, most of these meta-analyses not all

24  of them but most of them were well conducted, thoughtfully and

25  trying to answer the question and summarize the information.

1  Q.    Did I read that correctly?

2  A.    I think you did.

3  Q.    Thank you.  Now doctor, I think we're well aware of

4  your criticisms of the meta-analyses on Zoloft, but you did a

5  mini meta-analysis; right?

6  A.    I did as I described yesterday in the paused analysis

7  we had two major studies that allowed you to independently

8  look at the question of comparing woman on Zoloft and

9  comparing those who continued to use Zoloft during the first

10  trimester by some definition versus those who didn't and I

11  combined those two in front of the Court yesterday.

12  Q.    Right.  So there's a couple of steps here.  Let's see

13  if we can go one at that time.  You performed a calculation or

14  a reanalysis of some of the Huybrechts data comparing what you

15  say women have filled the prescription in the first trimester

16  and women who did not fill a prescription in the first

17  trimester; right?

18  A.    One or more prescriptions filled, yes.

19  Q.    Okay.  And this analysis or calculation is not part of

20  the peer review published study of Huybrechts; right?

21  A.    Well, the data are there in the peer review

22  publication.  That particular calculation is not.

23  Q.    Right.  That was my question.  And it's not part of the

24  investigator's methods; correct?

25  A.    I don't know if it's -- but an investigator certainly

1  deliberately tried to separate out these women that had at

2  least one prescription filled during pregnancy, because I

3  believe in their sensitivity analysis they believe that was a

4  more rock-hard measure of exposure if you actually fill a

5  prescription you're not only were exposed in that you had a

6  previous prescription that took you through the first days

7  after conception but then you also filled one.  From their

8  sensitivity analysis perception they thought that was a more

9  definitive measure of exposure and that's what they used it

10 for and I used the same data but in a slightly different way.

11 Q.    Sir, your calculation was not part of the

12 investigator's methods set forth in the peer review published

13 article?

14 A.    As I just indicated, yes, the data was there in the

15 supplement, but not that particular calculation, that is new,

16 yes.

17 Q.    And in fact, Dr. Huybrechts has referred to your

18 reanalysis as post hoc subgroup analysis; correct?

19 A.    As well as referencing it as interesting.

20 Q.    And after the fact sub -- post hoc took a little bit of

21 Latin means after the fact; right?

22 A.    I actually took a little bit more Latin than you.

23 Q.    There you go.

24 A.    But I'm surprised you didn't.

25 Q.    I rejected it.  I looked at it and rejected it.  You

1    haven't published your reanalysis, sir?

2    A.    No, I've asked, as I indicated yesterday I believe to

3    take the data from someone else's paper without approaching

4    that author directly and asking them to collaborate would be

5    not in my scientific approach, so I have asked the author if

6    she would be willing to publish them with me, because she --

7    it's her data and she knows that data and I think that would

8    be the right way.  And as we discussed yesterday we're on

9    route somewhere.  I don't know how it will play out in the

10   end.  She may not wish to be involved given how much contact

11   she's had from lawyers in this case.

12   Q.    She politely declined; right?

13   A.    No.  At the last e-mail she actually indicated that she

14   would maybe see if some of team could help.

15   Q.    Let me back up.  When you asked her to be a co-author

16   that e-mail politely declined; correct?

17   A.    Yes, she said she had too many other projects at that

18   point if you want to look at the e-mails, please do.

19   Q.    And --

20   A.    And then at the last e-mail when he had worked through

21   what I was getting a she said that's an interesting

22   possibility or something and then I'll see if -- I'll bring it

23   up to my team and see if someone else can.  I assume she's too

24   busy.

25   Q.    That was your request for the data?

1    A.    No.   That was the request to publish the data -- well,

2    that was my request for them to run the analysis adjusting

3    for --

4    Q.    Right.

5    A.    -- confounding.  I assumed if they did that they would

6    be willing to stand behind their work and go publish, but I

7    can't --

8    Q.    That wasn't the question was it doctor?

9    A.    I can't -- if you could just let me finish.  I

10   couldn't, I can't speak to that.  We're in the middle of

11   something here.  I wrote to Dr. Huybrechts saying here is an

12   interesting analysis it's your data would you co-author?  She

13   said I'm too busy and any way it doesn't adjust for

14   confounding.  I said, exactly, that's why I need your help and

15   would you be -- I need the raw data.  She said, I'm too busy

16   I'll see if my team can help.

17        Now whether that leads to a publication that they want

18   to be associated with or not that's for the future to decide.

19   Q.    You have no idea right now; right?

20   A.    Whether it will be done?  Well, I can't do it.  I have

21   no control, I think is a better way of putting it.

22   Q.    Right.

23   A.    Yes.

24   Q.    And the data you extracted was from the supplement from

25   the Huybrechts study; right?

1    A.    That's right.  The online supplement.

2    Q.    And you defined some users in that supplement as

3    paused.

4    A.    Well, I put paused in quotes, because --

5    Q.    So did I.

6    A.    Yes -- and so did you -- because the word pause comes

7    from the Jimenez-Solem paper and --

8    Q.    I'm coming to that, I promise.

9    A.    I understand.  I --

10   Q.    I'm just trying to do this -- right now the questions

11   are this long and the answers are really long doctor and I

12   really would appreciate it if you could focus a little bit

13   more on my question.  I will get there and then your counsel

14   has a chance to do a redirect.

15   A.    I'm sorry, I'm a teacher I can't help it.  I can't turn

16   it off.  That's why I put the word paused in quotes.  It's a

17   slightly different definition than what's used in

18   Jimenez-Solem where they used the word pause.

19   Q.    Precisely.  So, number one, Dr. Huybrechts did not

20   define this population as paused; correct?

21   A.    She didn't use that word, that is correct.

22   Q.    And number two, your definition of paused is different

23   from the Jimenez-Solem definition; right?

24   A.    Yes.  As I just indicated, yes.

25   Q.    And as you said, Dr. Huybrechts pointed out you haven't

1  adjusted for compounding; corrects?

2  A.    And we discussed that yesterday and the rest of the

3  story.

4  Q.    Now, doctor, yesterday there were a couple of slides,

5  pie charts and I'm sorry, I only have black and white, but if

6  I can use the Elmo [ph] maybe that's easier [indiscernible].

7  This pie chart was shown of this is your reanalysis of the

8  Huybrechts data and I apologize that's my handwriting,

9  Jewell's definition of pause, we've already gone through that.

10  And you've an odds ratio of 1.87 confidence in yours was 1.07

11  to 2.39 P value of .02; right?  That's what you showed us

12  yesterday?

13  A.    Yes.  I showed two of these I believe and this is the

14  one to be precise that refers to the "paused group" I mean the

15  exposed as filling one or more prescriptions.

16  Q.    Right.  There was another one that talked about after

17  Dr. Gibbons commented you went and did two or more; right?

18  A.    Correct.

19  Q.    But then we saw another slide meta-analysis Huybrechts

20  and Jimenez-Solem.  Huybrechts [indiscernible] odds ratio 1.9

21  confidences of 1.1 to 3.3.

22  A.    Could you show me the previous slide just so I can --

23  Q.    Yes.

24  A.    Because that's where I think you're going.  Yes, that

25  doesn't look right.

1   Q.    It doesn't right does it doctor?

2   A.    Yes, that's -- one of those is --

3   Q.    Do we know which one is wrong?

4   A.    Well it might take me a minute.  Because if I can take

5   logs I could do the symmetry.  Maybe Dr. Kimmel can do it for

6   me, he's better at that with his eye.  I can't -- with that, I

7   think to be fair I should correct one of those slides after

8   I've had a chance to be in a dark room for two minutes.

9   Q.    Okay.  All right.  One of them is wrong we don't know

10  which one?

11  A.    Yes.  The upper bound there looks incorrect on one of

12  those.

13  Q.    Okay.  And just so we're clear based on your

14  communications with Dr. Huybrechts you did not mean your

15  unpublished reanalysis to supersede Dr. Huybrechts' big

16  published study; right?

17  A.    No.  And I told her that, of course I didn't intend

18  that.

19  Q.    Right.  When you did your meta-analysis do you know if

20  you used the correct numbers?

21  A.    Which meta-analysis?

22  Q.    So you --

23  A.    Oh, you mean the two studies?

24  Q.    Yes.

25  A.    I would've used the raw data itself, not the summary

1    results.  So I did it myself using the raw data, not, so it's

2    the transcription error in one of those upper bounds.

3    Q.    All right.

4              MS. YATES:  Your Honor, I'm about to move on and

5    I can hopefully tighten things up.  I'm happy to go on or I'm

6    not sure.

7              THE COURT:  Well, it is a lunch break time.

8              MS. YATES:  Lunch break.  Okay.

9              THE COURT:  And I think we ask take the hour

10   again if that's not enough let me know, because we can easily

11   come back at 2:00, but it is appropriate to break now for a

12   lurch recess.  So why don't we get here in an hour and assess

13   where we are and that would be 10 minutes to 2:00.

14             MS. YATES:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             (Whereupon there was a recess in the

17   proceeding from 12:49 p.m. to 1:56 p.m.)

18             THE COURT:  Have a seat.

19   BY MS. YATES:

20   Q.    Hello doctor.

21   A.    High.

22   Q.    We left off with your post hoc subgroup analysis from

23   the Huybrechts that you then created your mini meta-analysis

24   with Jimenez-Solem and we were agreeing that that subgroup

25   reanalysis does not replace the overall study results, so I

1    just wanted to go to Dr. Huybrechts conclusion based on her

2    overall study results if we could show that please.

3    Huybrechts page 2405.  Huybrechts is in your binder and we'll

4    try and bring it up here as well, but page 2405.  Okay?  With

5    me doctor?

6    A.    Not yet.

7    Q.    Lower right-hand side, right-hand column, page 2405.

8    A.    Yes, I'm with you now.

9    Q.    All right.  The authors in Huybrechts conclude, in

10   conclusion our results suggest that the use of antidepressants

11   during the first trimester does not substantively increase the

12   risk of specific cardiac defects.  Did I read that correctly?

13   A.    You read it correctly.

14   Q.    And then they go onto state if you turn onto page 2405

15   to 2406.  The accumulated evidence.  The accumulated evidence

16   implies low absolute risks and argues against important

17   teratogenic effects associated with the most commonly used

18   antidepressant medications.  Did I read that correctly?

19   A.    You did.

20   Q.    And there published peer review methodology led them to

21   these conclusions; correct?

22   A.    Their main analysis led to their conclusions, yes.

23   Q.    And their main analysis was the published peer reviewed

24   analysis; correct?

25   A.    Correct.  And that's the analysis that you agreed my

1    paused analysis does not supplant or supersede in any way.  It

2    add to it rather than supersedes it in my view.

3    Q.    Understood.  Doctor, I wanted to move on.  Several

4    places in your report you refer to the word trend; correct?

5    A.    Probably, yes, it's a word I use a bit.

6    Q.    All right.  And you use -- for example on page 4 of

7    your report so that's tab 176.  Page 4 of your report you

8    refer to a trend when you're discussing nonsignificant

9    findings that you say in support increased risk; right?  Let's

10   just take a look.  No, that's not it.  Page 4,

11   nonsignificant -- I think we're all having trouble reading

12   what we've got on our screens, Your Honor.  I know I am.

13              THE COURT:  Do you have -- Dr. Jewell's report

14   in binder that he has handy.

15              MS. YATES:  You know what, I believe it's in --

16   good point.  Thank you, Your Honor.  It's in the binder from

17   yesterday I believe.  Tab A from Mr. Zonies' binder.

18              THE WITNESS:  I have it.

19              MS. YATES:  You have it?

20              THE WITNESS:  Yes.

21              MS. YATES:  Tab 1, I'm sorry.

22              THE COURT:  Tab 1.

23              MS. YATES:  So if we go and it's now on the

24   screen I'm being told.  Okay.  I can't read that.  So,

25   somebody's going to have to help me on that.

1  BY MS. YATES:

2  Q.    You discussed, you used the word trend.  We're looking

3  at page 4 of your report and you refer to result that reflect

4  statistically significant increased risk and nonsignificant

5  supporting trends in risks (positive associations); right?

6  That's one place where you use it in your report?

7  A.    Yes.  So, there I'm using it to say a positive

8  association, that's where I'm using the word, but it's not

9  statistically significant.

10  Q.    Right.  And you also use it when you discuss dose

11  response if we go to page 60 of your report you reference

12  trends in discussing an increased risk with dose with

13  increased risks; right?

14  A.    Yes, the word is there being used a little bit

15  differently because it's in the context of a dose response

16  where a trend has its own meaning --

17  Q.    Right.

18  A.    -- that the risk goes up or down monotonically.  And,

19  but again I'm using it there to point out that the evidence

20  from Huybrechts and Jimenez-Solem regarding dose response is

21  not statistically significant.

22  Q.    Okay.  You agree, sir, that there's no generally

23  accepted definition within the profession of biostatistics for

24  the word trend?

25  A.    Not for the English word, no. I mean, I think it can

1   mean different things in different context as we just saw.

2   Q.    Okay.  And there's no textbook that defines trending

3   data; correct?

4   A.    I would be shocked if there was.

5   Q.    All right.

6   A.    It's here being really used to point out the lack of

7   statistical significance, but yet a positive association.

8   Q.    Okay.  In fact trend is not a word you really like to

9   use is it doctor?

10  A.    Why, I just said I kind of like the word, but you have

11  to give me a context.  I guess there might be somewhere where

12  I don't like to I'm sure --

13  Q.    All right.

14  A.    -- I've said in the past in another context that I

15  don't like the word trend for a specific situation.

16  Q.    Well, it looks like in Avandia you didn't like the word

17  trend?

18  A.    Possibly.  I would have to see the --

19  Q.    Shall we look?

20  A.    Sure.  I would have to see the context.

21  Q.    Okay.  Let's -- you have the Avandia transcript, I

22  believe?

23  A.    I do.

24  Q.    Let's go to page 75 and turning over to 76, so it's

25  right at the end of 75 line 24 going over to page 76 line 14.

1   A.      Seven, I'm sorry, 75, 76?

2   Q.      Yes, 75, line 24.

3   A.      Okay.

4               Q:  There was some testimony about trends and then

5   I believe there was actually a question from the bench about

6   trends.  I want to know is there textbook that defines

7   trending data.

8               A:  No.  I mean, as I said, I don't like that word.

9   I don't use it much, my -- I don't use it myself very much.

10  It's really kind of a loosely used word to say when you want

11  summarize a set of trials and say do they tend to have a

12  tendency to give a certain picture or not.  Does it tend to be

13  a little bit red or a little bit blue?  And so the trend there

14  is very informal, just saying do these trials have a tendency

15  or a trend towards being negative or positive with regard to a

16  comparison.  That is the only way I've seen that word used.

17  It's not a word I use a lot myself.

18  Q.      Did I read that correctly?

19  A.      You read it correctly.

20  Q.      Okay.  Now, as part of your use of the word trend as

21  you said, you use that when you have nonstatistically

22  significant findings?

23  A.      Yes, so that's a different context from the text you

24  just read from Avandia where it's not talking about that

25  situation.

Page 24

1    Q.    Right.

2    A.    But if you want me to explain that I'm happy to do so.

3    Q.    But my question that actually related to that was you

4    said you didn't like the word trend.

5    A.    In that context and the context is described a little

6    bit there, but I could go into more detail, but it's different

7    from the way it's been used in that I -- the other two

8    examples you just gave.

9    Q.    It depends on the situation?

10   A.    Well, English words do tend to depend on the context

11   you're using them, yes.

12   Q.    All right.  But in Zoloft you use it for

13   nonstatistically significant findings; right?

14   A.    In the dose response, yes.  I use it in that context to

15   refer to non-significance?

16   Q.    Let's separate out dose response for a doctor.  Let's

17   focus on the nonstatistically findings, because you cite

18   several studies that "support" your trend; right?  Support a

19   trend in increased risk?

20   A.    Uh-huh.

21   Q.    Yes?  So let's start with Alwan 2007.  You cite Alwan

22   and we can go to your report at pages 4 to 5.  You support

23   Alwan finding a 1.3 odds ratio for conotruncal heart defects

24   as "support for an increased risk" correct?

25   A.    I'm sorry, I'm not with where you are.  You said 4 to

1    5.

2    Q.    Okay.

3    A.    But I didn't get there quick enough.

4    Q.    I'm sorry.  I will wait.

5    A.    Whereabouts on 4?

6              THE COURT:  Your report.

7              THE WITNESS:  Yes, I'm in my report on 4 and 5,

8    but I'm just not sure where you're reading from.

9    BY MS. YATES:

10   Q.    Okay.  Let's see if we can help you.  All right.  So

11   you say in your report page 4, the results that reflects

12   statistically significant increased risk and nonsignificant

13   supporting trend in risk positive associations for exposure

14   specifically to Zoloft include turn the page and you've got a

15   list of studies and their findings; right?

16   A.    Yes, that list is as I indicated the list of all

17   nonstatistically significant results but which it indicated

18   increased in risk and that's the definition of that list.

19   Q.    Right.  And --

20   A.    And Alwan is one of them.

21   Q.    Alwan 2007 you have as showing supporting your trend in

22   increased risk, but let's go to Alwan, page 2684 and let's

23   take a look at the author's conclusion.

24   A.    Okay.

25   Q.    All right.  So, here we have Dr. Jewell taken your

1    language from your report and we're going to go and look at

2    what the Alwan 2007 authors conclude; okay?

3    A.    Yes, and we're on what page on Alwan?

4    Q.    2684.

5    A.    Thank you.

6    Q.    And they conclude maternal use of SSRIs during

7    pregnancy was not associated with significantly increased

8    risks of congenital heart defects or of most other categories

9    of birth defects; did I read that correctly?

10   A.    Yes.

11   Q.    And there peer review published methodology led them to

12   that conclusion; correct?

13   A.    I assume.

14   Q.    And you disagree with that conclusion?

15   A.    Well, first of all they're talking about somewhat

16   different things, so on the left I'm talk -- which you haven't

17   noted on the slide, on the left I'm talking about Zoloft and

18   cardiac defects and in this case --

19   Q.    Right.

20   A.    -- you picked out the one which is conotruncal

21   subcategory of all cardiac.  On the right-hand side the

22   authors are talking about their overall conclusion that --

23   Q.    Right.

24   A.    -- it is all SSRIs and I guess they're talking about

25   all cardiac --

1    Q.    Right.

2    A.    -- heart defects.

3    Q.    So --

4    A.    But you didn't put on the left-hand was the Alwan

5    result for Zoloft for all cardiac which is not in the list you

6    just put up.

7    Q.    I'm going just with your report, right.  So different

8    lists.  Stick with me, I'm on that one --

9    A.    Yes, but you're just comparing here two statements

10    about two different things that's all I'm pointing out.

11    Q.    And I'm going to clear that up doctor.

12    A.    Great.

13    Q.    I went to your report, your list of nonstatistically

14    significant findings; right?

15    A.    Correct.

16    Q.    Now we know that the authors of each and every study

17    doesn't make a concluding statement about every single

18    finding; right?

19    A.    Correct.

20    Q.    That would be an awfully long study.  So what we did

21    was she just showed a result that was nonstatistically

22    significant; correct?

23    A.    Correct.

24    Q.    And all I'm trying to do is show the overall

25    conclusion, because you picked out various results from Alwan;

Page 28

1    right?

2    A.    No.  I reported all of the results from Alwan that are

3    due to Zoloft and elsewhere in my report I give the number for

4    Alwan for all congenital heart defects that corresponds to

5    their conclusion on the right.  Albeit theirs is for all

6    SSRIs.

7    Q.    Okay.

8    A.    So, we should probably go to my report if you want to

9    compare them and look at where did Alwan appear.

10   Q.    Sure.  All right.  Let's look at that then doctor and

11   go to page 2691 table 3.  You with me?

12   A.    Yes, I'm with you in the Alwan paper.

13   Q.    Okay.

14   A.    Yes.

15   Q.    Yes.  Page 2691, table 3.

16   A.    Yes.

17   Q.    All right.  Cardiac birth defects?

18   A.    Yes.

19   Q.    For -- go to Sertraline which is Zoloft, number of

20   exposed 22.  Odds ratio, adjusted odds ratio 0.7 confidence

21   intervals 0.4 to 1.3; did I read that correctly?

22   A.    You did.

23   Q.    Okay.

24   A.    Now that result is reported on page 12 as a result that

25   does not have a supporting trend to my opinion specifically.

1   So, that's why you cannot put those two sentences on the same

2   page, because where I do talk about the result that Alwan is

3   discussing, I have it in the right place in my report.  It's

4   less than one, it does not provide a supporting trend, it's

5   quite explicitly clear on my report.

6   Q.    I was coming to that.  That's fine, I -- we went

7   straight to it, that fine.  Let me see if I can move this

8   along, doctor.  But if we go back to page -- just so we're

9   clear, if we go back to that list in your report, they are the

10  nonstatistically significant findings and you cite in addition

11  to Alwan you cite Kalen [ph], Maum [ph], and Luick [ph]

12  because they had some non-statistical findings, Colvin, I mean

13  there are multiple studies in other words and I just want to

14  be clear they're nonstatistically significant that fits into

15  your trend bucket.

16  A.    This is the definition of this list is the list of all

17  the results in those core studies that show an increase in

18  risk, but, one that is not statistically significant for that

19  specific comparison.

20  Q.    Understood.

21          MS. YATES:  May I have a moment, Your Honor

22  because I may have just short-cutted something.

23          THE COURT:  Sure.

24  BY MS. YATES:

25  Q.    All right.  Let's move to -- I'm going to come back to

1    that, I apologize, Your Honor.  I'm trying to get organized

2    and apparently I'm not doing a very good job.  Well let's go

3    to -- you're familiar with Maum 2011; right?

4    A.    That is, yes, one of the studies.

5    Q.    And we can again pull up your report page 4 to 5

6    doctor, if you have it?

7    A.    I have it.

8    Q.    You cite two nonsignificant findings from Maum as part

9    of your supporting trend in risk; is that right?

10   A.    They are two positive associations there that are not

11   statistically significant; correct.

12   Q.    Right.  And that's conotruncal and --

13   A.    Yes.

14   Q.    -- transposition of the great arteries or TGA; is that

15   correct?

16   A.    That is correct.

17   Q.    And you recently testified in trial that the findings

18   in Maum for TGA is evidence that supports the claim that

19   Zoloft causes TGA; correct?

20   A.    Well, that in the context of a lot longer discussion,

21   because for TGA specifically that's the only finding reported

22   in any of the studies we've discussed yesterday and today,

23   it's based on very few TGA cases, so this comes back to the

24   grouping discussion that when you go down to subgroups as rare

25   as TGAs you cannot possibly rely on that one single study in

1   isolation to prove causation.  You can only rely on the fact

2   that it's contained in the larger group of all cardiac defects

3   where there is evidently an association.

4   Q.    Sir, am I correct that you testified to a jury in

5   Philadelphia that based on that one reported case of TGA in

6   the Maum study that Zoloft causes TGA?

7   A.    And that's the reason I just described, because as I've

8   already testified at deposition and was discussed at trial

9   that Maum finding is the only one reported for TGA.  There are

10  very few TGA cases even in the Maum study that reports it.  If

11  you only had that information in isolation you could not

12  really come to a conclusion of causation it's too much

13  variability, there's just -- you can see from the length of

14  the confidence interval there for TGA it stretches from .35 to

15  18.62 so there's just really very little precision, almost

16  none.  So you have to fall back on the argument that we

17  discussed yesterday which is what I tried to explain to the

18  jury which is when you come to such a rare subcategory you

19  have to rely on its membership of a larger group where you

20  have established association.

21  Q.    So, you've testified in that trial -- the birth defect

22  was TGA; right?

23  A.    I think there was multiple birth defects, I was -- I

24  think I testified that I wasn't really that conscious of the

25  specific nature of the birth defects by that particular child,

1    suffered by particular child.

2    Q.    Okay.  And Maum to your recollection was the only study

3    that reported on the breakout that they actually reported on

4    TGA?

5    A.    Yes, amongst those core studies in my report.

6    Q.    Okay.  And within Maum it was one case; right?  One

7    reported case?

8    A.    One exposed case, I believe.

9    Q.    One exposed case; right?  Okay.

10   A.    There had to be some unexposed cased to gate an odds

11   ratio calculation that's as described.

12   Q.    By women who didn't take Zoloft had children with TGA?

13   A.    Yes, there were a huge number, more of them of course

14   is so there must have been at least one or two in there also,

15   but it's rare.

16   Q.    And the Maum authors don't refer to this

17   nonstatistically significant finding in their conclusion as

18   one of the increased risk they found do they?

19   A.    No, I don't remember, but I wouldn't be surprised if

20   they didn't because of the width of that confidence interval

21   as I described there's really in isolation there's no real

22   information.  They reported it, but I would doubt they would

23   point it out in their conclusion section.

24   Q.    Okay.  They didn't point it out as a significant

25   finding; right?  Because it wasn't statistically significant;

Page 33

1    correct?

2    A.    It's absolutely not statistically significant, yes.

3    Q.    Okay.  Doctor, the Colvin 2011 study that didn't

4    adjust, that didn't do any adjustment on the results did it?

5    A.    You mean in terms of confounding?

6    Q.    Right.

7    A.    I'd have to go back and look at the paper, not all the

8    early papers were able to or did adjust for confounding, but I

9    don't recall specifically the details without going back and

10   looking.

11   Q.    Okay.  I can refresh your recollection with some

12   testimony.

13   A.    Sure.

14   Q.    Okay.  Let's -- Prozac deposition.  Doctor, I believe

15   this was a deposition taken in the Prozac case.

16   A.    Thank you.

17   Q.    If you would turn, sir, to page 170.

18   A.    Page 170, yes.

19   Q.    Line 14.

20   A.    Yes.

21   Q.    Okay.  And --

22          Q:  So, which of the 8 studies that did

23   adjustments?

24          A:  Well now, I said before the break and relying

25   on memory so I would have to go back to each of them, but I

Page 34

1    believe Alwan and Luick [ph] both did adjustment, I'm having a

2    hard time this is not the right place to look at this.

3              Mr.  Zonies:  Your report [indiscernible] the

4    witness is it in my report.

5              A:  What page are you looking at?

6              Mr. Zonies:  Page 14.

7    Q.    Scroll down.

8              A:  I knew I got it somewhere, but I just don't

9    remember these (reviewing document).  Yes, the chart in my

10   report gives a -- this is what I did.  So, you were talking

11   about sensitivity analysis.  So there is the -- there were

12   actually not 8 in there, but Colvin I wasn't sure.  I now

13   believe since I wrote the report that the fact that the study

14   adjusted odds ratio -- that the study adjusted odds ratio and

15   the odds ratio that Lilly used are identical and having reread

16   Colvin a number of times I don't believe they made any

17   adjustments.  So you can ignore the Colvin on the chart on the

18   page 14, but the other 7 clearly there are 7 of them that did

19   Maum, Dealsitrin [ph], Cornum, Reese Kalen, Petersen Alwan and

20   Lloyd.

21   Q.    Did I read that correctly?

22   A.    You did.

23   Q.    Does that refresh recollection, sir, that Colvin did

24   not adjust for confounding?

25   A.    Yes.  This is in terms of Prozac, but I assume the same

1  answer is true for Zoloft, they didn't do an adjustment for

2  confounding.  If you actually turn to page 105 of the same

3  deposition which I'm sure you've read the whole thing, it says

4  on line 11 if I can read out, "and that's just" -- I'm talking

5  about misclassification, and then so, that's one of the issues

6  that's there, confounding by other factors is an issue for

7  some other studies, because we only have unadjusted results, I

8  don't throw those out either.  I don't throw any of the

9  studies out as it happens.  So there I'm pointing out that

10  there are some of the studies where only unadjusted results

11  are provided and that's all I have.

12  Q.    Right.  And my next question was going to be that's in

13  relation to Prozac, but you assume that that's also true for

14  the data on Zoloft.  We have no reason to disagree with that?

15  A.    Sitting here today I would assume that, yes.

16  Q.    So, if your forest plot only includes studies that were

17  adjusted for confounding Colvin should not be on there; right?

18  A.    Well, I think I was trying to put on the visualization

19  all of the results that were there, unadjusted or not, but

20  every time there was an adjustment I wanted to put in the

21  adjusted result.

22  Q.    Right.

23  A.    That's what I believe that visualization tells us.

24  Q.    Okay.  So if you had said that the forest plot only

25  contained adjusted findings that would be wrong?

1    A.    For Colvin it would be wrong, yes, because we've just

2    determined it's one of the few if maybe the only that has

3    completely unadjusted results according to what you just read

4    to me.

5    Q.    Okay.  All right.  Doctor, we mentioned the word trend

6    in relation to dose response and if we turn to page 60 of your

7    report tab 110 you have a section entitled dose response;

8    right?

9    A.    I do, it's one of the Bradford Hill criteria.

10   Q.    Right.  And you write the epidemiological evidence, can

11   you find that for me?

12   A.    At the bottom maybe?

13   Q.    Yes, it's on the epidemiological evidence.  In some,

14   the epidemiological evidence with regard to dose response for

15   Zoloft and cardiovascular malformations specifically is

16   limited, however, the evidence that does exist shows a trend

17   towards an increasing risk with increased dosing.  Did I read

18   that correctly?

19   A.    You read that correctly.

20   Q.    And the two studies you rely on if we go to, if we look

21   at those citations 131 and 132 are actually Jimenez-Solem and

22   Huybrechts; correct?

23   A.    That is correct.

24   Q.    All right.  Well, let's look at what the scientists who

25   conducted the Jimenez-Solem study and the Huybrechts study

1    concluded about whether their studies found a dose response

2    relationship.  Let's first go to Jimenez-Solem at page 5, I

3    think you have that doctor.

4    A.     Jimenez-Solem, okay.  Page --

5    Q.     Five.

6    A.     Five, okay.  I'm there.

7    Q.     Right.  The author states analyzing the effect.

8    Apparently my tech person can't read my mind.  I don't know

9    why you don't know exactly where I am, Roger.  Okay.  Are you

10   with me doctor?

11   A.     I see where you're starting to read from, yes.

12   Q.     All right.  Jimenez-Solem the authors state, analyzing

13   the effective dose is a continuous variable yielded no dose

14   response association.  Did I read that correctly?

15   A.     You did.

16   Q.     And if we go to page 8 of Jimenez-Solem.

17   A.     Yes.

18   Q.     The authors state their conclusion regarding

19   confounding by indication are sustained by the lack of

20   relationship between dose and risk.  Did I read that

21   correctly?

22   A.     I said that, yes.

23   Q.     All right.  Let's move to Huybrechts.

24   A.     If I can just stop for a second, because I want to

25   correct what you did and make it clear that everyone

1  understands the first paragraph you read from Jimenez-Solem

2  was not about Zoloft it was not about cardiac defects it was

3  about all malformations if I understand it correct late.  And

4  though it says a sentence for individual major malformations

5  we found similar associations, but the two quoted odds ratios

6  are for major malformations and they actually are

7  contradictory to the dose response, they go down slightly

8  though it's statistically indistinguishable.

9       So, there's no question there that when you look at my

10  report you get the two odds ratios for low and high dose in

11  Jimenez-Solem which you didn't read which is 1.8 for the low

12  dose, odds ratio for Zoloft now specifically and specifically

13  for cardiac and for high dose it's 2.3.

14       Now, if we've learned anything in these last two days,

15  we should know by now you can't tell the difference

16  statistically with this level of data between 1.8 and 2.3, so

17  it's not statistically significant, but it is an increase

18  response as you increase the dose as reported specific in

19  Jimenez-Solem for those.  It's just not statistically

20  significant.  I have no disagreement there at all.

21  Q.   Okay.  And they don't refer to it in their overall

22  statement where they're talking bigger than just the cardiac

23  this was sustained by the lack of relationship between dose

24  and risk; correct doctor?

25  A.   Well, we've already talking about their conclusion and

1   since they're not starting from the conclusion that there is a

2   risk then it's hard to see how dose response would confirm

3   with conclusion of no risk or no increased risk, so that

4   doesn't surprise me they said that.  The bottom line is as I

5   say in my report and as all the authors agree on the data on

6   dose response in the human studies is really extremely limited

7   and even the definition of high and low dose as reported by

8   the experts differs enormously between Jimenez-Solem and the

9   one you're just going to Huybrechts.

10  Q.    Okay.  Well, let's go to Huybrechts.  Let's go to

11  Huybrechts page 2402.

12  A.    I'm there.

13  Q.    Okay.  Huybrechts page 2402, we did not observe a dose

14  response relationship either with respect to the first dose or

15  with respect to the highest dose dispensed.  Did I read that

16  correctly?

17  A.    You read it correctly on the screen.  I'm just trying

18  to locate -- oh, yes, I'm with you.  Yes, you read it

19  correctly.

20  Q.    Okay.  All right.  And then they have in parentheses

21  table S17 in the supplementary appendix; right?

22  A.    They do refer to table S17.

23  Q.    Okay.

24  A.    And as again this is the same issue that arose with

25  Jimenez-Solem table S17 which is on page 31 has a number of

1    results including Paroxetine, Zoloft, Fluoxetine, TCAs, SNRIs

2    and so on.  So, they're making a blanket statement there.  In

3    my own report I only pulled out the Zoloft specific

4    information and specific for cardiac the odds ratio for low

5    dose according to Huybrechts associated with Zoloft as 1.1.

6    For what she refers to as medium dose it's 1.33, of course

7    again, there's no way that's going to be statistically

8    significant and no one claims it is and that's all it is, it's

9    just an association in the direction of a dose response that

10   is not statistically significant nor would you expect it to be

11   with this size of data set.

12   Q.    Understood.  Doctor we've talked about a lot of studies

13   and despite my efforts to try and say that I don't need to

14   talk about anymore, my team seems to think I need to talk

15   about some more, but it's going to be focused on the issue of

16   confound ing by indication which I know we've discussed a

17   little bit.  But you agree that confounding by indication is a

18   particular concern in studies of depressed women; right?

19   A.    It's a concern in all observational studies where the

20   outcome is a clinical condition, yes.

21   Q.    Right.

22   A.    Or is it -- sorry, let me rephrase that.  When the

23   outcome is in a group of women or a group of individuals with

24   a clinical condition.

25   Q.    Excuse me, sorry.  And there are different methods by

1   which investigators can attempt to minimize confounding by

2   indication; correct?

3   A.      Correct.

4   Q.      And that's true in several of the more recent studies

5   that we've seen in Zoloft that they -- as size progress the

6   later studies attempt today employ these methods that were not

7   used in earlier studies; fair?

8   A.      I think the, yes, the thing your referring to most

9   prominently is the thing we discussed yesterday which is to

10  use only depressed women with a diagnosis of depression for

11  all of the pregnancies those exposed to Zoloft or an SSRI or

12  those not exposed where prior studies in this chart often had

13  used all women in there and then worried that in fact it might

14  be that that was not comparing an effective comparison group.

15  Q.      Right.  And so let's go through some of the methods

16  that these scientists used to attempt to examine confounding

17  by indication.  So, Jimenez-Solem 2012 attempted a new method

18  of examining confounding by indication by comparing SSRI users

19  to women who paused their use during pregnancy; right?

20  A.      That was the way they tackled the issue; correct.

21  Q.      Right.  And in fact they commented on the prior studies

22  that the data was conflicting and that some of these and none

23  of them hadn't successfully managed to differentiate between

24  the consequences of the drugs themselves and the underlying

25  disease; right?

1    A.    That was the concern, yes and it's been a consistent

2    concern throughout this literature.

3    Q.    And Jimenez-Solem they did the nationwide study in

4    Denmark; right?

5    A.    Correct.

6    Q.    And they focused on congenital heart defects in

7    comparing this paused group to look at, to account for special

8    characteristics of women using antidepressants?

9    A.    Correct.

10   Q.    All right.  And you agree, sir, that that's a step

11   forward in science; right?

12   A.    I think attempts to adjust for bias or control for bias

13   are always a step forward, yes.

14   Q.    Let's look at another one.  Ban [ph] 2014, right?  I

15   know I --

16   A.    I didn't know what the question was, sorry.

17   Q.    Sorry.  Ban was in 2014, wasn't it doctor?

18   A.    Okay.

19   Q.    If I get specific I'm sort of going to do what I just

20   did with Jimenez-Solem but if we need to go to the actual

21   study we can do that?

22   A.    Oh, you don't need it, okay.  Well, then I take your

23   word for it that it was 2014.  It sounds right to me.

24   Q.    Okay.  Ban control for depression by comparing women

25   with depression who are taking SSRIs and to those who are

1    depressed who are not taking medicines; right?

2    A.    I'd have to go back to the paper, but that sounds

3    familiar.

4    Q.    Does that sound right?

5    A.    But if we want to be exact we should look at the paper.

6    Q.    All right.  Can we find that quickly?

7    A.    Sure.

8    Q.    Sure.  Who said sure?

9    A.    I'm getting good at it now.  I have it.

10   Q.    You have it?

11   A.    I do.

12   Q.    Excellent.

13   A.    And you're absolutely right.  It is 2014.

14   Q.    There you go.  And just to confirm they, the study

15   control for depression by comparing women with depression who

16   were taking SSRIs and those with depression who were

17   unmedicated; right?

18   A.    Well, that I would have to get into the text a little

19   bit to confirm my memory.

20   Q.    Right.

21   A.    Do you want me to do that or wait?

22   Q.    I would like you to either take my word or confirm.

23   A.    I'm happy to take your word at this point, because I'm

24   sure someone will point out if you're wrong.

25   Q.    I'm sure they will.  Doctor can key agree that this Ban

1    is the first study to do that type of depression restricted

2    comparison certainly when we're talking about Zoloft and the

3    SSRIs?

4    A.    Again, without having to look at all the studies, I'm

5    perfectly willing to take your word, that was the first of the

6    10 to a dozen or so studies that started to use that approach.

7    Q.    Okay.  And this is another study that you cite of

8    evidence of an increased risk between Zoloft and cardiac birth

9    defects, right?  Page 24 of your report.

10   A.    Okay.  This is for the all cardiac, it's a

11   nonsignificant positive association; that is correct.

12   Q.    Okay.  And if we apply their depression restricted

13   comparison and look at their conclusion, so if you go to Ban

14   page 1, abstract conclusions, are you with me doctor?

15   A.    Yes.  Well, I'm not where -- if you tell me a page

16   number it helps.

17   Q.    Sorry, it is the front page, page 1?

18   A.    Okay.

19   Q.    They're conclusion, overall MCA, and that's major

20   congenital anomaly, again, that's bigger than cardiac and

21   subcategories; right?

22   A.    It is.

23   Q.    Risk did not increase with maternal depression or with

24   antidepressant prescriptions.  Paroxetine was associated with

25   increases of heart anomalies although this could represent a

1    chance finding from a large number of comparison under,

2    comparisons under taken.  Did I read that correctly?

3    A.    You did.

4    Q.    So based on their depression restricted methodology

5    that they employed to help counter this confounding problem

6    for cardiac, for heart anomalies they found no increased risk

7    accept Paroxetine which is Paxil; correct?

8    A.    Yes, I think they're pulling out the significant result

9    then.  We've had a lot of discussion that in an individual

10   study they're not going to, in isolation, they're not going to

11   report an increased risk of what was it 39 percent unless its

12   significant and they didn't and that would be consistent with

13   what we discussed this morning in the New England journal for

14   example.

15   Q.    All right.  Let's turn to very quickly again, just on

16   the issue of confounding, Huybrechts 2014 done by Harvard

17   Medical School; right?

18   A.    Brigham and Young I think at Harvard.

19   Q.    At Harvard, yes.  Largest study of SSRIs and Zoloft to

20   date.  Nearly a million women.

21   A.    I can't remember Furu.

22   Q.    Furu was 2.3 million?

23   A.    Furu I think had more women, yes.

24   Q.    Okay.  So, this one would be the largest U.S.?

25   A.    It's certainly the largest U.S., yes.

1   Q.    Okay.  Over 14,000 women exposed to Zoloft?

2   A.    Gen, I can't remember these numbers, but if you have

3   them there or I can take your word for it, but.

4   Q.    Okay.  If I say anything that you want to verify doctor

5   or troubles you will stop and look at the study, okay?  But

6   it's 2, page 2,402, table 2?

7   A.    Yes, just the way I work is I tend to like to look at

8   the original information.

9   Q.    That's fine.  So there we have it, table 2, Sertraline,

10   14,000 women.

11   A.    Yes, I see that now, thank you.

12   Q.    All right.  So, similar to the Ban study one step of

13   the analysis that was performed by the investigators of the

14   Huybrechts study was to do an adjustment made just for

15   depression; right?

16   A.    Yes, they originally had more pregnancies, more mothers

17   in their data set then depressed mothers and then they

18   subsequently restricted the comparison group and actually the

19   Zoloft exposed group because not everyone taking Zoloft has a

20   diagnosis of depression.  They restricted the comparison to

21   just those mothers with a diagnosis of depression.

22   Q.    Right, so they had a depression restricted analysis

23   comparing depressed women who took Zoloft and depressed women

24   who were unmedicated?

25   A.    Yes, were depressed means a diagnosis of depression.

1   Q.      Right.

2   A.      Cause it's --

3   Q.      And limiting the results to that analysis of the

4   depression restricted cohort is yielded a nonsignificant odds

5   ratio.  Well, let's turn to it.  Page 2403 figure 1, doctor.

6   Sorry, I didn't want to get ahead of you.

7   A.      That's okay.  Figure 1, yes.

8   Q.      Okay.  So, when you limit the results to the analysis

9   of the depression restricted cohort it yielded a

10  nonsignificant odds ratio of 1.16 confidence intervals .95 to

11  1.41 and that's for Zoloft and cardiac defects; correct?

12  A.      That's correct.  And that's a change from the

13  unadjusted the full analysis which of course used a lot more

14  women which was 1.24.  That happened to be statistically

15  significant, I didn't report it as that in my report because I

16  wanted to use --

17  Q.      The adjusted.

18  A.      -- the most extreme form of adjustment that the authors

19  reported.  But that effect of restricting to the women who had

20  a diagnoses of depression in both exposed and unexposed groups

21  changed the odds ratio from one, for Sertraline from 1.27 if I

22  am looking correctly to 1.16, so roughly a 10 percent drop in

23  the odds ratio.  So that gives you a sense which is I think

24  helpful in a courtroom or helpful in lay readers, that gives

25  you a sense of how big an impact would it be to do that kind

1    of adjustment for confounding by indication.  If we would go

2    back to Colvin now, who you said or some of the earlier ones

3    who you said didn't do that adjustment because they didn't

4    have the data or dint think of the idea that way, I have not

5    put this in my report, but then you can think well, what

6    would've been the impact, this is the way a statistician

7    thinks.  What would've been the impact if Colvin had done

8    that?

9        Well, the best evidence we have is it will do something

10   like it did in Huybrechts.  It will change it by 10 percent.

11   That's what I comment in my report that the effect of

12   confounding by indication when you do this particular solution

13   is important but not enormous and dramatic, it changes the

14   odds ratio by 10 percent, 9 percent, I need to be exact.

15   Q.    And that depression restricted analysis, that's not the

16   end of the Huybrechts analysis; right?  They also performed a

17   propensity score?

18   A.    Yes, but that propensity score now has less to do with

19   confounding by indication and more to do with general

20   confounding by other facts as we discussed yesterday.

21   Q.    Okay.  So, first step and then they did the second step

22   which was more to do with less specific confounding concerns?

23   A.    Other variables other than diagnosis of depression,

24   yes.

25   Q.    All right.

1    A.    Obesity, maternal age, things like that.

2    Q.    Now doctor I really don't know how to pronounce this,

3    I'm told Wemacher [ph], Wemaker [ph].

4    A.    I know the paper you referring to.

5    Q.    Okay.  I'll try and, I'm told it's Wemacher, but --

6    A.    This is the WHO study?

7    Q.    Yes.

8    A.    Yes.

9    Q.    That's -- the authors conclude in that paper, they also

10   make a comparison, strike that.  In the Wemacher paper they

11   note this issue of confounding by depression; do you recall

12   that?

13   A.    I'm sure they did, yes, this is a very recent paper.

14   Q.    All right.  And in fact if we just take a quick look at

15   it.  If you go to Wemacher, Wemacher, let's take a look at

16   page 8, the second paragraph.  Actually Wemacher page 8 the

17   bottom of the first paragraph, sorry, oh, yes, you have it.

18   You are ahead of me.

19   A.    I have the paper.  I'm at page 8, yes.  The pages

20   aren't numbered in the binder that's --

21             THE COURT:  So, it's up to discussion?

22             THE WITNESS:  It's discussion section, yes.

23             MS. YATES:  Yes, sorry.

24   BY MS. YATES:

25   Q.    It says, our finding of nonspecificity by SSRI type is

Page 50

1    compatible with a mechanism of teratogenic agent being one

2    that is common to all SSRIs and is also compatible with

3    confounding by depression as indication -- depression as

4    indication or other associated factors or exposers.  Did I

5    read that correctly?

6    A.    You read it correctly.

7    Q.    And then they go on to actually cite if we go to the

8    second paragraph the very three studies we just discussed;

9    right?  Jimenez-Solem, Ban, and Huybrechts?

10   A.    Correct.

11   Q.    And they say recent studies paragraph 2.  Recent

12   studies have suggested that the association between SSRI and

13   CHD may be explained by confounding.  Did I read that

14   correctly?

15   A.    That's what they wrote, yes.

16   Q.    All right.

17   A.    Now, of course if you continue down the paragraph they

18   come back into this discussion about confounding by

19   indication.  If you move over in your highlighter to the start

20   of the first paragraph on the right column, they say further

21   investigation of the hypothesis that the causal association is

22   with the underlying depression as necessary taking into

23   account the specificity we find in relation to types of CHD

24   and other CA, congenital abnormality.  The evidence that

25   maternal depression increases congenital anomaly risk is

1    lacking.  So, that link being missing undercuts the

2    confounding by indication argument, because you would need to

3    have a demonstrated association that being depressed increased

4    the risk of these specific birth defects.

5    Q.    Okay.  But you agree that the researchers should be

6    looking at this confounding by indication, that's important,

7    right?

8    A.    Yes, absolutely --

9    Q.    And in fact some of the earlier studies, you know,

10   Petersen, Cornum, they made statements they were concerned and

11   they addressed the issue that our results could be due to

12   confounding; right?

13   A.    And particularly confounding by indication, yes.

14   Q.    Right.  And then we get these later studies that say,

15   well, let's look at that; fair?

16   A.    That is correct.  And we saw from Huybrechts when she

17   adjusted that and 1 attempt by restricting to women with a

18   depression diagnoses that the odds ratio did overstate when

19   you ignored it by about 10 percent, so that's what we see.

20   That's the best evidence we have to date in as you said the

21   largest U.S. study about the impact of confounding by

22   indication.  Now, confounding in general can often annihilate

23   an odds ratio can take it from 2 to .5 if you get a strong

24   enough confounder so there's -- confounding by indication is

25   important you ought to deal with it as best you can, but it

1    doesn't as yet as far as we know it doesn't have a major

2    impact.  It reduces the odds ratio down by about 9 percent and

3    then other confounders also reduce the odds ratio down a

4    little bit as demonstrated by Huybrechts but again, not very

5    much.  Almost statistically indistinguishable.  In fact if you

6    read my text I'll say we tend to ignore confounding

7    adjustments that are less than 10 percent, because there's

8    noise associated with doing that statistically, so you have to

9    put it in context of how big is the impact of confounding by

10   indication?

11   Q.   So, are you saying that you can take the result from

12   one study where you see a 10 percent reduction due to

13   confounding and just say, oh, it's going to be 10 percent and

14   the other studies that had other study population, other

15   criteria, are you saying that?

16   A.   No, not exactly.  I said, I didn't put that in my

17   report.  I put in that if you wanted as a statistician, if

18   somebody came to me now as you're sort of hinting at and said

19   Colwin didn't adjust for confounding, well, that could make a

20   big impact, I agree, it could, just if I knew nothing else.

21        So, I go to another population where they adjusted for

22   these confounding factors if it changed by 9 percent, I would

23   imagine since that confounding adjustment is based on the

24   association of the confounder with the outcome so let's say

25   smoking, it's saying how much does smoking increase the risk

1    of a congenital cardiac birth defect, and it also is based on

2    the association between -- that we would assume it doesn't

3    change that much from population to population.  And we would

4    also -- it's based on the relationship between smoking and the

5    exposure to Zoloft for example.  How much more, how -- are

6    Zoloft exposed women more likely to be smokers or not.  That

7    could change from population.

8    Q.    Right.

9    A.    But the other one probably wouldn't, so a statistician

10   knows from doing simulations and computation that we alluded

11   to yesterday how much of an impact could you take -- get from

12   adjusting for confounding even though in this particular

13   population we around able to do it.  It's not a definitive

14   result.

15   Q.    Right.

16   A.    It's just a sense of scaling.  Are we talking about an

17   odds ratio 1.9 going to 1?  All I'm saying is no.  That would

18   demonstratively be different from what the published

19   literature shows us about the impact of adjusting for

20   confounding by indication.  And for confounding by indication

21   as we've just said, its predicated on the idea that depressed

22   women have an increased risk of cardiac defects which is the

23   Wemacher paper we just read, there is no evidence of that, so

24   then you would say, well, the little bit, it's not surprising

25   that Huybrechts only found a little change in the odds ratio

1    when she adjusted for confounding by indication.

2    Q.    I'm not going to go back to those studies.  Let's

3    switch topics.  Doctor, you referenced a Pfizer internal

4    e-mail from April, I think April 7, 2014, do you remember

5    that?

6    A.    I think there was an internal e-mail that came out at

7    the time of the Frye hearing and also at some, the periodic

8    safety update report and then subsequently some updates of

9    that, that's my vague memory.

10   Q.    Okay.  Doctor let me focus you.  I think yesterday you

11   mentioned an e-mail from April 2014; do you remember that?

12   A.    Well, it's fine if you want to put it up, that would be

13   great to refresh my memory.

14   Q.    Well, let me just see if I -- it was from Dr.

15   Katsopolis [ph].

16   A.    Okay.

17   Q.    Okay.  And it was part of that literature review that

18   was ongoing.

19   A.    Yes, that she was doing, yes.

20   Q.    Doctor, you're not relying on those internal Pfizer

21   documents to form the bases of your opinions; correct?

22   A.    No.  As I testified yesterday directly to Mr. Zonies I

23   didn't actually see those documents until my report has been

24   written.

25   Q.    All right.  And you now know that that e-mail was part

1    of the beginning of a review and you ultimately when you saw

2    the final conclusion you disagreed with Pfizer's conclusion of

3    no increased risk; right?

4    A.    I do.

5    Q.    Okay.  And you know that that was a part of a back and

6    forth with the FDA and reviewing the literature and it took

7    several months to compile; correct?

8    A.    I don't really know the internal details of how Pfizer

9    was corresponding with the FDA about the issue.

10   Q.    All right.  Let's go to your forest plot sir, and the

11   current one that you showed in court my guess is --

12   A.    That's the one that was blown up today?  Okay.

13   Q.    This is --

14   A.    Okay.  So that's, that one.

15   Q.    Blown up and I'm going to, had my team is going to

16   watch me make a complete [indiscernible] of myself?

17   A.    Finally a gentleman rises to his feet.

18              THE COURT:  You can get away where saying that I

19   can't.

20              THE WITNESS:  I'm just the statistician.

21              THE COURT:  Since I have two of these lovely

22   blowups, I'm going to give one to the witness.

23              THE WITNESS:  Thank you.  Thank you very much, I

24   really appreciate it.

25              THE COURT:  I think that's even easier than

Page 56

1    looking at that?

2              MS. YATES:  I think it might be.  Thank you Your

3    Honor.

4              THE COURT:  I will take the one that is sitting

5    on the desk, thank you.

6    BY MS. YATES:

7    Q.    All right.  So, doctor, just to orient us here, we have

8    at the top the statistically significant findings and they're

9    in red; right?

10   A.    Correct.

11   Q.    Okay.  And we've got Berard 2015 on there, but there's

12   certainly some question about Dr. Berard findings; right?

13   A.    In your mind, yes.  As I pointed out at deliberate

14   length yesterday.  I see no reason at this point to put her

15   findings on any different footing than any other, because I

16   understand the method she used, no one else seems to, but I

17   do.

18   Q.    Okay.  All right.

19   A.    So, I wouldn't circle it in red and take it out.  So,

20   if you can erase that that would be helpful.

21   Q.    My circle doesn't mean I'm taking it out?

22   A.    Oh.

23   Q.    I was just talking about it.

24   A.    Okay.

25   Q.    Berard's finding is all septal; right?

1    A.    Correct.

2    Q.    All septal was the result that we debated based on her

3    abstract in 2013 using the same method has a nonstatistically

4    significant finding and her published result using the same

5    method according to her own documents has now a statistically

6    significant, we debated that this morning; right doctor?

7    A.    Yes, and that description of it is a little inaccurate,

8    it all hinges on using the correct statistical analysis

9    approach and you would expect the results to be different.

10   Q.    Even using the same method twice?

11   A.    No.  If you use the same method, but in the published

12   paper I don't compare with the abstract, because if we'd start

13   using abstracts then the Laweek abstract has a significant

14   odds ratio for all septals.  So if you want to go to abstracts

15   let's bring the Laweek one out, but I would prefer to stick to

16   the published peer reviewed paper finding and their

17   discrepancy that we debated can be explained by her

18   explanation that's as written in the paper is this use of this

19   required additional statistical software method.

20   Q.    Okay.  Even though she says she also used that in the

21   abstract?

22   A.    Well, let's going back to want abstract.  So I prefer

23   to stick to something that went through the peer review

24   process.  I change papers during the peer review process

25   myself as reviewers point things out, so I would prefer to

1  stick just to the published, otherwise, I say, we bring in

2  Laweek's abstract.

3  Q.    And as you said, you can't verifier it, we're taking

4  Dr. Berard's word?

5  A.    Well, I can't --

6  Q.    We're going by what's in the paper and Dr. Berard's

7  word?

8  A.    I can't actually verify any of the numbers on those, on

9  that chart --

10  Q.    Okay.  All right.

11  A.    -- personally.

12  Q.    So, if we also look at your statistically significant

13  findings seven of them are Danish studies; right?  So we have

14  Jimenez-Solem, Cornum, Petersen.  Jimenez-Solem, Cornum,

15  Jimenez-Solem, Jimenez-Solem; right?

16  A.    These are the Danish studies; correct.

17  Q.    All right.  So, seven.  Seven Danish.  And let's look

18  at all cardiac.

19  A.    Well, do you want to point out there that there's one

20  American, one Australian, and one Canadian.

21  Q.    Not really.  Not really.

22  A.    Okay.  Then I'm just --

23  Q.    I'm going to Denmark right now.

24  A.    Okay.  Oh, I see, you're just focusing on the Danish

25  studies, okay.

1    Q.    Yes.  Just --

2    A.    Okay.

3    Q.    Let's look at all cardiac, doctor.  All cardiac is also

4    only Denmark studies that's Cornum and Jimenez-Solem; right?

5    A.    They're both the Danish studies, yes.

6    Q.    Okay.  And if we go to let's see, here severe CHD

7    Wemacher.

8    A.    That's there.

9    Q.    Right?

10   A.    Yes.

11   Q.    That's the object severe CHD; right?

12   A.    Yes.

13   Q.    Wemacher, Epstein's anomaly; right?

14   A.    Right.  The severe CHD which is a subset of looking at

15   very severe cardiac birth defects wasn't reported by any of

16   the other authors though some of them talk about doing that

17   analysis.

18   Q.    And Wemacher actually had an all cardiac.

19   A.    Its right there in front of you where you're pen is.

20   Q.    Right?

21   A.    Yes.  There it is.

22   Q.    And that was not statistically significant; right?

23   A.    That is correct.

24   Q.    Okay.  And let's stick with our statistically

25   significant.  Colvin and we now know that was not adjusted but

1    that had others congenital anomalies of the heart; right?

2    A.    Yes.  And that has an odds ratio of 3.8, so that's

3    where the discussion about the un-adjustment [ph] is important

4    because if you think about a 10 percent change in that odds

5    ratio that would bring it down to 2.7.  It would not influence

6    the significance nor really the impact of that study.

7    Q.    Well, actually doctor, you said 3.8, it's 3.08?

8    A.    Sorry, 3.08 yes.

9    Q.    Yes.  And then that leaves us with Berard that we

10    already discussed; right?

11    A.    Correct.  Berard has a significant result for all

12    septal.

13    Q.    All septal.  And previously where did Luick go?  Luick

14    all septal used to be in that category; right?

15    A.    Yes.  So, I moved if down because of the change that

16    we've discussed at length of the left-hand confidence to

17    include 1.0.

18    Q.    And Berard on the all septal finding has replaced

19    Luick, that's it.  That's [indiscernible]?

20    A.    I wouldn't say it's replaced it.  It came in as a

21    different paper, but Luick had to move down because of that

22    change.

23    Q.    On your chart?

24    A.    On my, on this visualization, yes.

25    Q.    Right.  And I counted 59 total entries on that forest

1    plot, sir.

2    A.    There are, that's the number 59 at the top.

3    Q.    59, right?

4    A.    Uh-huh.

5    Q.    And out of 59, 48 are not statistically significant?

6    A.    That is correct.  That's apparent from the colors on

7    the visualization.  Only the red ones are statistically

8    significant at the upper right-hand corner.

9    Q.    And you will agree sir, that most of the studies that

10   are represented on the forest plot are repeated multiple

11   times?

12   A.    Well, of course, they're repeated because that

13   particular visualization as I indicated yesterday contains not

14   only all cardiac, but also all reported subcategories of

15   cardiac, and so the same studies are repeated as you've

16   pointed out.

17        And also it contains the overlapping studies as we

18   discussed both yesterday and today which partially overlap

19   with regard to the Danish that they completely overlap in

20   regards to one of the American studies the Alwan and Rufhaus

21   [ph] and the Swedish, the Reese Collen [ph] and Collen

22   studies.  So yes, it's just a visualization.

23   Q.    Okay.  Now doctor while you've in terms of

24   observational studies you agree, doctor, that there are

25   typically some limitations and caveats with respect to the

1    data?

2    A.    That is correct.

3    Q.    And you agree that it's good practice to reflect the

4    necessary caveats when presenting the data; right?

5    A.    Correct.

6    Q.    You wouldn't want to overstate a case that you're

7    making against a medicine; right?

8    A.    No, I try to be as conservative actually.

9    Q.    All right.  And particularly when you're serving as an

10   expert in litigation; right?

11   A.    Actually I don't make any difference to my methodology

12   when I'm working at Berkeley or working here.

13   Q.    All right.  But you actually have been accused of

14   overstating the case in the medical literature about a drug in

15   which you were testifying as a paid expert; right?

16   A.    Are you referring to the Statin case?

17   Q.    Yes?

18   A.    Well, actually I haven't testified yet.  I filed a

19   report about statin, yes, but this paper was actually

20   unrelated to the litigation work, but so they are unrelated.

21   I did of course disclose the fact that I was working on

22   Statin's for a separate reason when I wrote the article for

23   the British Medical Journal.

24   Q.    And you disclosed your competing interest, right on

25   that paper?

1   A.   I did.

2   Q.   And you published an article in the British Medical

3   Journal entitled Should People at Low Risk of Cardiovascular

4   Disease Take a Statin; right?

5   A.   I did with some co-authors, yes.

6   Q.   Right.  Yes, John D. Abramson is the first author?

7   A.   Correct.

8   Q.   And then published the paper in October 22, 2013 if you

9   remember?

10  A.   I don't remember the date, but it was roughly around

11  then, yes.

12  Q.   All right.  And at that time you made the appropriate

13  disclosure because you were an expert working with plaintiff

14  lawyers in the statin litigation; right?

15  A.   I had been engaged.  At that point I hadn't written any

16  reports.  I now have written some reports on statins.

17  Q.   And do you recall that about four days after your

18  article a response was submitted to the journal raising

19  concerns about your interpretation of the data?

20  A.   I certainly do remember.

21  Q.   Dr. Emmerit Decar [ph]?

22  A.   Yes.

23  Q.   All right.  And Dr. Decar said one of the points in

24  your article was not conclusively backed up by the details

25  evidence and references presented; correct?

Page 64

1    A.    That's what he claimed, yes.

2    Q.    And he said do not overstate the case against statin,

3    sir; didn't he?

4    A.    He may have.  There were, I think several hundred

5    comments on that paper, so I don't remember each one of them

6    verbatim.  I'm sure you've found the interesting ones.

7    Q.    The bottom line, sir, after some back and forth and at

8    first you disagreed that you'd overstated the case, you

9    actually withdrew a statement from the article; correct?

10   A.    We modified it, we corrected a statement in the

11   article, yes.  And I can certainly explain the statement if

12   you would like, because there's been some very recent writings

13   that will bear on that if you wish.

14   Q.    And in your correction you stated that your article did

15   not reflect necessary caveats and did not take sufficient

16   account of the uncontrolled nature of the study; right?

17   A.    Yes.  That was the key issue that the reporting of

18   certain side effects associated with all statins.  I don't

19   want to alert, upset the Pfizer Lipitor people in the room,

20   but all statins -- the number we refer to which was from the

21   published peer reviewed literature was a number that did not

22   come from a controlled study and in reflection when people

23   called us on that we thought it better to point that out as a

24   limitation of that figure.

25   Q.    So, you were accused of overstating the case against

1   statins.  You corrected your paper in response?

2   A.    We didn't correct the overstatement, the number, I

3   think it was 19 percent of people on statins suffer from some

4   form of myopathy, you'd have to go back to be absolutely

5   precise, so don't quote me.

6        That was coming from a published paper where it said 19

7   per or something like that.  But we didn't make it clear

8   enough to the reader which we regretted and corrected that

9   that was an uncontrolled study so it wasn't like a controlled

10  clinical trial with people not on statins.  So, maybe that

11  number is too high.  I do want to say and there was a big

12  investigation of it and that correction was judged by the

13  journal to be perfectly adequate.

14       The New York City Times on Sunday published the number

15  of people on statins, I'm not claiming the New York Times is

16  the New England Journal, but they published a figure saying

17  that 25 percent of people on statins suffer from some form of

18  myopathy or muscle pain.

19       So the issue here was bringing to the attention of the

20  reader that that number comes from an uncontrolled study, not

21  a controlled study.  That was the paper we were referencing in

22  the literature.

23  Q.    Right.  The statement you withdrew was about the side

24  effects and the percentage they occurred in and it said, "The

25  article did not reflect necessary caveats and did not take

1   sufficient account of the uncontrolled nature of the study."

2   A.    Yes, I just explained that was the caveat.  The number

3   itself was not wrong.  It was just that one might

4   over-interpret that without realizing it's coming from an

5   uncontrolled studies.

6   Q.    Right.  And in at least, certainly Dr. Decar's opinion

7   you overstated the case against statins based on an

8   uncontrolled study; right doctor?

9   A.    That was his opinion, yes.

10  Q.    Okay.  Now, doctor, you are aware that there are

11  certain medical and scientific organizations who have either

12  put out position statements or prepared papers on Zoloft; that

13  is right?

14  A.    Yes, and Mr. Cheffo I think summarized them very well

15  on his opening.

16  Q.    Right.  So, let's take a look at some of those.  You

17  know, sir, that I think you learned about it in this hearing

18  that the FDA has just proposed some labeling; right?

19  A.    Yes, I think Mr. Cheffo put that statement up on the

20  screen on his opening.

21  Q.    Right.  And the FDA relies on multiple, or refer to

22  multiple studies; right?

23  A.    Well, if we could put the statement up, I think it

24  might be helpful to see what explicitly they said.

25  Q.    Sure.  Let's do that?

1  A.    I think Mr. Cheffo put it up, so you should have it

2  right at hand.

3  Q.    Let's go to FDA proposed label, tab 235, Roger, please.

4  And we're at page 11 to 12.  And to be fair --

5              THE COURT:  Is this in a binder.

6              MS. YATES:  It might be, Your Honor.  If it not

7  I can use the [indiscernible].  Let's do the [indiscernible].

8              MR. ZONIES:  Your Honor, I'm going to object to

9  this line of questioning because it has nothing to do with

10  methodologies presumably we're going to see some conclusions

11  reached by these organizations and it has nothing to do with

12  Dr. Jewell's methodology, it's about conclusions.  Unless

13  we're going to go into the methodologies of each of these and

14  compare those to Dr. Jewell's since I doubt we are and I hope

15  we're not.

16              And then secondly, this correspondence with the

17  FDA, we've requested from Pfizer the correspondence with the

18  FDA that led up to this proposed label, because IT may be just

19  Pfizer's proposal to the FDA and we don't know and if it's --

20  and we don't have that correspondence yet.  Pfizer hasn't

21  provided that to us.  And so --

22              THE COURT:  All right.  And I know this isn't

23  part of the report.

24              MR. ZONIES:  And it's not part of the report.

25              THE COURT:  Ms. Yates would you respond police

1    to why you are pursuing this course of questions.

2              MS. YATES:  Yes.  Dr. Jewell disagrees with

3    these organizations and our point is you can't follow a

4    reliable methodology and reach a different conclusion, because

5    everybody else is on the same page.  So, I can do this very

6    quickly, Your Honor.

7              THE COURT:  The methodologies you are referring

8    to that apparently he doesn't agree to how do we know that he

9    doesn't agree to them?

10             MS. YATES:  Well, I think the point is the

11   [indiscernible] versus Merrell Dow Pharmaceuticals case, Your

12   Honor.  When I scientist claims to rely on a method practiced

13   by most scientists yet presents conclusions that are shared by

14   no other scientist, the District Court should be wary that the

15   method has not been faithfully applied.

16             So, while I -- all of these organizations looked

17   at the literature; right?  I can't be more detailed in terms

18   of what they did, but several of them and I know Dr. Jewell

19   has criticisms of their methodologies, but their reached

20   certain conclusions based on those methodologies.  Dr. Jewell

21   disagrees with them.  And it is this very case that says, I

22   reviewed the literature, I rely on the literature, I conclude

23   X.  You can't all going down the same road if everybody else

24   is on a different page.

25             THE COURT:  But everybody else being on a

1    different path is a conclusion.  How do I apply that to his

2    methodology?

3              MS. YATES:  Because you can't get to Dr.

4    Jewell's conclusion if you have a reliable methodology.

5              THE COURT:  And how are you going to present

6    that other than presenting these other scientists?

7              MS. YATES:  I'm going to present these other

8    scientists' conclusions and argue it, Your Honor.

9              THE COURT:  Mr. Zonies, you want respond?

10   You're still on your feet.

11             MR. ZONIES:  Yes, that's the issue, Your Honor.

12   If Pfizer would like to bring the AHA in here and allow me to

13   cross-examine them on their methodology so we can understand

14   them and then compare their methods to Dr. Jewell's methods

15   I'm not averse to that, but this is essentially trying to use

16   a proxy out of court expert organization whom as we've showed

17   in opening, whom first of all Dr. Jewell does not rely upon,

18   because it's just a conclusion, the oldest conclusions a

19   single piece of paper, one page and based on two studies or

20   four studies.  So, absent my being able to cross-examine them

21   on their methods and show how we believe them to be, but it's

22   speculation on our part, we believe them to be terrible

23   methods, it's really not relevant here.

24             That case is talking about the underlying

25   studies and making an examination of the studies and the

Page 70

1    methodologies.  It's not talking about whether or not the AHA

2    in a one-page paper or the Otis in a one-page paper reach a

3    different conclusion.  We'll stipulate they reach a different

4    conclusion.  There's no need to go through a whole process of

5    it, because that's all that's going to be shown is their --

6             THE COURT:  All right.  Just let me clarify,

7    because that makes sense to me.  Let me clarify.  Are each of

8    these proffered studies and organizations that reached

9    different conclusions based on different methodologies than

10   Dr. Jewell, did each of them comment or critique Dr. Jewell's

11   methodology and his report?  In any of them?

12             MS. YATES:  I doubt that -- not specifically,

13   no, Your Honor, I doubt they've heard of Dr. Jewell unless

14   they've read his EEG paper.

15             THE COURT:  All right.  So this is really the

16   classic issue.  The battle of experts who are not here and

17   haven't submitted their work to be reviewed as Dr. Jewell's

18   have.

19             MS. YATES:  Well, let me clarify one thing, the

20   FDA current thinking on our label is not peer reviewed all of

21   the others are peer reviewed and statements out there in the

22   medical and scientific community for doctors and practitioners

23   and ladies deciding whether to take this medicine during

24   pregnancy review and rely on.  So they followed a methodology

25   that's Otis, Your Honor, it gives advice to patients.  Their

1   methodologies have pursed peer review with the advice and

2   statements they are giving.  That's in contrast to a

3   statistician who is in a courtroom and I think there's

4   courtroom versus peer review real world.  And that the Court

5   should be aware of that.

6           THE COURT:  But that's more argument than

7   anything else.  It's not the evidence that counters the

8   statistician who's here before him.  It's like putting up an

9   epidemiologist against a statistician.  One have a better

10  conclusion than the other, but it's really about his area of

11  expertise if he is doing it in a reasonably applied way.

12          And the FDA labeling is a whole other part of

13  the case that we've never gotten into in discovery or anything

14  else.  Labeling changes have a hierarchy and I went through

15  this in Avandia and a process that is foreign to most people

16  and it would be totally unfair to say FDA's going to do this

17  or has done this is.  That's not what he wrote on.

18          MR. Cheffo:  Your Honor, if I could just address

19  just a few quick things, because I think we may have gotten --

20  because I think there are a few different issues here.  The

21  first is everyone, the whole point of what Dr. Jewell has told

22  us; right, is that he wishes he had a team.  When he works in

23  the real world he has team.  His team is study authors; right?

24          We don't have any of those people here; right?

25  So the nature of kind of what we're all doing here is we have

Page 72

1   to rely --

2           THE COURT:  Not to interrupt you Mr. Cheffo --

3           MR. CHEFFO:  Sure.

4           THE COURT:  All these studied authors are in the

5   record in terms of their materials, their studies and he's

6   explaining repeatedly so how he's utilized them or ignored

7   them.

8           MR. CHEFFO:  And we -- and you're absolutely

9   right and the point I guess he is that he has taken what other

10  people's work is outside the courtroom where none of us can

11  take their depositions they're not here and the point is what

12  we're examining I believe and asking Your Honor to examine is

13  whether his methodology in reviews and analyzing that

14  independent peer review data meets the Daubert standards;

15  right?

16          So, what we're doing is looking at that and

17  we're looking at other organizations who are learned, who are

18  reliable, who've looked at that sim information and applied

19  the same methodology or a methodology and determined if it's

20  appropriate.  So, where I think it's fair and this is exactly

21  I think what Your Honor did with respect to Dr. Berard too,

22  and I guess there's two other quick things.

23          THE COURT:  But --

24          MR. CHEFFO:  First is the --

25          THE COURT:  I have not pass judgment as to the

1    standard of Daubert on any of the studies that have been

2    relied on in here, nor could I.

3              MR. CHEFFO:  Agreed.

4              THE COURT:  And how can I do the same with your

5    organizations, however great a reputation they may have.

6              MR. CHEFFO:  Well, I think the issue is this is,

7    Your Honor, Daubert, one of the factors I'm going to show this

8    I think in one of the first slides; right?  General acceptance

9    is not something that is required like it may be under

10   [indiscernible] Frye or [indiscernible] but it's certainly a

11   factor; right?

12             So, it's perfectly appropriate for Your Honor to

13   consider both from the Lusk [ph] decision and from Daubert and

14   it's progeny whether in fact these kinds of analysis, this

15   methodology is generally accepted.  It's, again, it's not the

16   end all and be all, but it is certainly a relevant factor and

17   I would say the one thing about the FDA, the plaintiff's

18   started this story in a number of way, right?  They put in and

19   they wanted to have and they've done this and in certain

20   hearings and at trial and in Dr. Jewell's report they took two

21   lines from or two entries from Dr. Katsopolis and then they

22   also took the PSURs.  That was part of a story; right?

23   Essentially you remember from the opening, Your Honor, the FDA

24   asked for some information there was an initial review.  There

25   was a subsequent amount of work for five or six months,

1  plaintiffs have got all this information.  They've given all

2  of that information.  Then ultimately Pfizer in response to

3  the FDA which was the beginning story was the documents that

4  they've relied on, Pfizer then submitted information in

5  January of 2015, all of that information has been given to

6  counsel, in fact we've told them that we've done searches for

7  any information between January and August.

8           Now, it's just I think by fortuity that the

9  hearing got moved to our knowledge and we're confirming this

10 with counsel and have told them this.  There's been no other

11 back and back and forth that was the first information.  We

12 got the information and within a very timely basis it was a

13 proposed labeling which you saw earlier that was given to

14 plaintiffs.

15          So this idea that they don't have the

16 information is not really accurate, but it's all again to the

17 point here, Your Honor, is that the story about whether you

18 can look at one little piece of the puzzle, the FDA has now

19 looked all the information.  They have the same information

20 that Dr. Jewell does that everybody else does and they've

21 basically come back and said looking at that, here's what we

22 think the appropriate labeling is.  So, I think it's

23 absolutely appropriate for Your Honor to consider it as part

24 of your Daubert analysis.

25          THE COURT:  Let me hear from you Mr. Zonies on

1    the FDA.

2              MR. ZONIES:  Yes, I mean, I'll read the e-mail

3    from Mr. Cheffo's colleague sent to me on the 27th.  To follow

4    up on this, we have requested all correspondence back and

5    forth between the FDA and Pfizer that led up to this proposed

6    label, because we don't know whose proposal it is or what the

7    back and forth was and Mr. Lafadda [ph] sent me an e-mail on

8    the 27th saying to follow up on this.  I estimate the

9    production from this file would go out late next week which is

10   after today so there appear to be documents according to Mr.

11   Lafadda, it's the first I've heard that there aren't and that

12   we're supposed to get those documents after the hearing today,

13   because we didn't think that necessarily because we believe

14   that this was not at all particularly relevant to Dr. Jewell's

15   methodology we didn't come to the Court and say, oh, we should

16   postpone, because this is what the FDA does or doesn't do

17   frankly in the context of a Daubert hearing about his methods

18   means very little in --

19             THE COURT:  And to propose to question him on

20   the as yet proposed, but probably some change in a label

21   approved by the FDA or not seems to me to be throwing

22   hypotheticals out.

23             Now there's a certain amount of that you can do

24   in a Daubert hearing.  But is this fair?  And is it relevant

25   to my Daubert analysis if the FDA is changing the label now?

1    That nobody else on the plaintiff's team has dealt with yet.

2              MR. CHEFFO:  Just to be clear on this, the FDA

3    is not -- that's the point the FDA is not changing the label.

4    The FDA is saying hey, we've looked at this it's a category C,

5    should there be something about the -- the plaintiff's whole

6    position has been, hey, Zoloft's a teratogen, you should warn

7    that it causes birth defects.

8              The FDA's now looked at all of this information

9    and they've basically come and we can put those back up, I

10   know Your Honor probably saw those quickly, they're saying we

11   don't think there is a labeling change required.  In fact,

12   we've looked at all the literature and there's no teratogen so

13   for the Court to basically not account for the fact that that

14   what Dr. Jewell is saying is against the entire of the world

15   and now the FDA is saying it seems to be absolutely relevant

16   for a Daubert analysis, because nobody is saying and it's not

17   unfair because they've -- we've got it the same time that

18   they've gotten it.

19             THE COURT:  It's how you're doing this Mr.

20   Cheffo.  It's the middle of the Daubert hearing, it's towards

21   the end of the Daubert hearing.  And all of a sudden this

22   hasn't been briefed, this hasn't been really noticed in time.

23   We only extended the time here because of the Luick changes

24   and I'm really concerned about some kind of fairness.  I want

25   all of the information out.  This isn't accounted for in his

1    report from what I know.

2              So, the question is can you ask him in a Daubert

3    hearing about an FDA label change or refusal to change when

4    his findings don't happen to agree with Pfizer's?

5              MR. CHEFFO:  I would just say this, Your Honor,

6    just in terms, because I hear you and I understand --

7              THE COURT:  It's a hypothetical, really.

8              MR. CHEFFO:  Well, I don't know that it's a

9    hypothetical to address the fairness point and again, I'm not

10   faulting counsel for this we specifically said, because this

11   was, you saw April 12th I think is the date of this we gave it

12   to counsel right after and we, or I'm sorry, August, thank

13   you.  And we specifically -- the 14th, it could be.  I have

14   my -- Verizon network is keeping me honest here.

15             And basically we said to the -- we gave it to

16   the PSE and we said hey, tell us now a week ago.  Tell us now

17   if you want to go and tell Judge Rufe that you need more time

18   for this and if so we will do that.  And I don't think there's

19   any dispute about that.  And PSE said, no, we don't want more

20   time.  So, they frankly have what we have.  I did tell and

21   Paul Lafadda is looking if there is any additional

22   information, I've told them also, I'm not aware of it, it's

23   not like we have anymore.  If we find it in files we will

24   produce it.  And again if they want to supplement, if there's

25   something that they want to do that's fair.  We're not trying

 1    to basically pull a gotcha, but remember this is a process,

 2    the FDA started, they asked March of 2014 then in September

 3    and October there was a submission then in January.  It's the

 4    FDA that basically just on August 14th said we've look at the

 5    information, we don't think that there should be any change.

 6    And I think again for the purposes of evaluating whether it's

 7    generally accepted -- is a methodology that finds that Zoloft

 8    causes all birth defects consistent when the FDA says, hey,

 9    don't change your label, that's something that we think that

10    Your Honor can and should evaluate as part of its decision.

11             THE COURT:  There is much litigation about FDA

12    label, its adequacy and correctness and right now you're going

13    to try to ask an expert who has been called by an opposing

14    party to start testifies outside his report which would not be

15    allowed if Mr. Zonies tried to ask that question.

16             And that's a big problem to me.  Where are you

17    going with this with all of the other as yet unnamed but some

18    of them have been named so-called authorities that allegedly

19    agree with the FDA, it's too much, it's too attenuated.  FDA

20    may not be attenuated because that has been in the works, but

21    their conclusion hasn't been and I want to be fair here and

22    only elicit evidence that should be admissible.

23             Now, I think it's perfectly reasonable to say

24    here's the label it's not what your conclusion is can you

25    please explain the difference and how do you explain that

1   other people don't agree with you?  I think that's okay.  But

2   where I think Ms. Yates was lining things up was a whole list

3   of different methodologies that are going to be outside the

4   evidence in this case.

5           MS. YATES:  I have a feeling Ms. Yates has a few

6   new questions to ask based on Your Honor's --

7           THE COURT:  Well, you can summarize on what the

8   FDA is doing or not doing.  If there's no agreement as to that

9   the premise of the question is going to elicit information I

10  can't use, testimony that I won't be able to use, but I don't

11  want to do this again.

12          So, can we come up with some context here that

13  says and I don't want to defer this.  I don't think there

14  should be a deferral of my rulings or this particular issue on

15  the FDA.  We better start getting all the evidence on the

16  record to get some conclusions drawn here, so we can move

17  forward whatever way that is.

18          Mr. Zonies, would your position change if the

19  questions posed were confined in any way to what the FDA is

20  currently doing?

21          MR. ZONIES:  Well, again, Your Honor, that's the

22  foundational issue is in part.  Our concern is this -- we

23  don't believe this was written by the FDA, we don't know if it

24  was.  Is this Pfizer's proposal to the FDA that the FDA is

25  hasn't -- so, in your own words when Ms. Yates stands up and

 1    says here's what the FDA's okay with, we don't know that;

 2    right?  Because it's not final so, if the question is about

 3    that document, hey, this document says by the way that there

 4    are some studies that show risk do you disagree with the

 5    records in that document, I suppose that's fine, it's about

 6    conclusions, but Dr. Jewell nor opposing counsel knows

 7    anything about the methods used to reach that, so to the

 8    extent that it's a -- it's some sort of affirmation that the

 9    methods used in these various documents we're about to see are

10    the correct methods, it's impossible for Dr. Jewell to comment

11    on that.

12              THE COURT:  Yes, I don't think there's a case

13    that's ever said that, because the FDA has said so that it's

14    correct.  And I'm not criticizing the agency, we depend on

15    them every minute of every day in many facets of our daily

16    lives.  But there is supposed to be a process here.  I would

17    need to hear, you may need to do this overnight counsel and I

18    would need to know what precisely are the questions that are

19    going to be posed and where are the parameters of this line of

20    questions and I'd that postponed until tomorrow morning.

21    Right now I'd like you to move onto something else.

22              MS. YATES:  Okay.  Your Honor then we -- this

23    may be my last section, so if we could just take a brief

24    recess so that I can figure out if there's more for me to

25    cover today.

 1                THE COURT:  All right.

 2                MS. YATES:  That would be perfect.

 3                THE COURT:  That would be fine.

 4                MS. YATES:  Thank you, Your Honor.

 5                THE COURT:  We're in brief recess.

 6                (Whereupon there was a recess in the

 7    proceeding from 3:27 p.m. to 4:20 p.m.)

 8                DEPUTY CLERK:  All rise.  Court is now in

 9    session had Honorable Cynthia Rufe now presiding.

10                THE COURT:  Good afternoon.

11                MULTIPLE SPEAKERS:  Good afternoon, Your Honor.

12                THE COURT:  Please be seated.  Where are we

13    counsel?  Does these courtroom feel like an obstacle course?

14                THE WITNESS:  It does a little, yes.

15                THE COURT:  Yes, in more ways than one.

16                THE WITNESS:  I've noticed.  I'm glad I'm a

17    statistician.

18    BY MS. YATES:

19    Q.    I may have actually tripped over there or dropped

20    something, but anyway.  Doctor we're almost done?

21    A.    Okay.

22    Q.    Okay?  Where went to your -- do you recall doctor that

23    with your expert report you had a reliance list attached to

24    it?

25    A.    Yes.

1    Q.    Is that correct?  And that should be in, I think tab 1

2    of the binder Mr. Zonies gave?

3    A.    Yes.

4    Q.    And if you go all the way to the back unfortunately,

5    it's in, I think alphabetical order.  It says Zoloft label and

6    then you've Pfizer's website.

7    A.    Yes.

8    Q.    So that's -- it's correct to state sir, that you have

9    the Zoloft label on your reliance materials; correct?

10    A.    Yes, I read the label at some point and I think I was

11    asked about at deposition and said no I had no expertise on

12    labeling or with the FDA.

13    Q.    Right.  You're not a regulatory expert; right doctor?

14    A.    No.

15    Q.    And we heard earlier today that in the hearing that in

16    fact you had asked the lawyers to submit your expert record to

17    the FDA; right?

18    A.    Yes, that was a question at trial that I hadn't done

19    that and if I felt important enough about it I should and so I

20    asked them to do so.  I was happy to be released to anyone,

21    actually.

22    Q.    And we just found out that the lawyers have in fact

23    submitted your report to the FDA sometime back in June; do you

24    know that?

25    A.    As I indicated I asked them verbally and they said they

1    had done it, but I didn't have anything in writing which is

2    what you asked me.

3    Q.    Right.  So with the label on your reliance list and

4    your report having been submitted I assume that you have some

5    interest in the current position or the current thinking of

6    the FDA and the language in the label?

7    A.    I have interest in everyone's opinion on the issue.

8    Q.    Okay.  Well, let's look at the FDA's weren't proposed

9    language in the label; okay doctor and -- Your Honor I don't

10   believe that this was previous marked even though there were a

11   lot of submissions?

12           THE COURT:  I don't think I've seen it.

13           MS. YATES:  I'm going to mark it as Exhibit A.

14   Defense Exhibit A to the Daubert hearing if that's okay.

15           THE COURT:  Yes.

16           MS. YATES:  And we will get you copies or we

17   have copies and we will get you copies.  Oh, there we go.

18   BY MS. YATES:

19   Q.    So, doctor, just quickly, I just want to know when I

20   show you certain statements made by the FDA the current

21   proposed label whether you agree with them; okay?

22           Let's go to pregnancy risk summary.  Doctor, overall --

23   A.    Could you tell me the page number again?

24   Q.    I'm so sorry.

25   A.    That's okay.

1    Q.    So, that's a very good question, so it's actually a

2    bates stamped page?

3    A.    I can manage that.

4    Q.    Can you do that, so 3744.

5    A.    Okay.  Now I'm there, thank you.

6    Q.    Right at the bottom, doctor.

7    A.    Yes.

8    Q.    Pregnancy risk summary.

9    A.    Yes.

10   Q.    Last word on the page, overall.  Okay?  Overall

11   available published epidemiologic studies of pregnant women

12   exposed to Sertraline in the first trimester suggests no

13   difference in major birth defect risk compared to the

14   background rate for major birth defects in comparative

15   populations.  I take it you disagree with that.

16   A.    I -- no.  I don't have an opinion about major birth

17   defects.

18   Q.    Okay.  Then we read on, some studies have reported

19   increase for specific major birth defects, however, these

20   studies are inconclusive, (see data).  Do you have an

21   agreement or disagreement on that statement?

22   A.    Well, it doesn't specifically mention that cardiac

23   birth defects are one of the specific ones there related to,

24   of course I would agree that some studies have reported

25   increases for cardiac birth defects, but they don't state that

Page 85

1    explicitly so I can't really comment.

2    Q.    All right.  Let's move to page 3745; right?  At the

3    bottom of the page, first trimester exposure.

4    A.    Third -- first.

5    Q.    First trimester exposure.

6    A.    Oh, it starts and then it moves onto the next page.

7    Q.    Yes.

8    A.    Yes.

9    Q.    Okay.  Are you with me?

10   A.    Yes.

11   Q.    Starting with the second sentence, "A meta-analysis of

12   studies suggests no increase in the risk of total

13   malformations summary odds ratio 1.01, 95 percent confidence

14   interval .88 to 1.17 or cardiac malformations (summary odds

15   ratio .93, 95 percent confidence intervals .70 to 1.23 among

16   offspring of women with first trimester exposure to

17   Sertraline.)  Do you agree or disagree with that statement?

18   A.    Well, that is actually just a descriptive sentence

19   about a meta-analysis.  It's parent from Mr. Cheffo's slide

20   and from the numbers that is in fact referring to the Miles

21   meta-analysis as I've now testified at length, I do not

22   believe that the Miles meta-analysis gives an appropriate

23   summary of the available data on Zoloft and cardiac birth

24   defects and in specifically it reflects that the FDA in that

25   sentence has not reviewed all of the studies on Zoloft and

1   cardiac defects that I have reviewed so I would state it twice

2   in the arguments about this language that the FDA has reviewed

3   all of the studies.

4        The Miles meta-analysis you will recall only contained

5   five of the old studies on Zoloft and cardiac birth defects so

6   I don't disagree with the sentence that's what Miles says, but

7   as I've said many times now that is inconclusive or

8   inappropriate summary of the evidence for the reasons that

9   it's got a lot of heterogeneity masked by the averaging and

10  it's only covers five studies.

11  Q.   Well, so just because the FDA references Miles for that

12  point doesn't mean that they haven't reviewed the other

13  studies.

14            MR. ZONIES:  Your Honor, I just want to clarify

15  the record and this was one of my concerns that as the law

16  provides and as we all know the FDA, this is not the FDA's

17  label, this is Pfizer's label and so we keep and since Dr.

18  Jewell's not an expert in this, he may not know that this is

19  actually Pfizer's language and not the FDA's, so I just want

20  to be clear on that.

21            MS. YATES:  No, I need to be very clear, Your

22  Honor.  This is what came to Pfizer from the FDA.  This is the

23  FDA's proposed language.

24            MR. ZONIES:  This was my concern about not

25  having a foundational required -- if we could just say this

1    language in this proposed label and not attribute it to being

2    the FDA saying it I'm fine with that, because this is not the

3    FDA's language.  The law makes it clear that the label is

4    Pfizer's label and they're responsible for it.  That was my

5    only concern.

6              THE COURT:  And will you accept that premise?

7              MS. YATES:  I will.

8              THE COURT:  Because I think it permits you to

9    continue this line of questions without the underlying

10   conclusion that the FDA has written this.

11             MS. YATES:  Fair enough, Your Honor.

12             THE COURT:  Thank you.

13   BY MS. YATES:

14   Q.    Dr. Jewell just one more section of the label and then

15   it again deals with cardiac.  Let's go to the next tab,

16   please, same page, doctor, right after where we were.

17   A.    Yes, I'm with you.

18   Q.    Okay.  And increased risk of congenital cardiac defects

19   specifically septal defects the most common type of congenital

20   heart defect was observed in some published epidemiological

21   studies where first trimester Sertraline exposure, however

22   these studies were limited by the use of comparison

23   populations that did not allow for the control of confounders

24   such as the underlying depression which may be independently

25   associated with these malformations.  I take it that you

Page 88

1   disagree with that statement as well.

2   A.    Well, I don't disagree that an increased risk has been

3   found in some published studies.  I do agree that some studies

4   were limited by the inability to adjust for confounding my

5   indication, but some others were not and I do not believe it's

6   a fair summary of the entire data to say that the observed

7   increases in risk that are in all of the studies are washed

8   away by dealing with confounding by indication as I've

9   previously testify.

10  Q.    Fair enough.  Doctor, also on your reliance list is the

11  scientific statement by Denofrio et al.

12  A.    Yes, I see that.

13  Q.    And that's the scientific statement -- well let me just

14  give a little bit more detail it's from the American Heart

15  Association.  Adults With Congenital Heart Disease Joint

16  Committee of the Council on Cardiovascular in the Young and

17  Council on Clinical Cardiology.  Council on Cardiovascular

18  Surgery and Anesthesia and Council on Cardiovascular and

19  Stroke Nursing, the title is Diagnosis and Treatment of Fetal

20  Cardiac Disease:  A Scientific Statement from the American

21  Heart Association, did I read that correctly?

22  A.    You did.

23  Q.    So, that scientific statement is on your reliance list

24  and you've been asked questions about that statement; right?

25  A.    Yes, the Pfizer lawyers have ask me about that a couple

1  times.

2  Q.   And you're critical of the fact that they only site to

3  two Zoloft related studies in that scientific statement;

4  correct?

5  A.   That I can't recall I'd have to go back and look at the

6  statement to refresh my memory.

7  Q.   Okay.  Were you listening to Mr. Zonies, because I

8  think that's what he said?

9  A.   I actually, my opinion doesn't, I don't listen to Mr.

10  Zonies for my opinions.  I've tuned them out.

11           MR. ZONIES:  Objection, Your Honor.

12           THE COURT:  Overruled.

13           MS. YATES:  I'm sorry, I think I have to end on

14  that, but I do have a couple more questions.

15           THE WITNESS:  Okay.

16           MS. YATES:  I timed that wrong.

17  BY MS. YATES:

18  Q.   Doctor, you will agree that that statement, their

19  conclusion, you disagree with their conclusion?

20  A.   I don't remember the conclusion.  That was a -- what my

21  memory tells me was that was a statement about the treatment

22  of fetal cardiac disease and was dealing with the issue of

23  whether infants whose mothers were exposed to Zoloft should be

24  screened more heavily because of the concerns about the

25  potential risk of Zoloft increases certain kinds of birth

1  defects.  That was my memory, but to say it, to be fair to it

2  if you really want to ask me questions we should look at it in

3  detail.

4  Q.   Yes, I apologize, I was trying to short circuit.  Let's

5  go to the AAHA page 8, please and just take a quick look at

6  the results.

7  A.   When is that?

8  Q.   That is a very good question.  That is, I don't know if

9  it's in your binder.

10           THE COURT:  It's in your binder.

11           MS. YATES:  It should be.  [Indiscernible].

12           THE COURT:  Number one.  That is in Pfizer's

13  binder.

14           MS. YATES:  First tab, I believe.

15           THE COURT:  Yes.

16           THE WITNESS:  This is the Denofrio.

17           MS. YATES:  Yes.

18           THE WITNESS:  Yes, okay.  I have it.

19  BY MS. YATES:

20  Q.   The scientific statement.  Doctor, the results -- so

21  selective serotonin reuptake inhibitors, the use of SSRIs in

22  pregnancy has been investigated, I assume you agree with that?

23  A.   Page number, please.

24  Q.   I'm sorry.

25  A.   That's okay.  I just don't know where you are.

1   Q.      Page 8.

2   A.      Eight, thank you.  Yes, okay.

3   Q.      All right.

4   A.      Now, I'm with you.

5   Q.      SSRIs, the use of SSRIs in pregnancy has been

6   investigated.  I assume you agree with that?

7   A.      It has been investigated, yes.

8   Q.      Okay.  Results indicate that there is no increased risk

9   of CHD associated with the use of most SSRIs although

10  Paroxetine may be an exception, did I read that correctly?

11  A.      You did.

12  Q.      And I take it you disagree with that?

13  A.      Well, it's not specific about Zoloft, I mean my opinion

14  is absolutely clear about Zoloft, they don't mention it and I

15  assume that you would put that in the category of the new

16  increased risk and then I would disagree with it.

17  Q.      Okay.  Right.  And so most --

18  A.      But not the Paxil.

19  Q.      Right.  They say no increased risk.  Most SSRIs and

20  then they actually separate out Paxil may be an exception;

21  right?

22  A.      Well, I don't know if they think of any others as being

23  an exception, I don't know.

24  Q.      They certainly don't state it; right?

25  A.      No.  They don't say all but one, they just say most.

1   Q.    And then the only one they site to is Paroxetine which

2   is Paxil?

3   A.    That is correct.

4   Q.    Okay.  Doctor, another article on your reliance list is

5   by Dr. Refuse et al.

6   A.    Could you say that name again?

7   Q.    I'm saying it the way I said it, but I've heard her say

8   it and it's nothing like this, but it's Refuse?

9   A.    Refuse, yes.

10  Q.    Refuse.  Good.

11  A.    And that's in your binder too, right?

12          THE COURT:  Same book.

13  BY MS. YATES:

14  Q.    Yes.  Thank you.

15  A.    Okay.  Yes, I have it, I see it at least.

16  Q.    And this is -- let me know when you get there.

17  A.    Yes, I have the paper open and now in front of me.

18  Q.    Perfect, and it's specific SSRIs and birth defects:

19  Basion Analysis to Interpret New Data in the Context of

20  Previous Reports.  That's a title; right?

21  A.    Correct.

22  Q.    And it was published very recently accepted for

23  publication May 29, 2015?

24  A.    Yes.

25  Q.    And if we turn to page 2015, I'm sorry, page 4.

1  Doctor, it shows that Zoloft was the most commonly SSRI when

2  the study was done; is that right?

3  A.    In this population, that is correct.  This is a U.S.

4  population.

5  Q.    In fact, the study was funded by the Centers For

6  Disease Control and Prevention; right, the CDC?

7  A.    I'm not familiar with the funders of the study it

8  probably says somewhere, but --

9  Q.    Right.  Let's go to page 8.

10  A.    Oh, there we go.

11  Q.    Okay.

12  A.    The data collection was funded, yes.

13  Q.    Right.

14  A.    I don't know if that refers to just the MBDPS whether

15  that's funded by the CDC or whether they funded the study.  It

16  actually looks like it's just the data itself.

17  Q.    The data collection?

18  A.    Yes.

19  Q.    All right.  Are you aware, sir, and you've reviewed the

20  study it's on your reliance list?

21  A.    Is it on my reliance list?

22  Q.    You did a supplemental reliance list dated August 13,

23  2015.

24  A.    Okay.  Well then it's, I know it's very recent that

25  I've seen it, so I was confused because you were referring me

1  back to the reliance list for my report and it couldn't -- I

2  didn't think it could be possibly be in there.

3  Q.   Right.  So this is a supplemental list, I'm sorry.

4  A.   Okay.  All right.  So a different document.  Okay.

5  That's fine.

6  Q.   Okay.

7  A.   I've certainly seen it, so --

8  Q.   All right.  And you are aware, sir, that in fact the

9  CDC has posted the key findings from this study on their

10 website; right?

11 A.   No.  I haven't actually looked at the CDC website in

12 the last week since I've seen this paper.

13 Q.   All right.  Well, let's see if you agree with some of

14 the postings on the CDC website based on the study that you've

15 reviewed; okay?

16 A.   Sure.

17 Q.   All right.  Let's go to tab 232.

18 A.   I can't read it.

19 Q.   Wait a minute, we're getting there doctor, I'm sorry?

20 A.   Okay.  I can't even try on that one.

21 Q.   No.  I give up too as well, doctor, I apologize and I

22 need a page number, page two.

23 A.   Is it in the binder?

24 Q.   Well, that's a good point?

25           THE COURT:  No.

1    BY MS. YATES:

2    Q.    No.   Sorry, can we struggle along and -- we've got it.

3    I'm sorry.

4    A.    Yes, thank you.

5    Q.    So, doctor, if you go to page 2 and it says, now I've

6    lost it.   So the -- actually it's the bolded paragraph, New

7    CDC Study Findings.

8    A.    I'm with -- oh, you've just changed it, but, oh, okay.

9    Yes, I see that paragraph.

10   Q.    All right.   And then let's pull out.   Researchers

11   found -- what you have [indiscernible] there we go, thank you.

12   Researchers found that some birth defects occur about two or

13   three times more frequently among babies born to women who

14   took certain types of SSRI medications early in pregnancy.

15         This analysis -- wait a minute, I'm reading from

16   somewhere else.

17   A.    No, you're reading what I'm reading.

18   Q.    Am I right?

19              THE COURT:   You're at the bottom of the page is

20   where the pullout is from, yes.

21              MS. YATES:   I'm sorry, I'm saying what does this

22   study add?

23              THE COURT:   What does this study add?

24              THE WITNESS:   Okay.   I can read that too.

25   BY MS. YATES:

1    Q.    Right.  Okay.  What does this study add?  Researchers

2    found some birth defects occur about two or three times more

3    frequently among babies born to women who took certain SSRI

4    medications like Fluoxetine and Paroxetine early in pregnancy.

5           However, links between birth defects and other SSIs

6    like Sertraline were not observed in the CDC study.  Did I

7    read that correctly?

8    A.    You read it correctly.

9    Q.    And that study is the Refuse study that we just talked

10   about that's on your reliance list?

11   A.    Yes.  There's -- I looked -- this looks like an online

12   press release from CDC specifically about the Refuse study.

13   Q.    Right.  It's their website; right?

14   A.    As I said an online press release, yes.

15   Q.    Okay.  And let's go to the next page if we can where it

16   says reassuringly.  What page is it?

17               MR. CHEFFO:  Three.

18               MS. YATES:  Page 3, next page.  Page three.

19   BY MS. YATES:

20   Q.    Reassuringly, doctor are you with me?

21   A.    Yes.

22   Q.    What were the studies main findings as the heading,

23   right doctor?  And then the -- fourth bullet, third bullet,

24   sorry.  Reassuringly, researchers did not confirm links

25   between Sertraline, the SSRI used most often and any of the

1  birth defects observed in previous studies.  Did I read that

2  correctly?

3  A.    You did.

4  Q.    And in fact Dr. Refuse reports the same thing in their

5  study if we turn to page 7 of her study.

6  A.    I'm there.

7  Q.    Okay.  Tab 230, okay.  Doctor, if we go to page 7 the

8  CDC website is actually referring to this language.  It is

9  reassuring that none of the five previously reported

10  associations between Sertraline and birth defects were

11  confirmed in this analysis particularly since about 40 percent

12  of women reporting use of an SSRI in early pregnancy used

13  Sertraline.  Did I read that correctly?

14  A.    You did.

15  Q.    And I take it that you disagree when the conclusions of

16  Dr. Refuse and the postings on the CDC website?

17  A.    Well, she took this study in complete isolation and

18  ignored almost more than 90 percent of the rest of the

19  evidence we've been talking about, that's what this study

20  says.  This is the one study on the National Birth Defects

21  Prevention Study where they collect the data like this.  This

22  is an update as we discussed earlier of the Alwan study.  The

23  Alwan study reported a lower association here and this study

24  actually increased it substantially because the new data

25  contradicted the Alwan study so I can't possibly -- knowing

1    that detailed analysis I can't possibly agree with this

2    sweeping generalization in the statement, it's not based on

3    the methodology I used which was to look at all the evidence.

4    Q.    Okay.  Thank you doctor.

5              MS. YATES:  Thank you, Your Honor.

6              THE COURT:  Thank you.  Redirect?

7              MR. ZONIES:  Thank you, Your Honor.

8    BY MR. ZONIES:

9    Q.    Dr. Jewell, in the National Birth Defects Prevention

10   Study do you -- that's a study -- how did they determine

11   exposure in that study?  Do you know?

12   A.    I do in the sense that I've read it, this one

13   relatively recently as was just discussed.  They did this, if

14   my memory is and we could look at the paper, we just had it

15   opened, it's based on interviews with the mother at 11, you

16   know, on an average about 11 months post-delivery, so about an

17   average of a year and a half post the exposure period by

18   interview and it was a very, very simplistic question.  The

19   question I think is actually in the paper if you're interested

20   in it.

21   Q.    So, just to be clear then the two eleven months plus

22   nine months, 20 months?

23   A.    A year and a half, I said to be conservative.

24   Q.    Thank you.  A year and a half after the question, the

25   exposure, the questions asking about, so a year and a half

Page 99

1    later they interviewed a mother and said, hey, what drugs were

2    you taking a year and a half ago? Is that one of the -- is

3    that how this study gathered the evidence of use?

4    A.    Yes. They didn't have the word "hey" in there, but

5    they said, to be specific on page 2, "Between three months

6    before conception and the babies' date of birth and putting in

7    the name of the baby, did you take any of the following

8    medications"?

9    Q.    Okay.

10    A.    Prozac, Paxil, Zoloft, Celexa that was the entire

11    question.

12    Q.    And in your in depth analysis does that give you --

13    that you've expressed in your report, did that give you some

14    concern about the accurate capture of exposure in this study?

15    A.    Yes. In a lot of work done on trying to measure

16    exposure in the accuracy of the classification of exposure

17    using various methods, maternal interviews probably the worst

18    of all for reasons that we could go into at length.

19    Retrospective maternal interview, so interviewing no

20    prospectively, that's bad enough, but retrospective maternal

21    interview is known to be extremely inaccurate, I mean, very

22    high rated of inaccuracies.

23        So most statisticians when they see that level of

24    inaccuracy know that the impact of that on the results is it

25    will wash out or dilute any potential association and that's

1   why we've moved to more accurate measures of exposure.

2   Q.     And despite your concerns about that, you actually

3   expressly discussed those concerns in great detail in your

4   report.

5   A.     I do and there are other studies that use maternal

6   interviews and that's why yesterday when I said not all of

7   these studies that were used in the meta-analysis or in my

8   visualization stand with equal footing, because they measure

9   exposure differently and that makes a big difference.

10  Q.     And despite those concerns you didn't hide from those

11  studies, those results are all in here; correct?

12  A.     Yes.  I believe Refuse should have been added to this

13  somewhere.  Yes, it's there.

14  Q.     Yes.

15  A.     So, it's there.

16  Q.     Okay.  And you take that into your analysis as you said

17  of the whole data and that's part of what you --

18  A.     That's part of the methodology, but you have to look at

19  the issue of bias and how exposure is measured.  We haven't

20  talked about it a great deal, but it's a very important part

21  of the puzzle.

22  Q.     Now, Dr. Jewell on your cross-examination you were

23  asked about the conclusions of some of the study authors; do

24  you recall that?

25  A.     I do.

1    Q.    And one of them was the Bond Study in 2014?

2    A.    Yes, in the U.K.

3    Q.    And that was a depression restricted analysis, in other

4    words it had women who were depressed on both sides of the

5    equation?

6    A.    Correct.

7    Q.    And you were showing this quote from the abstract at

8    the beginning of the paper; right?

9    A.    Yes.

10    Q.    And it says overall MCA risk and I think you pointed

11    out what does MCA mean?

12    A.    Major congenital abnormality.

13    Q.    So, MCA risk did not increase with maternal depression

14    or with antidepressant prescriptions and I think you also

15    discussed that that's talking about the all SSRIs; right?

16    A.    Correct.

17    Q.    Is that relevant to your analysis, MCA risk with all

18    SSRIs?

19    A.    No, because I want to be very specific about Zoloft and

20    not assume that there's a common effect for all of them.  It's

21    relevant to the extent that the antidepressants that are

22    lumped together show no increase because for there to be no

23    confounding by indication they should be at increased risk,

24    because they're suffering from depression, but as I state in

25    my report many studies don't find that and we've talked a

1  little bit about that, the absence of that evidence.

2  Q.    And then, Dr. Jewell you actually discussed this study

3  in great detail in your report; correct?

4  A.    In some detail, yes.

5  Q.    In some detail.  And, but you actually -- next slide,

6  please -- discussed the actually -- not these results which

7  were just shown to you, you discussed these results that are

8  about Zoloft and about cardiac birth defects; right?

9  A.    I did, yes.

10  Q.    This wasn't shown to you during cross-examination was

11  it?

12  A.    It was not.  No.

13  Q.    And you actually agree with these conclusions in Bond;

14  right?

15  A.    I do.

16  Q.    And Bond seems to agree with you.

17  A.    Well, we'd have to ask Bond but that's -- I don't

18  disagree with this statement.

19  Q.    And importantly, in Bond the result that they're

20  talking about here is a 1.39 or essentially a 40 percent

21  increase in risk that was nonsignificant in Bond; right?

22  A.    That's correct.  And I did bring that up to the

23  opposing counsel.

24  Q.    And yet that's the result, nonsignificant that they're

25  saying is consistent with other results?

1   A.    That is correct.

2   Q.    Even though it's nonsignificant?

3   A.    Correct.

4   Q.    So, to test consistency here Bond certainly like you

5   does not have a concern with methodologically looking at

6   nonsignificant results when you're looking at all of the data;

7   correct?

8   A.    No, because if they had found an odds ratio of .79 they

9   might well have written the sentence saying even though that

10  wasn't statistically significant that contradicted earlier

11  studies.  That would've been a different conclusion,

12  hypothetical, because that's not what happened, but I think

13  you should look at nonsignificant results and see how they

14  compare with what we already know in the literature.

15  Q.    And what you just described is actually what Refuse

16  did; right?  Which was a nonsignificant finding in Refuse and

17  they said this contradicts other significant findings?

18  A.    Yes.  They did, yes.

19  Q.    Yes, okay.  And to be clear methodologically everyone

20  seems to think it's appropriate to look at nonsignificant

21  results when assessing consistency, it's happening in the very

22  papers you've reviewed.

23  A.    It's certainly part of the evidence; correct.

24  Q.    And with regard to overlap, do you recall some

25  questions about overlap in a dangerous population?

1    A.    I do.

2    Q.    The next slide, please.  You mentioned that you find

3    there was some independent scientific data and evidence even

4    in the -- even when populations overlap somewhat that informed

5    your opinion; is that right?

6    A.    Yes.  I spent some time on this yesterday that

7    particularly with the Jimenez-Solem I there's the least

8    overlap, it's the biggest difference from Petersen and Cornum

9    that the new data that's provided by Jimenez-Solem provides

10   new information beyond what was in either Petersen or Cornum

11   if to the extent that it's different that would of course

12   contradict or not confirm to the extent it's the same it is a

13   measure of independent replication that's most, I think

14   relevant in comparing Jimenez-Solem's result and I talked

15   about this yesterday so I don't know for the sake of time I

16   don't want to repeat it, but had the odds ratios been

17   dramatically lower in Jimenez-Solem for the new women, their

18   overall result would've been substantially lower than what

19   Petersen or Cornum reported.  So that does provide some form

20   of replication.

21   Q.    And I think we looked at yesterday with Refuse and

22   Alwan in that situation, not only you looked at the fact that

23   Refuse must have necessarily had a 20 to 30 percent increased

24   risk in the new women in that population but Professor Bracken

25   another epidemiologist supported that methodology for looking

1    for replication?

2    A.    Exactly, yes.

3    Q.    And Dr. Jewell, it wasn't just Professor Bracken who's

4    done that and you, in Cornum itself this is done.

5    A.    Yes, Cornum itself made that point and he of course

6    knew about Petersen, they were probably -- knew each other

7    personally, I would imagine, both from Denmark looking --

8    interested in the same issues and they knew about the Petersen

9    paper which came first as we discussed this morning and they

10   point out that they were willing to compare the results that

11   they got with Petersen knowing that there was some overlap,

12   but not entire overlap because they realized they would've the

13   potential with the new women to change things a little bit and

14   so they believe that it agrees with Petersen, so that

15   reflecting -- confirms if you want Petersen.  They wouldn't

16   have said that if they felt the data was just an entire

17   replication of the same data, because they knew it wasn't

18   quite.

19   Q.    And the that that we're talking about Dr. Jewell is his

20   quote from the Cornum paper in 2010, "Our data are from the

21   same registers as those used by Petersen and colleagues,

22   however, the study by Petersen and colleague was based on

23   nationwide registries and included children born in Denmark

24   between 1996 and 2003 right after that discussed the fact that

25   there's a consistency there; correct?

1   A.    Yes, and they were giving you those dates, because

2   earlier in the paper they've given the dates they looked at

3   and the counties that they looked at in Denmark which we've

4   discussed actually this morning.

5   Q.    And Dr. Jewell, you were just asked about this label,

6   this proposed label and I want to quote from the label here.

7   It says, "An increased risk of congenital cardiac defects,

8   especially septal, the most common type of congenital heart

9   defects was observed in some published epidemiological studies

10  with first trimester Sertraline exposure."  Is that wholly 110

11  percent consistent with your opinion?

12  A.    Could you tell me the page number on that?

13  Q.    I'm sorry, it's the label in the bottom right corner --

14  thank you, for this -- the bates number ends with 3746.

15  A.    Okay.  I'm there now.  Sorry.

16  Q.    You've got that and I'm sorry, it's in that first

17  paragraph at the top --

18  A.    Yes, I see -- right to the top of the page.

19  Q.    Yes.  Just after the Miles data that's put in there and

20  it says, "An increased risk of congenital cardiac defects,

21  especially septal, the most common type of congenital heart

22  defects was observed in some published epidemiological studies

23  with first trimester Sertraline exposure."  That is wholly

24  consistent with your opinion; is that correct?

25  A.    That is correct.  As I said to the other counsel, I

1  agree with that part of the sentence.

2  Q.    And is it your appreciation having been across from Dr.

3  Kimmel about the number of time said so far that he disagrees

4  with that statement?

5  A.    Well, I think you should ask Dr. Kimmel that question.

6  Q.    Okay.  And then they go onto talk about the confounding

7  by the indication and underlying depression; correct?

8  A.    And I commented on that that I think is an insufficient

9  description of what actually happened.

10  Q.    But that is something that you specifically in your

11  report and ad nauseam over the past few days have discussed in

12  great detail.

13  A.    As I've said, my methodology demands a consideration of

14  all kinds of bias, one which is confounding by indication.

15  Q.    So methodologically those two, that one sentence is

16  effectively consistent with the method you applied it's simply

17  here.  There's some concern about confounding by the

18  underlying depression which you also share, so

19  methodologically you went after that and it's unclear whether

20  or not this even disagrees with your ultimate conclusion about

21  that issue.

22  A.    That is correct.  I of course don't know the background

23  analysis as was discussed that has been carried out by whoever

24  proposed this language.  It's clearly very briefly described

25  their attention to confounding by indication, I would find it

1    hard to imagine that they methodologically did as advanced a

2    look at the question as I did.

3    Q.    But again, we don't know that?

4    A.    But I don't know that.  I don't, because I don't see --

5    Q.    Dr. Jewell during your cross one of the issues that was

6    brought up was the potential error in one of the slides.

7    A.    Yes.

8    Q.    In the upper bound of a confidence interval; do you

9    recall that?

10   A.    I do.  Just before lunch.

11   Q.    And have you -- did you examine that issue?

12   A.    I did.

13   Q.    And what was your conclusion?

14   A.    The -- I actually need to see the one.

15              MR. ZONIES:  May I approach, Your Honor?

16              THE COURT:  Yes, you may.

17              THE WITNESS:  Yes.  Which slide because it was

18   the other counsel who had these slides.  Yes, okay.  I've seen

19   it now.  This slide here which was the pie chart and is

20   labeled Huybrechts-Jewell analysis has the correct odds ratio

21   and the correct -- there it is that is correct.  The upper

22   bound is 3.3.  Later on in the slides that with were used

23   yesterday, that result was quoted again with an incorrect

24   upper bound of the confidence and everything else was correct.

25   BY MR. ZONIES:

1   Q.    Yes, and here's the same slide with -- in other words

2   you've corrected it now with the 3.3.  Is this the slide from

3   yesterday?

4   A.    Yes.  That -- no, it's later on in these slides.  That

5   was already -- it's later on that was the second slide that

6   counsel showed me.  Yes, it's that slide that she's hold that

7   where it's -- I think it says 1.9 where the, well, let's wait.

8   Q.    Yes.  This says 1.9, 1.1 to 3.3.

9   A.    Well, that's the same, so --

10  Q.    Right.

11  A.    There was one that counsel showed me this morning that

12  said 2. --

13  Q.    That was this one that says 2. --

14  A.    Oh, so it's been corrected now already?  Yes, so this

15  is the corrected version.  Yes.  So the 2.39 was transcription

16  error of some form, so I gave away a little bit of my evidence

17  inadvertently, by whoever transcribed the slide.  So the

18  correct confidence intervals is 1.1 to 3.3.

19  Q.    And so would you prefer that this replace in deck?

20  A.    Yes.  This is the corrected version and that should be

21  replaced.

22          MR. ZONIES:  Your Honor, I don't know what we're

23  going to do about this and I haven't discussed it with

24  counsel, but we would ultimately would move for admission for

25  record purposes at a minimum that the notebook that has the

1    studies in it and Dr. Jewell's report in it and the slide

2    decks will provide the Court with colored version for the

3    record as well.

4              THE COURT:  All right.  Is there any objection

5    to any of the submissions by the PSE?

6              MS. YATES:  No, objections, Your Honor.  And we

7    will provide the Court the same to the extent if you haven't

8    already received it.

9              THE COURT:  All right.  Any objections to any of

10   the defense exhibits?

11             MR. ZONIES:  No, Your Honor.

12             THE COURT:  All right.

13             MR. ZONIES:  I mean, yes, to the exhibits,

14   but --

15             THE COURT:  They're all admitted anyway.

16   BY MR. ZONIES:

17   Q.   One final line of questioning Dr. Jewell.  Now, I'm not

18   sure what the objection is, but there maybe some floating

19   objection about your qualifications to reach the causal

20   conclusion in this case.  So, I'd like to explore those

21   qualifications.  Have you, Dr. Jewell, reached causal

22   conclusions in other cases and/or in others settings?

23   A.   Absolutely.

24   Q.   Have you challenged on your qualifications and ability

25   to do so and passed whatever that challenge was whether it was

1  Daubert or Frye or otherwise?

2  A.    I certainly have survived those challenges whether it

3  was about causation and I don't know, but I certainly survived

4  them.

5  Q.    And in some of those, Dr. Jewell, well, all of them,

6  they were in areas about which you have limited exposure, for

7  example in this very courtroom you testified about myocardial

8  infarction; correct?

9  A.    I did.

10  Q.    And are you a cardiologist?

11  A.    No.

12  Q.    And in that case as well you've had to deal with the

13  concept of myocardial ischemia as compared to myocardial

14  infarction; do you remember that?

15  A.    I did.

16  Q.    And are you schooled enough to be able to give us a

17  lecture on those issues?

18  A.    No.  I could only give you a lecture on how once the

19  data has been -- the terms have been defined and applied to

20  data how the data should be analyzed.

21  Q.    And even in that case in Avandia in particular, if you

22  recall myocardial ischemia was defined by the manufacturer and

23  that was what was used; do you recall that?

24  A.    That's correct.

25  Q.    Right.  You didn't make an independent cutting of the

1    data or do anything, you accepted those classifications by the

2    experts?

3    A.     I do, yes.

4    Q.     Is that the same thing you kid here?

5    A.     Absolutely the same.

6    Q.     Have you published Dr. Jewell on causation and

7    causation issues?

8    A.     I have, yes, from a statistical perspective.

9    Q.     And you mentioned a new book that you have coming out.

10   What is the focus of that book?

11   A.     Causation.

12   Q.     What's the name of that book?

13   A.     Causal Inference in Statistics a Primer.

14   Q.     And have you published on the --

15   A.     It's co-authored I should say.  It's co-authored with

16   Judea Pearl who's undoubtedly one of the world's leading

17   experts on causation.

18   Q.     And Dr. Jewell have you published on pregnancy before

19   or are you in the future?

20   A.     I have published papers before when I've been a

21   statistician that have looked at pregnancy outcomes and the

22   effect of chemical exposures, usually associated with

23   pesticide exposure and pregnant women in California.  And so

24   are in the record in my CV and I currently have two papers in

25   various stages of review on rheumatoid arthritis and during

1  pregnancy which actually uses the GEE model.

2  Q.    Which you have also published on?

3  A.    Yes.

4  Q.    Oh, and speaking of that, there was a list of studies

5  that were depression restricted studies that counsel discussed

6  with you; do you recall that?

7  A.    Yes.

8  Q.    And that those somehow provide better evidence with

9  which, I think you would agree?

10 A.    I think it's very helpful as a first step to

11 confounding my indication to do that.

12 Q.    And counsel discussed with you Huybrechts, Bond, and

13 Jimenez-Solem with their attempt to get at that too, did you

14 recall that?

15 A.    Yes.

16 Q.    Counsel I don't think discussed with you Berard and the

17 fact that that study is also depression restricted?

18 A.    That is correct.  The most recent -- her the, only one

19 that I have, yes.

20 Q.    That has that higher look at a smaller class trying to

21 get rid of confounding; right?

22 A.    By indication, yes.

23 Q.    Right.  Thank you, Dr. Jewell?

24 A.    Thank you.

25              THE COURT:  Any recross?

1          MS. YATES:  Thank you.  Two questions, Your

2   Honor.

3   BY MS. YATES:

4   Q.    Doctor, with regard to the Refuse study you seem to be

5   critical of the fact that they used interviews in order to

6   gather their data; right?

7   A.    I'm not critical, that may have been the only data they

8   had, but it's known to be less reliable as a measure of true

9   exposure.

10  Q.    And what method did the Cornum study use in obtaining

11  their information?

12  A.    I can't recall without going back to the papers.  I

13  know some of them by heart, but not that one to be explicit.

14  Q.    Okay.

15  A.    The registries in Denmark, certainly Jimenez-Solem used

16  pharmacy records [indiscernible].

17  Q.    I misspoke.

18  A.    Oh, so you're not asking about Cornum?

19  Q.    No.

20  A.    Okay.

21  Q.    Do you know what method Luick used?

22  A.    Yes.  Luick used I believe my memory is she used and

23  her team used maternal interviews.

24  Q.    Nothing further, thank you.

25          MR. ZONIES:  Nothing further.

1          THE COURT:  All right.  Thank you.  You may step

2    down.

3          THE WITNESS:  Thank you.

4          THE COURT:  And we will adjourn for today and

5    let's discuss the plan for tomorrow.  Any other witnesses from

6    the plaintiff.

7          MR. ZONIES:  None, Your Honor.

8          THE COURT:  Any other witnesses from the

9    defendant?

10         MR. CHEFFO:  No, Your Honor.

11         THE COURT:  Then if the evidence is closed

12   because we've admitted all of the charts and the documents and

13   the binders and the additional documents then would you like

14   to argue in the morning.

15         MR. CHEFFO:  I think we would.  We can do it

16   relatively briefly and succinctly, but as Your Honor knows

17   there's a lot of information the binders and things so

18   obviously it's all for the Court and Your Honor's convenience

19   and assistance, but we think it would be helpful to do within

20   an hour or less of closing as we've done in the past and then

21   to the extent after that if Your Honor would like any kind of

22   post-hearing briefing, of course we would entertain that

23   follow Your Honor's guidance on that.

24         THE COURT:  I do not require post-hearing

25   briefing, but I never like to deprive good counsel of their

1    last shot.  Tomorrow one hour or less for each of you.

2              MR. CHEFFO:  Okay.

3              THE COURT:  We'll start and 10:00 and I would

4    appreciate if we could really start on time and then get that

5    done.  And I are always find that that's helpful.  The

6    openings were helpful and the closing I trust will be just as

7    helpful.

8              I'm not as impressed that briefing -- additional

9    briefing is necessary, but I need to know how you both feel

10   about that, Mr. Zonies?

11             MR. ZONIES:  I don't, I wouldn't be impressed by

12   my own brief either, so I think the Court has --

13             THE COURT:  It's not personal, it's a

14   blanket statement.

15             MR. ZONIES:  I think the Court has a fine handle

16   on the situation and I'm not [indiscernible] I might get a

17   shot from somebody in the back.

18             THE COURT:  You might.

19             UNKNOWN:  I agree.

20             THE COURT:  As he runs out of the courtroom.

21             MR. ZONIES:  I don't think it, I certainly don't

22   think it is necessary.

23             THE COURT:  All right.  Mr. Cheffo?

24             MR. CHEFFO:  Again, I don't want to be one to

25   force a brief on Your Honor, if you have a lot of paper --

1            THE COURT:  Well, it's not that.  The briefing

2    was very, very complete in this matter.

3            MR. CHEFFO:  Here's what I would say and then

4    maybe we can talk to PSE on this.  Again, I don't think we

5    want to take a lot of time or a lot of pages and I'm not even

6    sure we'll need it, so, may be I can call Chris with my folks

7    and obviously we'll only do it if I think we can do something

8    within a limited page limit that we think add to the story.

9    If it doesn't then you don't need anymore and we don't need

10   anymore.

11           THE COURT:  Based on something that was

12   surprising or came out that you don't feel each of you that

13   you dealt enough with in the other briefs, I'll give you a

14   chance to do that if you really need it.

15           As I said, I'm not going to preclude, but think

16   about that overnight; all right?

17           MR. CHEFFO:  Yes, thank you, Your Honor.

18           MR. ZONIES:  And if I may clarify one thing,

19   Your Honor, I understand that the evidence is technically

20   closed and I happen to talk to Mr. Cheffo about this and I'm

21   sure he'll let me know if this is a problem.  Because we

22   anticipated Dr. Kimmel was going to testify and because he is

23   not testifying I've discussed with counsel that we would be

24   permitted to use his prior testimony either through deposition

25   or at the Frye hearing or elsewhere in our closing essentially

1    and argue that.  And to the extent that that's not formally in

2    evidence before the Court, when we argue that I would either,

3    whatever counsel wants to do, move that in as additional

4    evidence, it will be in the closing slides which we'll present

5    to the Court as well.

6              THE COURT:  Is that testimony at deposition or

7    is it trial or is it Frye hearing?

8              MR. ZONIES:  It is -- I'd have to see which ones

9    I need to use, but I think it's Frye hearing.

10             THE COURT:  All right.

11             MR. ZONIES:  That was sort of the condition that

12   which we didn't need call on.

13             MR. CHEFFO:  This is what I would say, as a

14   general matter that they obviously we didn't object to, I'm

15   certain of the things they've -- I think they've referred to

16   it in their brief.  It's hard for me to say kind of blanket

17   without seeing it we agree, but I think the rule of reason

18   will apply and to the extent it's sworn testimony and we did

19   say that to make things move a little quicker and not have to

20   call Dr. Kimmel that we would understand that they'd be

21   relying on certain prior testimony.

22             THE COURT:  All right.

23             MR. CHEFFO:  So, I guess generally yes, but

24   we'll just want to reserve our rights depending on what he

25   does.

1          THE COURT:  Any record testimony could be relied

2    on and it's not unfair surprise to anybody but me and it's not

3    unfair, so I'll have a chance to read a transcript to bolster

4    my understanding of whatever you're arguing about.  So, that's

5    fine with me.

6          MR. ZONIES:  Thank you.

7          THE COURT:  Work on that tonight.  And is there

8    anything else?  Thank you very much.

9          MULTIPLE SPEAKERS:  Thank you, Your Honor.

10          THE COURT:  We're adjourned.

11                    -  -  -

12          (Whereupon, the proceeding was concluded

13                 at 5:10 p.m.)

14                    -  -  -

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I do hereby certify that the aforesaid

4    hearing was transcribed by me from an audio recording to the

5    best of my ability; and that I am neither of counsel nor kin

6    to any party in said action, nor interested in the outcome

7    thereof.

8

9

10

11

12            WITNESS my hand and official seal this
     _____ day of _____, 2015.

13                   _____

14                        Janine Thomas
                          Notary Public

15

16

17

18

19

20

21

22

23

24

25

**A**

**AAHA** 90:5
**ability** 110:24
120:5
**able** 33:8 53:13
69:20 79:10
111:16
**abnormality** 50:24
101:12
**Abramson** 63:6
**absence** 102:1
**absent** 69:20
**absolute** 19:16
**absolutely** 33:2
43:13 51:8 65:4
72:8 74:23 76:15
91:14 110:23
112:5
**abstract** 44:14 57:3
57:12,13,21,22
58:2 101:7
**abstracts** 57:13,14
**accept** 45:7 87:6
**acceptance** 73:8
**accepted** 21:23
73:15 78:7 92:22
112:1
**account** 42:7 50:23
64:16 66:1 76:13
**accounted** 76:25
**accumulated** 19:15
19:15
**accumulating** 6:9
**accuracy** 99:16
**accurate** 74:16
99:14 100:1
**accused** 62:13
64:25
**action** 120:6
**actual** 42:20
**ad** 107:11
**add** 20:2 95:22,23
96:1 117:8
**added** 100:12
**addition** 29:10
**additional** 57:19

77:21 115:13
116:8 118:3
**address** 71:18 77:9
**addressed** 51:11
**adequacy** 78:12
**adequate** 65:13
**adjourn** 115:4
**adjourned** 119:10
**adjust** 14:13 33:4,8
34:24 42:12 52:19
88:4
**adjusted** 16:1
28:20 34:14,14
35:17,21,25 47:17
51:17 52:21 54:1
59:25
**adjusting** 14:2
53:12,19
**adjustment** 33:4
34:1 35:1,20
46:14 47:18 48:1
48:3 52:23
**adjustments** 33:23
34:17 52:7
**admissible** 78:22
**admission** 109:24
**admitted** 110:15
115:12
**Adults** 88:15
**advanced** 108:1
**adverse** 10:19
**advice** 70:25 71:1
**advised** 4:6
**affirmation** 80:8
**aforesaid** 120:3
**afternoon** 81:10,11
**age** 49:1
**agency** 80:14
**agent** 50:1
**ago** 7:13 77:16 99:2
**agree** 4:6,9 5:5
21:22 39:5 40:17
42:10 43:25 51:5
52:20 61:9,24
62:3 68:8,9 77:4
78:19 79:1 83:21
84:24 85:17 88:3

89:18 90:22 91:6
94:13 98:1 102:13
102:16 107:1
113:9 116:19
118:17
**agreed** 19:25 73:3
**agreeing** 18:24
**agreement** 79:8
84:21
**agrees** 105:14
**AHA** 69:12 70:1
**ahead** 47:6 49:18
**al** 88:11 92:5
**Albeit** 28:5
**alert** 64:19
**allegedly** 78:18
**allow** 69:12 87:23
**allowed** 11:7 78:15
**alluded** 53:10
**alphabetical** 82:5
**Alwan** 24:21,21,23
25:20,21,22 26:2
26:3 27:4,25 28:2
28:4,9,12 29:2,11
34:1,19 61:20
97:22,23,25
104:22
**American** 58:20
61:20 88:14,20
**amount** 6:23 73:25
75:23
**analogy** 10:15
**analysis** 11:6,19
12:3,8,18 14:2,12
18:22 19:22,23,24
19:25 20:1 34:11
46:13,22 47:3,8
47:13 48:15,16
57:8 59:17 73:14
74:24 75:25 76:16
92:19 95:15 97:11
98:1 99:12 100:16
101:3,17 107:23
108:20
**analyzed** 111:20
**analyzing** 37:7,12
72:13

**and/or** 110:22
**Anesthesia** 88:18
**annihilate** 51:22
**anomalies** 44:25
45:6 60:1
**anomaly** 44:20
50:25 59:13
**answer** 6:10,12
8:18 10:25 35:1
**answers** 15:11
**anticipated** 117:22
**antidepressant**
19:18 44:24
101:14
**antidepressants**
19:10 42:8 101:21
**anybody** 119:2
**anymore** 40:14
77:23 117:9,10
**anyway** 81:20
110:15
**apologize** 3:8 16:8
30:1 90:4 94:21
**apparent** 61:6
**apparently** 30:2
37:8 68:8
**appear** 28:9 75:10
**APPEARANCES**
1:8
**appendix** 39:21
**apple** 6:16,17 7:20
7:24 8:4
**apples** 7:5,10,15,16
8:5,6 9:20 10:14
10:16
**apple's** 7:21
**applied** 10:17
68:15 71:11 72:18
107:16 111:19
**apply** 44:12 69:1
118:18
**appreciate** 15:12
55:24 116:4
**appreciation** 107:2
**approach** 3:5 13:5
44:6 57:9 108:15
**approaching** 13:3

**appropriate** 18:11
63:12 72:20 73:12
74:22,23 85:22
103:20
**approved** 75:21
**April** 54:4,4,11
77:11
**area** 71:10
**areas** 111:6
**argue** 69:8 115:14
118:1,2
**argues** 19:16
**arguing** 119:4
**argument** 31:16
51:2 71:6
**arguments** 86:2
**arm** 10:17
**arose** 39:24
**ARPS** 1:14
**arteries** 30:14
**arthritis** 112:25
**article** 12:13 62:22
63:2,18,24 64:9
64:11,14 65:25
92:4
**asked** 7:9 13:2,5,15
73:24 78:2 82:11
82:16,20,25 83:2
88:24 100:23
106:5
**asking** 13:4 72:12
98:25 114:18
**assess** 18:12
**assessing** 103:21
**assistance** 115:19
**associated** 14:18
19:17 26:7 40:5
44:24 50:4 52:8
64:18 87:25 91:9
112:22
**association** 21:8
22:7 31:3,20
37:14 40:9 44:11
50:12,21 51:3
52:24 53:2 88:15
88:21 97:23 99:25
**associations** 21:5

25:13 30:10 38:5
  97:10
**assume** 13:23 26:13
  34:25 35:13,15
  53:2 83:4 90:22
  91:6,15 101:20
**assumed** 14:5
**attached** 81:23
**attempt** 41:1,6,16
  51:17 113:13
**attempted** 41:17
**attempts** 42:12
**attention** 5:10
  65:19 107:25
**attenuated** 78:19
  78:20
**attribute** 87:1
**audio** 1:16 120:4
**August** 74:7 77:12
  78:4 93:22
**Australian** 58:20
**author** 13:4,5 37:7
  63:6
**authorities** 78:18
**authors** 19:9 26:2
  26:22 27:16 32:16
  37:12,18 39:5
  47:18 49:9 59:16
  71:23 72:4 100:23
**author's** 25:23
**available** 84:11
  85:23
**Avandia** 3:2,8,9,18
  4:7 7:9 8:15 9:2,6
  22:16,21 23:24
  71:15 111:21
**average** 6:16,20
  8:21 98:16,17
**averaging** 4:10,18
  5:2,7 6:15,19,22
  6:23 8:10,12,24
  86:9
**averse** 69:15
**aware** 11:3 66:10
  71:5 77:22 93:19
  94:8
**awfully** 27:20

**B**

**babies** 95:13 96:3
  99:6
**baby** 99:7
**back** 4:6 9:2 13:15
  18:11 29:8,9,25
  30:23 31:16 33:7
  33:9,25 43:2 48:2
  50:18 54:2 55:5
  57:22 64:7 65:4
  74:11,11,21 75:4
  75:7 76:9 82:4,23
  89:5 94:1 114:12
  116:17
**backed** 63:24
**background** 84:14
  107:22
**bad** 99:20
**Ban** 42:14,17,24
  43:25 44:13 46:12
  50:9
**based** 4:20 5:5
  17:13 19:1 30:23
  31:5 45:4 52:23
  53:1,4 57:2 66:7
  68:20 69:19 70:9
  79:6 94:14 98:2
  98:15 105:22
  117:11
**bases** 54:21
**basically** 74:21
  76:9,13 77:15
  78:1,4
**Basion** 92:19
**basis** 74:12
**bates** 84:2 106:14
**battle** 70:16
**bear** 6:11 64:13
**beginning** 55:1
  74:3 101:8
**belabor** 4:5
**belief** 10:11
**believe** 9:4 12:3,3
  13:2 16:13 20:15
  20:17 22:22 23:5
  32:8 33:14 34:1

34:13,16 35:23
  69:21,22 72:12
  75:13 79:23 83:10
  85:22 88:5 90:14
  100:12 105:14
  114:22
**bench** 23:5
**Berard** 56:11,12
  60:9,11,18 72:21
  113:16
**Berard's** 56:25
  58:4,6
**Berkeley** 62:12
**best** 48:9 51:20,25
  120:5
**better** 14:21 17:6
  64:23 71:9 79:15
  113:8
**beyond** 104:10
**bias** 42:12,12
  100:19 107:14
**big** 4:15 17:15
  47:25 52:9,20
  65:11 78:16 100:9
**bigger** 38:22 44:20
**biggest** 104:8
**binder** 19:3 20:14
  20:16,17 49:20
  67:5 82:2 90:9,10
  90:13 92:11 94:23
**binders** 115:13,17
**biostatistics** 21:23
**birth** 26:9 28:17
  31:21,23,25 44:8
  51:4 53:1 59:15
  76:7 78:8 84:13
  84:14,16,19,23,25
  85:23 86:5 89:25
  92:18 95:12 96:2
  96:5 97:1,10,20
  98:9 99:6 102:8
**bit** 4:22 6:11 9:17
  12:20,22 15:12
  20:5 21:14 23:13
  23:13 24:6 40:17
  43:19 52:4 53:24
  88:14 102:1

105:13 109:16
**black** 16:5
**blanket** 40:2
  116:14 118:16
**blown** 55:12,15
**blowups** 55:22
**blue** 23:13
**body** 3:19
**bolded** 95:6
**bolster** 119:3
**Bond** 101:1 102:13
  102:16,17,19,21
  103:4 113:12
**book** 92:12 112:9
  112:10,12
**born** 95:13 96:3
  105:23
**bottom** 36:12 39:4
  49:17 64:7 84:6
  85:3 95:19 106:13
**bound** 17:11 108:8
  108:22,24
**bounds** 18:2
**Bracken** 104:24
  105:3
**Bradford** 36:9
**break** 18:7,8,11
  33:24
**breakout** 32:3
**brief** 80:23 81:5
  116:12,25 118:16
**briefed** 76:22
**briefing** 115:22,25
  116:8,9 117:1
**briefly** 107:24
  115:16
**briefs** 117:13
**Brigham** 45:18
**bring** 13:22 19:4
  57:15 58:1 60:5
  69:12 102:22
**bringing** 65:19
**British** 62:23 63:2
**brought** 108:6
**bucket** 29:15
**bullet** 96:23,23
**busy** 13:24 14:13

14:15

**C**

**C** 76:4 120:1,1
**CA** 50:24
**calculation** 11:13
  11:19,22 12:11,15
  32:11
**California** 112:23
**call** 117:6 118:12
  118:20
**called** 6:1 64:23
  78:13
**Canadian** 58:20
**candidate** 6:24
**capable** 6:7
**capture** 99:14
**cardiac** 19:12
  26:18,21,25 27:5
  28:17 31:2 38:2
  38:13,22 40:4
  44:8,10,20 45:6
  47:11 53:1,22
  58:18 59:3,3,15
  59:18 61:14,15
  84:22,25 85:14,23
  86:1,5 87:15,18
  88:20 89:22 102:8
  106:7,20
**cardiologist** 111:10
**Cardiology** 88:17
**cardiovascular**
  36:15 63:3 88:16
  88:17,18
**careful** 5:1
**carried** 107:23
**case** 4:23 6:1,22 9:2
  13:11 26:18 31:5
  32:6,7,8,9 33:15
  62:6,14,16 64:2,8
  64:25 66:7 68:11
  68:21 69:24 71:13
  79:4 80:12 110:20
  111:12,21
**cased** 32:10
**cases** 30:23 31:10
  110:22

categories 26:8
category 60:14
  76:4 91:15
causal 10:11 50:21
  110:19,21 112:13
causation 10:9 31:1
  31:12 111:3 112:6
  112:7,11,17
Cause 47:2
causes 30:19 31:6
  76:7 78:8
caveat 26:2
caveats 61:25 62:4
  64:15 65:25
CDC 93:6,15 94:9
  94:11,14 95:7
  96:6,12 97:8,16
Celexa 99:10
Centers 93:5
certain 23:12 64:18
  66:11 68:20 73:19
  75:23 83:20 89:25
  95:14 96:3 118:15
  118:21
certainly 3:17,18
  4:4 6:13 11:25
  44:2 45:25 56:12
  63:20 64:11 66:6
  73:10,16 91:24
  94:7 103:4,23
  111:2,3 114:15
  116:21
certify 120:3
challenge 110:25
challenged 110:24
challenges 111:2
chance 15:14 17:8
  45:1 117:14 119:3
change 8:5 47:12
  48:10 53:3,7,25
  57:24 60:4,15,22
  75:20 76:11 77:3
  77:3 78:5,9 79:18
  105:13
changed 47:21
  52:22 95:8
changes 48:13

71:14 76:23
changing 75:25
  76:3
characteristics
  42:8
chart 16:7 34:9,17
  41:12 58:9 60:23
  108:19
charts 16:5 115:12
CHD 50:13,23 59:6
  59:11,14 91:9
Cheffo 1:14 66:14
  66:19 67:1 71:18
  72:2,3,8,24 73:3,6
  76:2,20 77:5,8
  96:17 115:10,15
  116:2,23,24 117:3
  117:17,20 118:13
  118:23
Cheffo's 75:3 85:19
chemical 112:22
child 31:25 32:1
children 32:12
  105:23
Chris 117:6
circle 56:19,21
circuit 90:4
citations 36:21
cite 24:17,21 29:10
  29:11 30:8 44:7
  50:7
City 65:14
claim 30:18
claimed 64:1
claiming 65:15
claims 40:8 68:12
clarify 70:6,7,19
  86:14 117:18
class 113:20
classic 70:16
classification 99:16
classifications
  112:1
clear 5:12,22 17:13
  27:11 29:5,9,14
  37:25 65:7 76:2
  86:20,21 87:3

91:14 98:21
  103:19
clearly 5:18 34:18
  107:24
CLERK 81:8
clinical 3:20,24 4:1
  9:23 40:20,24
  65:10 88:17
close 3:25
closed 115:11
  117:20
closing 115:20
  116:6 117:25
  118:4
cohort 47:4,9
collaborate 13:4
colleague 75:3
  105:22
colleagues 105:21
collect 97:21
collected 10:7
collection 93:12,17
Collen 61:21,21
colored 110:2
colors 61:6
column 19:7 50:20
Colvin 29:12 33:3
  34:12,16,17,23
  35:17 36:1 48:2,7
  59:25
Colwin 52:19
combine 8:7
combined 11:11
combining 8:16
  9:23
come 5:15 18:11
  29:25 31:12,18
  50:18 64:22 74:21
  75:15 76:9 79:12
comes 15:6 30:23
  65:20
coming 8:13 15:8
  29:6 65:6 66:4
  112:9
comment 48:11
  70:10 80:10 85:1
commented 16:17

41:21 107:8
comments 64:5
Committee 1:9
  88:16
common 50:2
  87:19 101:20
  106:8,21
commonly 19:17
  93:1
communications
  17:14
community 70:22
COMPANY 1:20
comparative 84:14
compare 28:9
  57:12 67:14 69:14
  103:14 105:10
compared 84:13
  111:13
comparing 11:8,9
  11:14 27:9 41:14
  41:18 42:7,24
  43:15 46:23
  104:14
comparison 23:16
  29:19 41:14 44:2
  44:13 45:1 46:18
  46:20 49:10 87:22
comparisons 45:2
compatible 50:1,2
competing 62:24
compile 55:7
complete 55:16
  97:17 117:2
completely 36:3
  61:19
compounding 16:1
computation 53:10
concept 111:13
conception 12:7
  99:6
concern 40:18,19
  42:1,2 79:22
  86:24 87:5 99:14
  103:5 107:17
concerned 51:10
  76:24

concerns 48:22
  63:19 86:15 89:24
  100:2,3,10
conclude 10:9 26:2
  26:6 49:9 68:22
concluded 37:1
  119:12
concluding 27:17
conclusion 19:1,10
  25:23 26:12,14,22
  27:25 28:5 31:12
  32:17,23 37:18
  38:25 39:1,3
  44:13,19 55:2,2
  68:4 69:1,4,18
  70:3,4 71:10
  78:21,24 87:10
  89:19,19,20
  103:11 107:20
  108:13 110:20
conclusions 19:21
  19:22 44:14 67:10
  67:12 68:13,20
  69:8,18 70:9
  79:16 80:6 97:15
  100:23 102:13
  110:22
conclusively 63:24
condition 40:20,24
  118:11
conducted 9:21
  10:24 36:25
confidence 16:10
  28:20 31:14 32:20
  47:10 60:16 85:13
  85:15 108:8,24
  109:18
confidences 16:21
confined 79:19
confirm 39:2 43:14
  43:19,22 96:24
  104:12
confirmed 97:11
confirming 74:9
confirms 105:15
conflicting 41:22
confound 40:16

**confounder** 51:24
  52:24
**confounders** 52:3
  87:23
**confounding** 14:5
  14:14 33:5,8
  34:24 35:2,6,17
  37:19 40:17 41:1
  41:16,18 45:5,16
  48:1,12,19,20,22
  49:11 50:3,13,18
  51:2,6,12,13,21
  51:22,24 52:6,9
  52:13,19,22,23
  53:12,20,20 54:1
  88:4,8 101:23
  107:6,14,17,25
  113:11,21
**confused** 93:25
**congenital** 26:8
  28:4 42:6 44:20
  50:24,25 53:1
  60:1 87:18,19
  88:15 101:12
  106:7,8,20,21
**conotruncal** 24:23
  26:20 30:12
**conscious** 31:24
**consequences**
  41:24
**conservative** 62:8
  98:23
**consider** 73:13
  74:23
**consideration**
  107:13
**consistency** 103:4
  103:21 105:25
**consistent** 42:1
  45:12 78:8 102:25
  106:11,24 107:16
**contact** 13:10
**contained** 31:2
  35:25 86:4
**contains** 61:13,17
**context** 9:17 21:15
  22:1,11,14,20

23:23 24:5,5,10
24:14 30:20 52:9
75:17 79:12 92:19
**continue** 50:17
  87:9
**continued** 11:9
**continuous** 37:13
**contradict** 104:12
**contradicted** 97:25
  103:10
**contradictory** 38:7
**contradicts** 103:17
**contrast** 71:2
**control** 14:21 42:12
  42:24 43:15 87:23
  93:6
**controlled** 3:11
  64:22 65:9,21
**convenience**
  115:18
**copies** 83:16,17,17
**core** 29:17 32:5
**corner** 61:8 106:13
**Cornum** 34:19
  51:10 58:14,14
  59:4 104:8,10,19
  105:4,5,20 114:10
  114:18
**CORR** 1:12
**correct** 4:1,19,24
  6:10 11:24 12:18
  13:16 15:20,21
  16:18 17:7,20
  19:21,24,25 20:4
  22:3 24:24 26:12
  27:15,19,22,23
  30:11,15,16,19
  31:4 33:1 36:22
  36:23 37:25 38:3
  38:24 41:2,3,20
  42:5,9 44:11 45:7
  47:11,12 50:10
  51:16 54:21 55:7
  56:10 57:1,8
  58:16 59:23 60:11
  61:6 62:2,5 63:7
  63:25 64:9 65:2

80:10,14 82:1,8,9
89:4 92:3,21 93:3
100:11 101:6,16
102:3,22 103:1,3
103:7,23 105:25
106:24,25 107:7
107:22 108:20,21
111:8,24 113:18
**corrected** 64:10
  65:1,8 109:2,14
  109:15,20
**correction** 64:14
  65:12
**correctly** 7:1,2 8:20
  11:1 19:12,13,18
  23:18,19 26:9
  28:21 34:21 36:18
  36:19 37:14,21
  39:16,17,19 45:2
  47:22 50:5,6,14
  88:21 91:10 96:7
  96:8 97:2,13
**correctness** 78:12
**corrects** 16:1
**correspondence**
  67:16,17,20 75:4
**corresponding**
  55:9
**corresponds** 28:4
**Council** 88:16,17
  88:17,18
**counsel** 1:10,14
  15:13 74:6,10
  77:10,12 80:6,17
  81:13 102:23
  106:25 108:18
  109:6,11,24 113:5
  113:12,16 115:25
  117:23 118:3
  120:5
**counted** 60:25
**counter** 45:5
**counters** 71:7
**counties** 106:3
**couple** 11:12 16:4
  88:25 89:14

**course** 9:21 17:17
  32:13 40:6 47:13
  50:17 61:12 62:21
  68:1 81:13 84:24
  104:11 105:5
  107:22 115:22
**court** 1:1,20 3:6 4:7
  7:14 11:11 18:7,9
  18:15,18 20:13,22
  25:6 29:23 49:21
  55:11,18,21,25
  56:4 67:5,22,25
  68:7,14,25 69:5,9
  69:16 70:6,15
  71:4,6 72:2,4,23
  72:25 73:4 74:25
  75:15,19 76:13,19
  77:7 78:11 79:7
  80:12 81:1,3,5,8
  81:10,12,15 83:12
  83:15 87:6,8,12
  89:12 90:10,12,15
  92:12 94:25 95:19
  95:23 98:6 108:16
  110:2,4,7,9,12,15
  113:25 115:1,4,8
  115:11,18,24
  116:3,12,13,15,18
  116:20,23 117:1,7
  117:11 118:2,5,6
  118:10,22 119:1,7
  119:10
**courtroom** 47:24
  71:3,4 72:10
  81:13 111:7
  116:20
**cover** 80:25
**covers** 86:10
**co-author** 13:15
  14:12
**co-authored**
  112:15,15
**co-authors** 63:5
**Co-Lead** 1:9
**created** 18:23
**criteria** 6:9 10:3
  36:9 52:15

**critical** 89:2 114:5
  114:7
**criticisms** 11:4
  68:19
**criticizing** 80:14
**critique** 70:10
**cross** 2:3 6:23
  108:5
**cross-examination**
  100:22 102:10
**cross-examine**
  69:13,20
**CSR** 1:16
**current** 55:11
  70:20 83:5,5,20
**currently** 79:20
  112:24
**cutting** 111:25
**CV** 112:24
**Cynthia** 1:6 81:9

**D**

**D** 2:1 63:6
**daily** 80:15
**dangerous** 103:25
**Danish** 58:13,16,17
  58:24 59:5 61:19
**dark** 17:8
**data** 6:9,13 10:19
  11:14,21 12:10,14
  13:3,7,7,25 14:1
  14:12,15,24 16:8
  17:25 18:1 22:3
  23:7 35:14 38:16
  39:5 40:11 41:22
  46:17 48:4 62:1,4
  63:19 72:14 84:20
  85:23 88:6 92:19
  93:12,16,17 97:21
  97:24 100:17
  103:6 104:3,9
  105:16,17,20
  106:19 111:19,20
  111:20 112:1
  114:6,7
**date** 45:20 51:20
  63:10 77:11 99:6

**dated** 93:22
**dates** 106:1,2
**Daubert** 1:6 72:14
  73:1,7,13 74:24
  75:17,24,25 76:16
  76:20,21 77:2
  83:14 111:1
**day** 1:6 80:15
  120:12
**days** 12:6 38:14
  63:17 107:11
**deal** 51:25 100:20
  111:12
**dealing** 88:8 89:22
**deals** 87:15
**Dealsitrin** 34:19
**dealt** 76:1 117:13
**debated** 57:2,6,17
**Decar** 63:21,23
**Decar's** 66:6
**decide** 14:18
**deciding** 70:23
**decision** 73:13
  78:10
**deck** 109:19
**decks** 110:2
**declined** 13:12,16
**defect** 31:21 53:1
  84:13 87:20
**defects** 19:12 24:23
  26:8,9,18 27:2
  28:4,17 31:2,23
  31:25 38:2 42:6
  44:9 47:11 51:4
  53:22 59:15 76:7
  78:8 84:14,17,19
  84:23,25 85:24
  86:1,5 87:18,19
  90:1 92:18 95:12
  96:2,5 97:1,10,20
  98:9 102:8 106:7
  106:9,20,22
**defendant** 115:9
**Defendants** 1:14
**defense** 83:14
  110:10
**defer** 79:13

**deferral** 79:14
**define** 15:20
**defined** 6:8 15:2
  111:19,22
**defines** 22:2 23:6
**definition** 11:10
  15:17,22,23 16:9
  21:23 25:18 29:16
  39:7
**definitive** 12:9
  53:13
**deliberate** 56:13
**deliberately** 12:1
**demands** 107:13
**demonstrated** 51:3
  52:4
**demonstratively**
  53:18
**Denmark** 42:4
  58:23 59:4 105:7
  105:23 106:3
  114:15
**Denofrio** 88:11
  90:16
**depend** 24:10 80:14
**depending** 118:24
**depends** 24:9
**deposition** 5:25 6:1
  31:8 33:14,15
  35:3 82:11 117:24
  118:6
**depositions** 6:4
  72:11
**depressed** 40:18
  41:10 43:1 46:17
  46:23,23,25 51:3
  53:21 101:4
**depression** 41:10
  42:24,25 43:15,15
  43:16 44:1,12,23
  45:4 46:15,20,21
  46:22,25 47:4,9
  47:20 48:15,23
  49:11 50:3,3,22
  50:25 51:18 87:24
  101:3,13,24 107:7
  107:18 113:5,17

**deprive** 115:25
**depth** 99:12
**DEPUTY** 81:8
**described** 11:6 24:5
  31:7 32:11,21
  103:15 107:24
**description** 57:7
  107:9
**descriptive** 85:18
**designed** 4:8 10:4
**desk** 56:5
**despite** 40:13 100:2
  100:10
**detail** 5:21 24:6
  88:14 90:3 100:3
  102:3,4,5 107:12
**detailed** 68:17 98:1
**details** 6:3 7:12
  33:9 55:8 63:24
**determine** 98:10
**determined** 36:2
  72:19
**diabetics** 10:18
**diagnoses** 47:20
  51:18
**diagnosis** 41:10
  46:20,21,25 48:23
  88:19
**DIANNE** 1:9
**difference** 7:22,25
  8:3 38:15 62:11
  78:25 84:13 100:9
  104:8
**different** 4:11,13
  7:16,21,24 8:18
  10:5,7,10,16
  12:10 15:17,22
  22:1,1 23:23 24:6
  26:16 27:7,10
  40:25 53:18 56:15
  57:9 60:21 68:4
  68:24 69:1 70:3,3
  70:9,9 71:20 79:3
  94:4 103:11
  104:11
**differentiate** 41:23
**differently** 4:12

  21:15 100:9
**differs** 39:8
**dilute** 99:25
**dint** 48:4
**DIRECT** 2:3
**direction** 40:9
**directly** 13:4 54:22
**disagree** 26:14
  35:14 80:4 84:15
  85:17 86:6 88:1,2
  89:19 91:12,16
  97:15 102:18
**disagreed** 55:2 64:8
**disagreement**
  38:20 84:21
**disagrees** 68:2,21
  107:3,20
**disclose** 62:21
**disclosed** 62:24
**disclosure** 63:13
**discovery** 71:13
**discrepancy** 57:17
**discuss** 21:10 115:5
**discussed** 13:8 16:2
  21:2 30:22 31:8
  31:17 40:16 41:9
  45:13 48:20 50:8
  60:10,16 61:18
  97:22 98:13 100:3
  101:15 102:2,6,7
  105:9,24 106:4
  107:11,23 109:23
  113:5,12,16
  117:23
**discussing** 4:3 20:8
  21:12 29:3
**discussion** 7:12
  30:20,24 45:9
  49:21,22 50:18
  60:3
**disease** 41:25 63:4
  88:15,20 89:22
  93:6
**dispensed** 39:15
**dispute** 77:19
**distinct** 8:5
**distorted** 8:13

**District** 1:1,1,7
  68:14
**doctor** 3:1 5:5 6:6
  7:4 9:4 11:3 14:8
  15:11 16:4 17:1
  18:20 19:5 20:3
  22:9 24:16 27:11
  28:10 29:8 30:6
  33:3,14 36:5 37:3
  37:10 38:24 40:12
  42:17 43:25 44:14
  46:4 47:5 49:2
  54:3,10,20 56:7
  57:6 59:3 60:7
  61:23,24 66:8,10
  81:20,22 82:13
  83:9,19,22 84:6
  87:16 88:10 89:18
  90:20 92:4 93:1
  94:19,21 95:5
  96:20,23 97:7
  98:4 114:4
**doctors** 70:22
**document** 34:9
  80:3,3,5 94:4
**documents** 54:21
  54:23 57:5 74:3
  75:10,12 80:9
  115:12,13
**doing** 6:17,19,25
  8:10 30:2 52:8
  53:10 54:19 59:16
  71:11,25 72:16
  76:19 79:8,8,20
**dose** 21:10,12,15,20
  24:14,16 36:6,7
  36:14 37:1,13,13
  37:20 38:7,10,12
  38:13,18,23 39:2
  39:6,7,13,14,15
  40:5,6,9
**dosing** 36:17
**doubt** 32:22 67:14
  70:12,13
**Dow** 68:11
**dozen** 44:6
**Dr** 12:17 14:11

15:19,25 16:17
17:5,14,15 19:1
20:13 25:25 54:14
56:12 58:4,6
63:21,23 66:6
67:12,14 68:2,18
68:20 69:3,14,17
70:10,10,13,17
71:21 72:21 73:20
73:21 74:20 75:14
76:14 80:6,10
86:17 87:14 92:5
97:4,16 98:9
100:22 102:2
105:3,19 106:5
107:2,5 108:5
110:1,17,21 111:5
112:6,18 113:23
117:22 118:20
**dramatic** 48:13
**dramatically**
104:17
**drawn** 79:16
**DRIVE** 1:10
**driven** 4:21
**drop** 47:22
**dropped** 81:19
**drug** 62:14
**drugs** 10:17 41:24
99:1
**due** 28:3 51:11
52:12

**E**

**E** 2:1 120:1,1
**earlier** 41:7 48:2
51:9 74:13 82:15
97:22 103:10
106:2
**early** 33:8 95:14
96:4 97:12
**easier** 16:6 55:25
**easily** 18:10
**EASTERN** 1:1
**EEG** 70:14
**effect** 37:7 47:19
48:11 101:20

112:22
**effective** 6:25 37:13
41:14
**effectively** 107:16
**effects** 19:17 64:18
65:24
**efficacy** 10:4
**efforts** 40:13
**Eight** 91:2
**either** 35:8 39:14
43:22 66:11
104:10 116:12
117:24 118:2
**electronic** 1:18
**eleven** 98:21
**elicit** 78:22 79:9
**eligibility** 10:3
**Elmo** 16:6
**else's** 13:3
**Emmerit** 63:21
**employ** 41:6
**employed** 45:5
**ends** 106:14
**engaged** 63:15
**England** 45:13
65:16
**English** 21:25
24:10
**enormous** 48:13
**enormously** 39:8
**entertain** 115:22
**entire** 76:14 88:6
99:10 105:12,16
**entitled** 36:7 63:3
**entries** 60:25 73:21
**epidemiologic**
84:11
**epidemiological**
36:10,13,14 87:20
106:9,22
**epidemiologist**
71:9 104:25
**Epstein's** 59:13
**equal** 8:11 100:8
**equally** 5:14
**equation** 101:5
**erase** 56:20

**error** 18:2 108:6
109:16
**especially** 106:8,21
**ESQ** 1:9,11,12,12
1:14
**essentially** 10:19
69:15 73:23
102:20 117:25
**established** 31:20
**ESTELLE** 1:10
**estimate** 75:8
**et** 88:11 92:5
**evaluate** 78:10
**evaluating** 78:6
**events** 10:20
**everybody** 68:5,23
68:25 74:20
**everyone's** 83:7
**evidence** 19:15,15
21:19 30:18 36:10
36:13,14,16 44:8
48:9 50:24 51:20
53:23 63:25 71:7
78:22 79:4,15
86:8 97:19 98:3
99:3 102:1 103:23
104:3 109:16
113:8 115:11
117:19 118:2,4
**evidently** 31:3
**exact** 43:5 48:14
**exactly** 7:2 8:7,8,9
10:2 14:14 37:9
52:16 72:20 105:2
**examination** 69:25
**examine** 41:16
72:12 108:11
**examining** 41:18
72:12
**example** 4:12 7:8
20:6 45:14 53:5
111:7
**examples** 24:8
**Excellent** 43:12
**exception** 91:10,20
91:23
**exceptions** 10:18

**exclusion** 6:8
**Excuse** 40:25
**Exhibit** 83:13,14
**exhibits** 110:10,13
**exist** 36:16
**expect** 40:10 57:9
**experiences** 8:14
**expert** 62:10,15
63:13 69:16 78:13
81:23 82:13,16
86:18
**expertise** 71:11
82:11
**experts** 39:8 70:16
112:2,17
**explain** 24:2 31:17
64:11 78:25,25
**explained** 50:13
57:17 66:2
**explaining** 72:6
**explanation** 57:18
**explicit** 114:13
**explicitly** 29:5
66:24 85:1
**explore** 110:20
**exposed** 12:5 16:15
28:20 32:8,9
41:11,12 46:1,19
47:20 53:6 84:12
89:23
**exposers** 50:4
**exposure** 12:4,9
25:13 53:5 85:3,5
85:16 87:21 98:11
98:17,25 99:14,16
99:16 100:1,9,19
106:10,23 111:6
112:23 114:9
**exposures** 112:22
**expressed** 99:13
**expressly** 100:3
**extended** 76:23
**extent** 80:8 101:21
104:11,12 110:7
115:21 118:1,18
**extracted** 14:24
**extreme** 47:18

**extremely** 39:6
99:21
**eye** 17:6
**e-mail** 13:13,16,20
54:4,6,11,25 75:2
75:7
**e-mails** 13:18

**F**

**F** 120:1
**facets** 80:15
**fact** 9:25 12:17,20
12:21 22:8 31:1
34:13 41:13,21
49:14 51:9 52:5
62:21 73:14 74:6
76:11,13 82:16,22
85:20 89:2 93:5
94:8 97:4 104:22
105:24 113:17
114:5
**factor** 73:11,16
**factors** 35:6 50:4
52:22 73:7
**facts** 48:20
**fair** 17:7 41:7 51:15
67:4 72:20 75:24
77:25 78:21 87:11
88:6,10 90:1
**fairness** 76:24 77:9
**faithfully** 68:15
**fall** 31:16
**familiar** 30:3 43:3
93:7
**far** 52:1 107:3
**faulting** 77:10
**FDA** 55:6,9 66:18
66:21 67:3,17,18
67:19 70:20 71:12
73:17,23 74:3,18
75:1,5,16,21,25
76:2,3,4,15 77:3
78:2,4,8,11,19,19
79:8,15,19,23,24
79:24 80:13 82:12
82:17,23 83:6,20
85:24 86:2,11,16

86:22 87:2,10
**FDA's** 71:16 76:8
  80:1 83:8 86:16
  86:19,23 87:3
**feel** 81:13 116:9
  117:12
**feeling** 79:5
**feet** 55:17 69:10
**felt** 82:19 105:16
**fetal** 88:19 89:22
**figure** 47:5,7 64:24
  65:16 80:24
**file** 75:9
**filed** 62:18
**files** 77:23
**fill** 11:16 12:4
**filled** 11:15,18 12:2
  12:7
**filling** 16:15
**final** 55:2 80:2
  110:17
**Finally** 55:17
**find** 36:11 43:6
  50:23 77:23
  101:25 104:2
  107:25 116:5
**finding** 24:23 27:18
  30:21 31:9 32:17
  32:25 45:1 49:25
  56:25 57:4,16
  60:18 103:16
**findings** 20:9 23:22
  24:13,17 25:15
  27:14 29:10,12
  30:8,17 35:25
  56:8,12,15 58:13
  77:4 94:9 95:7
  96:22 103:17
**finds** 78:7
**fine** 8:10 29:6,7
  46:9 54:12 80:5
  81:3 87:2 94:5
  116:15 119:5
**finish** 14:9
**first** 5:17 11:9,15
  11:16 12:6 19:11
  26:15 37:2 38:1

39:14 44:1,5
  48:21 49:17 50:20
  63:6 64:8 69:17
  71:21 72:24 73:8
  74:11 75:11 84:12
  85:3,4,5,16 87:21
  90:14 105:9
  106:10,16,23
  113:10
**fits** 29:14
**five** 37:5,6 73:25
  86:5,10 97:9
**floating** 110:18
**FLOM** 1:14
**Fluoxetine** 40:1
  96:4
**focus** 4:1 15:12
  24:17 54:10
  112:10
**focused** 3:23 40:15
  42:6
**focusing** 58:24
**folks** 117:6
**follow** 68:3 75:3,8
  115:23
**followed** 70:24
**following** 99:7
**footing** 56:15 100:8
**force** 116:25
**foreign** 71:15
**forest** 35:16,24
  55:10 60:25 61:10
**form** 47:18 54:21
  65:4,17 104:19
  109:16
**formal** 4:7
**formally** 118:1
**forth** 12:12 55:6
  64:7 74:11 75:5,7
**fortuity** 74:8
**fortunate** 3:10
**forward** 42:11,13
  79:17
**Foster** 6:2
**found** 32:18 37:1
  38:5 45:6 53:25
  64:6 82:22 88:3

95:11,12 96:2
  103:8
**foundational** 79:22
  86:25
**four** 1:15 63:17
  69:20
**fourth** 96:23
**frankly** 75:17
  77:20
**frequently** 95:13
  96:3
**front** 11:11 44:17
  59:19 92:17
**Frye** 54:7 73:10
  111:1 117:25
  118:7,9
**full** 47:13
**funded** 93:5,12,15
  93:15
**funders** 93:7
**further** 50:20
  114:24,25
**Furu** 45:21,22,23
**future** 14:18
  112:19

### G

**gate** 32:10
**gather** 114:6
**gathered** 99:3
**GEE** 113:1
**Gen** 46:2
**general** 48:19
  51:22 73:8 118:14
**generalization** 98:2
**generally** 21:22
  73:15 78:7 118:23
**gentleman** 55:17
**getting** 13:21 43:9
  79:15 94:19
**Gibbons** 16:17
**give** 8:18 9:17
  22:11 23:12 28:3
  55:22 88:14 94:21
  99:12,13 111:16
  111:18 117:13
**given** 13:10 74:1,5

74:13 106:2
**gives** 5:11 34:10
  47:23,24 70:25
  85:22
**giving** 71:2 106:1
**glad** 81:16
**glasses** 8:3
**go** 3:1,14 4:6 5:20
  9:4,17 11:13
  12:23 14:6 18:5
  19:1,14 20:23
  21:11 22:24 24:6
  24:22 25:22 26:1
  28:8,11,19 29:8,9
  30:2,24 33:7,25
  36:20 37:2,16
  38:7 39:10,10
  41:15 42:20 43:2
  43:14 44:13 48:1
  49:15 50:7,7
  52:21 54:2 55:10
  57:14 59:6 60:13
  65:4 67:3,13 70:4
  75:9 77:17 82:4
  83:17,22 87:15
  89:5 90:5 93:9,10
  94:17 95:5,11
  96:15 97:7 99:18
  107:6
**goes** 6:10 21:18
**going** 4:5,11 9:6
  10:11 16:24 20:25
  22:25 26:1 27:7
  27:11 29:25 33:9
  35:12 39:9 40:7
  40:15 42:19 45:10
  45:10 52:13 53:17
  54:2 55:15,15,22
  57:22 58:6,23
  67:8,10,13 68:23
  69:5,7 70:5 71:16
  73:7 78:12,17
  79:3,9 80:19
  83:13 109:23
  114:12 117:15,22
**good** 20:16 30:2
  43:9 62:3 81:10

81:11 84:1 90:8
  92:10 94:24
  115:25
**gotcha** 78:1
**gotten** 71:13,19
  76:18
**great** 27:12 30:14
  54:13 73:5 100:3
  100:20 102:3
  107:12
**greater** 5:21
**group** 16:14 31:2
  31:19 40:23,23
  41:14 42:7 46:18
  46:19
**grouping** 30:24
**groups** 47:20
**guess** 22:11 26:24
  55:11 72:9,22
  118:23
**guidance** 115:23
**guys** 4:14

### H

**half** 98:17,23,24,25
  99:2
**hand** 7:21,25 67:2
  120:11
**handle** 116:15
**handwriting** 16:8
**handy** 20:14
**happen** 77:4
  117:20
**happened** 47:14
  103:12 107:9
**happening** 103:21
**happens** 5:20 35:9
**happy** 18:5 24:2
  43:23 82:20
**hard** 34:2 39:2
  108:1 118:16
**Harvard** 45:16,18
  45:19
**hat** 10:22
**heading** 96:22
**hear** 74:25 77:6
  80:17

**heard** 10:8 70:13
75:11 82:15 92:7
**hearing** 1:6 54:7
66:17 74:9 75:12
75:17,24 76:20,21
77:3 82:15 83:14
117:25 118:7,9
120:4
**hearings** 73:20
**heart** 24:23 26:8
27:2 28:4 42:6
44:25 45:6 60:1
87:20 88:14,15,21
106:8,21 114:13
**heavily** 89:24
**held** 7:21,24
**Hello** 18:20
**help** 13:14 14:14,16
15:15 20:25 25:10
45:5
**helpful** 47:24,24
56:20 66:24
113:10 115:19
116:5,6,7
**helps** 44:16
**heterogeneity** 4:24
5:6,11,24 6:23 7:5
7:10,20 8:12 9:1
9:16 86:9
**hey** 76:4,6 77:16
78:8 80:3 99:1,4
**he'll** 117:21
**hide** 100:10
**hierarchy** 71:14
**high** 18:21 38:10
38:13 39:7 65:11
99:22
**higher** 113:20
**highest** 39:15
**highlighter** 50:19
**Hill** 36:9
**hinges** 57:8
**hinting** 52:18
**hoc** 12:18,20 18:22
**hold** 109:6
**homogeneous** 8:20
**honest** 77:14

**honestly** 10:20
**Honor** 3:5 18:4,14
20:12,16 29:21
30:1 56:3 67:6,8
68:6,12 69:8,11
70:13,25 71:18
72:12,21 73:7,12
73:23 74:17,23
76:10 77:5 78:10
79:21 80:22 81:4
81:11 83:9 86:14
86:22 87:11 89:11
98:5,7 108:15
109:22 110:6,11
114:2 115:7,10,16
115:21 116:25
117:17,19 119:9
**Honorable** 1:6 81:9
**Honor's** 79:6
115:18,23
**hope** 7:23 67:14
**hopefully** 18:5
**horribly** 6:22
**hour** 18:9,12
115:20 116:1
**huge** 32:13
**human** 39:6
**hundred** 64:4
**Huybrechts** 11:14
11:20 12:17 14:11
14:25 15:19,25
16:8,19,20 17:14
17:15 18:23 19:1
19:3,3,9 21:20
36:22,25 37:23
39:9,10,11,13
40:5 45:16 46:14
48:10,16 50:9
51:16 52:4 53:25
113:12
**Huybrechts-Jewell**
108:20
**HYDROCHLO...**
1:4
**hypothesis** 50:21
**hypothetical** 7:8
77:7,9 103:12

**hypotheticals**
75:22

**I**
**idea** 7:17,20 10:9
14:19 48:4 53:21
74:15
**identical** 9:25 10:2
34:15
**ignore** 34:17 52:6
**ignored** 51:19 72:6
97:18
**imagine** 52:23
105:7 108:1
**impact** 47:25 48:6
48:7 51:21 52:2,9
52:20 53:11,19
60:6 99:24
**implies** 19:16
**important** 10:8
19:16 48:13 51:6
51:25 60:3 82:19
100:20
**importantly** 102:19
**impossible** 80:10
**imprecise** 8:21
**impressed** 116:8,11
**improper** 4:18
**inability** 88:4
**inaccuracies** 99:22
**inaccuracy** 99:24
**inaccurate** 57:7
99:21
**inadvertently**
109:17
**inappropriate** 86:8
**include** 25:14 60:17
**included** 105:23
**includes** 35:16
**including** 40:1
**inclusion** 6:8
**inconclusive** 84:20
86:7
**inconsistency** 5:23
**incorrect** 5:17
17:11 108:23
**increase** 19:11

29:17 38:17,18
44:23 52:25 84:19
85:12 101:13,22
102:21
**increased** 8:15 20:9
21:4,12,13 24:19
24:24 25:12,18,22
26:7 32:18 36:17
39:3 44:8 45:6,11
51:3 53:22 55:3
87:18 88:2 91:8
91:16,19 97:24
101:23 104:23
106:7,20
**increases** 44:25
50:25 84:25 88:7
89:25
**increasing** 36:17
**independent** 72:14
104:3,13 111:25
**independently** 11:7
87:24
**indicate** 91:8
**indicated** 4:11
12:14 13:2,13
15:24 25:16,17
61:13 82:25
**indication** 37:19
40:16,17 41:2,17
41:18 48:1,12,19
50:3,4,19 51:2,6
51:13,22,24 52:10
53:20,20 54:1
88:5,8 101:23
107:7,14,25
113:11,22
**indiscernible** 6:8
16:6,20 34:3
55:16 60:19 67:7
67:7 68:11 73:10
73:10 90:11 95:11
114:16 116:16
**indistinguishable**
38:8 52:5
**individual** 5:4 38:4
45:9
**individuals** 40:23

**infants** 89:23
**infarction** 111:8,14
**Inference** 112:13
**influence** 4:19,20
60:5
**informal** 23:14
**information** 3:14
3:24 4:3 10:25
31:11 32:22 40:4
46:8 72:18 73:24
74:1,2,4,5,7,11,12
74:16,19,19 76:8
76:25 77:22 78:5
79:9 104:10
114:11 115:17
**informed** 104:4
**ing** 40:16
**inhibitors** 90:21
**initial** 73:24
**insufficient** 107:8
**intend** 17:17
**interest** 62:24 83:5
83:7
**interested** 8:22
98:19 105:8 120:6
**interesting** 12:19
13:21 14:12 64:6
**internal** 54:3,6,20
55:8
**interpret** 5:16
92:19
**interpretation** 5:17
63:19
**interpreting** 5:1,11
**interrupt** 72:2
**interval** 31:14
32:20 85:14 108:8
**intervals** 28:21
47:10 85:15
109:18
**interview** 98:18
99:19,21
**interviewed** 99:1
**interviewing** 99:19
**interviews** 98:15
99:17 100:6 114:5
114:23

**investigated** 90:22
   91:6,7
**investigation** 50:21
   65:12
**investigator** 11:25
**investigators** 10:20
   41:1 46:13
**investigator's**
   11:24 12:12
**involved** 5:2 13:10
**ischemia** 111:13,22
**isolation** 31:1,11
   32:21 45:10 97:17
**issue** 35:6 39:24
   40:15 41:20 45:16
   49:11 51:11 55:9
   64:17 65:19 69:11
   70:16 73:6 79:14
   79:22 83:7 89:22
   100:19 107:21
   108:11
**issues** 10:8 35:5
   71:20 105:8 108:5
   111:17 112:7

**J**

**jam** 10:22
**Janine** 1:17 120:14
**January** 74:5,7
   78:3
**Jewell** 2:3 25:25
   68:2,18,20 69:17
   70:10,13 71:21
   74:20 76:14 80:6
   80:10 87:14 98:9
   100:22 102:2
   105:3,19 106:5
   108:5 110:17,21
   111:5 112:6,18
   113:23
**Jewell's** 16:9 20:13
   67:12,14 69:4,14
   70:10,17 73:20
   75:14 86:18 110:1
**Jimenez-Solem**
   15:7,18,23 16:20
   18:24 21:20 36:21

36:25 37:2,4,12
   37:16 38:1,11,19
   39:8,25 41:17
   42:3,20 50:9
   58:14,14,15,15
   59:4 104:7,9,17
   113:13 114:15
**Jimenez-Solem's**
   104:14
**job** 30:2
**John** 63:6
**Joint** 88:15
**JOSEPH** 1:11
**journal** 45:13
   62:23 63:3,18
   65:13,16
**Judea** 112:16
**Judge** 1:7 3:9,19
   77:17
**judged** 65:12
**judgment** 72:25
**juice** 6:17,18
**June** 82:23
**jury** 31:4,18

**K**

**Kalen** 29:11 34:19
**Katsopolis** 54:15
   73:21
**keep** 86:17
**keeping** 77:14
**key** 9:21 43:25
   64:17 94:9
**kid** 112:4
**Kimmel** 17:5 107:3
   107:5 117:22
   118:20
**kin** 120:5
**kind** 22:10 23:10
   47:25 71:25 76:24
   115:21 118:16
**kinds** 5:22 73:14
   89:25 107:14
**knew** 34:8 52:20
   105:6,6,8,17
**know** 3:17 4:12
   11:25 13:9 17:3,9

17:19 18:10 20:12
   20:15 23:6 27:16
   37:8,9 38:15
   40:16 42:15,16
   49:2,4 51:9 52:1
   54:25 55:5,8
   59:25 66:17 67:19
   67:22 68:8,18
   75:6 76:10 77:1,8
   79:23 80:1,18
   82:24 83:19 86:16
   86:18 90:8,25
   91:22,23 92:16
   93:14,24 98:11,16
   99:24 103:14
   104:15 107:22
   108:3,4 109:22
   111:3 114:13,21
   116:9 117:21
**knowing** 97:25
   105:11
**knowledge** 74:9
**known** 6:21 99:21
   114:8
**knows** 13:7 53:10
   80:6 115:16

**L**

**label** 67:3,18 70:20
   75:6,20,25 76:3
   77:3 78:9,12,24
   82:5,9,10 83:3,6,9
   83:21 86:17,17
   87:1,3,4,14 106:5
   106:6,6,13
**labeled** 108:20
**labeling** 66:18
   71:12,14 74:13,22
   76:11 82:12
**lack** 22:6 37:19
   38:23
**lacking** 51:1
**ladies** 70:23
**Lafadda** 75:7,11
   77:21
**LANCASTER**
   1:10

**language** 26:1 83:6
   83:9 86:2,19,23
   87:1,3 97:8
   107:24
**large** 10:18 45:1
**larger** 31:2,19
**largest** 45:19,24,25
   51:21
**late** 38:3 75:9
**Latin** 12:21,22
**law** 86:15 87:3
**Laweek** 57:13,15
**Laweek's** 58:2
**lawyers** 13:11
   63:14 82:16,22
   88:25
**lay** 47:24
**Lead** 1:14
**leading** 112:16
**leads** 14:17
**learned** 38:14
   66:17 72:17
**leaves** 60:9
**lecture** 111:17,18
**led** 19:20,22 26:11
   67:18 75:5
**left** 18:22 26:16,17
**left-hand** 27:4
   60:16
**lend** 6:14
**length** 31:13 56:14
   60:16 85:21 99:18
**let's** 3:1 4:6 5:14,25
   8:4 9:4,16 11:12
   20:9 22:21,24
   24:16,16,21 25:10
   25:22,22 28:10
   29:25 30:2 33:14
   36:24 37:2,23
   39:10,10 41:15
   42:14 45:15 47:5
   49:15 51:15 52:24
   54:2 55:10 57:15
   57:22 58:17 59:3
   59:6,24 66:16,25
   67:3,7 83:8,22
   85:2 87:15 90:4

93:9 94:13,17
   95:10 96:15 109:7
   115:5
**level** 38:16 99:23
**LIABILITY** 1:4
**Liaison** 1:14
**life** 6:20
**Lilly** 34:15
**limit** 47:8 117:8
**limitation** 64:24
**limitations** 9:22
   10:13 61:25
**limited** 36:16 39:6
   87:22 88:4 111:6
   117:8
**limiting** 47:3
**line** 6:6 9:8,13,18
   22:25,25 23:2
   33:19 35:4 39:4
   64:7 67:9 80:19
   87:9 110:17
**lines** 73:21
**lining** 79:2
**link** 51:1
**links** 96:5,24
**Lipitor** 64:19
**list** 25:15,16,16,18
   27:5,13 29:9,16
   29:16 79:2 81:23
   83:3 88:10,23
   92:4 93:20,21,22
   94:1,3 96:10
   113:4
**listen** 89:9
**listening** 89:7
**lists** 27:8
**literature** 5:16 42:2
   53:19 54:17 55:6
   62:14 64:21 65:22
   68:17,22,22 76:12
   103:14
**litigation** 1:4 62:10
   62:20 63:14 78:11
**little** 4:14,22 9:17
   12:20,22 15:12
   21:14 23:13,13
   24:5 31:15 40:17

43:18 52:4 53:24
53:25 57:7 74:18
75:18 81:14 88:14
102:1 105:13
109:16 118:19
**lived** 6:20
**lives** 80:16
**Lloyd** 34:20
**LLP** 1:14
**locate** 39:18
**logs** 17:5
**long** 6:21 15:11,11
27:20
**longer** 30:20
**look** 3:14 5:25 8:6
11:8 13:18 16:25
20:10 22:19 25:23
26:1 28:9,10 33:7
34:2 36:20,24
38:9 42:7,14 43:5
44:4,13 46:5,7
49:14,15 51:15
58:12,17 59:3
66:16 74:18 78:4
83:8 89:5 90:2,5
98:3,14 100:18
103:13,20 108:2
113:20
**looked** 12:25 68:16
72:18 74:19 76:4
76:8,12 94:11
96:11 104:21,22
106:2,3 112:21
**looking** 21:2 33:10
34:5 47:22 51:6
56:1 59:14 72:16
72:17 74:21 77:21
103:5,6 104:25
105:7
**looks** 17:11 22:16
93:16 96:11
**loosely** 23:10
**lost** 95:6
**lot** 3:24,25 23:17
30:20 40:12 45:9
47:13 83:11 86:9
99:15 115:17

116:25 117:5,5
**Louis** 6:2
**lovely** 55:21
**low** 19:16 38:10,11
39:7 40:4 63:3
**lower** 19:7 97:23
104:17,18
**Luick** 29:11 34:1
60:13,13,19,21
76:23 114:21,22
**lumped** 101:22
**lunch** 18:7,8
108:10
**lurch** 18:12
**Lusk** 73:13

————————

**M**

**M** 1:6
**magical** 8:18
**main** 19:22,23
96:22
**major** 11:7 38:4,6
44:19 52:1 84:13
84:14,16,19
101:12
**making** 40:2 62:7
69:25
**malformations**
36:15 38:3,4,6
85:13,14 87:25
**manage** 84:3
**managed** 41:23
**manufacturer**
111:22
**March** 78:2
**mark** 1:14 83:13
**marked** 83:10
**Market** 1:21
**masked** 86:9
**materials** 72:5 82:9
**maternal** 26:6
44:23 49:1 50:25
99:17,19,20 100:5
101:13 114:23
**matter** 117:2
118:14
**Maum** 29:11 30:3,8

30:18 31:6,9,10
32:2,6,16 34:19
**MBDPS** 93:14
**MCA** 44:19 101:10
101:11,13,17
**McDonough** 6:10
**MEAGHER** 1:14
**mean** 16:14 17:14
17:23 21:25 22:1
23:8 29:12 33:5
56:21 75:2 86:12
91:13 99:21
101:11 110:13
**meaning** 21:16
**means** 12:21 46:25
75:18
**measure** 8:22 12:4
12:9 99:15 100:8
104:13 114:8
**measured** 100:19
**measures** 100:1
**mechanism** 50:1
**med** 6:7
**medical** 45:17
62:14,23 63:2
66:11 70:22
**medications** 19:18
95:14 96:4 99:8
**medicine** 62:7
70:23
**medicines** 43:1
**medium** 40:6
**meets** 72:14
**membership** 31:19
**memory** 3:17,25
4:2 33:25 43:19
54:9,13 89:6,21
90:1 98:14 114:22
**mention** 84:22
91:14
**mentioned** 36:5
54:11 104:2 112:9
**Merrell** 68:11
**metaphor** 8:5
**meta-analyses**
10:23 11:4
**meta-analysis** 4:8

4:10,24 5:7,15,23
6:14,15,25 8:10
8:15,17,19,20,24
9:22,24 11:5
16:19 17:19,21
18:23 85:11,19,21
85:22 86:4 100:7
**method** 41:17
56:16 57:3,5,10
57:11,19 68:12,15
107:16 114:10,21
**methodologically**
103:5,19 107:15
107:19 108:1
**methodologies**
67:10,13 68:7,19
68:20 70:1,9 71:1
79:3
**methodology** 19:20
26:11 45:4 62:11
67:12 68:4 69:2,4
69:13 70:11,24
72:13,19,19 73:15
75:15 78:7 98:3
100:18 104:25
107:13
**methods** 11:24
12:12 40:25 41:6
41:15 69:14,14,21
69:23 75:17 80:7
80:9,10 99:17
**middle** 9:15 14:10
76:20
**MID-ATLANTIC**
1:20
**Miles** 6:9 85:20,22
86:4,6,11 106:19
**million** 45:20,22
**mind** 37:8 56:13
**mini** 11:5 18:23
**minimize** 41:1
**minimum** 109:25
**minute** 17:4 80:15
94:19 95:15
**minutes** 17:8 18:13
**misclassification**
35:5

**misinterpreting**
6:12
**mislead** 5:2 8:25
**misleading** 5:20,21
6:22
**misleads** 5:18
**missing** 51:1
**misspoke** 114:17
**mistakes** 4:18
**mix** 6:18 10:6
**mixing** 7:5,10,15
7:15 8:13 9:20
10:14,14,15
**model** 113:1
**modified** 64:10
**moment** 29:21
**monotonically**
21:18
**months** 55:7 73:25
98:16,21,22,22
99:5
**morning** 45:13
57:6 80:20 105:9
106:4 109:11
115:14
**mother** 98:15 99:1
**mothers** 46:16,17
46:21 89:23
**move** 18:4 20:3
29:7,25 37:23
50:19 60:21 79:16
80:21 85:2 109:24
118:3,19
**moved** 60:15 74:9
100:1
**moves** 85:6
**multiple** 8:16 29:13
31:23 61:10 66:21
66:22 81:11 119:9
**muscle** 65:18
**myocardial** 111:7
111:13,13,22
**myopathy** 65:4,18

————————

**N**

**N** 2:1
**name** 92:6 99:7

112:12
**named** 78:18
**NAST** 1:9
**National** 1:20
97:20 98:9
**nationwide** 42:3
105:23
**nature** 31:25 64:16
66:1 71:25
**nauseam** 107:11
**Nearly** 45:20
**necessarily** 75:13
104:23
**necessary** 50:22
62:4 64:15 65:25
116:9,22
**need** 14:14,15
40:13,14 42:20,22
48:14 51:2 70:4
77:17 80:17,17,18
86:21 94:22
108:14 116:9
117:6,9,9,14
118:9,12
**negative** 23:15
**neither** 120:5
**network** 77:14
**never** 71:13 115:25
**new** 1:15,15 12:15
41:17 45:13 65:14
65:15,16 79:6
91:15 92:19 95:6
97:24 104:9,10,17
104:24 105:13
112:9
**nice** 4:16
**NICHOLAS** 2:3
**nine** 98:22
**noise** 52:8
**nonsignificant** 20:8
20:11 21:4 25:12
30:8 44:11 47:4
47:10 102:21,24
103:2,6,13,16,20
**nonspecificity**
49:25
**nonstatistically**

23:21 24:13,17
25:17 27:13,21
29:10,14 32:17
57:3
**non-significance**
24:15
**non-statistical**
29:12
**notable** 10:18
**Notary** 1:17 120:14
**note** 49:11
**notebook** 109:25
**noted** 26:17
**noticed** 76:22 81:16
**number** 3:16,18
15:19,22 28:3,19
32:13 34:16 39:25
44:16 45:1 61:2
64:20,21 65:2,11
65:14,20 66:2
73:18 83:23 90:12
90:23 94:22
106:12,14 107:3
**numbered** 49:20
**numbers** 17:20
46:2 58:8 85:20
**Nursing** 88:19

———————
**O**

**Obesity** 49:1
**object** 59:11 67:8
118:14
**objection** 89:11
110:4,18,19
**objections** 110:6,9
**observation** 3:16
**observational** 3:14
3:18 4:3 9:24,24
40:19 61:24
**observe** 39:13
**observed** 87:20
88:6 96:6 97:1
106:9,22
**obstacle** 6:13,13,16
6:18 81:13
**obtaining** 114:10
**obviously** 115:18

117:7 118:14
**occur** 95:12 96:2
**occurred** 65:24
**October** 63:8 78:3
**odds** 5:13,14,16,19
5:19 8:23 16:10
16:20 24:23 28:20
28:20 32:10 34:14
34:14,15 38:5,10
38:12 40:4 47:4
47:10,21,23 48:14
51:18,23 52:2,3
53:17,25 57:14
60:2,4 85:13,14
103:8 104:16
108:20
**official** 120:11
**offspring** 85:16
**oh** 3:21 9:5 17:23
39:18 42:22 49:17
52:13 56:22 58:24
75:15 83:17 85:6
93:10 95:8,8
109:14 113:4
114:18
**okay** 3:9 4:5,17
7:18 9:7,8 11:19
17:9,13 18:8 19:4
20:24 21:22 22:2
22:8,21 23:3,20
25:2,10,24 26:2
28:7,13,23 32:2,6
32:9,24 33:3,11
33:14,21 35:24
36:5 37:4,6,9
38:21 39:10,13,20
39:23 42:18,22,24
44:7,10,12,18
45:24 46:1,4,5
47:7,8 48:21 49:5
51:5 54:10,16,17
55:5,12,14 56:11
56:18,24 57:20
58:10,22,24,25
59:2,6,24 61:23
66:10 79:1 80:1
80:22 81:21,22

83:8,9,14,21,25
84:5,10,18 85:9
87:18 89:7,15
90:18,25 91:2,8
91:17 92:4,15
93:11,24 94:4,4,6
94:15,20 95:8,24
96:1,15 97:7,7
98:4 99:9 100:16
103:19 106:15
107:6 108:18
114:14,20 116:2
**old** 86:5
**oldest** 69:18
**once** 111:18
**ones** 48:2 61:7 64:6
84:23 118:8
**one-page** 70:2,2
**ongoing** 54:18
**online** 15:1 96:11
96:14
**open** 92:17
**opened** 98:15
**opening** 66:15,20
69:17 73:23
**openings** 116:6
**OPERATOR** 1:16
1:16
**opinion** 5:8 28:25
66:6,9 83:7 84:16
89:9 91:13 104:5
106:11,24
**opinions** 54:21
89:10
**opposing** 78:13
80:6 102:23
**orange** 6:16,17
7:20 8:4
**oranges** 7:5,11,15
9:20 10:15
**order** 82:5 114:5
**organization** 69:16
**organizations**
66:11 67:11 68:3
68:16 70:8 72:17
73:5
**organized** 30:1

**orient** 56:7
**original** 46:8
**originally** 46:16
**Otis** 70:2,25
**ought** 51:25
**outcome** 40:20,23
52:24 120:6
**outcomes** 112:21
**outside** 72:10 78:14
79:3
**overall** 18:25 19:2
26:22 27:24 38:21
44:19 83:22 84:10
84:10 101:10
104:18
**overlap** 61:18,19
103:24,25 104:4,8
105:11,12
**overlapping** 61:17
**overnight** 80:17
117:16
**Overruled** 89:12
**overstate** 51:18
62:6 64:2
**overstated** 64:8
66:7
**overstatement** 65:2
**overstating** 62:14
64:25
**over-interpret** 66:4

———————
**P**

**P** 16:11
**PA** 1:3,10
**page** 2:1 6:6 9:5,8
9:10,11,15,18
19:3,4,7,14 20:6,7
20:10 21:3,11
22:24,25 25:11,14
25:22 26:3 28:11
28:15,24 29:2,8
30:5 33:17,18
34:5,6,18 35:2
36:6 37:2,4,16
39:11,13,25 44:9
44:14,15,17,17
46:6 47:5 49:16

49:16,19 67:4
68:5,24 69:19
83:23 84:2,10
85:2,3,6 87:16
90:5,23 91:1
92:25,25 93:9
94:22,22 95:5,19
96:15,16,18,18,18
97:5,7 99:5
106:12,18 117:8
**pages** 24:22 49:19
117:5
**paid** 62:15
**pain** 65:18
**paper** 13:3 15:7
28:12 33:7 43:2,5
49:4,9,10,13,19
53:23 57:12,16,18
58:6 60:21 62:19
62:25 63:8 64:5
65:1,6,21 69:19
70:2,2,14 92:17
94:12 98:14,19
101:8 105:9,20
106:2 116:25
**papers** 33:8 57:24
66:12 103:22
112:20,24 114:12
**paragraph** 38:1
49:16,17 50:8,11
50:17,20 95:6,9
106:17
**parameters** 80:19
**parent** 85:19
**parentheses** 39:20
**Paroxetine** 40:1
44:24 45:7 91:10
92:1 96:4
**part** 11:19,23 12:11
23:20 30:8 54:17
54:25 55:5 67:23
67:24 69:22 71:12
73:22 74:23 78:10
79:22 100:17,18
100:20 103:23
107:1
**partially** 61:18

**particular** 10:12,12
11:22 12:15 31:25
32:1 40:18 48:12
53:12 61:13 79:14
111:21
**particularly** 51:13
62:9 75:14 97:11
104:7
**party** 78:14 120:6
**pass** 72:25
**passed** 110:25
**path** 69:1
**patients** 70:25
**Paul** 77:21
**pause** 15:6,18 16:9
**paused** 11:6 15:3,4
15:16,20,22 16:14
20:1 41:19 42:7
**Paxil** 45:7 91:18,20
92:2 99:10
**pay** 5:10
**Pearl** 112:16
**peculiar** 10:12
**peer** 11:20,21
12:12 19:20,23
26:11 57:16,23,24
64:21 70:20,21
71:1,4 72:14
**pen** 59:19
**pending** 6:2
**Pennsylvania** 1:1
1:21
**people** 8:25 63:3
64:19,22 65:3,10
65:15,17 71:15,24
79:1
**people's** 72:10
**percent** 45:11
47:22 48:10,14,14
51:19 52:2,7,12
52:13,22 60:4
65:3,17 85:13,15
97:11,18 102:20
104:23 106:11
**percentage** 65:24
**perception** 12:8
**perfect** 81:2 92:18

**perfectly** 6:7 44:5
65:13 73:12 78:23
**performed** 11:13
46:13 48:16
**period** 98:17
**periodic** 54:7
**permits** 87:8
**permitted** 117:24
**person** 37:8
**personal** 116:13
**personally** 58:11
105:7
**perspective** 112:8
**pesticide** 112:23
**Petersen** 34:19
51:10 58:14 104:8
104:10,19 105:6,8
105:11,14,15,21
105:22
**Pfizer** 54:3,20 55:8
64:19 67:17,20
69:12 74:2,4 75:5
86:22 88:25
**Pfizer's** 55:2 67:19
77:4 79:24 82:6
86:17,19 87:4
90:12
**ph** 6:7,10 16:6
29:11,11,11 34:1
34:19 42:14 49:3
49:3 54:15 60:3
61:21,21 63:21
73:13 75:7
**Pharmaceuticals**
68:11
**pharmacy** 114:16
**phenomena** 10:9
**phenomenon** 8:21
8:22
**Philadelphia** 1:3,21
31:5
**physical** 6:18
**picked** 26:20 27:25
**picture** 23:12
**pie** 16:5,7 108:19
**piece** 69:19 74:18
**place** 21:6 29:3

34:2
**places** 10:5,7 20:4
**plaintiff** 63:13
115:6
**plaintiffs** 74:1,14
**Plaintiff's** 1:9
**plaintiff's** 73:17
76:1,5
**plan** 115:5
**play** 13:9
**please** 13:18 19:2
67:3 78:25 81:12
87:16 90:5,23
102:6 104:2
**plot** 35:16,24 55:10
61:1,10
**plus** 98:21
**point** 8:23,24 13:18
20:16 21:19 22:6
32:23,24 43:23,24
56:14 57:25 58:19
63:15 64:23 68:3
68:10 71:21 72:9
72:11 74:17 76:3
77:9 82:10 86:12
94:24 105:5,10
**pointed** 15:25
56:13 61:16
101:10
**pointing** 27:10 35:9
**points** 63:23
**police** 67:25
**politely** 13:12,16
**population** 10:2,3
10:13 15:20 52:14
52:21 53:3,3,7,13
93:3,4 103:25
104:24
**populations** 10:10
84:15 87:23 104:4
**posed** 79:19 80:19
**position** 66:12 76:6
79:18 83:5
**positive** 21:5,7 22:7
23:15 25:13 30:10
44:11
**possibility** 13:22

**possibly** 8:1 22:18
30:25 94:2 97:25
98:1
**post** 12:18,20 18:22
98:17
**posted** 94:9
**postings** 94:14
97:16
**postpone** 75:16
**postponed** 80:20
**post-delivery** 98:16
**post-hearing**
115:22,24
**potential** 89:25
99:25 105:13
108:6
**practice** 62:3
**practiced** 68:12
**practitioners** 70:22
**precise** 16:14 65:5
**precisely** 15:19
80:18
**precision** 8:15,23
31:15
**preclude** 117:15
**predicated** 53:21
**prefer** 57:15,22,25
109:19
**pregnancies** 41:11
46:16
**pregnancy** 12:2
26:7 41:19 70:24
83:22 84:8 90:22
91:5 95:14 96:4
97:12 112:18,21
113:1
**pregnant** 84:11
112:23
**premise** 79:9 87:6
**prepared** 66:12
**prescription** 11:15
11:16 12:2,5,6
**prescriptions** 11:18
16:15 44:24
101:14
**present** 69:5,7
118:4

presented 63:25
presenting 62:4
  69:6
presents 68:13
presiding 81:9
press 96:12,14
presumably 67:10
pretty 5:7 6:24
Prevention 93:6
  97:21 98:9
previous 12:6
  16:22 83:10 92:20
  97:1
previously 60:13
  88:9 97:9
prime 6:24
Primer 112:13
print 3:8
prior 41:12,21
  117:24 118:21
probably 8:6 20:5
  28:8 53:9 75:20
  76:10 93:8 99:17
  105:6
problem 5:6 7:5
  45:5 78:16 117:21
proceeding 18:17
  81:7 119:12
Proceedings 1:18
process 4:10 6:15
  57:24,24 70:4
  71:15 78:1 80:16
produce 77:24
produced 1:19
production 75:9
PRODUCTS 1:4
profession 21:23
Professor 104:24
  105:3
proffered 70:8
progeny 73:14
progress 41:5
projects 13:17
prominently 41:9
promise 15:8
pronounce 49:2
propensity 48:17

48:18
properly 4:9
proposal 67:19
  75:6 79:24
propose 75:19
proposed 66:18
  67:3,18 74:13
  75:5,20 83:8,21
  86:23 87:1 106:6
  107:24
prospectively
  99:20
prove 31:1
provide 29:4
  104:19 110:2,7
  113:8
provided 35:11
  67:21 104:9
provides 86:16
  104:9
proxy 69:16
Prozac 33:14,15
  34:25 35:13 99:10
PSE 77:16,19 110:5
  117:4
PSURs 73:22
pub 6:7
Public 1:17 120:14
publication 11:22
  14:17 92:23
publish 13:6 14:1,6
published 11:20
  12:12 13:1 17:16
  19:20,23 26:11
  53:18 57:4,11,16
  58:1 63:2,8 64:21
  65:6,14,16 84:11
  87:20 88:3 92:22
  106:9,22 112:6,14
  112:18,20 113:2
pull 10:22 30:5
  78:1 95:10
pulled 10:19 40:3
pulling 45:8
pullout 95:20
purchase 8:19
purpose 8:19

purposes 78:6
  109:25
pursed 71:1
pursuing 68:1
put 3:22 6:5 15:4
  15:16 27:4,6 29:1
  35:18,20 48:5
  52:9,16,17 54:12
  56:14 66:12,19,23
  67:1 73:18 76:9
  91:15 106:19
putting 4:16 14:21
  71:8 99:6
puzzle 74:18
  100:21
P.C 1:9
p.m 18:17,17 81:7
  81:7 119:13

_____

Q

qualifications
  110:19,21,24
question 10:21,25
  11:8,23 14:8
  15:13 23:5 24:3
  35:12 38:9 42:16
  56:12 75:19 77:2
  78:15 79:9 80:2
  82:18 84:1 90:8
  98:18,19,24 99:11
  107:5 108:2
questioning 67:9
  110:17
questions 15:10
  68:1 79:6,19
  80:18,20 87:9
  88:24 89:14 90:2
  98:25 103:25
  114:1
quick 25:3 49:14
  71:19 72:22 90:5
quicker 118:19
quickly 43:6 45:15
  68:6 76:10 83:19
quite 7:21 29:5
  105:18
quote 65:5 101:7

105:20 106:6
quoted 38:5 108:23
quotes 15:4,16

_____

R

R 120:1
raising 63:18
randomized 3:10
  3:20,23 4:1
rare 30:24 31:18
  32:15
rate 84:14
rated 99:22
ratio 5:13,14,16,19
  5:19 8:23 16:10
  16:20 24:23 28:20
  28:20 32:11 34:14
  34:14,15 38:12
  40:4 47:5,10,21
  47:23 48:14 51:18
  51:23 52:2,3
  53:17,25 57:14
  60:2,5 85:13,15
  103:8 108:20
ratios 38:5,10
  104:16
raw 14:15 17:25
  18:1
reach 68:4 70:2,3
  80:7 110:19
reached 67:11
  68:19 70:8 110:21
read 7:1,2 9:1 11:1
  19:12,13,18 20:24
  23:18,19,24 26:9
  28:21 34:21 35:3
  35:4 36:3,17,19
  37:8,11,14,20
  38:1,11 39:15,17
  39:18 45:2 50:5,6
  50:13 52:6 53:23
  70:14 75:2 82:10
  84:18 88:21 91:10
  94:18 95:24 96:7
  96:8 97:1,13
  98:12 119:3
reader 65:8,20

readers 47:24
reading 20:11 25:8
  95:15,17,17
real 32:21 71:4,23
realized 105:12
realizing 66:4
really 10:22 15:11
  15:12 22:6,8
  23:10 31:12,15,24
  32:21 39:6 49:2
  55:8,24 58:21,21
  60:6 69:23 70:15
  71:10 74:16 76:22
  76:24 77:7 85:1
  90:2 116:4 117:14
reanalysis 11:14
  12:18 13:1 16:7
  17:15 18:25
reason 10:4 31:7
  35:14 56:14 62:22
  118:17
reasonable 78:23
reasonably 71:11
reasons 86:8 99:18
reassuring 97:9
reassuringly 96:16
  96:20,24
recall 6:3 7:9,12
  33:9 49:11 63:17
  81:22 86:4 89:5
  100:24 103:24
  108:9 111:22,23
  113:6,14 114:12
received 110:8
recess 18:12,16
  80:24 81:5,6
recollection 3:2,15
  32:2 33:11 34:23
record 72:5 79:16
  82:16 86:15
  109:25 110:3
  112:24 119:1
recorded 1:18
recording 1:18
  120:4
records 80:5
  114:16

**recross** 2:3 113:25
**red** 23:13 56:9,19
  61:7
**redirect** 2:3 15:14
  98:6
**reduce** 52:3
**reduces** 52:2
**reduction** 52:12
**Reese** 34:19 61:21
**refer** 7:20 9:22
  20:4,8 21:3 24:15
  32:16 38:21 39:22
  64:20 66:21
**reference** 21:11
**referenced** 54:3
**references** 63:25
  86:11
**referencing** 12:19
  65:21
**referred** 12:17
  118:15
**referring** 41:8 49:4
  62:16 68:7 85:20
  93:25 97:8
**refers** 16:14 40:6
  93:14
**reflect** 21:3 62:3
  64:15 65:25
**reflecting** 105:15
**reflection** 64:22
**reflects** 25:11 85:24
**refresh** 3:15 33:11
  34:23 54:13 89:6
**refreshes** 3:2
**refusal** 77:3
**Refuse** 92:5,8,9,10
  96:9,12 97:4,16
  100:12 103:15,16
  104:21,23 114:4
**regard** 23:15 36:14
  61:19 103:24
  114:4
**regarding** 21:20
  37:18
**regards** 61:20
**REGION** 1:20
**registers** 105:21

**registries** 105:23
  114:15
**regretted** 65:8
**regulatory** 82:13
**rejected** 12:25,25
**related** 24:3 84:23
  89:3
**relation** 35:13 36:6
  50:23
**relationship** 37:2
  37:20 38:23 39:14
  53:4
**relatively** 98:13
  115:16
**release** 96:12,14
**released** 82:20
**relevant** 69:23
  73:16 75:14,24
  76:15 101:17,21
  104:14
**reliable** 68:4 69:4
  72:18 114:8
**reliance** 81:23 82:9
  83:3 88:10,23
  92:4 93:20,21,22
  94:1 96:10
**relied** 73:2 74:4
  119:1
**relies** 66:21
**rely** 5:3 30:25 31:1
  31:19 36:20 68:12
  68:22 69:17 70:24
  72:1
**relying** 33:24 54:20
  118:21
**remember** 6:1
  32:19 34:9 45:21
  46:2 54:4,11 63:9
  63:10,20 64:5
  73:23 78:1 89:20
  111:14
**repeat** 104:16
**repeated** 61:10,12
  61:15
**repeatedly** 72:6
**rephrase** 40:22
**replace** 18:25

109:19
**replaced** 60:18,20
  109:21
**replicated** 10:10
**replication** 104:13
  104:20 105:1,17
**report** 3:19,22,23
  4:2,2 5:15 20:4,7
  20:7,13 21:3,6,11
  24:22 25:6,7,11
  26:1 27:7,13 28:3
  28:8 29:3,5,9 30:5
  32:5 34:3,4,10,13
  36:7 38:10 39:5
  40:3 44:9 45:11
  47:15,15 48:5,14
  52:17 54:8,23
  62:19 67:23,24
  70:11 73:20 77:1
  78:14 81:23 82:23
  83:4 94:1 99:13
  100:4 101:25
  102:3 107:11
  110:1
**reported** 28:2,24
  30:21 31:5,9 32:3
  32:3,7,22 38:18
  39:7 47:19 59:15
  61:14 84:18,24
  97:9,23 104:19
**reporting** 1:20
  64:17 97:12
**reports** 31:10 63:16
  63:16 92:20 97:4
**represent** 44:25
**represented** 61:10
**reputation** 73:5
**request** 13:25 14:1
  14:2
**requested** 67:17
  75:4
**require** 115:24
**required** 57:19
  73:9 76:11 86:25
**reread** 34:15
**researchers** 51:5
  95:10,12 96:1,24

**reserve** 118:24
**resolve** 5:23
**resort** 5:23
**respect** 39:14,15
  61:25 72:21
**respond** 67:25 69:9
**response** 21:11,15
  21:20 24:14,16
  36:6,7,14 37:1,14
  38:7,18 39:2,6,14
  40:9 63:18 65:1
  74:2
**responsible** 87:4
**rest** 16:2 97:18
**restricted** 44:1,12
  45:4 46:18,20,22
  47:4,9 48:15
  101:3 113:5,17
**restricting** 47:19
  51:17
**result** 21:3 27:5,21
  28:24,24 29:2
  35:21 45:8 52:11
  53:14 57:2,4
  60:11 102:19,24
  104:14,18 108:23
**results** 4:18 5:3,11
  18:1,25 19:2,10
  25:11,17 27:25
  28:2 29:17 33:4
  35:7,10,19 36:3
  40:1 47:3,8 51:11
  57:9 90:6,20 91:8
  99:24 100:11
  102:6,7,25 103:6
  103:13,21 105:10
**retrospective** 99:19
  99:20
**reuptake** 90:21
**review** 3:21,22
  11:20,21 12:12
  19:20 26:11 54:17
  55:1 57:23,24
  70:24 71:1,4
  72:14 73:24
  112:25
**reviewed** 19:23

57:16 64:21 68:22
  70:17,20,21 85:25
  86:1,2,12 93:19
  94:15 103:22
**reviewers** 57:25
**reviewing** 34:9
  55:6
**reviews** 72:13
**rheumatoid** 112:25
**rid** 113:21
**right** 3:11,21 4:5,6
  4:9 5:5 7:6,9,21
  7:22 8:2 9:4,16
  11:5,12,17,20,23
  12:21 13:8,12
  14:4,19,19,22,25
  15:1,10,23 16:11
  16:16,17,25 17:1
  17:9,16,19 18:3
  19:9 20:6,9 21:5
  21:10,13,17,22 22:5
  22:13,25 24:1,12
  24:13,18 25:10,15
  25:19,25 26:19,23
  27:1,7,14,18 28:1
  28:5,10,17 29:3
  29:25 30:3,9,12
  31:22 32:6,9,25
  33:6 34:2 35:12
  35:17,22 36:5,8
  36:10,24 37:7,12
  37:23 39:20,21
  40:18,21 41:15,19
  41:21,25 42:4,10
  42:11,14,23 43:1
  43:4,6,13,17,20
  44:9,21 45:15,17
  46:12,15,22 47:1
  48:16,25 49:14
  50:9,16,20 51:7
  51:12,14 53:8,15
  54:25 55:3,10
  56:7,9,12,18,25
  57:6 58:10,13,15
  58:17,23 59:4,9
  59:11,13,14,19,20
  59:22 60:1,10,14

60:25 61:3 62:4,7
62:9,10,13,15,24
63:4,6,12,14,23
64:16 65:23 66:6
66:8,13,16,18,21
66:22 67:2,22
68:17 70:6,15
71:22,23,24 72:9
72:15 73:8,11,18
73:22 77:12 78:12
80:2,21 81:1
82:13,13,17 83:3
84:6 85:2,2 87:16
88:24 91:3,17,19
91:21,24 92:11,20
93:2,6,9,13,19
94:3,4,8,10,13,17
95:10,18 96:1,13
96:13,23 101:8,15
102:8,14,21
103:16 104:5
105:24 106:13,18
109:10 110:4,9,12
111:25 113:21,23
114:6 115:1
116:23 117:16
118:10,22
**rights** 118:24
**right-hand** 19:7,7
26:21 61:8
**rise** 81:8
**rises** 55:17
**risk** 5:16 10:10
19:12 20:9 21:4
21:12,18 24:19,24
25:12,13,18,22
29:18 30:9 32:16
36:17 37:20 38:24
39:2,3,3 44:8,23
45:6,11 50:25
51:4 52:25 53:22
55:3 63:3 80:4
83:22 84:8,13
85:12 87:18 88:2
88:7 89:25 91:8
91:16,19 101:10
101:13,17,23

102:21 104:24
106:7,20
**risks** 19:16 21:5,13
26:8
**road** 68:23
**rock-hard** 12:4
**RODANAST** 1:9
**Roger** 37:9 67:3
**room** 17:8 64:19
**roughly** 47:22
63:10
**route** 13:9
**Rufe** 1:6 3:9,19
77:17 81:9
**Rufhaus** 61:20
**rule** 118:17
**rulings** 79:14
**run** 14:2
**runs** 116:20

────────────
**S**
**S** 1:14
**safety** 54:8
**sake** 104:15
**sample** 4:12,21
**sampling** 10:2
**saw** 16:19 22:1
51:16 55:1 74:13
76:10 77:11
**saying** 4:25 8:8,9
9:3 14:11 23:14
52:11,15,25 53:17
55:18 65:16 75:8
76:4,10,14,15,16
87:2 92:7 95:21
102:25 103:9
**says** 35:3 38:4
49:25 57:20 68:21
78:8 79:13 80:1,3
82:5 86:9 93:8
95:5 96:16 97:20
101:10 106:7,20
109:7,8,13
**scaling** 53:16
**scheme** 4:21,21
**School** 45:17
**schooled** 111:16

**science** 42:11
**scientific** 13:5
66:11 70:22 88:11
88:13,20,23 89:3
90:20 104:3
**scientist** 68:12,14
**scientists** 36:24
41:16 68:13 69:6
69:8
**score** 48:17,18
**screen** 6:5 20:24
39:17 66:20
**screened** 89:24
**screens** 20:12
**Scroll** 34:7
**seal** 120:11
**SEAN** 1:12
**searches** 74:6
**searching** 6:7
**seat** 18:18
**seated** 81:12
**second** 37:24 48:21
49:16 50:8 85:11
109:5
**secondly** 67:16
**section** 32:23 36:7
49:22 80:23 87:14
**see** 3:2,4 4:6 7:17
9:15 11:12 13:14
13:22,23 14:16
22:18,20 25:10
29:7 31:13 37:11
39:2 46:11 51:19
52:12 54:14,23
56:14 58:24 59:6
66:24 67:10 80:9
84:20 88:12 92:15
94:13 95:9 99:23
103:13 106:18
108:4,14 118:8
**seeing** 10:9 118:17
**seen** 23:16 41:5
83:12 93:25 94:7
94:12 108:18
**selective** 90:21
**sense** 6:19 47:23,25
53:16 70:7 98:12

**sensitivity** 12:3,8
34:11
**sent** 75:3,7
**sentence** 38:4 85:11
85:18,25 86:6
103:9 107:1,15
**sentences** 29:1
**separate** 12:1 24:16
62:22 91:20
**septal** 56:25 57:2
60:12,13,14,18
87:19 106:8,21
**septals** 57:14
**September** 1:4 78:2
**serotonin** 90:21
**Sertraline** 1:4
28:19 46:9 47:21
84:12 85:17 87:21
96:6,25 97:10,13
106:10,23
**service** 1:19
**serving** 62:9
**session** 81:9
**set** 6:8 12:12 23:11
40:11 46:17
**settings** 110:22
**seven** 23:1 58:13,17
58:17
**severe** 59:6,11,14
59:15
**share** 107:18
**shared** 68:13
**shocked** 22:4
**short** 90:4
**short-cutted** 29:22
**shot** 116:1,17
**show** 3:1 16:22
19:2 27:24 29:17
69:21 73:7 80:4
83:20 101:22
**showed** 16:11,13
27:21 55:11 69:16
109:6,11
**showing** 25:21
101:7
**shown** 16:7 70:5
102:7,10

**shows** 5:13,13
36:16 53:19 93:1
**side** 19:7 26:21
64:18 65:23
**sides** 101:4
**significance** 22:7
60:6
**significant** 21:4,9
21:21 23:22 24:13
25:12,17 27:14,22
29:10,14,18 30:11
32:17,24,25 33:2
38:17,20 40:8,10
45:8,12 47:15
56:8 57:4,6,13
58:12 59:22,25
60:11 61:5,8
103:10,17
**significantly** 26:7
**sim** 72:18
**similar** 38:5 46:12
**simple** 5:14
**simplistic** 98:18
**simply** 107:16
**simulations** 53:10
**single** 27:17 30:25
69:19
**sir** 7:14 12:11 13:1
21:22 31:4 33:17
34:23 42:10 55:10
61:1,9 64:3,7
66:17 82:8 93:19
94:8
**site** 89:2 92:1
**sitting** 35:15 56:4
**situation** 22:15
23:25 24:9 104:22
116:16
**situations** 5:22
**six** 73:25
**size** 4:21 40:11 41:5
**sizes** 4:13
**SKADDEN** 1:14
**SLATE** 1:14
**slide** 16:19,22
26:17 85:19 102:5
104:2 108:17,19

109:1,2,5,6,17
110:1
**slides** 16:4 17:7
73:8 108:6,18,22
109:4 118:4
**slightly** 12:10 15:17
38:7
**small** 8:16
**smaller** 113:20
**smokers** 53:6
**smoking** 52:25,25
53:4
**SNRIs** 40:1
**software** 57:19
**solution** 48:12
**somebody** 52:18
116:17
**somebody's** 20:25
**somewhat** 10:5
26:15 104:4
**sophisticated** 4:22
**sorry** 9:5,10,11
15:15 16:5 20:21
23:1 24:25 25:4
40:22,25 42:16,17
44:17 47:6 49:17
49:23 60:8 77:12
83:24 89:13 90:24
92:25 94:3,19
95:2,3,21 96:24
106:13,15,16
**sort** 10:22 42:19
52:18 80:8 118:11
**sound** 1:18 7:19
43:4
**sounds** 42:23 43:2
**so-called** 78:18
**speak** 14:10
**SPEAKERS** 81:11
119:9
**speaking** 113:4
**special** 42:7
**specific** 6:3 19:12
22:15 29:19 31:25
38:18 40:3,4
42:19 48:22 51:4
84:19,23 91:13

92:18 99:5 101:19
**specifically** 25:14
28:25 30:21 33:9
36:15 38:12,12
70:12 77:10,13
84:22 85:24 87:19
96:12 107:10
**specificity** 50:23
**speculation** 69:22
**spend** 4:2
**spent** 104:6
**SQUARE** 1:15
**SSIs** 96:5
**SSRI** 41:11,18
49:25 50:12 93:1
95:14 96:3,25
97:12
**SSRIs** 26:6,24 28:6
42:25 43:16 44:3
45:19 50:2 90:21
91:5,5,9,19 92:18
101:15,18
**St** 6:2
**stages** 112:25
**stamped** 84:2
**stand** 14:6 100:8
**standard** 73:1
**standards** 72:14
**stands** 79:25
**start** 24:21 50:19
57:12 78:14 79:15
116:3,4
**started** 44:6 73:18
78:2
**starting** 6:6 37:11
39:1 85:11
**starts** 85:6
**state** 19:14 37:12
37:18 82:8 84:25
86:1 91:24 101:24
**stated** 64:14
**statement** 27:17
38:22 40:2 64:9
64:10,11 65:23
66:19,23 84:21
85:17 88:1,11,13
88:20,23,24 89:3

89:6,18,21 90:20
98:2 102:18 107:4
116:14
**statements** 27:9
51:10 66:12 70:21
71:2 83:20
**states** 1:1,7 37:7
**statin** 62:16,19
63:4,14 64:2
**statins** 63:16 64:18
64:20 65:1,3,10
65:15,17 66:7
**Statin's** 62:22
**statistical** 5:17 22:7
57:8,19 112:8
**statistically** 21:4,9
21:21 25:12 29:18
30:11 32:25 33:2
38:8,16,17,19
40:7,10 47:14
52:5,8 56:8 57:5
58:12 59:22,24
61:5,7 103:10
**statistician** 48:6
52:17 53:9 55:20
71:3,8,9 81:17
112:21
**statisticians** 6:21
99:23
**Statistics** 112:13
**Steering** 1:9
**step** 42:10,13 46:12
48:21,21 113:10
115:1
**STEPHEN** 1:12
**steps** 11:12
**stick** 27:8 57:15,23
58:1 59:24
**stipulate** 70:3
**stop** 37:24 46:5
**story** 16:3 73:18,22
74:3,17 117:8
**straight** 29:7
**Street** 1:21
**strength** 10:1,7,13
**strengthen** 10:11
**stretches** 31:14

**strike** 49:10
**Stroke** 88:19
**strong** 51:23
**struggle** 95:2
**studied** 72:4
**studies** 3:15,16,18
4:8,11,15 5:12,24
6:23 8:16,18 9:24
9:25 10:16 11:7
17:23 24:18 25:15
29:13,17 30:4,22
32:5 33:22 35:7,9
35:10,16 36:20
37:1 39:6 40:12
40:18,19 41:4,6,7
41:12,21 44:4,6
50:8,11,12 51:9
51:14 52:14 54:2
58:13,16,25 59:4
59:5 61:9,15,17
61:20,22,24 66:5
66:22 69:19,20,25
69:25 70:8 72:5
73:1 80:4 84:11
84:18,20,24 85:12
85:25 86:3,5,10
86:13 87:21,22
88:3,3,7 89:3
96:22 97:1 100:5
100:7,11 101:25
103:11 106:9,22
110:1 113:4,5
**study** 4:3,19 5:18
11:20 14:25 17:16
18:25 19:2 27:16
27:20 30:25 31:6
31:10 32:2 33:3
34:13,14 36:25,25
42:3,21 43:14
44:1,7 45:10,19
46:5,12,14 49:6
51:21 52:12,14
60:6 64:16,22
65:9,20,21 66:1,8
71:23 93:2,5,7,15
93:20 94:9,14
95:7,22,23 96:1,6

96:9,9,12 97:5,5
97:17,19,20,21,22
97:23,23,25 98:10
98:10,11 99:3,14
100:23 101:1
102:2 105:22
113:17 114:4,10
**studying** 10:18
**sub** 12:20
**subcategories**
44:21 61:14
**subcategory** 26:21
31:18
**subgroup** 12:18
18:22,24
**subgroups** 30:24
**submission** 78:3
**submissions** 83:11
110:5
**submit** 82:16
**submitted** 63:18
70:17 74:4 82:23
83:4
**subsequent** 73:25
**subsequently** 3:13
46:18 54:8
**subset** 59:14
**substantial** 5:3
**substantially** 4:13
97:24 104:18
**substantively** 19:11
**successfully** 41:23
**succinctly** 115:16
**sudden** 76:21
**suffer** 65:3,17
**suffered** 32:1
**suffering** 101:24
**sufficient** 64:15
66:1
**suggest** 19:10
**suggested** 50:12
**suggests** 84:12
85:12
**Suite** 1:21
**summarize** 10:25
23:11 79:7
**summarized** 66:14

**summary** 5:3 17:25
  83:22 84:8 85:13
  85:14,23 86:8
  88:6
**Sunday** 65:14
**supersede** 17:15
  20:1
**supersedes** 20:2
**supplant** 20:1
**supplement** 12:15
  14:24 15:1,2
  77:24
**supplemental**
  93:22 94:3
**supplementary**
  39:21
**support** 20:9 24:18
  24:18,22,24
**supported** 104:25
**supporting** 21:5
  25:13,21 28:25
  29:4 30:9
**supports** 30:18
**suppose** 80:5
**supposed** 8:17
  75:12 80:16
**sure** 3:3 4:8,17 7:23
  18:6 22:12,20
  25:8 28:10 29:23
  33:13 34:12 35:3
  43:7,8,8,24,25
  49:13 64:6 66:25
  72:3 94:16 110:18
  117:6,21
**Surgery** 88:18
**surprise** 39:4 119:2
**surprised** 12:24
  32:19
**surprising** 53:24
  117:12
**survived** 111:2,3
**sustained** 37:19
  38:23
**Swedish** 61:21
**sweeping** 98:2
**switch** 54:3
**sworn** 118:18

**symmetry** 17:5
**S17** 39:21,22,25

——————————
**T**
**T** 120:1,1
**tab** 20:7,17,21,22
  36:7 67:3 82:1
  87:15 90:14 94:17
  97:7
**table** 28:11,15
  39:21,22,25 46:6
  46:9
**tackled** 41:20
**take** 5:25 6:15,17
  8:20 13:3 17:4,4
  18:9 20:10 25:23
  32:12 42:22 43:22
  43:23 44:5 46:3
  49:14,15 51:23
  52:11 53:11 56:4
  56:19 63:4 64:15
  65:25 66:16 70:23
  72:11 80:23 84:15
  87:25 90:5 91:12
  97:15 99:7 100:16
  117:5
**taken** 6:1 25:25
  33:15 45:2 72:9
**talk** 26:16 29:2
  40:14,14 59:16
  107:6 117:4,20
**talked** 3:13 16:16
  40:12 96:9 100:20
  101:25 104:14
**talking** 3:10 23:24
  26:15,17,22,24
  34:10 35:4 38:22
  38:25 44:2 53:16
  56:23 69:24 70:1
  97:19 101:15
  102:20 105:19
**TCAs** 40:1
**teacher** 15:15
**team** 13:14,23
  14:16 40:14 55:15
  71:22,23,23 76:1
  114:23

**tech** 37:8
**technically** 117:19
**techniques** 4:7,17
**tell** 7:22,25 8:3
  38:15 44:15 77:16
  77:16,17,20 83:23
  106:12
**tells** 35:23 89:21
**tend** 23:11,12
  24:10 46:7 52:6
**tendency** 23:12,14
**teratogen** 76:6,12
**teratogenic** 19:17
  50:1
**terms** 33:5 34:25
  61:23 68:17 72:5
  77:6 111:19
**terrible** 69:22
**terribly** 6:20
**test** 103:4
**testified** 30:17 31:4
  31:8,21,24 54:22
  62:18 85:21 111:7
**testifies** 78:14
**testify** 4:23 88:9
  117:22
**testifying** 62:15
  117:23
**testimony** 3:1,9,19
  7:17 8:8 23:4
  33:12 79:10
  117:24 118:6,18
  118:21 119:1
**text** 23:23 43:18
  52:6
**textbook** 22:2 23:6
**TGA** 30:14,18,19
  30:21,23 31:5,6,9
  31:10,14,22 32:4
  32:12
**TGAs** 30:25
**thank** 9:12,14 11:3
  18:14,15 20:16
  26:5 33:16 46:11
  55:23,23 56:2,5
  77:12 81:4 84:5
  87:12 91:2 92:14

95:4,11 98:4,5,6,7
  98:24 106:14
  113:23,24 114:1
  114:24 115:1,3
  117:17 119:6,8,9
**theirs** 28:5
**thereof** 120:7
**they'd** 118:20
**thing** 9:9,19,21
  35:3 41:8,9 70:19
  73:17 97:4 112:4
  117:18
**things** 8:11 10:6,14
  10:22 18:5 22:1
  26:16 27:10 49:1
  57:25 71:19 72:22
  79:2 105:13
  115:17 118:15,19
**think** 9:22 10:21
  11:2,3 13:7 14:21
  16:24 17:7 18:9
  20:11 21:25 31:23
  31:24 35:18 37:3
  40:14 41:8 42:12
  45:8,18,23 47:23
  48:4,5 54:4,6,10
  55:25 56:2 60:4
  64:4 65:3 66:14
  66:17,19,23 67:1
  68:10 71:3,19,20
  72:20,21 73:6,8
  74:8,22,22 75:13
  76:11 77:11,18
  78:5,6,9,23 79:1,2
  79:13 80:12 82:1
  82:5,10 83:12
  87:8 89:8,13
  91:22 94:2 98:19
  101:10,14 103:12
  103:20 104:13,21
  107:5,8 109:7
  113:9,10,16
  115:15,19 116:12
  116:15,21,22
  117:4,7,8,15
  118:9,15,17
**thinking** 70:20

83:5
**thinks** 48:7
**third** 85:4 96:23
**Thomas** 1:17
  120:14
**thought** 5:21 12:8
  64:23
**thoughtfully** 10:24
**three** 50:8 95:13
  96:2,17,18 99:5
**throw** 35:8,8
**throwing** 75:21
**tighten** 18:5
**time** 6:21 11:13
  18:7 34:2 35:20
  54:7 63:12 76:17
  76:22,23 77:17,20
  104:6,15 107:3
  116:4 117:5
**timed** 89:16
**timely** 74:12
**times** 1:15 34:16
  61:11 65:14,15
  86:7 89:1 95:13
  96:2
**Tiny** 3:8
**title** 88:19 92:20
**today** 9:3 30:22
  35:15 41:6 55:12
  61:18 75:10,12
  80:25 82:15 115:4
**told** 7:14 17:17
  20:24 49:3,5
  71:21 74:6,10
  77:22
**tomorrow** 80:20
  115:5 116:1
**tonight** 119:7
**top** 56:8 61:2
  106:17,18
**topics** 54:3
**total** 60:25 85:12
**totally** 71:16
**Trace** 6:2
**TRACEY** 1:12
**transcribed** 109:17
  120:4

**TRANSCRIBER** 1:17
**transcript** 1:6,19 9:5,6,6 22:21 119:3
**transcription** 1:19 18:2 109:15
**transposition** 30:14
**treatment** 10:17 88:19 89:21
**trend** 20:4,8 21:2 21:16,24 22:8,15 22:17 23:13,15,20 24:4,18,19 25:13 25:21 28:25 29:4 29:15 30:9 36:5 36:16
**trending** 22:2 23:7
**trends** 21:5,12 23:4 23:6
**trial** 3:24 10:3,4,5 10:12 30:17 31:8 31:21 65:10 73:20 82:18 118:7
**trials** 3:11,20 4:1 5:4 9:23 23:11,14
**tried** 5:12 12:1 31:17 78:15
**trimester** 11:10,15 11:17 19:11 84:12 85:3,5,16 87:21 106:10,23
**tripped** 81:19
**trouble** 20:11
**troubles** 46:5
**true** 7:14 35:1,13 41:4 114:8
**trust** 116:6
**try** 19:4 40:13 49:5 62:8 78:13 94:20
**trying** 10:6,21,22 10:25 15:10 27:24 30:1 35:18 39:17 69:15 77:25 90:4 99:15 113:20
**tuned** 89:10
**turn** 6:5 9:8 15:15

19:14 25:14 33:17 35:2 36:6 45:15 47:5 92:25 97:5
**turning** 22:24
**twice** 57:10 86:1
**two** 5:12,13,24 7:24 8:5 11:7,11 15:22 16:13,17 17:8,23 24:7 27:9,10 29:1 30:8,10 32:14 36:20 38:5,10,14 55:21 69:19 72:22 73:20,21 89:3 94:22 95:12 96:2 98:21 107:15 112:24 114:1
**type** 44:1 49:25 87:19 106:8,21
**types** 7:16 50:23 95:14
**typically** 61:25

─────────

**U**

**Uh-huh** 3:12 24:20 61:4
**ultimate** 107:20
**ultimately** 55:1 74:2 109:24
**unadjusted** 35:7,10 35:19 36:3 47:13
**unclear** 107:19
**uncontrolled** 64:16 65:9,20 66:1,5,8
**undercuts** 51:1
**underlying** 41:24 50:22 69:24 87:9 87:24 107:7,18
**understand** 15:9 38:3 56:16 69:13 77:6 117:19 118:20
**understanding** 119:4
**understands** 38:1
**Understood** 20:3 29:20 40:12
**undoubtedly**

112:16
**undue** 4:19
**unexposed** 32:10 47:20
**unfair** 71:16 76:17 119:2,3
**unfortunately** 82:4
**UNITED** 1:1,7
**UNKNOWN** 116:19
**unmedicated** 43:17 46:24
**unnamed** 78:17
**unpublished** 17:15
**unrelated** 62:20,20
**un-adjustment** 60:3
**update** 54:8 97:22
**updates** 54:8
**upper** 17:11 18:2 61:8 108:8,21,24
**upset** 64:19
**use** 3:23 10:15 11:9 15:21 16:6 19:10 20:5,6 21:6,10 22:9 23:9,9,17,20 23:21 24:12,14 26:6 41:10,19 44:6 47:16 57:11 57:18 67:7 69:15 79:10,10 87:22 90:21 91:5,9 97:12 99:3 100:5 114:10 117:24 118:9
**useful** 6:14
**users** 15:2 41:18
**uses** 113:1
**usually** 4:21 112:22
**utilized** 72:6
**U.K** 101:2
**U.S** 45:24,25 51:21 93:3

─────────

**V**

**vague** 54:9
**valuable** 6:20

**value** 8:14,14 16:11
**variability** 31:13
**variable** 37:13
**variables** 48:23
**variation** 5:4
**varieties** 7:24 8:5 10:16
**various** 27:25 80:9 99:17 112:25
**vary** 10:4
**verbally** 82:25
**verbatim** 64:6
**verifier** 58:3
**verify** 46:4 58:8
**VERITEXT** 1:20
**Verizon** 77:14
**version** 109:15,20 110:2
**versus** 11:10 68:11 71:4
**view** 6:25 10:1 20:2
**visualization** 35:18 35:23 60:24 61:7 61:13,22 100:8
**voluble** 8:12

─────────

**W**

**wait** 25:4 43:21 94:19 95:15 109:7
**want** 6:15 13:18 14:17 23:6,10 24:2 28:8 29:13 37:24 43:5,21 46:4 47:6 54:12 57:14,22 58:19 62:6 64:19 65:11 69:9 76:24 77:17 77:19,24,25 78:21 79:11,13 83:19 86:14,19 90:2 101:19 104:16 105:15 106:6 116:24 117:5 118:24
**wanted** 9:9,19 19:1 20:3 35:20 47:16 52:17 73:19

**wants** 118:3
**warn** 76:6
**wary** 68:14
**wash** 99:25
**washed** 88:7
**wasn't** 14:8 31:24 32:25 34:12 42:17 59:15 65:9 102:10 103:10 105:3,17
**watch** 55:16
**way** 4:16 6:9,10 12:10 13:8 14:13 14:21 20:1 23:16 24:7 40:7 41:20 46:7 48:4,6 71:11 73:18 79:17,19 80:3 82:4 92:7
**ways** 81:15
**weakness** 10:1,6
**website** 82:6 94:10 94:11,14 96:13 97:8,16
**week** 75:9 77:16 94:12
**weight** 4:11,14
**weighted** 4:9 5:14
**weighting** 4:20 5:2
**Wemacher** 49:3,5 49:10,15,15,16 53:23 59:7,13,18
**Wemaker** 49:3
**went** 16:17 27:13 29:6 57:23 71:14 81:22 107:19
**weren't** 83:8
**we'll** 19:3 70:3 116:3 117:6,7 118:4,24
**we're** 9:6 11:3 13:8 14:10 17:13 20:11 21:2 26:1,3 29:8 44:2 58:3,6 67:4 67:10,13,15 71:25 72:12,16,17 74:9 75:12 77:25 80:9 81:5,20 94:19 105:19 109:22

119:10
we've 16:9 20:12
 30:22 36:1 38:14
 38:25 40:12,16
 41:5 45:9 53:21
 56:11 60:16 67:17
 69:16 71:13 74:6
 74:6 76:4,12,17
 78:4 95:2 97:19
 100:1 101:25
 106:3 115:12,20
Whereabouts 25:5
white 16:5
wholly 106:10,23
who've 72:18
width 32:20
willing 13:6 14:6
 44:5 105:10
wine 8:3
wish 13:10 64:13
wishes 71:22
withdrew 64:9
 65:23
witness 2:3 20:18
 20:20 25:7 34:4
 49:22 55:20,22,23
 81:14,16 89:15
 90:16,18 95:24
 108:17 115:3
 120:11
witnesses 115:5,8
woman 11:8
women 5:18 11:15
 11:16 12:1 32:12
 40:18,23 41:10,13
 41:19 42:8,24
 43:15 45:20,23
 46:1,10,23,23
 47:14,19 51:17
 53:6,22 84:11
 85:16 95:13 96:3
 97:12 101:4
 104:17,24 105:13
 112:23
word 9:16 15:6,16
 15:18,21 20:4,5
 21:2,8,14,24,25

22:8,10,15,16
23:8,10,16,17,20
24:4 36:5 42:23
43:22,23 44:5
46:3 58:4,7 84:10
99:4
words 3:23 5:9
 24:10 29:13 79:25
 101:4 109:1
work 14:6 46:7
 62:20 70:17 72:10
 73:25 99:15 119:7
worked 13:20
working 62:12,12
 62:21 63:13
works 71:22 78:20
world 71:4,23
 76:14
world's 112:16
worried 41:13
worst 99:17
wouldn't 5:9 32:19
 53:9 56:19 60:20
 62:6 105:15
 116:11
would've 17:25
 48:6,7 103:11
 104:18 105:12
write 36:10
writing 83:1
writings 64:12
written 54:24 57:18
 63:15,16 79:23
 87:10 103:9
wrong 17:3,9 35:25
 36:1 43:24 66:3
 89:16
wrote 14:11 34:13
 50:15 62:22 71:17

_____

X

X 2:1 68:23

_____

Y

Yates 3:5,7 18:4,8
 18:14,19 20:15,19
 20:21,23 21:1

25:9 29:21,24
49:23,24 56:2,6
67:6,25 68:2,10
69:3,7 70:12,19
79:2,5,5,25 80:22
81:2,4,18 83:13
83:16,18 86:21
87:7,11,13 89:13
89:16,17 90:11,14
90:17,19 92:13
95:1,21,25 96:18
96:19 98:5 110:6
114:1,3
year 98:17,23,24,25
 99:2
years 7:12
yesterday 5:12 7:3
 8:9 9:3,16 10:8
 11:6,11 13:2,8
 16:2,4,12 20:17
 30:22 31:17 41:9
 48:20 53:11 54:10
 54:22 56:14 61:13
 61:18 100:6 104:6
 104:15,21 108:23
 109:3
yielded 37:13 47:4
 47:9
York 1:15,15 65:14
 65:15
Young 45:18 88:16

_____

Z

Zoloft 1:3 5:6 6:1
 11:4,8,9 24:12
 25:14 26:17 27:5
 28:3,19 30:19
 31:6 32:12 35:1
 35:14 36:15 38:2
 38:12 40:1,3,5
 41:5,11 44:2,8
 45:19 46:1,19,19
 46:23 47:11 53:5
 53:6 66:12 78:7
 82:5,9 85:23,25
 86:5 89:3,23,25
 91:13,14 93:1

99:10 101:19
102:8
Zoloft's 76:6
Zonies 1:11 20:17
 34:3,6 54:22 67:8
 67:24 69:9,11
 74:25 75:2 78:15
 79:18,21 82:2
 86:14,24 89:7,10
 89:11 98:7,8
 108:15,25 109:22
 110:11,13,16
 114:25 115:7
 116:10,11,15,21
 117:18 118:8,11
 119:6

_____

0

0.4 28:21
0.7 28:20
02 16:11

_____

1

1 5:19 20:21,22
 44:14,17 47:5,7
 51:17 53:17 82:1
1.0 5:16 60:17
1.01 85:13
1.07 16:10
1.1 16:21 40:5
 109:8,18
1.16 47:10,22
1.17 85:14
1.23 85:15
1.24 47:14
1.27 47:21
1.3 24:23 28:21
1.33 40:6
1.39 102:20
1.41 47:11
1.8 38:11,16
1.87 16:10
1.9 16:20 53:17
 109:7,8
1:56 18:17
10 7:12 18:13 44:6
 47:22 48:10,14

51:19 52:7,12,13
60:4
10:00 116:3
10036 1:15
103 6:6
105 35:2
11 35:4 67:4 98:15
 98:16
110 36:7 106:10
114 2:3
12 28:24 67:4
12th 77:11
12:49 18:17
13 93:22
131 36:21
132 36:21
14 22:25 33:19 34:6
 34:18
14th 77:13 78:4
14,000 46:1,10
170 33:17,18
176 20:7
17601 1:10
18.62 31:15
1800 1:21
1801 1:21
19 65:3,6
19103 1:21
1996 105:24

_____

2

2 1:4 5:19 7:7 8:13
 46:6,6,9 50:11
 51:23 95:5 99:5
 109:12,13
2,402 46:6
2.3 38:13,16 45:22
2.39 16:11 109:15
2.7 60:5
2:00 18:11,13
2:12-md-02342-...
 1:2
20 98:22 104:23
2003 105:24
2007 24:21 25:21
 26:2
2010 105:20

**2011** 30:3 33:3
**2012** 41:17
**2013** 57:3 63:8
**2014** 42:14,17,23
  43:13 45:16 54:4
  54:11 78:2 101:1
**2015** 1:4 56:11 74:5
  92:23,25 93:23
  120:12
**22** 28:20 63:8
**230** 97:7
**232** 94:17
**235** 67:3
**24** 22:25 23:2 44:9
**2402** 39:11,13
**2403** 47:5
**2405** 19:3,4,7,14
**2406** 19:15
**25** 65:17
**2684** 25:22 26:4
**2691** 28:11,15
**27th** 75:3,8
**29** 92:23

---
**3**
**3** 1:6 2:3 28:11,15
  96:18
**3.08** 60:7,8
**3.3** 16:21 108:22
  109:2,8,18
**3.8** 60:2,7
**3:27** 81:7
**30** 9:16 104:23
**31** 9:5,8,11,12,18
  39:25
**35** 31:14
**3744** 84:4
**3745** 85:2
**3746** 106:14
**39** 45:11

---
**4**
**4** 20:6,7,10 21:3
  24:22,25 25:5,7
  25:11 30:5 92:25
**4:20** 81:7
**40** 97:11 102:20

**48** 61:5

---
**5**
**5** 5:14 7:7 8:13
  24:22 25:1,7 30:5
  37:2 51:23
**5:10** 119:13
**50** 3:25
**59** 60:25 61:2,3,5

---
**6**
**6** 9:8,13,18
**60** 21:11 36:6

---
**7**
**7** 6:6 34:18,18 54:4
  97:5,7
**70** 85:15
**75** 22:24,25 23:1,2
**76** 22:24,25 23:1
**777-6690** 1:22
**79** 103:8

---
**8**
**8** 33:22 34:12 37:16
  49:16,16,19 90:5
  91:1 93:9
**801** 1:10
**88** 85:14
**888** 1:22

---
**9**
**9** 48:14 52:2,22
**90** 97:18
**93** 85:15
**95** 47:10 85:13,15
**98** 2:3